# Exhibit II

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES BLAKES, STEVEN CLARK, HERMAN DECKYS, BRADLEY HUNT, PHILLIPE PORTER, ERNEST ROBERTS, JR., LARRY WILLIAMS, for themselves and on behalf of similarly situated others,<br><br>Plaintiffs,<br><br>v.<br><br>ILLINOIS BELL TELEPHONE COMPANY d/b/a AT&T Illinois,<br><br>Defendant. | Case No. 11-cv-336<br><br>Hon. Judge Manning<br><br>Magistrate Judge Kim |

### Declaration of Christopher Burk

I, Christopher Burk, hereby submit this Declaration and state as follows:

1. I am currently employed by AT&T Services, Inc. as an Area Manager in the Construction and Engineering ("C&E") Department.

2. I have been with Illinois Bell or its affiliates for almost 13 years. I began working for Illinois Bell as an Installation and Repair ("I&R") repairman and a lineman until 2007, when I became a construction supervisor. I was in that role until early 2011 when I was promoted to an Area Manager role.

3. While I was working as a construction supervisor at the 1640 Hazel Dell Road garage, I oversaw a team of cable splicers. Two members of that team were Mark Rentschler ("Rentschler") and Gary Crowder ("Crowder"). I understand that certain allegations were raised in this lawsuit by Rentschler and Crowder. This declaration is meant to primarily address those allegations.

4. The cable splicers that I supervised were entitled to a thirty minute unpaid lunch break. The exact time when they took that break was up to the technician's discretion. There

were times when technicians, including Rentschler and Crowder, would call me to ask permission to work through lunch. I either gave them permission to work through lunch, in which case they were expected to record the thirty minutes of overtime and receive overtime compensation for the work, or I would allow them to leave work a half hour early for the day. I am not aware of a time when either Rentschler or Crowder called for permission to work through lunch, that permission was denied, and he worked through his lunch without permission. Neither of them ever told me this happened or made me aware in any way. I also have never seen Rentschler fill out paper timesheets after his shift ended, nor has he ever told me this has happened.

5. Though I do not remember specific examples, I have had technicians who worked through their lunch without getting prior approval and who put that time down on their timesheets. In those instances, I would coach them on working unauthorized overtime and the need to call their supervisors for overtime approval. However, I never refused to sign their timesheets or otherwise do anything to prevent them from being paid and company policy requires employees to be paid in this situation.

6. To the best of my recollection, Illinois Bell transitioned to an electronic timekeeping system in late 2009. The cable splicers that I supervised had varying levels of computer skills. Some of the technicians had zero computer skills and really no interaction with computers until electronic time reporting was introduced. As a result, some technicians would take longer to complete their timesheets than others.

7. The Hazel Dell garage had around 6 or 7 computers for the technicians to do their time on. The number of technicians in the garage could fluctuate depending on how many were assigned to particular shifts and whether there were technicians assigned to work out of the

Hazel Dell garage. When there were a lot of technicians in the garage, such as 20, I would break the group in half and tell half that it was ok for them to enter their timesheets the following morning. The technicians also had periods where they were working a lot of overtime, meaning that technicians would arrive back to the garage at separate times. It was very rare to have a crew of 20 technicians or more back at the garage at the same time before 3:30 p.m.

8. I also advised technicians to write down what they were going to charge to their jobs throughout the day so that when the technician sat down at a computer he would just input the time and the process would be shortened.

9. I have coached numerous technicians, including Rentschler, on how to accurately allocate their time to specific units. Even when time allocated to units changed, this would not affect the total hours a technician was paid for.

10. There are a few instances I can recall when Crowder came into my office after a tailgate meeting to correct his timesheets so that steps and units were allocated appropriately.

11. I have also counseled Crowder regarding his timesheets. There were multiple occasions when Crowder did not complete his timesheets accurately, such as by failing to include certain codes. I issued a written warning to Crowder for failing to accurately complete his timesheets. I also suspended Crowder in November of 2008 for falsification of time reporting. Crowder had put down time on jobs that he had never completed. At the time, Crowder was doing copper conditioning work, which involved traveling to different locations in backyards and doing an hour to an hour and a half worth of work at each location. When I went out to do a quality review on the job, I saw that no work had been done, though Crowder had put down a significant amount of time to those jobs. When I spoke with Crowder about this, he could not clarify what had happened and told me that he might have forgotten to do the work or

might have done work at a different location. Because the work had not been done but Crowder had charged time to it, he was issued a three-day suspension. My understanding is that, even though Crowder falsified his time, he was still paid for that time.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and recollection.

_____  01-11-13
Christopher Burk