# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAMES BLAKES, STEVEN CLARK, HERMAN DECKYS, BRADLEY HUNT, PHILLIPE PORTER, ERNEST ROBERTS, JR., LARRY WILLIAMS, for themselves and on behalf of similarly situated others,<br><br>                Plaintiffs,<br><br>     v.<br><br>ILLINOIS BELL TELEPHONE COMPANY d/b/a AT&T Illinois,<br><br>                Defendant. | Case No. 11-cv-336<br><br>Hon. Judge Kim |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR FLSA DECERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

      A.     Illinois Bell Must Move to Decertify a Class That Was Never Certified.............. 1

      B.     Plaintiffs Fail to Establish That Liability and Damages Could Be Adjudicated on a Collective Basis ........................................................................ 2

      C.     Plaintiffs Are Not Similarly Situated on Any of Their Theories .......................... 4

      D.     Illinois Bell Has Substantial Individualized Defenses .......................................... 5

      E.     Plaintiffs' Additional "Fairness and Procedural Grounds" Arguments Do Not Preclude Decertification........................................................................... 6

      F.     Plaintiffs' Subclassing Proposal Is Not Viable ..................................................... 7

II.     THE COURT SHOULD REJECT PLAINTIFFS' EFFORTS TO RECONFIGURE THEIR COLLECTIVE ACTION THEORIES.................................... 7

III.    PLAINTIFFS FAIL TO ESTABLISH THAT THE COURT COULD MANAGE THIS CASE EFFICIENTLY AS A COLLECTIVE ACTION ...................................... 10

      A.     Plaintiffs Disregard the Question of Liability...................................................... 11

            1.     The Record Precludes a Collective Assessment of Liability ................... 11

            2.     Plaintiffs Misconstrue the Johnson Report, Which Underscores That Liability Could Not Be Addressed Collectively.............................. 14

      B.     Plaintiffs Cannot Overcome the Individualized Inquiries Necessary tTo Establish Damages ............................................................................................. 18

            1.     Plaintiffs Must Establish a Manageable Plan for a Collective Action ................................................................................................... 18

            2.     Plaintiffs' Sampling Plan Cannot Salvage Their Class........................... 22

                   a.     Dr. Bardwell's Report Assumes Liability While Misstating Judicial Acceptance of Representative Testimony ...................... 22

                   b.     Dr. Bardwell Does Not Use a Random or Scientific Sample ...... 24

                   c.     Dr. Bardwell Improperly Relies upon Plaintiffs' "Estimates" Provided by Plaintiffs' Counsel............................... 27

                   d.     Plaintiffs' Damages Estimates Are Unreliable and Inconsistent and Cannot Be Extrapolated to the Rest of the Collective ................................................................................ 31

                   e.     Dr. Bardwell's Sampling Methodology Suffers from Further Flaws That Warrant Its Rejection ................................... 35

IV.    NONE OF PLAINTIFFS' HODGEPODGE OF ALLEGED POLICIES CAN BIND A CLASS ...................................................................................................... 38

<u>**TABLE OF CONTENTS**</u>
(continued)

**Page**

A. Illinois Bell's Implementation of MSOC Does Not Render Plaintiffs and Opt-ins Similarly Situated ...................................................................... 38

    1. Plaintiffs Misrepresent MSOC ............................................................ 38

    2. The Record Refutes Plaintiffs' Premise of Pervasive Discipline for Not Meeting Efficiency Objectives .......................................................... 40

    3. Plaintiffs and Opt-Ins Admit That MSOC Does Not Require Working Off-The-Clock .......................................................................... 44

    4. Plaintiffs' "Uniform Uncertainty" Point Is Baseless ............................... 47

    5. Plaintiffs' Attempt to Extend Their Efficiency Theory to the Pre-MSOC Period Fails .................................................................................. 49

    6. Plaintiffs Fail to Distinguish Boelk ........................................................ 51

B. Certification Is Not Warranted on Any of the Alleged "Lunch" Policies .......... 56

    1. Plaintiffs' Work on Manhole Jobs Cannot Support a Class .................... 56

    2. Other "Security" or "Safety" Expectations Do Not Warrant a Class ...... 59

C. The "Overtime Policies" Do Not Warrant a Collective Action ......................... 63

D. Plaintiffs' Additional Theories Also Do Not Warrant Certification .................. 65

    1. JAM Time Entry System ....................................................................... 65

    2. "Route Expectations" ............................................................................ 68

V. ILLINOIS BELL'S INDIVIDUALIZED DEFENSES PRECLUDE CERTIFICATION ....................................................................................... 71

A. Management Knowledge Is an Individual, Not Common, Defense ................... 71

B. Defendant Must Challenge Credibility on an Individual Basis ......................... 83

C. Illinois Bell's Additional Defenses Are Individualized .................................... 87

VI. NONE OF PLAINTIFFS' ARGUMENTS ON FAIRNESS AND PROCEDURAL GROUNDS WARRANT CERTIFICATION ...................................................... 89

VII. PLAINTIFFS' SUBCLASS PROPOSAL SHOULD BE REJECTED .................... 92

VIII. CONCLUSION ................................................................................................ 95

Appendix A……………………………………………………………………………..I

Appendix B……………………………………………………………………………..II

Appendix C……………………………………………………………………………..III

Appendix D……………………………………………………………………………..IV

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>C</u>ASES

*Adams v. Hy-Vee, Inc.*,
  No. 11-00449-CV-W-DW, 2012 U.S. Dist. LEXIS 98590 (W.D. Mo. May 22, 2012) ..........19

*Alvarez v. City of Chicago*,
  605 F.3d 445 (7th Cir. 2010) ................................................................91

*Anderson v. Mt. Clemens Pottery*,
  328 U.S. 680 (1946) ..........................................................................30

*Andrako v. U.S. Steel Corp.*,
  788 F. Supp. 2d 372 (W.D. Pa. 2011) ......................................................91

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) .................................................................22

*Ascolese v. County of Los Angeles*,
  ED CV 08-1267 ABC (C.D. Cal. Aug. 6, 2012) ........................................82

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
  772 F. Supp. 2d 1111 (N.D. Cal. 2011) ...............................................50, 93

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*,
  No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631 (W.D.N.C. Sept. 16, 2011) .......................9

*Boelk v. AT&T Teleholdings, Inc.*,
  No. 12-cv-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) ................................... passim

*Bradford v. Bed Bath & Beyond, Inc.*,
  184 F. Supp. 2d 1342 (N.D. Ga. 2002) ...................................................35

*Brennan v. Qwest Communications International, Inc.*,
  2009 U.S. Dist. LEXIS 47898 (D. Minn. June 4, 2009) ...............................5, 57, 62

*Brickey v. Dolgencorp., Inc.*,
  272 F.R.D. 344 (W.D.N.Y. 2011) ..........................................................46

*Briggins v. Elwood Tri, Inc.*,
  882 F. Supp. 2d 1256 (N.D. Ala. 2012) ..................................................... passim

*Brock v. Seto*,
  790 F.2d 1446 (9th Cir. 1986) ..............................................................35

*Brown v. Family Dollar Stores of Indiana*,
  534 F.3d 593 (7th Cir. 2008) ...............................................................30

**TABLE OF AUTHORITIES**
(continued)

Page

*Burch v. Qwest Communications Int'l, Inc.*,
   677 F. Supp. 2d 1101 (D. Minn. 2009) ........................................................................38, 56

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
   No. 09-85J, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011) .....................................87

*Camilotes v. Resurrection Health Care Corp.*,
   No. 10-cv-366, 2012 WL 4754743 (N.D. Ill. Oct. 4, 2012) .........................9, 57, 72

*Clark v. Honey-Jam Café, LLC*,
   No. 11 C 3842, 2013 WL 1789519 (N.D. Ill. Mar. 21, 2013) ................................19

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013) ........................................................................20, 21, 22, 35

*Crawford v. Lexington-Fayette Urban County Gov't*,
   No. 06-299-JBC, 2008 WL 2885230 (E.D. Ky. July 22, 2008) ..............................1

*Creely v. HCR Manorcare, Inc.*,
   No. 3:09 CV 2879, 2013 WL 377282 (N.D. Ohio Jan. 31, 2013) .............12, 72, 90

*Donovan v. New Floridian Hotel, Inc.*,
   676 F.2d 468 (11th Cir. 1982) .............................................................................35

*Dove v. Coupe*,
   759 F.2d 167 (D.C. Cir. 1985) .............................................................................35

*Doyel v. McDonald's Corp.*,
   4:08-CV-1198 CAS, 2010 WL 3199685 (E.D. Mo. Aug. 12, 2010) ................29, 37

*Driver v. AppleIllinois*,
   No. 06 C 6149, 2012 U.S. Dist. LEXIS 27659 (N.D. Ill. Mar. 2, 2012) ................22

*Duncan v. Phoenix Supported Living, Inc.*,
   No. 2:05cv1, 2007 WL 1033360 (W.D.N.C. Mar. 30, 2007) .................................51

*England v. New Century Fin. Corp.*,
   370 F. Supp. 2d 504 (M.D. La. 2005) ..................................................................37

*Espenscheid v. DirectSat USA, LLC*,
   3:09-cv-00625-bbc (W.D. Wis. May 12, 2011) ....................................................30

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ....................................................................... passim

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Espinoza v. County of Fresno*,
    No. 1:07-cv-01145-SMS, 2013 WL 1222034 (E.D. Cal. Mar. 25, 2013) ...........................3, 37

*Falcon v. Starbucks Corp.*,
    580 F. Supp. 2d 528 (S.D. Tex. 2008) ...................................................................................35

*Farmer v. DirectSat USA, LLC*,
    No. 08 CV 3962, 2013 WL 1195651 ...............................................................................26, 36

*Frank v. Gold'n Plump Poultry*,
    No. 04-cv-1018, 2007 U.S. Dist. LEXIS 71179 ...............................................................13, 88

*Gatewood v. Koch Foods of Mississippi, LLC*,
    No. 3:07CV82-KS-MTP, 2009 WL 8642001 (S.D. Miss. Oct. 20, 2009) ............................37

*Geletich v. Varris Management, Inc.*
    Case No. RG11 603428 (Alameda Sup. Ct. Jan. 29, 2013) .................................................3

*Genesis Healthcare Corp. v. Symczyk*,
    133 S. Ct. 1523 (2013) ...................................................................................................18, 19

*Ginsburg v. Comcast Cable Communications Mgmt LLC*,
    No. C11-1959RAJ, 2013 WL 1661483 (W.D. Wash. April 17, 2013) .............................46, 82

*Hawkins v. Securitas Sec. Servs. USA, Inc.*,
    No. 09 C 3633, 2011 WL 5598365 (N.D. Ill. Nov. 16, 2011) ...............................................72

*Hernandez v. Ashley Furniture Indus., Inc.*,
    No. 10-5459, 2013 WL 2245894 (E.D. Pa. Mar. 22, 2013) ...........................................37, 6

*Hill v. Muscogee County Sch. Dist.*,
    No. 4:03-CV-60 (CDL), 2005 U.S. Dist. LEXIS 35725......................................................13

*Hinojos v. Home Depot, Inc.*,
    No. 2:06-CV-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006)...........................................72

*Hoffman v. La-Roche, Inc. v. Sperling*,
    493 U.S. 165 (1989)........................................................................................................8, 89

*Howard v. Securitas Sec. Servs. USA, Inc.*,
    No. 08 C 2746, 09 C 3633, 2013 WL 1337150 (N.D. Ill. Mar. 28, 2013) ............................27

*Hundt v. DirectSat USA, LLC*,
    No. 08 C 7238, 2013 WL 3338586 (N.D. Ill. July 1, 2013) ...........................................71, 90

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Johnson v. Meriter Health Servs. Employee Ret. Plan*,
  702 F.3d 364 (7th Cir. 2012) (Pls.' Resp., p. 51) ...................................22

*Kallar v. Summit Seating Inc.*,
  664 F.3d 169 (7th Cir. 2011) ...............................................72

*Kasten v. St.-Gobain Performance Plastics Corp.*,
  556 F. Supp. 2d 941 (W.D. Wis. 2008) ..................................89

*Kautsch v. Premier Communications*,
  No. 06-cv-04035-NKL, 2008 U.S. Dist. LEXIS 7219............................91

*Koval, et al. v. AT&T Inc.*,
  Case No. RG10510513 (Cal. Sup. Ct. June 27, 2013) ..........................3

*Kuznyetsov v. West Penn Allegheny Health Sys., Inc.*,
  No. 10-948, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011) ..............57, 72

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
  2004 U.S. Dist. LEXIS 16288 (N.D. Ill. Aug. 17, 2004)........................72

*Ladik v. Wal-Mart Stores, Inc.*,
  No 13-CV-123-bbc, 2013 WL 2351866 (W.D. Wis. May 24, 2013) ...................10

*Leyva v. Medline Indus.*,
  716 F.3d 510 (9th Cir. 2013) ...........................................14, 21

*Lyman v. St. Jude Med. S.C., Inc.*,
  580 F.Supp.2d 719 (E.D.Wis. 2008)........................................28

*Marshall v. Amsted Rail Co., Inc.*,
  No. 10-cv-0011-MJR-SCW, 2012 WL 5499431 (S.D. Ill. Nov. 13, 2012)...........38, 88, 92, 94

*Marshall v. Van Marte*,
  634 F.2d 1115 (8th Cir. 1980) ..........................................35

*Martin v. Citizens Fin. Group, Inc.*,
  No. 10-260, 2013 WL 1234081 (E.D. Pa. Mar. 27, 2013) ........................... passim

*Martin v. Tony & Susan Alamo Found.*,
  952 F.2d 1050 (8th Cir. 1992) ..........................................35

*Maynor v. Dow Chem. Co.*,
  671 F. Supp. 2d 902 (S.D. Tex. 2009) .....................................3

**TABLE OF AUTHORITIES**
(continued)

**Page**

*McLaughlin v. DialAmerica Mktg., Inc.*,
716 F. Supp. 812 (D.N.J. 1989) ........................................................................22

*Mendez v. Radec Corp.*,
232 F.R.D. 78 (W.D.N.Y. 2005) ......................................................................22

*Messner v. Northshore Univ. Health Sys.*,
669 F.3d 802 (7th Cir. 2012) ...........................................................................22

*Monroe v. FTS USA, LLC*,
763 F. Supp. 2d 979 (W.D. Tenn. 2011) ...........................................................13

*Morgan v. Family Dollar Stores*,
551 F.3d 1233 (11th Cir. 2008) ........................................................................35

*Munsch v. Domtar Indus., Ind.*,
587 F.3d 857 (7th Cir. 2009) ...........................................................................63

*Nerland v. Caribou Coffee Co.*,
564 F. Supp. 2d 1010 (D. Minn. 2007) .............................................................93

*Obrycka v. City of Chicago*,
No. 07 C 2372, 2011 WL 2173728 (N.D. Ill. June 2, 2011) ............................28

*Ordonez v. Radio Shack, Inc.*,
No. CV 10-7060-CAS, 2013 WL 210223 (C.D. Cal. Jan. 17, 2013) ................47

*Pendlebury v. Starbucks Coffee Co.*,
518 F. Supp. 2d 1345 (S.D. Fla. 2007) ...............................................................1

*Phillips v. Asset Acceptance, LLC*,
No. 09 C 7993, 2013 WL 1568092 (N.D. Ill. Apr. 12, 2013) ..........................21

*Prise v. Alderwoods Group, Inc.*,
No. 06-1641, 2011 WL 4101145 (W.D. Penn. Sept. 9, 2011) ..............12, 38, 72, 80

*Raposo v. Garelick Farms, LLC*,
11-11943-NMG (D. Mass. July 11, 2013) .............................................47, 58, 65

*RBS Citizens, N.A. v. Ross*,
133 S.Ct. 1722 (2013) .....................................................................................21

*Reed v. County of Orange*,
266 F.R.D. 446 (C.D. Cal. 2010) ..........................................................72, 82, 89

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Reich v. Southern New England Telecomunications Corp.*
121 F.3d 58 (2nd Cir. 1997)..........................................................................35, 61, 62

*Reich v. Southern New England Telecomunications Corp.*
892 F. Supp. 389 (D.C. Conn. 1995) ..............................................................61, 62

*Richardson v. Wells Fargo Bank, N.A.*,
No. 4:11-cv-00738, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012)...........................80

*Roach v. T.L. Cannon Corp.*,
No. 3:10-CV-0591, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) ........................21

*Rosenberg v. Renal Advantage, Inc.*,
No. 11-cv-2152-GPC-KSC, 2013 WL 3205426 (S.D. Cal. June 24, 2013) ...........21

*Schremp v. Langlade County*,
No. 11-c-590, 2012 WL 3113177 (E.D. Wis. July 31, 2012) .................................74

*Skelton v. Am. Intercontinental Univ. Online*,
382 F. Supp. 2d 1068 (N.D. Ill. 2005) ..................................................................72

*Smith v. Family Video Movie Club, Inc.*,
No. 11 CV 1773, 2013 WL 1628176 (N.D. Ill. Apr. 15, 2013)...............................21

*Sommerfield v. City of Chicago*,
254 F.R.D. 317 (N.D. Ill. 2008).............................................................................28

*Spellman v. Amer. Eagle Express, Inc.*,
No. 10-1764, 2013 WL 1010444 (E.D. Pa. Mar. 14, 2013) ..................................57

*Taylor v. Pittsburgh Mercy Health Sys., Inc.*,
No. 09-377, 2012 WL 1739821 (W.D. Pa. May 16, 2012) ....................................72

*Vang v. Kohler Co.*,
488 Fed. Appx. 146, 2012 WL 3689501 (7th Cir. Wis. Aug. 28, 2012) ................13

*Vang v. Kohler Co.*,
No. 09-C-842, 2012 U.S. Dist. LEXIS 98802 (E.D. Wis. July 17, 2012) .........13, 72

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)..............................................................................9, 10, 73

*Wang v. Hearst Corp.*,
No. 12-CV-793 (HB), 2013 WL 1903787 (S.D.N.Y. May 8, 2013) .......................21

# TABLE OF AUTHORITIES
(continued)

**Page**

*Whineglass v. Smith*,
No. 8:11-cv-2784-T-23TGW, 2013 WL 2237841 (M.D. Fla. May 21, 2013) ..............7, 88, 89

*Williams v. Accredited Home Lenders, Inc.*,
No. 1:05-CV-1681-TWT, 2006 WL 2085312 (N.D. Ga. July 25, 2006) ..............................80

*Zivali v. AT&T Mobility, LLC*,
784 F. Supp. 2d 456 (S.D.N.Y. 2011).........................................................................38, 72, 90

## STATUTES

29 U.S.C. §216(b) ........................................................................................................... passim

Portal to Portal Act (PPA)................................................................................................7

## RULES

29 C.F.R. § 785.19(a)...........................................................................................................62

Fed. R. Civ. P. 16(b)(4).........................................................................................................2

Fed. R. Civ. P. 23 ........................................................................................................ passim

Fed. R. Civ. P. 23(b)(3)..................................................................................................20, 21

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................................17, 27

Fed. R. Civ. P. 30(b)(6).......................................................................................................55

Fed. R. Civ. P. 68 ................................................................................................................18

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

### A.   Illinois Bell Must Move to Decertify a Class That Was Never Certified

Plaintiffs' case at the decertification stage barely resembles the one that this Court conditionally certified. This Court had found Plaintiffs surpassed the modest, first-stage threshold that they were similarly situated with respect to: (1) working through lunch breaks due to being "required to maintain the safety of the work site"; (2) their claim that "travel from work site to work site precludes them from taking a lunch break"; and (3) "their claim that AT&T Illinois fails to pay them for time spent completing time sheets after their shift ends." (Doc. No. 56, pp. 6, 8). Plaintiffs alleged Illinois Bell pays only pre-approved overtime and routinely disciplines employees who seek compensation for non-preapproved overtime, thereby intimidating them into not asking for overtime pay. (*Id.*, at 2-3). Other Illinois Bell Cable Splicers were invited to join this case if they too believed that *for these reasons* they had been underpaid, not to litigate "any possible FLSA claim under the sun." (Doc. No. 56, p. 16).

Plaintiffs' Response confirms this case is now also about "efficiency standards," and in particular MSOC, as creating an "unfair ranking system" leading employees to underreport time to avoid discipline – not the discipline that Plaintiffs previously described, but rather discipline for not performing jobs efficiently. (Pls.' Rep., § II, B). Further, Plaintiffs now point to even *more* alleged policies to unite the collective: (1) "route policies" (when a technician is to leave and return to the garage each day), which Plaintiffs never before alleged led to pre-shift work or any post-shift activities other than electronic time entry; and (2) the time-reporting system (JAM) precluding them from reporting all time worked. (*Id.*, pp. 18-21). Meanwhile, Plaintiffs abandon their "tremulous" claim that driving among job sites causes foregone meal breaks (Doc. No. 56, p. 6), presumably meaning that anyone who opted-in on that basis no longer belongs in this case. Plaintiffs also propose that this Court create subclasses. (Pls.' Resp., § III).

Plaintiffs suggest that to deal with their shifting theories, they can amend their complaint "should the Court find it appropriate," even though this case was filed in January 2011, the parties spent over a year in opt-in discovery, and discovery has closed. (Pls.' Resp., pp. 1-2, n. 2). Any opportunity to reconfigure their case has long passed. Plaintiffs never sought to amend their complaint so that Defendant – and the Court – could confront these new theories, and to interject them now notwithstanding previous schedules entered by the Court would not meet the Fed. R. Civ. P. 16(b)(4) "good cause" standard.[1] Plaintiffs thus have circumvented the Federal Rules of Civil Procedure and employed the FLSA Section 216(b) notice and opt-in process to pursue a class this Court never before confronted, much less determined qualified for conditional certification and expensive discovery that followed. In doing so, they have thwarted the two-step collective action process and forced Defendant in large part to move to decertify not only the conditionally certified class but also a class that was never certified.

### B. Plaintiffs Fail To Establish That Liability and Damages Could Be Adjudicated on a Collective Basis

Regardless, Plaintiffs have not demonstrated how the Court could try any of their myriad claims efficiently and consistent with Defendant's due process rights. Plaintiffs assume liability can be addressed through various policies and representative testimony, notwithstanding a record establishing no basis for one Cable Splicer to represent anyone else. Instead, the seven named plaintiffs and 18 opt-ins subjected to discovery have shown how individualized inquiries are required to evaluate whether they engaged or did not engage in pre-shift, post-shift, and/or lunch break work – that is, whether Illinois Bell could be liable in the first place. Without explaining

---

[1]    Indeed, Defendant had proposed a deadline of April 22, 2011 to amend the pleadings; Plaintiffs objected to this deadline only "insofar as it limits amending the complaint to add additional state wage claims where appropriate." (Doc. No. 28, p. 8).

how the Court could wade through multiple individualized issues on liability, Plaintiffs contend that the only differences are damages; that is, "the rest is about how much."  (Pls.' Resp., p. 4).

To resolve *that* question, Plaintiffs advance a "sampling model" or bifurcation or using a special master to assess damages.  (Pls.' Resp., p. 50).  But the question of how frequently someone worked off-the-clock is intertwined with the question of whether such work occurred.  As another court in California recently determined in denying class certification of Pacific Bell technicians' wage and hour claims, these embody a "hybrid individualized determination of both liability and damages."  *Koval, et al. v. AT&T Inc.*, Case No. RG10510513 (Cal. Sup. Ct. June 27, 2013) (attached hereto as Ex. A, p. 25); *see also Espinoza v. County of Fresno*, No. 1:07-cv-01145-SMS, 2013 WL 1222034, at *10 (E.D. Cal. Mar. 25, 2013) ("[S]ometimes the difference in damages is symptomatic of the fact that Plaintiffs are truly not similarly situated.").  Plaintiffs just skip past liability to posit that the only differences that matter here are damages.

Thus, Plaintiffs have *no* plan to address resolving liability on a collective basis, and their damages approach, if it could be disentangled from the liability inquiry, should be rejected.  The Seventh Circuit's decision in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), issued after Defendant's original motion, warns that if plaintiffs cannot control for variation among the classes they seek to certify, and cannot establish a feasible trial plan, then claims can only proceed individually.  Although Plaintiffs put forth a mathematics expert to address damages and argue for purportedly scientific sampling, Plaintiffs' approach is premised entirely on Plaintiffs and opt-ins giving testimony (specifically, estimates of their alleged unpaid work) that is "representative" of others.  Both the record and the social science that their expert does not consider belies this approach.  As discussed below, and in the rebuttal reports of Dr. Gregory

Mitchell and Dr. John Johnson, Plaintiffs' sampling methodology is unscientific, unreliable, and incompatible with Defendant's due process rights to defend against both liability and damages.

### C. Plaintiffs Are Not Similarly Situated on Any of Their Theories

Plaintiffs also have not established that they are similarly situated with respect to any of the alleged policies or other bases that they contend the Court could address collectively. Plaintiffs do not establish how MSOC affects Illinois Bell technicians consistently, as was the case for Wisconsin Bell technicians making the same argument in *Boelk v. AT&T Teleholdings, Inc.*, Case No. 12-cv-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013). Instead, Plaintiffs misrepresent MSOC as so onerous that it inevitably compels off-the-clock work in order to meet their "numbers" and stave off discipline, even though their own testimony is to the contrary. Plaintiffs present virtually no evidence of discipline under MSOC beyond speculative beliefs of what *might* happen or receiving the coaching expected from prudent managers. Plaintiffs also theorize, based on a mathematician's opinion, that all Cable Splicers react uniformly to a "highly variable rating system," when testimony from just the 25 Plaintiffs/opt-ins proves otherwise. (Pls.' Resp., p. 40). And Plaintiffs try to account MSOC not being implemented until 2010 by simultaneously asserting that it was a new, patented job management system, but at the same time no different from its predecessors – when, again, the record shows otherwise.

Nor have Plaintiffs established how the Court could collectively adjudicate claims about missing meal breaks because of maintaining a manhole and "security" and "safety" at job sites. Plaintiffs ignore their self-defeating testimony addressed in Defendant's opening memorandum about being able to break for lunch, not spending all day at a manhole, and other reasons why simply the prospect of working at a manhole or having to make sure equipment is safe and secure, could not lead to a classwide assessment of whether off-the-clock work results. Indeed, Plaintiffs have represented that Cable Splicers throughout the state miss lunch breaks *also*

4

because of driving among multiple job sites. Plaintiffs provided sworn declarations attesting to foregone meal breaks due to intrasite travel, the antithesis of their premises confinement theory. Although Plaintiffs may drop their tremulous claim, they cannot erase this record.

Plaintiffs' additional theories fare no better. Insofar as Plaintiffs are trying to bind a class under the JAM timekeeping system specifically, and not as an adjunct to MSOC, which is unclear, Plaintiffs' attempt fails. JAM does not preclude Cable Splicers from reporting all time worked, and has no more consequence for Plaintiffs' off-the-clock claims than any other policy that universally applies to Cable Splicers. Nor are expectations as to when employees leave and return to their garages availing: the record shows that these expectations are inconsistent (i.e., Plaintiffs/opt-ins cite a range of expected departure and return times), and, even if there were consistency, they do not result in any predictable pattern of alleged pre-shift and post-shift work.

### D.    Illinois Bell Has Substantial Individualized Defenses

Plaintiffs fail to refute that Defendant has viable individualized defenses. Chief among these are that management neither knew nor should have known of such work. Here again, Plaintiffs just disregard their testimony that they never reported or otherwise made management aware of working through meal breaks. They also ignore how every manager and supervisor in this case denies knowledge of any Plaintiffs/opt-ins' alleged off-the-clock work, demonstrating how in a collective action Illinois Bell would lose the opportunity to defeat liability on this basis. Indeed, underscoring the importance of the lack of knowledge defense, the *Boelk* Court recently granted summary judgment on all named plaintiffs' claims because "plaintiffs have not submitted evidence from which a jury could find that defendants knew or should have known that plaintiffs were performing any work during their meal breaks for which they were not compensated. Without such evidence, defendants cannot be liable for failing to pay plaintiffs for such work." *Boelk*, Doc. No. 157, p. 2 (July 19, 2013) (attached hereto as Ex. B).

DB2/ 24212269.1

If claims were to proceed to trial, Illinois Bell could contest liability by challenging technicians' credibility. Plaintiffs' class case would be built on purportedly representative testimony: "Both Parties [sic] cases will rise and fall on the credibility of the representative Plaintiffs." (Pls.' Resp., p. 68). Plaintiffs must convince the Court they are believable when they say they "feared" discipline and felt "pressure" to be efficient. Yet Plaintiffs/opt-ins have provided conflicting testimony across their declarations, interrogatory responses, and depositions; Illinois Bell data (e.g., GPS data showing a technician's truck at a restaurant for an hour) could undermine credibility; and individual supervisors and managers could rebut assertions made against them – all of which show one person's credibility could not be a proxy for anyone else's. Further, even if someone is deemed to some degree credible – that is, his retrospective recall of his daily activities appears genuine – Illinois Bell could respond by marshaling evidence like manager testimony (e.g., that this technician was habitually late); coworker testimony (e.g., he always sat in the breakroom pre-shift); and relevant data (e.g., his truck left the garage well after the tailgate meeting, leaving ample time to collect supplies). None of this individualized proof to defeat liability is feasible in a collective action.

###### E. Plaintiffs' Additional "Fairness and Procedural Grounds" Arguments Do Not Preclude Decertification

A collective action cannot be sustained just because the alternative could mean multiple trials. The Court must also consider the feasibility of trying this case collectively when Plaintiffs implicate everything from timekeeping methods to performance measures to safety and security expectations to expected garage return and departure times; when Plaintiffs/opt-ins have testified that whether they engaged in such alleged work could depend not only on job position but also at what garage they worked and to which supervisor they reported (Def.'s Mem. pp. 21-22); when Plaintiffs have testified that every day is different and there is no typical day (Clark pp. 86:15-

24; Wright pp. 49:16-50:2); when Defendant's witnesses dispute any allegations of unpaid work attributed to them; and when all Plaintiffs offer to resolve their claims is applying their estimates of unpaid work – which discovery confirmed to be unreliable – and assume that what they remembered doing three years ago is identical to 300 other people. "Judicial economy is not served in this circumstance because each plaintiff's claim raises distinct factual and legal issues which would essentially evolve into four distinct trials. The need for such individualized inquiries contravenes the basic theory of judicial economy upon which the certification of collective actions is based." *Whineglass v. Smith*, No. 8:11-cv-2784-T-23TGW, 2013 WL 2237841, at *10 (M.D. Fla. May 21, 2013) (internal quotations and citations omitted). So too here, only judicial *in*efficiency would result from a collective action.

### F. Plaintiffs' Subclassing Proposal Is Not Viable

Finally, Plaintiffs' subclassing proposal cannot salvage their class. Dividing Cable Splicers by job type would not obviate the need for individualized proofs and defenses *within* each subclass. Plaintiffs also do not address how to ascertain each subclass's composition when employees have worked across multiple job types (both on a loan or ad hoc basis), with some even spending time in groups other than those represented by the subclasses (e.g., Installation & Repair or First Mile). Plaintiffs also do not account for how employees have testified to experiences varying for other reasons, such as by their garage and supervisor.

## II. THE COURT SHOULD REJECT PLAINTIFFS' EFFORTS TO RECONFIGURE THEIR COLLECTIVE ACTION THEORIES

Two and one-half years ago this case was about missing meal breaks due to having to stay on site or driving among multiple sites, or staying past shift to enter time on garage computers. (In fact, in the Report of Conference of Parties, Plaintiffs identified only being confined to a job site and entering time on garage computers post-shift as the bases for their

claims. (Doc. No. 28, p. 2)). Plaintiffs have since expanded from the discrete theories which this Court held warranted notice (while ditching their intrasite travel theory), in hopes that the Court will allow something to survive. (Pls.' Resp., p. 1 (arguing that "the standard on collective certification is whether there is **any** common question") (emphasis in original)). Indeed, Plaintiffs are not so much opposing decertification but instead moving to certify a new class for new reasons. Plaintiffs effectively nullify the two-step collective action process, and by cobbling together multiple alleged policies in one case, and asking the Court to then sort it out, disserve the FLSA Section 216(b) collective action's purpose of promoting judicial efficiency. *See generally Hoffman v. La-Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

Meanwhile, approximately 350 people elected to join a case different than the one the notice described to them, of "working through meal breaks and completing time sheets at the end of the shift." (*See* Gary Crowder Dep. Ex. 1, (attached hereto as Ex. C, p. 1)). Those who would *not* profess to violating the Code of Business Conduct by underreporting hours to appear more efficient, or who would *not* agree that they collect equipment pre-shift, or who do *not* stay past shift to unload their trucks, are through Plaintiffs' approach nonetheless bound to these theories. Plaintiffs contend that they are "representative" of all such Cable Splicers, notwithstanding the opt-ins even knowing the new course on which Plaintiffs have steered them.

To be sure, Plaintiffs did not need to await notice and class discovery to argue that they have been in "constant fear" of not meeting efficiency objectives, resulting in each "do[ing] work off-the-clock before and after the shift, and during lunch but not record[ing] that work" or that the system they used to report their time every day was broken. (Pls.' Resp., pp. 40-41). Plaintiffs were obligated to move to amend their complaint long ago, which they indisputably could have done, and allow Defendant to respond then, rather than await class certification

briefing to inject new bases for the Court to sustain a collective action.  In essence, Plaintiffs used the notice process to round up litigants, open the floodgates to class discovery, and then force Defendant to move to decertify a class that neither it nor the Court had ever confronted.

Plaintiffs also cannot genuinely contend that efficiency objectives or other never-before addressed theories fall under the same umbrella of off-the-clock work previously alleged.  (Pls.' Resp., p. 1, n. 2 ("Irrespective of whether the unpaid overtime is worked pre-shift, post-shift, or during an unpaid lunch period, the allegations of unpaid overtime are still common to the collective.")).  *Every* off-the-clock case entails allegations that nonexempt employees worked without pay, but to avoid decertification, Plaintiffs "must demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present."  *See Camilotes v. Resurrection Health Care Corp.*, No. 10-cv-366, 2012 WL 4754743, at *5 (N.D. Ill. Oct. 4, 2012) (internal quotations and citations omitted).  Or, as the *Dukes* Court explains for Rule 23, "[c]ommonality requires the plaintiff to demonstrate that class members have suffered the same injury … This does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("*Dukes*") (internal quotations and citations omitted).

Therefore, Defendant submits that the Court should summarily reject Plaintiffs' post-conditional certification theories.  *See* Def.'s Mem., p. 49; *see also Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631, at *6, n. 3 (W.D.N.C. Sept. 16, 2011) ("The unlawful 'common policy' which allegedly binds Plaintiffs, opt-ins, and class members together has been a moving target during the course of litigation. … *That the course of discovery has compelled Plaintiffs to revise the policy complained of in such a*

*drastic fashion alone counsels against certification*.") (emphasis added). The claims at issue here should be limited to only those that Plaintiffs previously alleged and that formed the bases for this Court's conditional certification order.

III. **PLAINTIFFS FAIL TO ESTABLISH THAT THE COURT COULD MANAGE THIS CASE EFFICIENTLY AS A COLLECTIVE ACTION**

Even if the Court considered all of Plaintiffs' claims, none could be adjudicated collectively. Plaintiffs call liability "a common question" and represent that "the claim for liability is a common claim" (Pls.' Resp., p. 3), but merely stating liability is common does not make it so, as "any competently crafted class complaint literally raises common 'questions' … Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S. Ct. at 2551 (internal citations and quotations omitted). Liability is not a common inquiry when Plaintiffs have lumped together multiple theories of off-the-clock work, on top of a maze of inconsistent individual testimony. "By challenging so many different matters in the same case, plaintiffs have made it impossible to craft a cohesive class." *See Ladik v. Wal-Mart Stores, Inc.*, No 13-CV-123-bbc, 2013 WL 2351866, at *11 (W.D. Wis. May 24, 2013); *see also Martin v. Citizens Fin. Group, Inc.*, No. 10-260, 2013 WL 1234081, at *6 (E.D. Pa. Mar. 27, 2013) (decertifying off-the-clock collective action and noting, "Plaintiffs point to five different methods that were allegedly used by Defendants in an effort to deny overtime, but the number of Plaintiffs who claim to have been subject to each illegal practice differs"). Further, even if liability could be evaluated collectively, Plaintiffs' approach for addressing damages, via their expert Dr. Bardwell (who focused only on damages, not liability), is fatally flawed and irreconcilable with *Espenscheid* and its progeny.

### A. Plaintiffs Disregard the Question of Liability

### 1. The Record Precludes A Collective Assessment of Liability

Plaintiffs are not correct that Defendant only has shown "differences in each of the Plaintiff's damage calculations[.]" (Pls.' Resp., p. 3).[2] Defendant demonstrated in its opening brief (and will again throughout this Reply) how Plaintiffs are not similarly situated as to whether they engaged in any uncompensated work at all. Plaintiffs/opt-ins testified that some technicians do no manhole work; that they take lunch breaks even on days assigned to manholes; that there are Cable Splicers that do not enter timesheets on garage computers; that technicians have entered this time on subsequent days; that efficiency objectives either never, sometimes, or always compel lunch break work or any of a variety of pre-shift and post-shift activities – or that technicians also engage in these same types of activities after their shifts start or before their shifts end; and that these issues could vary by (at least) their supervisor, job type, and/or geographic location. (*See e.g.*, Def.'s Mem., §§ III, C-E). By way of example testimony:

- Opt-in Mark Rentschler would collect supplies some days but not others because "some days I had enough supplies for a couple days. Other days, depending on the job. I would have to get them on a daily basis." (Rentschler p. 150:14-19).

- Whether Plaintiff Steven Clark took a lunch break could vary from partner to partner: "if you were working with them – like, if they were a senior person, like, if I only had five years, and the person I was working with had ten years, it was kind of like, an unknown respect that you gave the senior man, that you know – you followed their pattern. If they didn't take lunch, you didn't take lunch." (Clark p. 90:10-23).

- Opt-in Emanuel Tripolitakis said "[p]robably, yes" there were days he stocked his truck after his shift started rather than before, but cannot say how frequently this happened. (Tripolitakis pp. 67:8-69:3).

- Opt-in Robert Schilling said "[i]t's all the circumstances" as to what days he cleaned his truck or checked supplies before his shift started as opposed to after. (Schilling pp. 232:22-233:9).

---

[2]  *See also* Pls' Resp., p. 38, n. 41 ("[T]o the extent the Defendant has identified differences; they are often limited to how much someone worked off-the-clock, as opposed to whether in fact an individual worked off-the-clock at all. Therefore, the differences are not regarding liability, but rather damages, which Plaintiffs' [sic] acknowledge will be different among the members of the collective.").

All of these inquiries implicate liability and how Plaintiffs would prove their claims of off-the-clock work in the first place, not just "the amount of unpaid overtime work." (Pls.' Resp., p. 48). If there is no similarity as to whether those Cable Splicers who gave discovery were allegedly working pre-shift, post-shift, or through lunch and why, then they cannot anchor a collective action through "representative" testimony. Rather, the "right to compensation hinges on their individual experiences. It is unclear how proceeding collectively and using representative testimony would be fair or useful." *See Creely v. HCR Manorcare, Inc.*, No. 3:09 CV 2879, 2013 WL 377282, at *9 (N.D. Ohio Jan. 31, 2013); *see also Martin*, 2013 WL 1234081, at *7 (rejecting plaintiffs' proposed trial plan calling for representative testimony); *Briggins v. Elwood Tri, Inc.*, 882 F. Supp. 2d 1256 at 1276 (N.D. Ala. 2012) (calling use of representative testimony "dubious given the inconsistencies the defendants have already highlighted in this small sample of plaintiff depositions"); *Prise v. Alderwoods Group, Inc.*, No. 06-1641, 2011 WL 4101145, at *22 (W.D. Penn. Sept. 9, 2011) (emphasis in original):

> Plaintiffs argue that the majority of Alderwoods' defenses relate to damages, i.e., the amount of overtime compensation due to each plaintiff. Plaintiffs contend individual defenses related to damages should not preclude certification; rather, the trial may be bifurcated into liability and damages phases … Plaintiffs' argument is unpersuasive because they fail to address the preliminary issue of liability, i.e., whether a violation occurred. Only after liability is found can the court determine the *amount owed* to each opt-in plaintiff in a damages phase of a trial.[3]

---

[3] *See also Boelk v. AT&T Teleholdings, Inc.*, 12-cv-bbc (W.D. Wis. Mar. 11, 2013) (Doc. No. 124, p. 11) (attached hereto as Ex. D), denying plaintiffs' motion to reconsider denial of collective and class action certification:

> Plaintiffs contend that once defendant's knowledge is proven, *"the only remaining question will be how much work went unpaid," … and that this question could be resolved through estimates, averages, surveys, sampling and other methods created by their damages experts. Plaintiffs are incorrect.* Regardless whether defendants had actual or constructive

(Footnote Continued)

So too here, the variability established by Plaintiffs/opt-ins themselves (discussed in detail in Defendant's opening brief) underscores how individualized inquiries would be necessary to determine whether an employee performed *any* off-the-clock work – and which of the multiple types identified, for any of the multiple reasons proffered – not just "how much" he could recover. Even if the Court found one plaintiff is owed compensation for missing a lunch break because he could not leave an aerial pole, that does not speak to someone who did no aerial work. If the Court found one supervisor knew a technician was coming in early to "work," that does not answer the question for someone reporting to another supervisor at another garage. That is, there is no basis for the Court to conclude that liability in one employee's circumstance would mean liability for another.[4]

---

knowledge that technicians were working during their lunch breaks, *plaintiffs are still required to prove that they were, in fact, working during their lunch breaks without reporting it.* As I have explained already, this will required individualized inquiries regarding whether the technicians actually performed activities that constituted compensable work and whether they were compensated for it. (emphasis added).

[4]   Plaintiffs' argument that "numerous courts have held that in FLSA §216(b) cases individual damage calculations do not warrant decertification" (Pls.' Resp., p. 48) is therefore beside the point, since that says nothing of the antecedent liability question and, as discussed further herein (*supra* §III, B), is inconsistent with *Espenscheid* and other recent caselaw in any event. The only case from within this Circuit that Plaintiffs cite for this proposition, *Vang v. Kohler Co.*, No. 09-C-842, 2012 U.S. Dist. LEXIS 98802 (E.D. Wis. July 17, 2012), was *vacated and remanded by the Seventh Circuit*. 488 Fed. Appx. 146, 2012 WL 3689501 (7th Cir. Wis. Aug. 28, 2012). The remaining cases Plaintiffs cite on this point do not address an employer's defenses as to *liability* or are otherwise distinguishable. *See Frank v. Gold'n Plump Poultry*, No. 04-cv-1018 (PJS/RLE), 2007 U.S. Dist. LEXIS 71179, at **13 (D. Minn. Sept. 24, 2007) (defendant did *not* dispute whether employees in fact spent time donning and doffing outside of their shift; "Gold'n Plump has, at a minimum, decided not to require that its employees be paid for donning and doffing. That no-policy policy has allegedly injured all members of the putative class and is properly challenged through a class action."); *Hill v. Muscogee County Sch. Dist.*, No. 4:03-CV-60 (CDL), 2005 U.S. Dist. LEXIS 35725, at **2, 10, 15 (M.D. Ga. Dec. 20, 2005) (14-person class; plaintiffs were compensated only for their scheduled hours; and defendant's defenses were "chiefly" on damages, not liability); *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 984 (W.D. Tenn. 2011) (evidence of telling employees not to record all of their time, deducting for lunch breaks regardless if taken, altering timesheets to reduce or remove overtime, forging employees' signatures on timesheets, and routine complaints about not being paid); *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 904, 906 (S.D. Tex.

(Footnote Continued)

## 2. Plaintiffs Misconstrue the Johnson Report, Which Underscores That Liability Could Not Be Addressed Collectively

Likewise, the variation among Plaintiffs/opt-ins' experiences that Johnson's Report displays is not just about "challenging or corroborating the reasonableness of the estimates made by the Plaintiffs of their hours worked, but not paid." (Pls.' Resp., p. 99). The Johnson Report comports with Plaintiffs/opt-ins' testimony of being "all over the map" as to issues like how frequently they worked manhole jobs, whether they completed electronic timesheets before or after their shifts, and their widely divergent levels of efficiency. (*See* Doc. No. 193-3, §§ IV-VI). The Johnson Report illustrates the lack of any common methodology to resolve Plaintiffs' claims, including whether off-the-clock work took place. As explained in Dr. Johnson's Rebuttal Report, he addressed at least two issues relevant to certification:

> First, my analyses demonstrate the nature of the inquiry that would be required to prove *liability* in this case—i.e. the type of evidence that would be required for the plaintiffs and opt-in employees to prove their claims that they worked unpaid overtime. The analyses demonstrate the individualized nature of the inquiry and the numerous individual factors that must be taken into account to determine liability for each class member. Second, my analyses also demonstrate the same potential issues that make liability necessarily an individualized inquiry will also affect damages. (Dr. John Johnson Rebuttal Expert Report, ¶ 7) (emphasis in original) (attached hereto as Ex. E)).

Plaintiffs similarly are off-base in asserting that "the data analyzed by Dr. Johnson (VTS, JAMS, and MSOC), by his own admission, has little probative value." (Pls.' Resp., p. 99). To the contrary, such data could not resolve claims *classwide* but *can* be harnessed to address *individual* allegations. Dr. Johnson elaborated on this point at his deposition:

---

2009) (one facility class on claims of not being paid for training and skills assessment tests). (The Ninth Circuit's *Leyva* decision is discussed *supra* at footnote 10.)

Q: Okay. And from the VTS data, there's nothing that tells you that assist in knowing whether or not somebody worked through lunch or didn't, is that correct?

A: Well I don't think I agree with that. What the VTS gives you is one piece of information about individual circumstances on a given day. So what it can tell you, for example, is, you know, person's testimony says that they never took a lunch break, but there is time where the truck is stopped at a non-job location for 30 minutes. Now that doesn't mean from the data in isolation you can tell they were taking a lunch break, but it does provide information about where they were, and in combination with testimony, that would be an issue that I assume a plaintiff's lawyer and a defense lawyer would both focus on in terms of what does that mean. So in terms of the actual is there any probative value, I think there is. Can it be done on a class-wide basis? Absolutely not. You're – you're illustrating my point that it is definitely an individualized analysis. (Johnson pp. 89:18-90:14).

See also Johnson pp. 87:20-88:3 ("Q: If you've got the truck parked at a restaurant, it could also be correct that the individual ran in to use the washroom, correct? A: Absolutely. Q: It could be that the individual wasn't at the restaurant at all, but had parked the truck there to do work somewhere nearby? A: Yes. That's exactly the type of individual inquiry you'd have to conduct to figure it out."), pp. 199:15-200:17 (describing how VTS data for Deckys might be used to validate his testimony or recollection that day).

Plaintiffs purposely try to confuse this point as meaning that, "[h]aving determined that Illinois Bell has inadequate data, Dr. Johnson then concludes that as a result of the inadequate data, this case cannot proceed on a collective basis because examination of the inadequate data requires asking each person what the data really means." (Pls.' Resp., p. 94). The point is that

GPS data and the like cannot resolve this case on a classwide basis – and Plaintiffs do not suggest it can – leaving only individualized inquiries.[5]

Contrary to Plaintiffs' contention that Dr. Johnson's analyses "cannot provide any challenge to collective treatment for liability purposes" (Pls.' Resp., p. 99), his report demonstrates starkly how data could be marshaled for cross-examination and impeachment:

| Plaintiffs' Claims | Dr. Johnson's Analysis. |
|---|---|
| "In this case virtually all copper and fiber splicers who were deposed testified that on days they worked on an underground project they did not receive a lunch." (Pls.' Resp., p. 55). | VTS (GPS) data showed that on a day when plaintiff Larry Williams recorded 7.5 hours to underground work, his vehicle nonetheless made multiple stops at several different locations, including spending 67 minutes at his garage in the middle of the day. (Doc. No. 193-3, ex. 10, ¶ 26). |
| Opt-in Rentschler's Interrogatory Responses: "Almost every shift I worked past 3:30 completing various tasks, and my time sheet, but was only paid until 3:30. This took me 30 additional minutes per shift." (Doc. No. 196-20, ex. MMM, pp. 5-6, Response to Interrogatory No. 4). | Time entry data shows only seven of 243 occasions in which Rentschler submitted an electronic timesheet after 3:30 (and only twice after any recorded overtime). (Doc. No. 193-3, ex. 5, p. 12). |

---

[5]     It is also incorrect that "Dr. Johnson is incapable of giving an opinion because his opinion starts from the premise that the Fair Labor Standards Act is wrong, or at the very least, unworkable." (Pls.' Resp., p. 86). Plaintiffs omitted Dr. Johnson's testimony that whether a case can proceed collectively depends on its facts (portions Plaintiffs excised in brackets):

> Q:     Have you ever seen any case where it could be done?
> A:     I don't believe the issue has come up.  [Again, I – I like to speak in specifics.  In    the three other wage and hour cases where I testified, you know, all three cases, the court either decertified the class or didn't certify it to begin with, so in those cases, that wasn't, you know, that – there was no viable method.  So at least in the cases I've testified in, I haven't seen that.  *That doesn't mean could there be some conception, some fact pattern, perhaps.*]
> Q:     Can you imagine one?
> A:     Not as I sit here, again, I always think these things are very factually specific. [I'd wanna see the type of data, see the type of jobs, see the type of allegations. It's just – it's very hard in the abstract to do it.  *These types of cases are specific, and that's where I give my opinion on it, based on the data and the facts of the case.*]  (Johnson pp. 247:10-248:11) (emphasis added).

The GPS data that Dr. Johnson addressed does not, alone, refute that Williams skipped his meal break that day, but it is at least probative of that question and would assist the fact-finder[6] in making this determination – the very individualized assessment and challenge to Plaintiffs' assertions that Defendant could not mount in a collective action. Similarly, time-entry data informs the analysis of whether Rentschler had to complete timesheets every day on threat of discipline and routinely could not do so before shift end due to an insufficient number of computers. Further, if confronted with this data, Rentschler could argue that he then engaged in *other* post-shift activities like unloading his truck or completing paperwork, or Williams could respond to GPS data by testifying he was so pressured to be efficient that he worked through lunch for that reason – all of which show the importance of individualized inquiries.[7]

---

[6]     Defendant understands that Plaintiffs are *not* seeking a jury trial in this case, as Plaintiffs' counsel represented at Dr. Bardwell's deposition. (Bardwell pp. 252:24-253:9).

[7]     Other challenges that Plaintiffs mount to Dr. Johnson are also baseless. Plaintiffs suggest that as a labor economist, Dr. Johnson "has nothing to offer" (Pls.' Resp., p. 98), though Dr. Johnson is a statistician, uses econometrics to apply economic methodologies to data, had a chapter of his Ph. D. dissertation devoted to the FLSA published in the *Journal of Labor Economics*, and has testified in other wage and hour proceedings, on top of antitrust, price fixing, discrimination, and DOL cases and proceedings on class certification. (Johnson pp. 6:15-7:13, 20:13-24, 22:23-29:16, 34:14-35:20, 40:22-44:9, 45:23-47:2, 60:21-61:16; 194:22-24, 341:1-18). Plaintiffs' contention that Dr. Johnson "was unable to understand the data" (Pls.' Resp., 93) is misleading, since he did not calculate efficiency scores; he "simply took the data as it is, and I reported it exactly as it is" and used these measures – which Plaintiffs do not contend were calculated incorrectly – to generate the graphs on his report. (Johnson pp. 281:6-8, 343:13-23). There is also no merit to the assertion that his report violated Fed. R. Civ. P. 26(a)(2)(B) because it did not identify computer programming codes used to run calculations of data – when the underlying data upon which Dr. Johnson relied had been produced to Plaintiffs starting as early as September and October 2011 and was identified in Johnson's report. (Pls.' Resp., pp. 85-87; Declaration of Gregory P. Abrams (attached hereto as Ex. F) ¶ 15.). Plaintiffs' premise would mean the calculators experts use to add numbers would need to be listed on expert disclosures. Further, after receiving the Johnson Report, Plaintiffs did not serve a subpoena or other requests, as Plaintiffs' counsel believed "we couldn't ask for written discovery." (Johnson pp. 151:10-152:6; Ex. F, Abrams Decl., ¶ 15). And if Plaintiffs believe that programming codes "clearly fall into category (ii) of [ ] [R]ule [26(a)(2)(B)]," a proposition for which they do not supply any supporting authority (Pls.' Resp., p. 88), they cannot explain why their *own* expert did not identify on *his* report a spreadsheet counsel prepared for him summarizing Plaintiffs/opt-ins' deposition testimony and interrogatory answers. *Infra* n. 16.

### B.    Plaintiffs Cannot Overcome The Individualized Inquiries Necessary To Establish Damages

As discussed above, the question whether someone worked through lunch due to having to monitor a manhole or to meet their "numbers" and so on cannot be pristinely distinguished from how often that has happened.  But even assuming, despite the evidence to the contrary, that the *only* differences were damages, Plaintiffs' attempt to squeeze their case into *Espenscheid* with labels like "statistically significant scientific sampling techniques" (Pls.' Resp., p. 53), which are really anything but, fails to overcome the individualized nature of this analysis that *Espenscheid* and other decisions have held preclude certification.

### 1.    Plaintiffs Must Establish a Manageable Plan for a Collective Action

As an initial matter, Plaintiffs cannot avoid *Espenscheid* on the basis that this case involves only federal claims.  (Pls.' Resp., p. 36, n. 40).  Judge Posner was clear that courts should not approach FLSA collective actions differently from Rule 23 class actions, at least where, as here and as in *Espenscheid*, the Court is at the FLSA "second stage":

> Indeed, despite the difference between a collective action and a class action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23 … *there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards*, though with some terminological differences.  *Espenscheid*, 705 F.3d at 771-72 (emphasis added).

Like FLSA Section 216(b), "the provisions of Rule 23 are intended to promote efficiency as well … and in that regard are as relevant to collective actions as to class actions."  (*Id.*, at 772).  *Espenscheid*, which entailed Rule 23 and Section 216(b) claims, applies fully here.[8]

---

[8]      The Supreme Court's *Genesis Healthcare Corp.* opinion does not undermine this principle.  (Pls.' Resp., pp. 36, 77).  The Supreme Court held that, assuming a Fed. R. Civ. P. 68 offer of judgment mooted the named plaintiff's individual claim, "the mere presence of collective-action allegations in the

(Footnote Continued)

Turning to the allegations in *Espenscheid*, the plaintiffs were cable technicians (though appeared to work installation, not cable splicing jobs) who allegedly worked additional hours without being paid overtime. *Espenscheid*, 705 F.3d at 772-73. The District Court had decertified the class (more precisely, multiple subclasses) "when it became apparent that the trial plan submitted by the plaintiffs was infeasible." *Id.*, at 773. Because the plaintiffs sought damages, separate evidentiary hearings would be required for each class member, in part because defendant allegedly "concealed its violations by forbidding the technicians to record time spent on certain tasks"; damages could not then be computed "effortlessly, mechanically, from the number of days [the technician] worked each week and his hourly wage." *Id.*, at 773. The plaintiffs' proposal "to get around the problem of variance" was to offer testimony from 42 purportedly "representative" class members, but there was "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses, or more precisely random samples, each one composed of victims of a particular type of alleged violation." *Espenscheid*, 705 F.3d at 773. Further,

---

complaint cannot save the suit from mootness once the individual claim is satisfied." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529 (2013). The Court observed that "there are significant differences between certification under Federal Rule of Civil Procedure 23 and the joinder process under § 216(b)." *Id.*, at 1528, n. 1; *see also* *1529 (stating Rule 23 actions are "fundamentally different" from FLSA collective actions). But the Court made this distinction to explain how in an FLSA collective action unnamed individuals are not part of the case until they affirmatively opt-in, and how *that* feature is significant for Rule 68 offers: "Under the FLSA, by contrast, 'conditional certification' does not produce a class with an independent legal status, or join additional parties to the action. The sole consequence of conditional certification is sending of court-approved written notice to employees … who in turn become parties to a collective action only by filing written consent with the court, § 216(b)." *Id.*, at *1530; *see also* *1531. *Genesis Healthcare* did not even address the FLSA Section 216(b) or Rule 23 standards, much less hold that it should be easier to certify FLSA collective actions. *Cf. Clark v. Honey-Jam Café, LLC*, No. 11 C 3842, 2013 WL 1789519, at *3 (N.D. Ill. Mar. 21, 2013) (applying same standard for Rule 23 certification and Section 216(b) conditional certification); *Adams v. Hy-Vee, Inc.*, No. 11-00449-CV-W-DW, 2012 U.S. Dist. LEXIS 98590, at *13 (W.D. Mo. May 22, 2012) ("District courts have relied on the Supreme Court's discussion in Dukes in determining whether a single policy exists such that collective certification is appropriate under the FLSA.").

> even if the 42, though not a random sample, turned out by pure happenstance to be representative in the sense that the number of hours they worked per week on average when they should have been paid (or paid more) but were not was equal to the average number of hours of the entire class, this would not enable the damages of any members of the class other than the 42 to be calculated. To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage. *Id.*

Moreover, applying an average number of overtime hours per class member would confer a windfall on some and under-compensate others. *Espenscheid*, 705 F.3d at 773. There was also a "further complication" in accounting for an employee underreporting his time "not under pressure by DirectSat," but rather "because he wanted to *impress the company with his efficiency in the hope of obtaining a promotion or maybe a better job elsewhere – or just to avoid being laid off*." *Id.*, at 774 (emphasis added). The *Espenscheid* plaintiffs did not demonstrate how unlawful conduct could be distinguished from "such benign underreporting" – suggesting that not only must a plaintiff establish which of potentially many reasons caused the unpaid work at issue, but also perhaps that choosing to work off-the-clock without being told to do so and for "benign" purposes like improving efficiency is not compensable. *Id.* at 774. Because the fact finder could not draw a "just and reasonable inference" of the amount of time worked, "2341 separate hearings loomed," even if the District Court bifurcated the proceedings. *Id.* at 775. Consequently, neither an FLSA nor Rule 23 class could survive.

Post-*Espenscheid* courts have held that the prospect of predominantly individualized inquiries dooms class cases, rendering the viability of trying off-the-clock claims even more tenuous for plaintiffs. Significantly, the Supreme Court in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1431-33 (2013), concluded that the failure to establish classwide damages meant Rule 23(b)(3) predominance could not be satisfied: "Questions of individual damage calculations will

inevitably overwhelm questions common to the class." *Id.* at 1433. Demonstrating that this principle applies equally in the wage and hour field, the Supreme Court thereafter vacated and remanded the Seventh Circuit's order granting class certification in the *Ross v. RBS Citizens* wage and hour case "in light of *Comcast*[.]" *RBS Citizens, N.A. v. Ross*, 133 S.Ct. 1722 (2013).[9]

Other courts in this and other districts have followed suit. *See e.g.*, *Smith v. Family Video Movie Club, Inc.*, No. 11 CV 1773, 2013 WL 1628176, at *11 (N.D. Ill. Apr. 15, 2013) (class certification denied on off-the-clock claims, including for time spent preparing the store to open, in light of individualized inquiries); *Wang v. Hearst Corp.*, No. 12-CV-793 (HB), 2013 WL 1903787, at *9 (S.D.N.Y. May 8, 2013) (Despite efficiency from "consolidating and concentrating the litigation of similar claims, the individualized nature of proofs in this case signals that case management would be difficult, if not near impossible, and separate actions may be more appropriate."); *Rosenberg v. Renal Advantage, Inc.*, No. 11-cv-2152-GPC-KSC, 2013 WL 3205426, at *11 (S.D. Cal. June 24, 2013) ("There is no common proof of hours worked for all the RDs without resorting to individualized inquiries … The Court would have to resort to a series of mini-trials to determine hours worked for each class member."); *Roach v. T.L. Cannon Corp.*, No. 3:10-CV-0591 (TJM/DEP), 2013 WL 1316452, at *3 (N.D.N.Y. Mar. 29, 2013); *cf. Phillips v. Asset Acceptance, LLC*, No. 09 C 7993, 2013 WL 1568092, at *3 (N.D. Ill. Apr. 12, 2013) (*Comcast* and *Espenscheid* "may portend a tightening of class certification standards more generally, particularly as to the circumstances under which the task of measuring damages sustained by absent class members destroys predominance under Rule 23(b)(3).").[10]

---

[9]     The parties in *RBS Citizens* subsequently reported a tentative agreement to settle. Case No. 1:09-CV-5695 (N.D. Ill.) (Doc. No. 403).

[10]     By contrast, in *Leyva v. Medline Indus.*, 716 F.3d 510 (9th Cir. 2013), cited by Plaintiffs (Pls.' Resp., p. 51), the Ninth Circuit reversed a denial of class certification when damages could be mechanically calculated, as when plaintiffs challenged how an employer rounds time in its timekeeping

(Footnote Continued)

### 2. Plaintiffs' Sampling Plan Cannot Salvage Their Class

#### a. Dr. Bardwell's Report Assumes Liability While Misstating Judicial Acceptance of Representative Testimony

Plaintiffs try to respond to *Espenscheid* by proposing a sampling methodology from Dr. Bardwell. His report is focused on damages; it "is a preliminary analysis of commonality and the application of sampling to estimate the prevalence and amount of overtime hours claimed by Plaintiffs[.]" (Doc. No. 217-7, p. 3). Dr. Bardwell assumes liability, based on what he described at his deposition as "a non-zero amount of unpaid time that they testified to," although he also testified he is "not clear about what the, you know, theories of liability are." (Bardwell pp. 189:22-190:7, 226:6-15). Dr. Bardwell's report shows that he draws his understanding of the case largely from his review of Plaintiffs' second amended complaint (which was withdrawn (Doc. No. 54)) or "conversations with counsel for Plaintiffs." (Doc. No. 217-7, pp. 3-5).[11]

Dr. Bardwell represents that sampling enjoys widespread judicial acceptance, citing 1980s tax court decisions and other almost entirely non-wage and hour caselaw no more recent

---

system or whether it excludes bonuses from overtime rate calculations. The other cases (not already discussed herein) that Plaintiffs cite for the notion that damages can be easily calculated and that differences in damages do not support decertification – all of which pre-date *Espenscheid* and *Comcast* – are likewise inapposite. *See Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 371 (7th Cir. 2012) (Pls.' Resp., p. 51) (affirming class certification in cash balance pension plan case; "all that the class is seeking … is a reformation of the Meriter pension plan – a declaration of the rights that the plan confers and an injunction ordering Meriter to conform the text of the plan to the declaration … the monetary relief will truly be merely 'incidental' to the declaratory and … injunctive relief[.]"); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) (Pls.' Resp., p. 51) (Section 1983 action involving inmates denied use of crutches, in which the Court found it "premature to express an opinion one way or the other on the suitability of [plaintiff]'s case for (b)(3) class treatment"); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 818 (7th Cir. 2012) (Pls.' Resp., p. 52) (antitrust case, citing the subsequently-reversed appellate court decision in *Comcast*, and in which plaintiffs' expert opined on effect of post-merger price increases); *Driver v. AppleIllinois*, No. 06 C 6149, 2012 U.S. Dist. LEXIS 27659, at *9 (N.D. Ill. Mar. 2, 2012) (tip-credit case that "parallels the [subsequently vacated] *Ross* case"); *Mendez v. Radec Corp.*, 232 F.R.D. 78 (W.D.N.Y. 2005) (allegations of automatic deductions for lunch breaks, payment for travel time on overnight projects, and failure to include bonuses in calculating overtime rates); *McLaughlin v. DialAmerica Mktg., Inc.*, 716 F. Supp. 812, 814 (D.N.J. 1989) (DOL action alleging minimum wage violations in which defendant indisputably kept *no* record of employees' hours worked).

[11] Dr. Bardwell also cites to "depositions," but his report only lists the deposition of Gigi Severson, who testified regarding JAM, not any of the named plaintiffs or opt-ins. (Doc. 217-7, p. 5, n.25; p. 23).

than 1998, which he cut and pasted "with minor edits" from previous reports as far back as 1996. (Doc. No. 217-7, pp. 6, 9-11, n. 30-40; Bardwell pp. 191:20-192:25). As Dr. Mitchell explains, the Bardwell Report mixes class cases with those involving non-parties (like a survey of community sentiment in an obscenity case) and with single-party cases summarizing already-existent evidence (e.g., producing a party's random sample of email correspondence to determine the full scope of production), thereby exaggerating the degree of permissible use of sample-based evidence. (Dr. Gregory Mitchell Expert Report ¶ 2(a), § II, A) (attached hereto as Ex. G)). Dr. Bardwell does not address how sampling in collective or class actions poses unique problems, as it creates "new data," introducing systematic error that cannot be captured by the margin of error. (*Id.*, ¶¶, 21-22). These systematic errors can result from biased recall (i.e., remembering events from years prior), and compound hearsay and due process concerns. (*Id.*, ¶¶ 23-25).

Plaintiffs do not suggest any expert method to address these issues. They do not consider how "[s]ampling for liability should be distinguished from sampling for damages. Unless it is shown that a high number of Plaintiffs can prevail on their claims, a trial-by-formula approach would result in recovery for many Plaintiffs who are not entitled to an award (windfalls). Likewise, any formula for recovery based on a sample containing many unsuccessful claims would result in an average estimate of damages too low for the few Plaintiffs who were entitled to recovery (shortfalls)." (Ex. G, Mitchell Rep., ¶ 2(c)).

Brushing these concerns aside, Dr. Bardwell proposes that "random sampling will make the adjudication of this litigation more efficient, while preserving sufficient trustworthiness so as to satisfy the requirements of due process." (Doc. No. 217-7, p. 6). But he does not say how due process to contest liability is satisfied, since his report is limited to damages. (*Id.*, p. 5 ("This report documents the appropriateness and efficiency of sample estimates of overtime claimed by

Plaintiffs in this case and rebuts claims by Defendant's expert that Plaintiffs claims are too disparate for a class-wide calculation of damages.")).  Instead, Dr. Bardwell takes liability as "given," or, as he put it at deposition, "[o]nce the finder of fact concludes what the hours are then they can be plugged in."  (Bardwell p. 253:11-17).  But if it is a simple matter of inputting a number of unpaid hours and multiplying that by the overtime rate and weeks worked, then all Dr. Bardwell offers is simple math, not any expert analysis to demonstrate sampling is viable.

### b. Dr. Bardwell Does Not Use a Random or Scientific Sample

Even just considering damages, the Bardwell Report does not employ a representative sample, and thus his report is flawed from the start.  Instead, he assumes the Court's decision to permit Defendant to serve discovery on 18 opt-ins (plus the seven named plaintiffs) yields an appropriate "sample" or "sampling plan" that should apply for class certification process.  (Doc. No. 217-7, pp. 12, 19; Doc. No. 139; *see also* Bardwell pp. 47:14-18 ("But the sample itself was designed by the court.  Q:  You're saying that this sample was – the court designed the sample?  A:  Yes.")).[12]  In other words, the seven named plaintiffs and 18 opt-ins are a sufficiently representative sample for purposes of trial solely because they were subject to discovery, which is to say that the Court's order that 25 people give discovery to help determine whether a class is

---

[12]     *See also* Bardwell p. 48:10-24:

> Q:     What scientific basis did the court use, to your knowledge, to
>        determine the sample?
> A:     Maybe the judge is just either very knowledgeable or an intuit
>        but I think the sample design was pretty – pretty – the sample
>        design itself was pretty optimal.
> Q:     And the number is optimal –
> A:     The number is –
> Q:     -- as a matter of math or statistics or anything else, the math?
> A:     The number – the sample size is predicted on the precision that's
>        required.  In my experience in similar sampling scenarios, as I
>        said, I think the judge did a remarkably good job.

appropriate also meant that 25 people – and *these* 25 people – could speak for the collective for purposes of both liability and damages. But the Court of course never made such a finding.

Further, even if there were an appropriate sample size and that were 25, it is indisputable that the 18 opt-ins were not randomly selected (and certainly the seven named plaintiffs were self-selected). To get around this problem, Dr. Bardwell posits that because Defendant selected the opt-ins to depose, "any bias in this sample would be reasonably assumed to be in Defendant's favor. In spite of this bias, Plaintiffs are willing to accept this sample for purposes of showing unpaid overtime was worked and estimating damages." (Doc. No. 217-7, p. 12). Yet Defendant has never agreed to this methodology (indeed, it disputed that any random sampling was possible) (Doc. No. 135, p. 9); Dr. Bardwell does not know Defendant's view on sampling (Bardwell pp. 47:19-48:7); and Dr. Bardwell has no idea as to how Defendant selected these opt-ins (*id.*, pp. 49:5-7, 80:6-8). He admitted that these 25 should be considered representative only if (i) they had been picked randomly – which unquestionably was not the case – or (ii) "if *we can all agree* that the bias that [Defendant] introduced by your selection process doesn't preclude the use of the sample result" (Bardwell p. 61:9-20) – yet Defendant certainly does not so agree.

There also is no reason to assume that Defendant's choice of whom to depose resulted in opt-ins biased for Defendant. Dr. Bardwell seems to suggest that because Defendant made this choice, it must have ended up with those who testified to less unpaid work than had individuals been selected randomly or by some other method. This concept strains logic and has never been validated. In fact, because five opt-ins whom Defendant had originally identified withdrew from this case rather than participate in discovery (Doc. Nos. 156, 160), if anything the 18 opt-in "sample" entails those with more incentive to participate in this case and obtain compensation.[13]

---

[13]    *See generally*, *Briggins*, 882 F. Supp. 2d at 1279 (emphasis added):

(Footnote Continued)

To try to make the sample appear more precise, Dr Bardwell also proposes a stratification-by-garage method. (Doc. No. 217-7, pp. 13-14). But Dr. Bardwell does not explain the rationale for distinguishing between garages with 10 or more opt-ins from those with less. (*Id.*, p. 13). He does not point to anything in the record for why those who work in smaller garages are more like each other than they are to those in larger garages. He does not suggest anything geographically significant about garage size (e.g., urban vs. rural), does not account for Cable Splicers who have worked in several garages (Def.'s Mem., p. 10, n. 3; p. 21; Bardwell p. 140:6-9), and does not consider how Plaintiffs/opt-ins have testified to experiences varying not just by garages but also by supervisor (Def.'s Mem., pp. 21-22; Bardwell p. 137:18-21). Nor does he account for how different types of Cable Splicers can work within the same garages.[14] Remarkably, although Plaintiffs propose subclassing by Cable Splicer type (*infra* §VII), Dr. Bardwell uses this by-garage approach without considering job type. (Bardwell p. 137:8-11).

In sum, there is nothing remotely "scientific" about Plaintiffs' sample. *See e.g.*, *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 1195651, at **5-6 (N.D. Ill. Mar. 22, 2013) (striking plaintiffs' expert in off-the-clock case when there was no evidence that the GPS data, technician depositions, or employee timesheets used "provide[d] a random sample of the class";

---

If representative testimony were to be a more important part of the plaintiffs' case, the court has concerns over the fairness of proceeding based on the limited deposition testimony taken thus far, even apart from the previously mentioned credibility concerns. Earlier in this case, the court denied a motion to dismiss plaintiffs who failed to attend depositions, *see* doc. 159, because it found dismissal to be too draconian a sanction. Upon reviewing the depositions, however, *the court speculates as to whether a potential bias exists in that testimony among plaintiffs who had claims they were willing to state, noting that those who feel more strongly they worked uncompensated time would have a stronger motivation to attend.*

[14]     *See* Hunter p. 29:3-10.

the expert had "no idea" how defendant chose the 30 vans in which to install GPS units, and "[t]here is no evidence that the employees deposed were randomly selected or that the time sheets [the expert] obtained from Plaintiffs' counsel were randomly chosen"); *Howard v. Securitas Sec. Servs. USA, Inc.*, No. 08 C 2746, 09 C 3633, 2013 WL 1337150, at *4 (N.D. Ill. Mar. 28, 2013) (plaintiffs' expert's "opinion that classwide damages can be 'extrapolated' by way of 'sampling' from the damages sustained by named plaintiffs and certain other class members [ ] is inadmissible" under *Espenscheid*). Because the sample was not properly constructed, Dr. Bardwell's methodology should be rejected for that reason alone.[15]

> ### c. Dr. Bardwell Improperly Relies upon Plaintiffs' "Estimates" Provided by Plaintiffs' Counsel

Dr. Bardwell's approach is invalid even apart from the non-random sample he used. Plaintiffs' counsel provided Dr. Bardwell a summary of the 25 Plaintiffs/opt-ins' estimates of unpaid overtime work from their interrogatory responses. (Bardwell Deposition Exhibit 14 (attached hereto as Ex. H); Bardwell pp. 112:2-11).[16] Dr. Bardwell credits interrogatory responses even though their trustworthiness as "data" sources can be undercut by their attorneys' involvement in formulating answers, their knowledge of the purpose behind the questioning, and their incentive to present the information in a favorable light. (Ex. G, Mitchell Rep., ¶ 29(a)-(b)). Counsel also provided Dr. Bardwell a summary of Plaintiffs/opt-ins' deposition testimony regarding alleged pre-shift, lunch break, and post-shift work. (*See* Ex. H, Columns I-L);

---

[15]   Defendant understands that the Court prefers parties not move to strike experts, and instead address such issues in the substantive brief; therefore, Defendant has not filed a separate motion to strike.

[16]   Notably, this document was *not* listed in Dr. Bardwell's report, even though it indisputably constituted "facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed," in violation of Fed. R. Civ. P. 26(a)(2)(B)(4)(C)(ii). Defendant did not receive it until serving a subpoena upon Dr. Bardwell and an earlier version of this file was not supplied until after the deposition had started. (Ex. F, Abrams Decl. ¶ 16; Bardwell pp. 145:17-23, 195:5-196:7)). Dr. Bardwell also admitted in his deposition to excluding other items from his report that he had considered, in further violation of this Rule. (Bardwell pp. 18:3-14, 45:19-46:2, 56:3-8).

(Bardwell pp. 112:12-113:4, 114:12-25). Dr. Bardwell testified that he reviewed these deposition citations but not the entire transcripts, and he did not review the depositions to see if there was any contradiction to what Plaintiffs' counsel culled from the depositions. (Bardwell pp. 112:18-113:4, 114:19-25, 158:21-25). His report states that he reviewed all 25 Plaintiffs/opt-ins' interrogatory responses, but he did not review the "Exhibit A" spreadsheet to each interrogatory response in which each Plaintiff/opt-in provided a summary of his alleged unpaid work. (*Id.*, pp. 24:13-25:4).

The process of counsel providing information to Dr. Bardwell for his review did not always function correctly. Dr. Bardwell's estimate for plaintiff Ernest Roberts' pre-shift work is *four to five* times per week, but when asked at deposition how frequently he worked before his shift, not only did his attorney object that the question "call[ed] for speculation," Roberts estimated *two to three times* per week. (Roberts, p. 216:6-20; Ex. H, Columns S, T, Rows 12, 13). For Schilling, Dr. Bardwell uses a minimum of four and maximum of five lunches per week as supplied by counsel, but when Schilling was asked if he worked through less than four lunches per week, he testified, "Obviously that had to happen. I would say, yes, the chances are, right, right." (Schilling p. 155:4-7; Ex. H, Columns S, T, Row 30).[17]

---

[17]     In addition, courts have held that where, as here, an expert relies upon summaries and estimates provided by plaintiffs' counsel and makes no independent effort to confirm whether those estimates are correct, such evidence should be excluded. *Obrycka v. City of Chicago*, No. 07 C 2372, 2011 WL 2173728, at *10 (N.D. Ill. June 2, 2011) (excluding opinion where expert's reliance on plaintiffs' counsel's summary of evidence rendered the report inadmissible and noting that plaintiff's counsel's summary was inherently biased); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321-22 (N.D. Ill. 2008) (rejecting expert's report since expert reviewed only summaries of deposition transcripts provided by plaintiff's counsel due to inherent slant on facts); *Lyman v. St. Jude Med. S.C., Inc.,* 580 F.Supp.2d 719, 726 (E.D.Wis. 2008) (excluding as unreliable expert testimony where expert did not independently verify the source and accuracy of plaintiff's sales data but rather accepted the summary of the data he received from the defendant's attorney).

If interrogatory responses conflicted with deposition testimony, Dr. Bardwell used the higher of the two estimates (if one of either the interrogatory responses or deposition testimony reported no off-the-clock work, Dr. Bardwell used the one that did). (Bardwell pp. 157:21-24, 202:14-205:8). Dr. Bardwell calculated each individual's average unpaid overtime per week, and then added these averages to yield a simple average across the 25 Plaintiffs/opt-ins. (Ex. H, AP: 35, AQ: 35). According to Plaintiffs, at trial, "[t]he actual facts that will be applied to the sampling (e.g., the amount of unpaid overtime) is an issue that will be decided by the trier of fact, and those factual conclusions can then be applied to the methodology to create a damage model." (Doc. No. 220, p. 4). Thus, presumably, Dr. Bardwell would repeat the process: take whatever estimates Plaintiffs provide and call that the damages for everyone else. But even that is unclear, as Dr. Bardwell testified that he would "recommend" the parties "use some more sophisticated sample estimation techniques" than those in his report, in which he "erred on the side of simplicity for the sake of the Court and understandability." (Bardwell pp. 209:13-210:7).

Dr. Bardwell also explains that he "use[d] the interrogatory responses and depositions to determine the sample overtime per week because all other data produced by Defendant fail to record unpaid work time." (Doc. No. 217-7, p. 13). Of course, the notion that Illinois Bell "failed" to record alleged unpaid work is consistent with where the defendant finds itself in any off-the-clock case. *See e.g.*, *Espenscheid*, 705 F.3d at 774-775 ("A further complication is that the technicians have no records of the amount of time they worked but didn't report on their time sheets."); *Doyel v. McDonald's Corp.*, 4:08-CV-1198 CAS, 2010 WL 3199685, at *7 (E.D. Mo. Aug. 12, 2010) ("By definition, plaintiffs' off-the-clock work would not be reflected in the employee's recorded time punches."). Even Dr. Bardwell acknowledged this point at his deposition. (Bardwell pp. 96:23-97:4) ("Q: And the records the defendant chose to keep shows

that they paid everyone for every minute that they reported they worked?  A:  That's always the case in a case – in a case like this.  The defendants don't record unpaid work time.").

It thus is senseless for Plaintiffs to argue that "[t]here is no dispute that Illinois Bell failed in its duty to capture and retain the data needed to properly compensate its employees.  If it had the appropriate data, one would assume that it would have properly compensated them in the first instance." (Pls.' Resp., p. 86).  Defendant provided the means for employees to report their time and paid them when they did.  As Defendant explained in its opening brief (Def.'s Mem., p. 12), the Code of Business Conduct mandates employees report all hours worked, and they are trained on FLSA compliance.  The only "data" that is missing is the alleged time they chose to hide from management.  Plaintiffs' Response's repeated references to *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1946) get them nowhere then, since that decision establishes a test for calculating damages "assum[ing] that a violation of the FLSA had been shown" and is predicated on "the employer's own actions in keeping inadequate or inaccurate records." *See Brown v. Family Dollar Stores of Indiana*, 534 F.3d 593, 595-96 (7th Cir. 2008).  It is Plaintiffs, not Defendant, who – *by their own admission* – made Illinois Bell's time records inaccurate by violating clear company policy, and "it would be improper to hold defendants liable for plaintiffs' voluntary failure to comply with reasonable timekeeping procedures, particularly when there is no evidence that defendants discouraged plaintiffs from complying with the system or had any reason to believe plaintiffs would not comply with it."  (Ex. B, *Boelk*, p. 22).[18]

---

[18]    *See also Espenscheid v. DirectSat USA, LLC*, 3:09-cv-00625-bbc (W.D. Wis. May 12, 2011) (Doc. No. 595) (attached hereto as Ex. I) ("The rule in *Anderson* applies after the employee has proved that he is entitled to damages by 'prov[ing] that he has performed work and has not been paid in accordance with the statute.' … *Anderson* does not lower or eliminate plaintiffs' burden of proving that they have in fact performed work for which they were improperly compensated.") (citations omitted).

### d. Plaintiffs' Damages Estimates Are Unreliable and Inconsistent and Cannot Be Extrapolated to the Rest of the Collective

The building blocks of Dr. Bardwell's analysis are Plaintiffs' interrogatory responses and deposition testimony *and nothing else*. But as Dr. Mitchell explains, "A sampling of evidence is only useful if the data obtained from that sample can be trusted and a meaningful margin of error can be calculated without having to test the responses given by every respondent. Otherwise, there is no efficiency gained from using a sample and the sample's results are likely to be very misleading." (Ex. G, Mitchell Rep., p. 2, ¶ 1(b)). In laymen's term, garbage in will beget garbage out.

Yet Plaintiffs themselves demonstrate that their estimates are too unreliable to extrapolate to 300 plus other people. The summary file Plaintiffs' counsel created for Dr. Bardwell's analysis shows individuals' estimates changing between interrogatory responses and depositions:

- Opt-in Kirk Parro's estimate of unpaid lunches per week went from two to three per week in his interrogatory responses, to three to four times at his deposition. (Ex. H, ex. 2, Row 22, Columns F, I).
- Opt-in Donald Smith estimated one lunch per week in his interrogatory responses, but then testified to two to three lunches per week at his deposition. (*Id.* at Row 9, Columns F, I.).
- Opt-in Elizabeth Olmstead did not identify any pre-shift work in her interrogatory responses but then testified at deposition to engaging in pre-shift work three to four times per week. (*Id.* at Row 11, Columns G, K).
- Tripolitakis estimated 2.50 hours per week for unpaid lunch breaks (a half hour every day of the week) in his interrogatory responses, but when asked at deposition if he believes he was not paid for 30 minutes a day for every week he worked at Illinois Bell, said, "No, absolutely not." (Doc. No. 196-25, pp. 13-16, ex. RRR, pp. 5-6, 14 and Exhibit A (Interrogatory Response No. 4); Tripolitakis Dep. p. 23:19-23).[19]

The notion that the Court could extrapolate one technician's estimates to anyone else with confidence that the former is truly representative of the latter, further collapses under

---

[19] For each technician, Dr. Bardwell used the larger number of unpaid hours alleged. (Ex. H, Row 22, Columns S, T; Row, 9, Columns S, T; Row 11, Columns Y, Z; Rows 14, 15, Columns S, T.)

testimony like that of opt-in William Sterk, who would increase the estimate of pre-shift work

previously identified in his interrogatory responses if he were to redo them, admits his answer

could change again if asked these questions in the future, and further testified as follows:

> Q:    If we were to ask you to come up with [an] analysis of how much
>        time you believe you worked that you were not paid for, do
>        you think you would be able to do that?
> MR. MADUFF:  Objection [sic] so far as it calls for a legal conclusion.
> A:    I have no idea. I don't know where to start.  I wouldn't know
>        where to start. (Sterk pp. 199:4-200:17, 214:2-10).

Opt-in Rentschler's testimony was also notable in this regard:

> Q:    Do you see where it says, "Unpaid lunch"?  Do you see that
>        column?
> A:    Yes.
> Q:    And if you flip through this page and the next few pages, it
>        says "2.50" for every week that is indicated on Exhibit A?
> A:    U-huh.
> Q:    And am I correct that that is meant to reflect 30 minutes a
>        day for all five days of each week?
> A:    That's the way that I understand it.
> Q:    So the calc – and then you understand Exhibit A is meant to
>        calculate your damages in this case?
> A:    That's the way I understand it.
> Q:    Okay.  And so you are reflecting that you were not paid for
>        a half an hour every day all five days of each week for
>        lunch?
> A:    That's the way I understand it.
> Q:    Okay.  But you have also told me, have you not, that there
>        were days where you worked through a lunch break and
>        were paid?
> A:    Yes.  The ones that I noted on the time sheets.
> Q:    And you have also told me that there were days where you
>        did not work through a lunch break; am I correct?
> A:    There were some, yes.
> Q:    And you also told me if you ever worked through lunch,
>        you reported all eight and a half hours of work, do you
>        recall that testimony?
> A:    Yes.
> Q:    So my question is, why do you have a 2.50 for … every
>        week on Exhibit A?

> A:    That is just a rough –in, I'm guessing.  The way I understand it, it's just a rough estimate.  (Rentschler, pp. 145:5-146:17).[20]

Plaintiffs/opt-ins' inability to land on any meaningful estimate of alleged unpaid work is consistent with the social science research that Dr. Mitchell references about how workers often overstate work time and how "[a]sking respondents to estimate the frequency and duration of mundane, long-past events is an exercise guaranteed to generate suspect data."  (Ex. G, Mitchell Rep. ¶¶ 29(d)-(e), 32).   His report discusses other problems with asking employees to retrospectively report unpaid time estimates, including reconstructed memories (basing estimates on present conditions even if working conditions or routines were different previously) and reluctance to provide estimates of work time that may put the worker in a poor light.  (*Id.*, ¶ 33).

Plaintiffs' argument that "due process" can be preserved by taking representative employees' estimates of unpaid work is refuted then by both social science that warns this is a flawed task and a record that establishes no reason to assume one person's estimate could be representative of anyone else's.   Consider also that Plaintiffs and opt-ins were presented documentary evidence like timesheets and their trucks' GPS stops, which still did not help them recall whether they worked through lunch breaks or engaged in pre- or post-shift activities.  (Def.'s Mem., p. 67).  And Dr. Bardwell's qualification that he incorporated a margin of error (*see e.g.*, Doc. No. 217-7, p. 6) cannot redeem this unreliability, as "[a]n average and margin of error can be calculated for any sample; the fact that these statistics can be calculated says nothing

---

[20]      Making matters worse, Plaintiffs/opt-ins sometimes did not even understand their own estimates. *See* Schilling, pp. 28:3-29:1 (did not review Exhibit A until day before his deposition, and has "no clue" whether it is correct); Rentschler, p. 143:11-15 ("Q:  You said you reviewed Exhibit A for the most part. Did I hear that correctly?  A:  When it was sent to me, yes.  Q:  Did you understand Exhibit A?  A:  Not really."); Tripolitakis p. 22:24-23:18 ("I'm not sure I understand" estimates in interrogatory responses); Blanchette p. 192:3-20 (damages estimate in interrogatory responses "came from when you [plaintiffs' counsel] talked to me about working through lunches and pre-shift and after shift work, you guys figured it out and put it into that Exhibit.  I did not figure that out.").

about how trustworthy they are as guides for all of the members of the population, particularly where the sampled data may be biased and highly variable." (Ex. G, Mitchell Rep., ¶ 37).[21]

Further, as Dr. Johnson explains in his rebuttal report, Dr. Bardwell's methodology still reveals significant variation among individuals. Plaintiffs/opt-ins' estimates of unpaid work range from *zero* days to *every* day, and Dr. Bardwell's analysis yielded a range of estimated unpaid hours from 0.27 to 5.25 hours per week. (Ex. E, Johnson Rebuttal Rep., ¶ 20). This variation poses due process concerns, as Dr. Mitchell explains:

> As the variation in individual circumstances increases, due process concerns about sampling for both liability and damage purposes should increase because the sample-based evidence is likely to be less representative of the full range of experiences of the persons within the sampled population. If a substantial number of the persons sampled cannot establish that they are entitled to recovery, then many within the larger class are likely to be unable to do so as well, and the Defendant is likely to have a strong due process objection to proceeding further on a trial-by-formula basis. If persons in the sample who could establish liability were entitled to widely varying damages, then use of a single estimate of damages from this sample is likely to raise due process objections from both the Defendant and members of the plaintiff class. The Defendant may object that the estimate provides a windfall to some number of plaintiffs, and plaintiffs who believe their damages exceed the sample-based estimate may object that the estimate provides them with a shortfall. In general, as the imprecision of a sample-based estimate for liability or for damages increases, concern about the fairness and accuracy of a trial by formula for liability or damages purpose also increases. (Ex. G, Mitchell Rep., ¶ 26).

With more than 350 opt-ins, and a potential three-year limitations period, the wide variation in total potential unpaid hours Plaintiffs/opt-ins have presented is dramatic and

---

[21]    *See also* Ex. E, Johnson Rebuttal Rep., ¶ 19 ("Dr. Bardwell's calculations of the potential unpaid time worked in his sampling methodology are similarly meaningless, as they are derived from an unreliable estimate").

underscores the lack of similarity among the Plaintiffs and opt-ins and the unreliability of calculating any classwide damages.[22]

e. **Dr. Bardwell's Sampling Methodology Suffers from Further Flaws That Warrant Its Rejection**

The *Comcast* Court rejected a damages approach that did not tie damages to a specific liability theory. *Comcast*, 133 S.Ct. 1433. Dr. Bardwell does not differentiate among the reasons for the alleged unpaid work at issue, instead grouping them together under the pre-shift, lunch, and post-shift categories. (Bardwell p. 41:8-9); *see also Espenscheid*, 705 F.3d at 774 (representative proof would not distinguish "benign underreporting from unlawful conduct").

Further, Dr. Bardwell (a) does not weight averages for the employee's tenure, meaning estimated unpaid hours for someone who worked three months is treated the same as someone who worked for three years; (b) assumes the employees' alleged off-the-clock work would exceed the 40-hour threshold under the FLSA; and (c), in direct contravention of *Espenscheid*, extrapolates averages to absent class members, which "would confer a windfall" on some and "undercompensate" others. *See Espenscheid*, 705 F.3d at 770.

---

[22] Given this variation, Plaintiffs can hardly be said to have performed "the same amount of overtime work." *Espenscheid*, 705 F.3d at 773. This case is therefore markedly different from the ones Plaintiffs cite for the notion that "[n]umerous courts have explained that under the FLSA and its §216(b) mechanism (as opposed to FRCP) the amount of overtime can reasonably be inferred for a group of affected employees and testimony from every employee is not required." (Pls.' Resp. pp. 53- 55). These cases involve old Secretary of Labor actions to recover wages where it was undisputed that the employer did not properly record overtime hours worked (*Brock v. Seto*, 790 F.2d 1446 (9th Cir. 1986), *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982); *Marshall v. Van Marte*, 634 F.2d 1115 (8th Cir. 1980); *Martin v. Tony & Susan Alamo Found.*, 952 F.2d 1050 (8th Cir. 1992); exemption cases (*Morgan v. Family Dollar Stores*, 551 F.3d 1233 (11th Cir. 2008), *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342 (N.D. Ga. 2002); or cases with other distinguishing characteristics (*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008) ("significant" evidence of store managers shaving time when employees attempted to record all hours worked), *Dove v. Coupe*, 759 F.2d 167, 170, 176 (D.C. Cir. 1985) (four-plaintiff case in which the employer did not record the hours the plaintiff-limousine drivers worked except to "re-calculate[] hours backward from compensation," and the *defendant* called its own records "unbelievably and absurdly inaccurate"). (Defendant addresses the *Reich* case *supra* pp. 61-62.)

Plaintiffs fail to respond to *Espenscheid* and its mandate that wage and hour plaintiffs demonstrate how classwide proof is feasible. In this regard, they are also like the plaintiffs in the recent *Farmer v. DirectSat USA, LLC* case, in which Judge Lee decertified a class of 500 Illinois technicians alleging pre and post-shift work that included tasks like loading vans and unloading tools. No. 08 CV 3962, 2013 WL 2457956 (N.D. Ill. June 6, 2013). Plaintiffs there, like in *Espenscheid* and here, alleged that they could not record time spent on certain job-related tasks. *Farmer*, 2013 WL 2457956, at *5. After initially denying the defendants' motion to decertify, the Court granted the defendants' renewed motion following *Espenscheid*.

The Court rejected the *Farmer* plaintiffs' argument that *Espenscheid* differed from their case because *Espenscheid* involved both FLSA and state law claims. *Farmer*, 2013 WL 2457956, at *5. The *Farmer* plaintiffs proposed relying on representative proof "but have failed to demonstrate that the selected representatives provide an appropriate benchmark from which classwide damages can be extrapolated," as plaintiffs could not explain how their proposed representative technicians were chosen, and there was no suggestion random samples were created. *Id.*, at *6. Further, "even if Plaintiffs had demonstrated that the sixteen class members proposed to testify at trial were representative of the class, 'this would not enable the damages of any members of the class other than the [16] to be calculated.'" *Id.*, *citing Espenscheid*, 705 F.3d at 774. Using language that rings just as true in this case, the Court explained that:

> As the Seventh Circuit recognized in *Espenscheid*, because technicians varied in the amount they worked, the amount of overtime they worked, and the efficiency with which they worked, even if Plaintiffs could establish an "average" number of overtime hours through representative proof, some technicians would receive a windfall while others would be undercompensated. (*Id.*).

Like *Espenscheid*, plaintiffs also did not explain how representative proof would distinguish those technicians underreporting their time for "benign" reasons. *Id.*, at *7. Finally,

"as in *Espenscheid*, to calculate damages here, the hours Plaintiffs worked would need to be reconstructed from 'memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways,' which were unique to the individual technician." *Id.*, *citing Espenscheid*, 705 F.3d at 774-75; *see also Hernandez v. Ashley Furniture Indus., Inc.*, No. 10-5459, 2013 WL 2245894, at *6 (E.D. Pa. Mar. 22, 2013) (decertification denied when plaintiffs' expert "frame[d] various methods for estimating class-wide damages, the use of which will depend on a factfinder's determination on liability … For example, Plaintiffs' expert explains that 'if the finder of fact determines that all or some group of class members were required or permitted to skip or return early from paid rest breaks but were not compensated,' then based on testimony the finder of fact will determine 'the typical amount of time [of uncompensated work] for the average employee,' and the expert will finally convert those findings to a calculation of damages."); *Espinoza*, 2013 WL 1222034, at *12 (rejecting representative testimony, as "paying each Plaintiff a 'reasonable' amount has its unfair side as well, rewarding individuals who did less work and punishing those who did more. Decertifying this claim, and allowing Defendant to conduct individualized discovery, will ensure that deputies are only paid for overtime work that they actually did."); *Doyel*, 2010 WL 3199685, at *7 (finding evidence to support off-the-clock claim "would have to be testimonial," and that the amount of time employees spent cleaning and ironing uniforms "and thus the amount of allegedly compensable time, varies from class member to class member"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) ("If liability is found, damages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class."); *Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07CV82-KS-MTP, 2009 WL 8642001, at *17 (S.D. Miss. Oct. 20, 2009) (calling damages in a decertification donning and doffing case a "circus of nightmares").

For these same reasons, that neither liability nor damages could be established other than by individualized proof, Plaintiffs' alternative requests for bifurcation and/or a special master to evaluate damages are also inappropriate. (Pls.' Resp. p. 50, n. 57; pp. 55-57).[23] A collective action here would prove unmanageable, and no representative testimony or sampling or other method Plaintiffs propose can change this outcome.

## IV. NONE OF PLAINTIFFS' HODGEPODGE OF ALLEGED POLICIES CAN BIND A CLASS

### A. Illinois Bell's Implementation of MSOC Does Not Render Plaintiffs and Opt-ins Similarly Situated

Plaintiffs' primary focus seems now to be MSOC, but they ignore ample caselaw rejecting common performance objectives as a basis for certification. (Def.'s Mem., pp. 49-52). Instead, they mischaracterize MSOC, depict a culture of pervasive "discipline" that does not exist, ignore a record that establishes employees did not respond to MSOC in any consistent way – what social science says is to be expected, and cannot avoid that MSOC applied during only part of the limitations period. Nor do they present any convincing basis to distinguish Illinois Bell technicians from those at Wisconsin Bell whose same theory already has been rejected.

### 1. Plaintiffs Misrepresent MSOC

Plaintiffs have no evidence that MSOC was implemented to facilitate employee discipline. MSOC is a management methodology meant to provide greater transparency and clarity as to job expectations from technicians up through management. (Def.'s Mem., pp. 29-

---

[23]    *See e.g.*, *Espenscheid*, 705 F.3d at 775; *Marshall v. Amsted Rail Co., Inc.*, No. 10-cv-0011-MJR-SCW, 2012 WL 5499431, at *12 (S.D. Ill. Nov. 13, 2012) (decertification "is the only viable option," including because bifurcating damages and liability would not be "appropriate, equitable or economical here"); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 469 (S.D.N.Y. 2011) (bifurcation not feasible "as there is no consistent evidence as to either liability or damages"); *Burch v. Qwest Communications Int'l, Inc.*, 677 F. Supp. 2d 1101, 1122 (D. Minn. 2009) ("bifurcating the FLSA case into a liability and a damages stage does not address the manageability problems because individualized inquiry is required to determine liability, not just damages."); *Prise v. Alderwoods Group, Inc.*, 2011 WL 4101145, at *22.

30).  As MSOC Coach Arether Macon testified, MSOC "help[s] the front line managers organize their day so they're able to do all the tasks that they need to do, as well as have time to look at all the factors that's involved in their job.  It gives them a front line base of what a day in a life should be like for that front line manager.  It's … a methodology to help them do their job." (Macon Dep. 125:23-126:7).  Put another way, MSOC "provides managers information to run the business every day and to constantly improve what we do and how we do it."  *See* Ex. J, ATTBLAKES 008747; *see also* Def.'s Mem., p. 29.  No matter how much Plaintiffs strain to suggest otherwise, MSOC is not a bottom-line numbers-driven system, as Macon explained:

> Q:      MSOC is then a system that's designed to give management the ability to compare the day's efficiency that's happening with what they should – with what is happening versus what they should be doing, so they can determine how well they're doing their job?
>
> [ …]
>
> A:      I understood [the question].  I think I understood, but the answer's no.
>
> Q:      Okay.  So MSOC is not a tool that's used by Illinois Bell to determine how well a tech, for example, is doing their job?
>
> A:      MSOC is not a system.  MSOC is not a tool.
>
> Q:      What is it?
>
> A:      MSOC is a methodology.
>
> Q:      Accept that.   MSOC though gives management the ability to identify how well someone is doing or completing a task?
>
> A:      That question I don't understand.  (Macon pp. 127:7-128:1).

Further, efficiency is one of multiple metrics associated with MSOC, and Plaintiffs do not dispute that technicians are measured on additional criteria – such as customer experience, work quality, following company policy, attendance/punctuality, dependability, and safety.[24] (Def.'s Mem., p. 31); *see also* Ex. K, ATTBLAKES 007792 ("MSOC is behaviorally based.  Not 'chasing numbers' … But changing those behaviors which will lead to good results."); Ex. G,

---

[24]      Indeed, there are "quintiles" for other areas like attendance and motor vehicle accidents.  (Macon pp. 164:18-165:4).

Mitchell Rep., ¶ 56 (explaining efficiency as one part of the overall employee evaluation process).

### 2. The Record Refutes Plaintiffs' Premise of Pervasive Discipline for Not Meeting Efficiency Objectives

The notion that all (or even most) Illinois Bell Cable Splicers operate on the verge of losing their job under MSOC – compelling them to cut corners by working off-the-clock and falsifying their time records, in violation of clear company policy – collapses under their own testimony.

As discussed in Defendant's brief (Def.'s Mem., p. 36), numerous Plaintiffs expressly disavowed any such discipline. *See e.g.*, Blakes, pp. 195:23-196:1 ("Q: Have you ever been written up for efficiency? A: No, not that I recall."); Clark pp. 270:23-271:9 ("Q: So you don't recall who disciplined you for efficiency? A: No, sir. Q: Or when? A: No, sir. Q: Or for what? A: Correct, sir. No, sir. Q: Or even whether you were at this point? A: Yes, that's correct, I could not recall. Q: You cannot recall? A: Yes, sir, that's correct.").[25] Ignoring this record, Plaintiffs cite to Macon's deposition for the proposition that "falling into the 5th quintile or lower 20% causes the employee to be subject to discipline" (Pls.' Resp., p. 12), even though she said no such thing.[26]

---

[25]     *See also* Parro pp. 228:24-229:6 ("I personally have not" had coaching, letters in his file, or a potential loss of job because of productivity); Olmstead pp. 377:8-381:13 (never suspended; received only "verbal counseling on our numbers"; never put on a performance improvement plan); Rentschler p. 189:4-9 ("Q: So you were coached to get your numbers up because they were too low? A: Correct. Q: But you never – it never resulted in any discipline?" A: To my knowledge, no."); Deckys pp. 199:4-200:4 (even though his numbers have been "[u]sually in the bottom," he has never been suspended).

[26]     Macon's testimony that Plaintiffs cite, excerpted below, does not refer to discipline at all:

> Q:      What other quintile systems are there?
> A:      They have – you have technicians where they're – determine where they are based on attendance, motor vehicle accidents, etc., all of that.
> Q:      Okay. The efficiency, it – essentially just ranking who – based on who has the highest positions, the other way to go is the lowest, is that right?

(Footnote Continued)

Plaintiffs then cite a string of Plaintiff/opt-in testimony on page 12 (repeated on page 42) of their Response to depict a culture of widespread discipline that does not exist. Rather, this cited testimony reflects an employee's speculative belief of what *could* happen. *See* Blakes, pp. 195:15-22 ("I have to do what I have to do in order to not be written up."); Hunt pp. 141:19-23 (was told by one supervisor that he was going to be put on a PIP if he did not "keep [his] numbers up.")[27]; Deckys pp. 199:6-18 (describing how he would not report his time accurately "under threat of punishment")[28]; *see also* Appendix A for additional citations. Otherwise, these cites reflect coaching employees into better performance – not "discipline." *See* Deckys pp. 192:24-193:8 ("I've been coached, been written up, but I've never been – never suspended. Q: Helping you become more efficient? You've been coached to be more efficient? A: Yes."); Haynes pp. 121:20-123:11 (once put on a IAP [individual action plan]);[29] *see also* Appendix A.[30]

It is of course a matter of good business sense for a company's management to focus resources on those technicians who are underperforming. Macon elaborated at her deposition

---

| A: | That would be a ranking. |
|---|---|
| Q: | Okay. And is – is it broken down into fifths, so the top 20 percent – going by 20 percents? |
| A: | I don't know if – I know it's broken down into five quadrants, yes. |
| Q: | Okay. And the last quadrant is called the fifth quintile? |
| A: | It's the bottom 20 percent. (Macon p. 165:1-15). |

Nor are Plaintiffs correct that even if all technicians are performing over 100%, those in the lower 20% are still "subject to discipline and being placed on a performance improvement plan." (Pls.' Resp., p. 12, n.15). Plaintiffs cite nothing for this proposition, and it is contradicted by Deckys' own records that he was in the bottom quintile but deemed to still be meeting target. (Deckys Dep. Ex. 31, p. 3, (attached hereto as Ex. L)).

[27] Hunt's immediately preceding testimony was that he does not think he was ever put on a PIP, and the immediately subsequent testimony was that he never told this supervisor that concerns over being put on a PIP allegedly led him to work through lunch. (Hunt pp. 141:1-142:21).

[28] Deckys' continued testimony was that he has never been suspended for efficiency: "I'm just saying you can be. I'm not saying I have." (Deckys p. 199:15-18).

[29] An IAP is "a plan documented as to what the manager and the technician have agreed upon, ways to help them improve whatever that action plan applies to." (Macon pp. 168:10-14).

[30] Plaintiffs' Exhibit 38, "Examples of Discipline" (Pls.' Resp., p. 43), also reflects this coaching and in fact illustrates management's effort to improve employee performance, as reflected in Appendix A.

41

that, "It's the first level [manager]'s responsibility to find out why the efficiency is low. After finding out why the efficiency is low, it's the first level's responsibility to help that technician improve his first – his efficiency." (Macon, p. 156:11-15). This can be done "dozens" of ways, such as by observing the technician in the field, talking to the technician, or "something as simple as looking at a time sheet and figuring out it was an error done on the time sheet." (*Id.*, pp. 156:16-158:3). As Macon explained, "[e]very manager addresses things differently, and she *does not know of any technician that has received discipline solely because of low efficiency.* (*Id.*, pp. 158:21-159:3, 160:15-23).

As Dr. Mitchell further explains, it is hardly unexpected that a company would create a system to gauge employee efficiency and productivity. (Ex. G, Mitchell Rep., ¶ 54). Employees vary widely in their motivation and ability to produce; "[m]atching employee effort to available work time and motivating workers to use their time properly are thus important parts of making any labor-intensive organization operate efficiency and fairly." (*Id.*, ¶ 53). If Illinois Bell's intent to work more closely with certain employees were the basis for a collective action – because that must lead an employee to fear "discipline" – it is hard to imagine any scenario in which a company with performance objectives could avoid a collective action.

In short, Plaintiffs have built their universal "fear-of-'discipline'-under-MSOC" house of cards without a foundation. Plaintiffs do not point to any employee terminated for efficiency reasons, and only *one* Plaintiff/opt-in testified to being suspended one day – after he was put on a PIP and subsequently failed to improve. (McKey pp. 140:20-143:19). Nor do Plaintiffs come forward with a series of union grievances about the MSOC issues that they raise in this lawsuit. (Def.'s Mem., p. 63, n. 39). And Area Manager Harn, the only Illinois Bell manager in a Cable

Splicer's line of supervision whom Plaintiffs deposed, testified that discipline and threatened discipline are not used to encourage technicians to increase productivity. (Harn p. 67:23-68:6).

To fill these holes, Plaintiffs resort to citing International Brotherhood of Electric Workers (IBEW) Local 21 monthly newsletters that in part criticize MSOC, none of which were previously produced and should be disregarded for that reason alone. (Pls.' Resp. pp. 13-14); s*ee* Ex. F, Abrams Decl., ¶ 17. Further, putting aside that an IBEW official's statement in a newsletter that management is "trying to discipline people" or that "we have many grievances" is rank hearsay (Pls.' Resp., p. 13; Doc. No. 217-6, p. 12), it is telling that Plaintiffs must use union propaganda to fill gaps in a record absent of the pervasive discipline they suggest.[31] Having to buttress their Response with this inadmissible and irrelevant "evidence" only underscores how desperate Plaintiffs are to sustain an MSOC-causes-discipline framework that they could not establish during discovery.

Plaintiffs' reliance on union discontent is also ironic because any alleged threat of discipline is mitigated by their IBEW membership. The collective bargaining agreement (CBA) to which Plaintiffs are subject dictates pay and provides procedural safeguards for discipline. (*see* Ex. M, at ATTBLAKES 000980 – 988; ATTBLAKES 001023 – 1024). Perhaps that is why Plaintiffs excerpt from the IBEW Local 21's June 2011 newsletter the beginning of a sentence "So far no one has lost" (Pls.' Resp. p. 14), rather than the whole sentence: "So far, no one has lost their job." (Doc. No. 217-6, p. 50). Unlike in other workforces, management is limited from

---

[31] By way of context, these newsletters also report how "a whole slew of anti-worker bills were very cowardly rammed down our throats" by the Indiana General Assembly; reminds members that "what we have now was gained through bloodshed"; states how "[w]e are fighting in this anti-worker, anti-union climate for jobs and a way of life, while some of you sit back, watch Fox, vote Republican, make xenophobic comments, and rationalize that you are with 'them,' the people who have never been your friends"; believes executives "resent every one of us who cashes a check with a beating heart"; and criticizes other company policies such as those surrounding building and vehicle safety and the idling of company vehicles. (Doc. No. 217-6, pp. 45, 46, 50, 53, 55).

summarily dismissing an underperforming employee, and working more "efficiently" will not lead to any bonus since pay is dictated by contract. Illinois Bell Cable Splicers therefore enjoy more job security and autonomy than others, and would have even less incentive to try to "game the system."

### 3. Plaintiffs and Opt-Ins Admit That MSOC Does Not Require Working Off-The-Clock

Plaintiffs' own testimony also refutes their argument that throughout the Illinois Bell Cable Splicer population, "[a]ll splicers were subject to MSOC/Efficiency standards that created unrealistic expectations of the amount of work to be completed in one day." (Pls.' Resp., p. 25). Plaintiffs again seem to hope that the Court will ignore their own self-defeating testimony. Thus, in its brief, Defendant recited Plaintiffs/opt-ins' testimony that, although they were always purportedly subject to efficiency pressures and potential discipline, nonetheless did *not* have to work off-the-clock. (Def.'s Mem., § III, E, 2). Defendant does not repeat these myriad examples here beyond illustrating that if MSOC's effects could be evaluated in one proceeding to find that MSOC inevitably compelled employees to work through lunch, Plaintiffs could not explain why plaintiff James Blakes, for example, would have testified as follows:

> Q:    Is it your testimony that in order to hit your efficiency numbers, the technician must work through lunch?
> A:    Not necessarily, no.
> Q:    And why is that?
> A:    Some – depending on the task at hand.
> Q:    Okay. What do you mean by that?
> A:    Some things take longer, some – you know, some tasks, I think are – the numbers just don't match the job.
> Q:    Some jobs you're able to complete in the time allocated without working through lunch; some you cannot?
> A:    Yes. That's correct.
> Q:    … Those jobs you're able to complete without working through lunch, are those the days in which you take your lunch break?
> A:    Yes.

Q:     Okay. Are there – can you tell me which jobs fall under the category of those you cannot meet and which jobs do not?

A:     No, I can't answer that. Depending on the job.

Q:     Okay. Well, sitting here today, can you tell us which jobs you may – may have caused you to work through lunch to meet your numbers and which jobs you didn't need to?

A:     No, I can't answer that.

Q:     Is there anything we can look at, any document that you're aware of that we'd be able to look at to determine that?

A:     No. (Blakes pp. 183:19-185:5).

Likewise, if MSOC could bind a class here, then:

•     Williams would not have testified that "[y]ou can get a clean job that has lots of time and make your numbers without working through lunch" (Williams p. 283:18-20);

•     Crowder would not have testified that on some jobs he could "work eight hours a day and take a break and still run over 100 percent" [referring to efficiency] (Crowder p. 167:23-168:5); and

•     Plaintiff Bradley Hunt would not have admitted that there were times that the demands of the job did not require he work through lunch or he could complete a job step in the time allocated without having to skip his lunch break. (Hunt pp. 87:5-7; 130:15-23).

Defendant also demonstrated that this same lack of consistency applied to the alleged pre-shift and post-shift work that Plaintiffs identified. (*See* Def.'s Mem., pp. 34-35, Appendix A, B); *see also* Smith p. 99:3-9 ("Q: Have you ever gotten supplies before your shift started? A: No. Q: Is there any activity that you engage in before your shift started that you contend you should be – you should have been paid for? A: Not that I know of."); Haynes pp. 146:3-147:1 (alleging he spent four to five times per week doing preshift work between November 2009 through April 2011, and then one or two times per week from April 2011 on). *See* Appendix B, providing additional examples of Plaintiffs/opt-in testimony regarding MSOC. As a result, determining whether any given Cable Splicer may have worked outside of his normal shift due to perceived pressure to work efficiently would boil down to individualized inquiries. *See e.g.*, *Briggins*, 882 F. Supp. 2d at 1272 ("Although some associates testified that they felt the need to

perform this [pre-shift] work, the testimony of others casts doubt on whether all plaintiffs had to do this work incident to their job.").[32]

To try to get around their own unhelpful testimony, Plaintiffs recite the formula for calculating efficiency to argue that there is an inherent "incentive" to underreport time. (Pls.' Resp., pp. 15, 39). This principle applies to *any* nonexempt employee subject to performance expectations; if a nonexempt employee responds to job "pressure" by representing that he made 100 widgets in eight hours when it really took ten, he can appear more efficient. But *Boelk* and other courts have consistently rejected this concept as the basis for sustaining a class. *See* Def.'s Mem., pp. 49-51 (collecting numerous cases); *see also Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) ("Whenever an employer creates a reward system which depends upon the attainment of a particular goal, the potential is created for dishonest persons to act unlawfully in attempting to exploit the policy for their own gain. This does not, however, render the underlying policy illegal, in the absence of some evidence that the employer intended, compelled or condoned unlawful consequences that were a direct result of the policy.").[33]

---

[32]   Plaintiffs' Response also discusses "working on a task that they did not do in order to hide time spent on tasks that they did do (usually at the supervisor's discretion)." (Pls.' Resp., p. 15). As far as Defendant can tell, this means a technician reallocates hours worked on one job to another – i.e., moving hours from a job completed in less than the time expected to a job that took more time – which would not affect their total hours worked or paid each day. *See e.g.*, Blakes pp. 185:15-186:23 (never a time when he allocated hours among different jobs throughout the day when he was not paid for all hours worked); Denny p. 168:14-20 (no change in hours worked or paid through this alleged practice). And it is hard to see how this practice could benefit the technician's efficiency, since he is still reporting the same total hours worked that day. Along these lines, Plaintiffs' citation to Parro's testimony that he has seen supervisors "alter timesheets in order to help keep the hourly employees off the last quintile" (Pls.' Resp., p. 64) makes even less sense, since such a practice (which, again, would not affect pay) would seem useless because by definition there would always be technicians in the bottom 20% quintile.

[33]   Additional caselaw decided after Defendant filed its opening memorandum is in accord. *See Ginsburg v. Comcast Cable Communications Mgmt LLC*, No. C11-1959RAJ, 2013 WL 1661483, at *3 (W.D. Wash. April 17, 2013) (rejecting pre-shift work claim that alleged "efficiency pressures lead ineluctably to pressure on individual [employees] to complete their preliminary tasks before their shifts began, thus maximizing the amount of time that they spend on the phone"); *Hernandez*, 2013 WL 2245894, at *6 (despite testimony regarding working through lunch "in an effort to improve efficiency,"

(Footnote Continued)

There is no evidence that at Illinois Bell (or any other entity in any other state where MSOC applies) management intended MSOC to force off-the-clock work or that it has been condoned, especially when company policy requires employees to report and be paid for all time worked. And, significantly, Plaintiffs/opt-ins' testimony disproves MSOC having this effect.

### 4. Plaintiffs' "Uniform Uncertainty" Point Is Baseless

Plaintiffs attempt to explain away this inconsistency as to how MSOC *actually affected* employees' day-to-day experiences by calling MSOC "consistently uncertain." (Pls.' Resp., p. 40). Plaintiffs argue MSOC created a "common experience among the entire group" because it was so variable and uncertain. The fact that efficiency scores fluctuated both for each technician and across technicians (Def.'s Mem., p. 34) means that "all putative class members shared a uniform uncertainty in their efficiency ratings on any given day." (Pls.' Resp., p. 40).

Plaintiffs' support for this proposition is the Bardwell Report. (Pls.' Resp. p. 40; Doc. No. 217-7, p. 16 (calling variability in MSOC records "evidence of a highly variable rating system that Plaintiffs claim generated ongoing uncertainty about their job security and pressure that resulted in under-reporting work time")). Dr. Bardwell is a mathematician who cannot opine as to whether all Cable Splicers shared this so-called uncertainty. He also did not study MSOC except to look at data and "one or perhaps two documents that describe the – basic calculations of the MSOC statistics," consisting of *two pages* Plaintiffs' counsel excerpted from documents

---

finding that resolving off-the-clock claims "would necessitate an individualized inquiry for each claimant, making the claims unsuitable for class certification"); *Raposo v. Garelick Farms, LLC*, 11-11943-NMG (D. Mass. July 11, 2013) (attached hereto as Ex. N), pp. 1, 7, 10 (denying certification on claims that trucks divers frequently were forced to work through lunch to meet work requirements); *Ordonez v. Radio Shack, Inc.*, No. CV 10-7060-CAS (JCGx), 2013 WL 210223, at *3 (C.D. Cal. Jan. 17, 2013) (rejecting certification of off-the-clock claims allegedly caused in connection with "RadioShack's creation of 'unrealistic' work schedules to avoid overtime hours but that in fact result in understaffing problems"); *Martin*, 2013 WL 1234081, at *1 (decertification granted over plaintiffs' argument that bank branch managers were pressured to not pay overtime due to budgetary constraints).

that provide further context and explanation about MSOC. (Bardwell pp. 17:17-18:2,109:14-17, 181:13-182:21). Nor did he review MSOC Coach Macon's deposition. (*Id.*, pp. 43:13-25).

Perhaps to make up for this deficiency, Dr. Bardwell instead refashions the MSOC data to try to establish commonality, opining that "erratic fluctuations in the MSOC daily scores mask overall patterns that affected all employees" and that *weekly* averages reduce "noise in the data." (Doc. No. 217-7, p. 17). But as Dr. Mitchell explains, "averaging across data points will always smooth out the data by reducing the data to fewer data points," weekly averages do not overcome the large standard deviations in efficiency scores, and even with weekly figures there is considerable variation in efficiency scores. (Ex. G, Mitchell Rep., ¶¶ 41-42).[34] As Dr. Johnson also explains, Dr. Bardwell calculates efficiency scores' standard deviations as between 25% and 65%, meaning that even employees with similar average scores can have dramatically different ranges around that average. (Ex. E, Johnson Rebuttal Rep., ¶ 14). Put simply, no reconfiguration can manufacture evidence of employees behaving the same way.

Moreover, social science research on worker productivity and ethical behavior would predict (as Plaintiff/opt-in testimony and the efficiency data reveals) that the more than 350 Cable Splicers in this case do not act as monoliths responding to MSOC in a uniform fashion. Dr. Mitchell explains how variables like prior experience, job satisfaction, and intrinsic motivation affect employees' work pace and achievement level. (Ex. G, Mitchell Rep., ¶ 50). Workers also differ in their propensity to engage in unethical conduct on the job, i.e., to falsify time records to inflate MSOC scores. (*Id.*, ¶ 51). As Dr. Mitchell explains:

---

[34] As. Dr. Mitchell further explains, if Plaintiffs all sought to improve their perceived efficiency by working off-the-clock and inflating MSOC scores, there should be little downward movement over time as individuals submit false data; however, Dr. Bardwell still maintains that all employees' efficiency scores varied and that employees did not start having higher efficiency scores until after March 2011. (Ex. G, Mitchell Rep., ¶ 45; Doc. No. 217-7, p. 17).

> In sum, the commonality opinion offered by Dr. Bardwell obscures rather than explains the variation in MSOC data, and Dr. Bardwell's treatment of all employees as equally likely to *need* to engage in dishonest behavior to maintain their efficiency scores, and as equally *willing* to engage in such behavior, is not supported by social science research on worker productivity and integrity. (*Id.*, ¶ 52) (emphasis in original)

Put differently, whether all Cable Splicers will react to MSOC the same way implicates individual state of mind, and probing state of mind does not comport with a class proceeding.

The record belies Plaintiffs' "consistently uncertain" theory in other ways. Plaintiffs do not dispute the ability to add additional time to a job or have efficiency objectives waived. (Def.'s Mem. p. 30); *see e.g., Briggins*, 882 F. Supp. 2d at 1266 (noting defendants "created release valves for this pressure" to work outside of the shift to complete work within the scheduled time)). This purported consistency does not account for Hunt testifying that he does not know if he worked through lunch break to meet his numbers when his efficiency level was in the first quintile, and likewise does not know if he was working through lunch when he was in the bottom quintile. (Hunt pp. 134:1-135:13); *see also* Blakes p. 190:2-21 (would not know from efficiency reports which days reflected him manipulating his time and which did not). Nor does it account for those like opt-in Jeff Palenske who do not bother to look at their MSOC numbers, or Sterk, who would just overrun a job. (Def.'s Mem., p. 33). In short, Plaintiffs' attempt to justify a record of inconsistency by arguing that this very inconsistency led employees to act the same – a concept that would presumably always lead to class certification – should be rejected.

### 5. Plaintiffs' Attempt to Extend Their Efficiency Theory to the Pre-MSOC Period Fails

Plaintiffs acknowledge that MSOC was not rolled out to Illinois Bell Cable Splicers until February 2010. (Pls.' Resp. p. 11). Plaintiffs try to cure this temporal problem by arguing that "Illinois Bell has always had an objective standard to evaluate how much work a cable splicer is

getting done for the time he is paid." (*Id.*, p. 10). Plaintiffs want to have their cake and eat it too: they argue that certification is necessary because "[a]ll cable splicers are subjected to Illinois Bell's patented method for measuring efficiency – MSOC," and that "MSOC creates a uniform measurement system which Illinois Bell uses to evaluate the efficiency of all cable splicers," while at the same time maintaining that Cable Splicers' experiences pre-MSOC were no different. (Pls.' Resp., pp. 37-38).[35] Here too, Plaintiffs' testimony disproves this contention:

- Palenske p. 39:10-19 ("Q: Did this pressure and perceived threatened discipline start with MSOC? A: Yes, sir. Q: And you personally – the pressure, the perceived threat of discipline that you are describing, you personally did not feel that until MSOC was implemented? A: That's correct.").

- Rentschler pp. 204:8-21, 206:11-207:8 (became more difficult to meet numbers without working through lunch after MSOC; after MSOC was implemented, "[t]hey were cutting the times in half on the time that was allotted for each step").

- Schilling, p. 88:9-11 ("*[D]uring the MSOC period*, my lunch was more or less on the run.").

- Tripolitakis, p. 145:14-23 (numbers became tougher to meet "when MSOC was probably implemented").

- Ericson p. 59:10-20 (pre-MSOC, could return to the garage before 3:00).

- Parro pp. 122:4-123:6 (when asked if he would hide his time to boost his numbers before MSOC, responded, "I don't recall. We are talking a long time ago now."); *see also* Def.'s Mem., pp. 33-34.

Performance evaluations also show how before MSOC, there were *different* objectives, in which employees were given targets and evaluated on whether they exceeded, met, of fell below them during an annual appraisal period, and thus the purportedly universal policies that Plaintiffs contend span the pre-MSOC and post-MSOC period were dissimilar. (Ex. O, at ATTBLAKES008818 - 8822). *See e.g.*, *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1125 (N.D. Cal. 2011) (noting how "one of plaintiffs' main theories of liability" did not

---

[35]     Similarly, Dr. Bardwell's Report does not parse between pre-MSOC and post-MSOC periods on the grounds that it was his "understanding [ ] that defendant has had similar systems in place prior to MSOC," based on "discussions with counsel." (Bardwell pp. 42:18-43:3).

apply to nearly half of the claims period); *Duncan v. Phoenix Supported Living, Inc.*, No. 2:05cv1, 2007 WL 1033360, at *2 (W.D.N.C. Mar. 30, 2007) (fact that defendant's policies changed, with some employees working both before and after, illustrates disparate factual and employment issues). This temporal limitation further warrants rejecting MSOC or efficiency as a basis for certification.

### 6. Plaintiffs Fail to Distinguish *Boelk*

*Boelk* involved two claims. First, "[a]ccording to plaintiffs, defendants imposed such severe restrictions on what plaintiffs could do during the breaks that the breaks should have been compensated." 2013 WL 261265, at *1. Second, "plaintiffs contend that *defendants' performance and efficiency rating system compels plaintiffs to work through their meal breaks without reporting the work*." (*Id.*) (emphasis added). Judge Crabb explained how "[s]ince 2010, defendant has used a performance system called Management System and Operating Control … The extent to which technicians complete jobs within these targets is used to determine their efficiency." (*Id.*, at *2). As argued here, "[a] ranking in the bottom twenty percent (or below the goal) can put a technician into Performance Improvement Plan status and on track to possible discipline or termination," and "[s]ome technicians believed they could increase their productivity ratings by using all or part of their meal break for work." (*Id.*, at **2-3).

The Court rejected Rule 23 class certification and FLSA Section 216(b) conditional certification on both claims. *Boelk*, 2013 WL 261265, at *11:

> In light of defendants' policy mandating that employees report and be paid for all hours worked, the crucial question with respect to this claim is *why* plaintiffs and other technicians worked through all or part of their meal breaks without reporting their doing so. Plaintiffs have failed to show that this question could be resolved on a classwide basis. (*Id.*, at *12) (emphasis in original).

The Court continued that:

> whether a technician felt rushed in completing jobs or pressure from the performance and ranking system depended on the size of the territory to which the technician was assigned, the number of technicians available to cover the territory, the type of job assigned, the technicians' experience and supervisors' varying expectations. In light of these variables, the common questions central to plaintiffs' claim could not be resolved on a classwide basis. (*Id.*).

The Court further explained how "plaintiffs' own deposition testimony proves how variable their experiences were with respect to the way performance standards affected their day-today [sic] work activities and with respect to how other factors affected their work." (*Id.*, at *15).

*Boelk* therefore squarely rejected the *Blakes* Plaintiffs' efficiency theory based on the _identical_ MSOC program. None of Plaintiffs' bases for distinguishing *Boelk* and distancing themselves from the losing Wisconsin Bell technicians is convincing.

Plaintiffs' first line of attack is that *Boelk* is not persuasive because it involved a hybrid Rule 23 and FLSA Section 216(b) case. (Pls.' Resp., p. 77). But *Espenscheid* rejects that premise. (*Supra*, n. 8). Plus, Judge Crabb held that even FLSA *conditional certification* was unwarranted, a far more modest burden than the second-stage decertification process.

Plaintiffs next try to limit *Boelk*'s import to the first of the two claims at issue, meal break restrictions, while apparently hoping the Court does not read the rest of the opinion that addressed and rejected certification based on the "performance scoring and ranking system." *Boelk*, 2013 WL 261265, at *12. Lest there be any doubt as to the issues before the *Boelk* Court, the *Boelk* plaintiffs argued in their class certification memorandum that they were all subject to "the same MSOC system for ranking their efficiency on the job"; that "AT&T closely tracks the technicians' productivity, quality, and efficiency"; and that "MSOC … measures each technician's efficiency by dividing expected times established for each job by the time the technician actually takes to do them … A ranking in the bottom twenty percent (or below the

goal) can put a technician into Performance Improvement Plan (PIP) status and on track to possible termination." (*Boelk*, Doc. No. 37, pp. 3-5, (attached hereto as Ex. P)).[36]  In addition, the *Boelk* plaintiffs also argued that defendants "used a similar productivity system" before MSOC was implemented.  (*Boelk*, Ex. P, p. 5).  The *Boelk* plaintiffs also joined the *Blakes* plaintiffs in arguing that "MSOC efficiency rankings … create an incentive for the technicians to use the lunch breaks for work" and that "[m]ost of the time, plaintiffs work through all or part of the unpaid lunch break[.]"  (*Id.*, p. 7).[37]  As much as Plaintiffs may want to strike parts of *Boelk* from the books, they cannot overcome that another court has explicitly rejected their same theory.[38]

Plaintiffs' remaining efforts to distinguish *Boelk* are no more availing.  Plaintiffs point out how the *Boelk* plaintiffs worked in multiple departments (Pls.' Resp. p. 78), but nothing in *Boelk* turned on employees working in Installation & Repair (I&R) and U-Verse in addition to

---

[36]      Plaintiffs are similarly off base in stating that "the complaint in *Boelk* relates to the ability to spend one's lunch as one sees fit as opposed to being required to work during lunch" (Pls.' Resp., p. 79, n. 76); the *Boelk* complaint indeed alleged "separate from the restrictions, the company's productivity-based performance ranking system puts the technicians under significant pressure to work through the unpaid lunch breaks in order to complete as many jobs as possible in each work shift." (*Boelk*, Doc. No. 19 ¶ 29 (attached hereto as Ex. Q)).

[37]      *See also Boelk*, Doc. No. 98, pp. 5-6 (attached hereto as Ex. R) ("AT&T makes much of the complexities of the MSOC system, but only two aspects of the system matter for plaintiffs' claims:  the MSOC efficiency scoring (with its consequences for the technicians' security in the job) and what amounts in effect to an invitation for technicians' under-reporting lunch-break work to boost their scores."), p. 6 (citing one of the plaintiff's deposition testimony that "MSOC and HPD [hours per dispatch] are getting these people so razzled that they don't take their lunch because they want that upper edge … They need that edge.").

[38]      Plaintiffs are also incorrect that manhole work was not at issue in *Boelk*.  (Pls.' Resp., pp. 78, 80), since the *Boelk* plaintiffs raised these allegations as well.  *See Boelk*, Doc. No. 19, ¶ 20 (attached hereto as Ex. Q) ("Some technicians in each category are assigned to do underground cable (or manhole) work, as well."); ¶ 22 ("[T]echnicians assigned to underground cable (or manhole) work are subject to the specific restriction that they must remain at the site of the manhole and guard it throughout the lunch break."). *See also Boelk*, Doc. No. 31, ¶ 11(h) (attached hereto as Ex. S) ("When we work underground doing manhole work we are not permitted to break down the manhole site for lunch.  We are required to stay at the manhole site for lunch.  We are required to stay at the manhole while we eat, so as to protect the public and guard the AT&T equipment.").

Construction & Engineering (C&E). Nor do Plaintiffs explain why Illinois Bell C&E technicians would respond to "pressure" under MSOC in a common way (by working off-the-clock), but that MSOC does not engender such uniformity when a technician works in Wisconsin or because he "fix[es] a terminal in someone's home" (Pls.' Resp., p. 81). And even if MSOC-induced pressure were a phenomenon reserved for C&E technicians, Plaintiffs cannot account for how two *Boelk* plaintiffs worked in C&E, and cannot explain how the Court should handle technicians here who have spent time on loan to I&R. (*See e.g.*, Pls.' Ex. 45; Def.'s Mem. p. 20; Ex. S, ¶ 4; Ex. T, ¶ 4).

Plaintiffs further argue that "the facts in *Boelk* are diametrically opposed to the facts elicited in this case" and that each Plaintiff here has testified that "MSOC pressured him to hide time." (Pls.' Resp., pp. 79, 82). Yet the *Boelk* plaintiffs made these points in their motion papers too. (Boelk, Ex. P, p. 7 ("It is widely believed (by plaintiffs and also by AT&T 30(b)(6) designee and Labor Relations Manager Peg Texeira) that technicians can improve their efficiency rankings by using all or part of the lunch break for work … And they do … Most of the time, plaintiffs work through all or part of the unpaid lunch break.")).[39] Finally, *Boelk* did not have a "less developed record" (Pls.' Resp., p. 80): "the parties have conducted significant discovery," including "several declarations from field technicians, depositions of all six named plaintiffs, depositions of two individuals who consented to opt in should a class be certified, and

---

[39]  Along these lines, Plaintiffs also argue that "[e]very single cable splicer in this case is already behind because he has to attend a tailgate meeting" (Pls. Resp., p. 82), yet Wisconsin Bell technicians also have these morning tailgates. *Boelk*, 2013 WL 261265, at *3 (describing how technicians "begin their shifts at garages throughout the state" before being dispatched to job sites); *see also Boelk*, Doc. No. 75, p. 50:19-22 (attached hereto as Ex. U) ("[W]e have 15 minute-meetings, up to half-hour meetings, you know, in the morning usually, and we got to get our supplies, get our trucks rolling); p. 85:9-10 (referring to a "daily huddle meeting in the morning"). It is also unclear why Plaintiffs refer to a *Boelk* plaintiff's testimony about calling his manager for approval to leave early when he did not take a lunch break as a point of distinction (Pls.' Resp., p. 80), when there is ample testimony to the same effect here. (*See* Def.'s Mem., pp. 14-15).

a Fed. R. Civ. P. 30(b)(6) deposition by plaintiffs," all of which were sufficient to rule on both FLSA conditional certification *and* Rule 23 certification. *Boelk,* 2013 WL 261265, at *14.

Although *Boelk* is not binding, it is hard to contemplate more persuasive authority for rejecting Plaintiffs' efficiency theory than a case raising the same theory based on the same MSOC program. Nonetheless, Plaintiffs suggest that the Court should disregard *Boelk* for the District Court of Minnesota's earlier decision in *Brennan v. Qwest Communications International, Inc.*, 2009 U.S. Dist. LEXIS 47898 (D. Minn. June 4, 2009), since it too involved a "[different] telephone company's [different] efficiency rating system." (Pls. Resp., p. 72). Even putting aside the caselaw rejecting the efficiency theory Plaintiffs raise (Def.'s Mem., pp. 50-51) – as well as the fact that the *Boelk* plaintiffs also cited *Brennan* in their certification motion (Boelk, Ex. R, p. 11, n. 7, p. 18, n. 9) – *Brennan* is inapplicable for multiple reasons.

First, in *Brennan*, the defendant conceded that the employees at issue "perform many of the same job duties" and "perform substantially the same tasks." *Brennan*, 2009 U.S. Dist. LEXIS 47898, at **8-9. The collective group here involves employees working across multiple departments performing distinct job functions; how the productivity expectations affected Qwest employees did not need to account for a heterogeneous technician population. Second, in *Brennan*, supervisors testified to affirmatively instructing employees not to report overtime, and the plaintiffs "deposed several Qwest supervisors" who acknowledged being told that the performance standards were too onerous, "with one supervisor estimating that probably half of the technicians he supervised had made such complaints." *Id.*, at **15-16. There is no such record here: Plaintiffs/opt-ins testified to not being so instructed (*see* Def.'s Mem., p. 57), Plaintiffs have not deposed any supervisors, and the manager testimony before the Court is consistent that not a single one has ever told an Illinois Bell employee to work off-the-clock or

has been aware of anyone who has, consistent with COBC policy that managers are "prohibited from requiring or permitting nonexempt employees to work 'off the clock.'"[40] Finally, the *Brennan* Court faced only a productivity expectations theory, rather than addressing whether employees were similarly situated on account of the myriad reasons Plaintiffs have lumped into one case.[41] In short, *Brennan* cannot immunize Plaintiffs from *Boelk* and its rejection of the same MSOC theory raised by their Wisconsin counterparts.

**B.      Certification Is Not Warranted on Any of the Alleged "Lunch" Policies**

**1.      Plaintiffs' Work on Manhole Jobs Cannot Support a Class**

Plaintiffs cite to language from the Non-Management Employee Expectations and Construction Technician Expectations that "Employees working in the underground may not break down the work location to travel to lunch. Underground locations may not be left unattended. Lunches should be carried in this situation. Employees desiring to take other than the approved lunch must obtain approval from their manager." (Pls.' Resp. p. 17). This

---

[40]      Doc. No. 36-3, ex. C, ¶¶ 8, 14; Doc. No. 36-4, ex. D, ¶ 15; Doc. No. 36-5, ex. E, ¶¶ 7, 11; Doc. No. 36-6, ex. F, ¶¶ 10, 14; Doc. No. 36-7, ex. G, ¶ 20; Doc. No. 36-8, ex. H ¶¶ 10, 14-15; Doc. No. 36-11, ex. K, ¶ 12; Doc. No. 36-12, ex. L, ¶ 26. Doc. No. 36-13, ex. M, ¶¶ 8, 10, 12; Doc. No. 36-15, ex. O, ¶ 12; Doc. No. 36-17, ex. Q, ¶¶ 4-5; Doc. No. 195-28, ex. HH ¶¶ 3, 5; Doc. No. 195-29, ex. II, ¶ 4; Doc. No. 195-30, ex. JJ, ¶¶ 2a-2c, 3; Doc. No. 195-31, ex. KK, ¶¶ 4, 6-7; Doc. No. 195-33, ex. MM, ¶ 5; Doc. No. 195-35, ex. OO, ¶¶ 5-9; Doc. No. 195-37, ex. QQ, ¶¶ 4-5, 6b, 8; Doc. No. 195-38, ex. RR, ¶¶ 5, 11; Doc. No. 196-1, ex. TT, ¶¶ 4-6, 9; Def.'s Mem., p. 12.

[41]      In that regard, it is notable that in *Brennan* "the issues raised by the current Motion for Decertification are substantially similar to those discussed in the [Court's] May 25, 2008 [conditional certification] Order." *Brennan*, 2009 U.S. Dist. LEXIS 47898, at *2. Further, the District Court of Minnesota subsequently in *Burch*, 677 F. Supp. 2d at 1115, held that although collective and class action certification was appropriate on call center employees' claims of unpaid time spent booting into and logging out of their computers, certification was inappropriate on their remaining off-the-clock allegations "such as working through meal and lunch breaks and performing other pre- and post-shift tasks, such as customer call backs and reading emails," as "there is no evidence of Qwest policy or common practice for those activities. Testimony is widely varying among Plaintiffs regarding whether they ever performed these activities and, if so, how often and which activities."); *see also id.* at 1122 ("[T]he Court's analysis has demonstrated that Plaintiffs who allege FLSA violations based on the hodgepodge of other uncompensated activities are not a cohesive group of Plaintiff with a common set of claims that would be conductive to a class action.").

statement does not embody a requirement that employees stand guard at a manhole during a lunch break, as opposed to that their lunch breaks should be scheduled to take into account that a manhole must not be left unattended. This policy works in conjunction with the CBA that Plaintiffs also reference which states that if an employee cannot leave a job site, "it is assumed no lunch period has been taken." (Pls.' Resp., Ex. 45, p. 17; Pls.' Ex. 34, § 17.11). Thus, if an employee believes he cannot take a lunch break because he cannot leave a manhole site, he is expected to inform his supervisor so that he could be paid for this time – and Plaintiffs/opt-ins indeed have testified to seeking and receiving such approval. (Def.'s Mem., pp. 14-15).[42]

Further, the salient topic on decertification is not the policies alone, but whether they *affected* employees in a similar manner. *See e.g.*, *Camilotes*, 2012 WL 4754743, at *10 ("Although Plaintiffs argue that Defendants' implementation of the automatic deduction policy caused FLSA violations, Plaintiffs have not demonstrated that Defendants' implementation of the policy was uniform system-wide. Indeed, the evidence shows the opposite[.]"); *Kuznyetsov v. West Penn Allegheny Health Sys., Inc.*, No. 10-948, 2011 WL 6372852, at *5 (W.D. Pa. Dec. 20, 2011) (even though all employees were subject to the same policy, "the application and implementation of the policy was not standard by any means"); *Spellman v. Amer. Eagle Express, Inc.*, No. 10-1764, 2013 WL 1010444, at *4 (E.D. Pa. Mar. 14, 2013) (decertification

---

[42]    Plaintiffs state that these expectations "are expected to be followed, and failure to abide by [sic] expectations may lead to discipline." (Pls.' Resp., p. 42). But these same expectations also state, "Employees are responsible for submitting accurate and complete daily timesheets at the end of their shift. Time documented must match the time actually worked," and "Daily time input … must be accurately completed after each job and must match the time actually worked and reported in the system. Time input should be accurate and all job steps closed out when job is completed." (Def.'s Mem., p. 12, n. 8). Plaintiffs do not explain why Cable Splicers should be expected to follow (in their view) certain provisions because of the potential for discipline for not doing so, but would be willing to violate these unambiguous provisions mandating that employees report all time worked.

granted when plaintiffs "failed to show the collective class members are similarly situated with respect to how such policies were actually enforced").

Plaintiffs/opt-ins' testimony regarding manhole experiences disproves that any expectations that Plaintiffs reference could be presumed to cause meal break work. Plaintiffs' representation that "when working in a manhole the splicer was not able to get lunch" (Pls.' Resp. p. 24), does not comport with their testimony:

- Parro testified that if manhole work were a half a day, he could get lunch before or after working the manhole. (Parro p. 112:1-8).

- Opt-in Gary Denny testified that there are "[s]ome days" he would take his lunch when he had manhole work. (Denny pp. 65:21-66:7).

- Blakes testified he could have manhole work but the manhole would not be open, in which case he could take a lunch. (Blakes p. 166:16-19).

- Sterk testified that he could be at a manhole "for a few hours or whatever and then leave" (Sterk p. 15:2-7); *see also* Deckys (p. 206:15-18 (has spent less than 35 minutes at a site opening a manhole, closing it, and leaving)).

Plaintiffs also do not account for how manhole work is done in teams of two (or more) technicians, such that one technician could leave a manhole to get lunch while the other stays. (Deckys pp. 133:7-134:20); Schilling p. 182:13-17 (same); Ericson p. 208:5-14 (two people do not have to stay at the manhole); Olmstead p. 47:6-13 (can be working in the central office or somewhere else for a manhole job while partner is at the manhole). *See also* Def.'s Mem., pp. 23-24; *Raposo*, Ex. N, p. 9 (denying certification on claims of foregone meal breaks when "deposition testimony indicate[d] that not all drivers worked through their meal breaks").

Nor could expectations surrounding manhole work bind this class when there is no consistency as to the frequency of such work, as Defendant explained in its opening brief. (Def.'s Mem., pp. 23-24). Indeed, as the Johnson Report illustrated, for *every* technician, there are far more days spent *not* performing manhole work. (*Id.*, p. 44; Doc. No. 193-3, Ex. 9, column [g]). Even a copper splicer like Clark (Clark p. 18:24-19:1) had only 5% of days with

manhole work; Hunt, another copper splicer (Hunt p. 161:8-17) had only 4%; and Olmstead, who did both copper and fiber (Olmstead p. 43:1-8), had only 22%. (Doc. No. 193-3, Ex. 9, column [g]). Plaintiffs/opt-ins' testimony was in accord. *See e.g.*, Blakes p. 124:2-16 ("it was not unusual" to not have manhole work, and "[i]t varied" based on the job as to how frequently he had manhole work); Roberts p. 231:5-15 ("I am going to speculate probably about 50/50" as to how often he works a manhole in a fiber job). Def.'s Mem., pp. 23-24. In fact, Crowder, a Fiber and Copper splicer, testified that there were "certainly" days when he had no manhole work at all, and the Johnson Report indeed reports *no* days for him with manhole work. (Crowder pp. 27:13-15, 121:4-13; Doc. No. 193-3, p. 19, Ex. 9).

Plaintiffs also cannot reconcile the notion that Cable Splicers are alike in being confined to manhole sites during lunch breaks, when they *also* have alleged that they miss lunches due to having to drive among job sites, an exact opposite point that Plaintiffs argued at the conditional certification stage made them similar to all Illinois Bell Cable Splicers. Each Plaintiff stated in his declaration that, "As part of my job I am scheduled to work at various job sites that I and other cable splicers must drive to from the garage" and that each is "required to travel from job site to job site in a given day if I have been assigned to multiple locations." (Doc. No. 34-1, ¶¶ 14, 18). Although Plaintiffs for presumably strategic reasons have abandoned the intrasite job travel claim, Plaintiffs' testimony about their job duties, and that they and everyone else miss lunch breaks because they *drive* from site to site, remains the record and is incompatible with the premise of missing lunches by being *confined* to job sites.

### 2.     Other "Security" or "Safety" Expectations Do Not Warrant a Class

Plaintiffs also fail to establish that whether technicians forewent meal breaks because of having to maintain "security of expensive equipment" or to comply with "safety expectations" is capable of classwide resolution. Plaintiffs' evidence for how these so-called policies compelled

off-the-clock work is particularly sparse. Plaintiffs cite to plaintiff Phillipe Porter receiving a three-day suspension because he lost a fiber optic meter (Pls. Resp., p. 24), but Plaintiffs do not explain why a technician's obligation to not lose company equipment – an expectation that, one would think, applies to any employee – should mean that he and hundreds of other technicians throughout the state routinely work through their lunch breaks. Plaintiffs do not even argue that the meter (a hand-held device) was lost while Porter was on lunch or otherwise had anything to do with his lunch break that day. Plaintiffs also cite to opt-in Hiram Anderson, who discusses not being able to leave his equipment unattended for an extended period of time (*id.*, p. 25), yet he also testified to not using this equipment everyday and to leaving a worksite to go to McDonald's. (Anderson, p. 56:23-57:11, 109:2-23). Plaintiffs' rationale of safety (as compared to security) expectations compelling lunch break work is even more undeveloped and unsupported, as they do not cite even one Plaintiff or opt-in on this issue, instead pointing to Area Manager Harn's rather non-controversial testimony that employees must adhere to safety expectations, from which Plaintiffs boldly declare, "Obviously, these expectations preclude a splicer from taking a lunch break." (Pls.' Resp., p. 46).

Here again, Plaintiffs would pretend that their own self-defeating testimony does not exist. If it was "obvious" that safety expectations precluded lunch breaks, opt-in Ramsey Haynes would not have testified that he has left the job site to get lunch. (Haynes, p. 108:21-23). If the expectation that employees maintain the security of expensive equipment "was particularly relevant to DAVAR technicians" (Pls.' Resp. pp. 24-25), then one would not expect Sterk to testify that he is "sure" he has eaten lunch as a DAVAR technician (and DEG technician) without at the same time monitoring equipment, or that he has read the newspaper or a magazine or a book or surfed the Internet during his lunch break. (Sterk, p. 117:16-21; 123:13-124:24);

*see* Def.'s Mem., pp. 23-24; *see also* Hunt pp. 118:18-119:23 ("Q: You set up and break down a job every day?  A:  Uh-huh.  Q:  Is that right?  A: Yeah. Q: But you don't work through lunch every day? A. Right. … Q:  Recognizing you have to set up and break down a job site every day, my question is, can you tell me why you would have to work through lunch on certain days and not others?  A: If the job was hot, if it needed to be done today, and if somebody says they want this job done today or of that nature, if that's what you're asking me.").

This case is therefore unlike the *Reich v. Southern New England Telecommunications Corp.* cases ("*Reich*"), from 1995 (District Court) and 1997 (Second Circuit), that Plaintiffs call "directly on point."  (Pls.' Resp., p. 73).  In *Reich* – which involved a Department of Labor trial, not a class or collective action applying Section 216(b) decertification or Rule 23 certification standards – technicians were required to bring lunch with them to work and stay at the work site during lunch, and they presented multiple examples of being disciplined for leaving the job site during lunch.  *Reich*, 892 F. Supp. 389, 392-94 (D.C. Conn. 1995); 121 F.3d 58 (2nd Cir. 1997). Here, by contrast, Plaintiffs/opt-ins have not presented uniform testimony of being confined to a job site during lunch, but instead have been able to leave a site – be it manhole work or otherwise – for their lunch breaks, and that they are told to take their lunch breaks.  *Infra*, pp. 58-60; Def.'s Mem., pp. 22-24 (*see also* Harn pp. 230:11-231:2 (describing how there are generally two people assigned with two trucks to an underground job)).  Further, the *Reich* plaintiffs generally had to take their half-hour lunch at the set time of 12:00 noon.  *Reich*, 892 F. Supp. at 392.  Unlike the *Reich* technicians who "generally do not have large degree of flexibility to plan when and where they take their lunch periods" *id.*, at 393, Illinois Bell Cable Splicers have far more autonomy since lunch breaks are not scheduled at set times, and thus it cannot be assumed that a lunch break inevitably would overlap with time spent on the job site:  (i) the parties' CBA provides for

a lunch sometime between the third and sixth hours of the shift; and (ii) while some managers direct crews to take lunches between 12:00 and 12:30 p.m., others peg the window as between 10:00 a.m. and 12:00 p.m., 11:00 a.m. and 1:00 p.m., or 10:00 a.m. and 2:00 p.m. (and Cable Splicers can deviate from these time periods). (Doc. No. 36-12, pp. 9-12, ex. O; Doc. No. 36-3; Doc. No. 36-8; Doc. No. 36-10; Doc. No. 36-11).[43] *Reich* also involved far more consistency in the amount of alleged lunch break work (892 F. Supp. at 396), unlike here where the range is from opt-in Donald Smith's identification of one unpaid lunch per week to every day for McKey. (Doc. No. 196-23, ex. PPP, p. 6, Interrogatory Response No. 5; Doc. No. 196-15, ex. HHH, p. 6, Interrogatory Response No. 5). The Second Circuit also noted that defendants "offered no contradictory testimony" (121 F.3d at 68), whereas the testimony from every Illinois Bell supervisor and manager is that they have no knowledge of any off-the-clock work. And as with the *Brennan* Court addressing only the productivity theory, the *Reich* courts confronted only the argument of employees having to "keep a vigil over the manhole" (892 F. Supp. at 401), as compared to the multiple permutations Plaintiffs present.[44]

At the end of the day, Plaintiffs' meal break claims cannot be resolved solely by reference to any policies without ascertaining how they applied. Indeed, employees need not leave the premises in order to have a bona fine meal period, *see* 29 C.F.R. § 785.19(a), so even if a Cable Splicer had to remain on site, the question remains what he was doing there and whether

---

[43]     *See Raposo*, Ex. N, p. 2 ("Although Garelick requires that all drivers take the unpaid meal break, drivers have complete discretion as to when during their shift they take their meal breaks. Accordingly, when and how a driver takes his meal break varies significantly from driver to driver.")

[44]     Similarly, the use of representative testimony in *Reich*, based on a finding made at trial that the testifying witnesses constituted a representative sample, does not warrant its use here. *Reich*, 892 F. Supp. at 402. Unlike the record in this case, the Second Circuit found that there "was actual consistency among those workers' testimony, both within each category and overall; [the employer] offered no contradictory testimony; the abuse arose from an admitted policy of the employer that was consistently applied; and the periods at issue were the employees' lunch hours, which are predictable, daily-recurring periods of uniform and predetermined duration." *Reich*, 121 F.3d at 68.

it was time spent "necessarily and primarily for the benefit of the employer and his business." Def.'s Mem., pp. 45-46 (citing *Munsch v. Domtar Indus., Ind.*, 587 F.3d 857, 859 (7th Cir. 2009)). The record points unmistakably to the need for an individualized assessment of this issue and how one individual's experiences could not be a proxy for anyone else's, rendering certification inappropriate. *See* Def.'s Mem., pp. 45-47 (collecting cases denying certification of unpaid meal break claims); *cf. Geletich v. Varris Management, Inc.*, Case No. RG11 603428, (Alameda Sup. Ct. Jan. 29, 2013) (attached hereto as Ex. V) (denying California meal break claim premised on having to stay at store during meal break when evidence established they in fact were able to leave).[45]

## C. The "Overtime Policies" Do Not Warrant a Collective Action

Plaintiffs also contend that "Cable Splicers are subject to uniform overtime policies. Specifically, all overtime must be approved before it is worked." (Pls.' Resp. p. 47). As explained in Defendant's opening brief though (Def.'s Mem., p. 17, n. 11; p. 42), directing employees to obtain advance approval before working overtime and policing non-compliance is not illegal, and it is a reasonable and common way to manage overtime costs. Indeed, insisting that employees seek pre-approval is necessary because an employer is still obligated to pay for overtime worked. Plaintiffs also do not point out that the policies that they cite are clear that employees must report their time accurately and will be paid for time reported. (Doc. No. 217-6,

---

[45] Plaintiffs refer in their Response, without any support to the record, to "automatically deducted meal periods." (Pls.' Resp., pp. 5, 44; *see also* Pls.' Resp., p. 19, n. 23) ("Usually, It [sic] is common that on paper time sheets the shift start time, end time, and total hours has [sic] been pre-printed such that it excludes payment for the meal period." ). It is not clear if Plaintiffs are suggesting that the time reporting system Cable Splicers use automatically deducts 30 minutes of each technician's reported time for lunch, but if so that is incorrect, as technicians fill out timesheets reflecting total hours worked each day without any time being removed. *See* Severson pp. 202:12-204:24 (giving examples in JAM of how a technician reports hours worked and submits the timesheet, which is then sent to supervisor for approval); *see also* Def.'s Mem. pp. 15-16 (citing Plaintiff/opt-in testimony of being paid for all time reported).

Ex. 32, p. 2; Doc. No. 217-6, Ex. 33, p. 1). *See also* Def.'s Mem., p. 12 (citing the COBC mandating that nonexempt employees "report all hours worked each day"). The "FAQ" that Plaintiffs reference are in accord: "DO ensure overtime for your non-exempt employees is recorded accurately and paid accordingly." (Doc. No. 217-9, Ex. 43, p. 2).[46] And, perhaps most notably, Plaintiffs/opt-ins admit to being paid for all time worked, including non-preapproved overtime. *See* Def.'s Mem., pp. 15-16.

Plaintiffs' suggestion that Cable Splicers nonetheless face a "Catch 22" that leads them to "simply not ask to be paid for this work" (Pls.' Resp. 48) is equally groundless. Plaintiffs made this assertion at the conditional certification stage – that Cable Splicers are "intimidated into not asking for overtime" (Doc. No. 56, p. 3) – but discovery proved it had no basis, as the record is replete with technicians requesting and being paid for working non-preapproved overtime (and also to not being disciplined for working unapproved overtime). *See* Def.'s Mem., p. 14; *see* Appendix C for additional examples of this testimony.

Indeed, Plaintiffs back their Catch 22 argument by citing only to Olmstead and Roberts' depositions, but neither of the cited testimony discusses being disciplined for working overtime or seeking approval to do so. (Pls.' Resp., p. 48). Olmstead also testified that, "If you write that on your time sheet, that you worked through lunch then you should be paid for that. Q: Have you ever been disciplined for doing so? A: No."; the one manager whom she remembers asking to work overtime that was not preapproved "didn't discipline me"; and she is not sure if she has *ever* reported time on her timesheet that was not preapproved. (Olmstead pp. 204:11-17; 305:1-

---

[46]    These FAQ further provide: "DO ensure that all non-exempt employees perform no work before recording their start time."; "DO ensure that all non-exempt employees perform no work after recording their stop time at the end of the day.": "DO ensure that all non-exempt employees begin their meal periods on time, take the entire time allotted, and perform no work during the period."; "DO ensure to comply with FLSA laws which may vary from state to state." (Doc. No. 217-9, Ex. 43, p. 2).

307:3). Roberts also testified that he has asked managers for approval to work through lunch, and the "response that I have gotten from managers has been, 'Okay, but you cannot do this; you're not supposed to do this.' Q: They gave you approval to work through lunch? A: Yes." (Roberts pp. 241:11-242:20); *see also* p. 352:4-15 (has reported non-preapproved overtime, been paid, and cannot think of any time he reported non-preapproved overtime and was not paid for it)[47]; *see also Raposo*, Ex. N, pp. 10-11 (noting how some drivers who worked through breaks were subsequently compensated after notifying their supervisor; "[a]s a result, whether a driver was compensated for working through a meal break depended on decisions made by his individual supervisor"). Asking employees to seek advance approval of overtime, yet indisputably still paying them if it is worked, therefore cannot bind this class.

### D. Plaintiffs' Additional Theories Also Do Not Warrant Certification

Plaintiffs' Response points to still other bases for certification: (1) the JAM time-reporting system, and (2) Defendant's "route" policies regarding when technicians are to leave and return to the garage as causing pre-shift work, and post-shift work beyond electronic time entry. Neither was previously presented to the Court and therefore should be stricken. (*See infra* § II). If the Court does consider these claims, both should be rejected as the basis for a class.

### 1. JAM Time Entry System

On the first issue, at least as Defendant understands it, JAM allegedly is set up to not capture all time that Cable Splicers work. (Pls' Resp., p. 5, n. 7; pp. 18-20). As an initial matter, it strains credulity to believe that a time reporting system would have remained in existence since at least 1997 in a unionized workforce if it inherently led to systematic underpayment. (*Id.*, pp. 18, 41). Further, if Cable Splicers had been using this purportedly broken system throughout

---

[47] This deposition testimony completely contradicts Roberts' declaration that "Illinois Bell has not paid me for hours worked that were not pre-approved." (Doc. No. 34-1, ¶ 23(c)).

their careers, one would have expected Plaintiffs to raise this issue in their complaint (which was amended twice) or in their conditional certification motion. But regardless, any uniformity in Cable Splicers' use of JAM to report their time is of no more moment for decertification purposes than the uniformity from Cable Splicers all wearing AT&T uniforms.

To start with, it is simply not correct that JAM precludes Cable Splicers from reporting all of their time. Ellery Hunter, Lead Manager for Labor Relations, walked through an example in his deposition of how if an employee started at 12:00, ended at 9:00, and took a half-hour lunch, the "total hours" on his timesheet would be 8.50 hours. (Hunter pp. 9:4-8, 190:1-191:20 (also describing how the start time would be the time someone would have punched into a time clock if one existed: "Q: It doesn't start after he starts a task … A: No.")). Hunter also described how a technician can enter an overtime code if he worked through lunch. (Hunter pp. 280:13-281:4). Plaintiffs themselves point out that JAM has a specific code ("EXTA") that an employee can enter to report overtime work. (Pls' Resp., p. 20; *see also* Bradly Hunt, Dep. Ex. 16 at ATTBLAKES 005976; Steven Clark Dep. Ex. 2 at ATTBLAKES 001999 (hereto attached as Ex. W)). Indeed, as Dr. Johnson demonstrated, Plaintiffs/opt-ins have reported a substantial amount of overtime. (Doc. No. 193-3, p. 14, Ex. 6).

Further, Plaintiffs contend that a technician cannot record time "which is not strictly devoted to doing the particular task described in a blueprint" (Pls' Resp., p. 5, n. 7), but codes are available for miscellaneous-type work like cleaning the yard. (Severson Dep., pp. 204:25-205:8); Rentschler, pp. 94:20-95:1, Rentschler Dep. Ex. 2, at ATTBLAKES 017712 (attached hereto as Ex. X)) (noting specific code on timesheet used to report three hours of cleaning his truck and the yard)). A collection of JAM "frequently asked questions" also reflects how a technician's "travel time" is embodied in task codes that are entered into JAM, and that even if

there is no job task yet created by the engineering department, technicians can still enter a project number to submit their timesheets. (Severson Dep. Ex. 8 at ATTBLAKES 015379, pp. 7, 14 (attached hereto as Ex. Y)).[48]  The FAQ also makes clear that if a technician "enters a known incorrect value into his timesheet, he is falsifying his timesheet." (*Id*. at p. 7). In addition, Plaintiffs discuss how Cable Splicers' shifts start with a morning tailgate session and that they return to the garage before ending their shifts (Pls.' Resp. pp. 37, 45-46); these parts of their day are not associated with a job task, yet Plaintiffs do not contend that they are not paid for this time.

Nor does Plaintiffs' argument that a "technician is able to manipulate the amount of hours associated with a particular task" (Pls.' Resp., p. 20) make a difference. The potential for employees to misreport their time when given the autonomy to do applies to any self-reporting system, but the DOL does not mandate time clocks or any other specific device: "employers may use a time clock, have a timekeeper keep track of employee's work hours, or tell their workers to write their own time on the records. Any timekeeping plan is acceptable as long as it is complete and accurate."[49]  Plaintiffs cite no authority for the notion that an employee's ability to do mischief to a self-reporting system is grounds for a collective action. As Judge Crabb pointed out in the *Boelk* summary judgment decision, "plaintiffs cite no authority for the proposition that defendants were required to change their payroll and tracking practices simply because some

---

[48]     *See also* Rentschler p. 187:5-21 ("Q:  There were times that you were not able to enter your time because you did not have the codes that you needed from the engineers? A: Correct. Q: And then eventually you would get them? A: Correct. Q: And then you would go back and enter your time? A: Correct. Q: Was there ever any day where you worked and you didn't have codes and you never got the codes to go back and enter your time? A: No. Q: Is there, sitting here today, any day in which you worked where your time, even if it was late, was never entered? A: Not that I can recall.").

[49]     *See* Wage and Hour Div., U.S. Dep't of Labor, Fact Sheet #21: Recording Requirements Under the       Fair      Labor      Standards      Act      (FLSA)      (2008),      *available      at* http://www.dol.gov/whd/regs/compliance/whdfs21.pdf (last visited July 23, 2013).

technicians were refusing to comply with existing system for reporting overtime work, and I am not persuaded that the law would require that." Ex. B, p. 22.[50]

Insofar as Plaintiffs contend that "it was this JAM system that was used by Illinois Bell to generate the Efficiency [sic] scores that caused cable splicers to work off-the-clock" (Pls.' Resp., p. 41; *see also* p. 64 (describing JAM as "invariably creat[ing] the incentive and need to under report [sic] time")), Plaintiffs are dressing up their MSOC theory in other clothes, and it should be rejected for the same reasons already discussed herein. *See also Briggins*, 882 F. Supp. 2d at 1264-65 (decertification on claims that included "the defendants' system is structured to require the plaintiffs to perform off-the-clock work to be able to keep up with the demands of the production line"). Whether Plaintiffs try to extend MSOC to JAM, or just misrepresent JAM on its own, neither effort warrants a class.

### 2. "Route Expectations"

Plaintiffs' other new (and therefore should be disregarded) theory is that expectations as to when employees should leave and return to the garage each day can be shown to cause pre-

---

[50]     Plaintiffs' apparent suggestion that Illinois Bell should use punch clocks begs the question of why Cable Splicers, who by Plaintiffs' theory routinely lie on their timesheets in violation of company policy, would not then abuse that time reporting system (e.g., by punching a time clock once they arrive at the garage but then engaging in non-work activities like having coffee in the break-room). Nor do Plaintiffs explain how punch clocks would work for lunch breaks; would technicians drive back to a garage to punch out for lunch? All that aside, the timekeeping system that Illinois Bell does *not* use is inconsequential to the decertification question, and thus Defendant need not belabor Plaintiffs' reference to Dr. Johnson's testimony on "reliable system[s]" to pay employees (Pls.' Resp., p. 19, n. 25), which was based on Plaintiffs' counsel presenting Dr. Johnson with a one-page typed hypothetical about "Blackstone Telephone Company" in the "State of Blackstone," and then was followed by a series of questions to Dr. Johnson about whether this fictitious entity should use the system the Maduff & Maduff firm utilizes for its nonexempt employees and whether time clocks used by factory workers in Attorney Mike Maduff's "young adulthood" that "you've seen [ ] in movies" would be optimal. (Dr. John Johnson Expert Deposition Ex. 1 at p. 11 (hereto attached as Ex. FF); Johnson Dep. pp. 307:15-314:19, 322:12-325:16, 333:13-336:19).

and post-shift work on a classwide basis. (Pls.' Resp. p. 45).[51]  Plaintiffs identify the

expectations as not leaving the garage after 7:15 a.m. and not returning before 3:15 (according to

Non-Management Employee Expectations) or 3:20 p.m. (according to Construction Technician

Expectations). (*Id.*). But here again, the record from just 25 Cable Splicers shows that whether

expectations regarding when someone leaves and returns to the garage each day cause off-the-

clock work cannot be addressed on a collective basis.

    First, there is not the rigidity with which Plaintiffs characterize departure and return

times:

| Departure Times | Return Times |
| --- | --- |
| Smith: expectation under one supervisor was that he leave the garage by 7:30 a.m., "but no one really cared if you got out," except when MSOC came into place and then this 7:30 a.m. expectation became more strictly enforced – although he was also told by "other bosses" the departure time should be 7:20 a.m. (Smith pp. 100:14-101:20).<br><br>Rentschler: for every garage at which he worked he had to leave the garage "before 7:30 at the latest." (Rentschler, pp. 93:18-94:3).<br><br>McKey: expected to leave the garage by 7:15 a.m. but also described a day in which he did not leave until an hour later because he was getting supplies. (McKey p. 54:5-16).<br><br>Hunt: referred to "by 7:30" as "when they want you out of the garage." (Hunt p. 259:8-18).<br><br>Schilling: the expected departure time was always 7:45 a.m., but "half the time our boss | Parro: "[W]e were informed not to show up at the garage before, say, 3:10." (Parro p. 58:2-7).<br><br>Roberts: describing AT&T "policy" as having to come back to the garage at 3:10 p.m., and describing how he may return earlier and just wait in his truck in the street until it is 3:10 p.m.. (Roberts p. 259:6-260:24).<br><br>Porter: "It's 3:10 is what they require us to come in at. Q: You are usually in by 3:10 then; right? A: That's most of the time I'll be in, either at 3:10 or a little beyond 3:10. Occasionally, I come in before 3:10." (Porter pp. 121:24-122:6 );<br><br>Blakes: "there's a standard rule – a standing rule that you don't return to the garage prior to ten after 3:00." (Blakes p. 328:5-7).<br><br>Hunt: "Q: But you have in fact been to the garage as early as 3:00? A: I suppose so. Q: |

---

[51]    It is unclear if this issue is independent of MSOC either. *See* Pls.' Resp., p. 26 ("*Part of MSOC* created an expectation to get out of the garage by 7:15 a.m. and to get on the road to the first job as soon as practicable.") (emphasis added).

| | |
|---|---|
| didn't even give us our jobs until 7:30 sometimes." (Schilling, pp. 229:18-230:7). | Sometimes earlier? A: I suppose so." (Hunt p. 357:12-16 ). <br><br> Smith:  supposed to return to the garage "[n]o earlier than 3:00."  (Smith p. 138:15-21). <br><br> Tripolitakis:  "3:15 sounds right.  I think so."  (Tripolitakis pp. 97:18-19 ); <br><br> Sterk: "They want us to get into the garage no earlier than, say, 3:15. Somewhere between 3:15 and 3:30 I would show up to the garage." (Sterk p. 170:5-8 ).[52] |

Moreover, even if there were a uniform policy as to when Cable Splicers had to leave and return to the garage, it could not predict pre-shift or post-shift "work."  Thus, Plaintiffs cite Roberts' testimony that he would not have enough time upon returning to the garage at 3:10 p.m. to enter his time and collect materials (Pls.' Resp., p. 21), but his testimony continues that he only "[s]ometimes" would collect materials "if it's on my mind, I'll go and grab it … Depends on if I realize that this something that I need on my truck … [s]ometimes I think about it at the end of the day and sometimes I do not."  (Roberts pp. 204:19-205:16).  Plaintiffs cite to Parro allegedly entering his time before his shift started because he could not do so the day before, but he also testified that there were "some times" he would do so in the morning *after* the tailgate

---

[52]       In fact, the various coaching and feedback in the so-called "Examples of Discipline" that Plaintiffs reference further illustrates this variation:  "I have an expectation for everyone to be in there [sic] trucks and ready to pull out to their job site no later than 07:26 a.m. every morning unless I have been previously informed that you are unable to do so for some reason"; referencing "action step" for Arvizu of "[g]etting out of garage before 7:30 a.m."; "Leave garage no late[r] than 15 minutes after start of shift[t] and return no sooner than 15 minutes before end of shift"; feedback to Crowder that, "Every attempt should be made to leave the garage no later than 7:30 and arrive back no later than 3:00"; "You must be out of the garage within 15-20 minutes of the start of your shift and your ARRIVAL time must be within 15 minutes before the end of your shift"; directions to McKey to "[l]eave the garage prior to 7:30 a.m. … You are not to return to the garage earlier than 20 minutes before the end of your shift, without manager approval." (Doc. No. 217-8, Plfs.' Ex. 38 at ATTBLAKES020283, p. 2; ATTBLAKES 020212, p. 1; ATTBLAKES 020318, p. 8; ATTBLAKES 020317, p. 2; ATTBLAKES 020225, p. 1; ATTBLAKES 016165).

meeting (and that he did not tell his manager he allegedly entered time pre-shift).  (Parro p. 83:1-22).  Plaintiffs also state, with no record citation, that employees "often" recorded their time post-shift without pay (Pls' Resp., p. 20), but the Johnson Report shows that this did *not* happen 95.2% of the time.  (Def.'s Mem., pp. 28-29).[53]

Nor do Plaintiffs deal with the mountain of testimony set forth in Defendant's opening brief showing nothing but variability as to whether and when employees engaged in any identified activities before or after their shifts, including entering their time – demonstrating that any route expectations do not affect Cable Splicers in a consistent manner.  (Def.'s Mem., pp. 27-28, 34-36, 53-54, 67-69, App. A, B, D, E); *see also supra*, 45-46.

## V.   ILLINOIS BELL'S INDIVIDUALIZED DEFENSES PRECLUDE CERTIFICATION

As Judge Gottschall explained just weeks ago in the misclassification context, citing Judge St. Eve's *Camilotes* off-the-clock decertification decision, "[w]here the court must engage in individualized inquiries to determine the applicability of a defense, this factor favors decertification."  *Hundt v. DirectSat USA, LLC*, No. 08 C 7238, 2013 WL 3338586, at *5 (N.D. Ill. July 1, 2013).  Illinois Bell's defenses cannot be addressed on a collective basis either.[54]

### A.   Management Knowledge Is an Individual, Not Common, Defense

As Illinois Bell discussed in its opening brief, courts have held that an employer's defense of lack of actual or constructive knowledge of alleged off-the-clock work is necessarily

---

[53]    For the other almost 5%, one would still need to analyze that employee's hours worked that week, when his shift started, whether he was paid any other overtime premium pursuant to the parties' CBA, and any other variables to determine whether there is liability for unpaid work that week.  As Dr. Johnson explains in greater detail in his rebuttal, Plaintiffs' challenge to his JAM data analyses only further illustrates the individualized inquiries in this case and how the JAM data belies the claim that employees were entering electronic time post-shift on a regular basis.  (Ex. E, Johnson Rebuttal Rep., ¶¶ 9-11).

[54]    In addition to the other defenses discussed in this section, Plaintiffs also contend that one of Illinois Bell's bases for decertification is "defenses regarding damages, i.e., the amount of unpaid overtime work."  (Pls.' Resp., p. 48).  Defendant addressed this point in Section III *infra*.

individualized.  *See* Def.'s Mem., pp. 55, 58, 60, *citing Hawkins v. Securitas Sec. Servs. USA, Inc.*, No. 09 C 3633, 2011 WL 5598365, at *10 (N.D. Ill. Nov. 16, 2011) (actual or constructive knowledge of off-the-clock work, and the amount of work of which the employer had knowledge, "are issues that defy resolution on a classwide basis"); *Prise*, 2011 WL 4101145, at *22 (recognizing employer could assert that it had no knowledge of unrecorded work); *Kuznyetsov*, 2011 WL 6372852, at *6 (management knowledge is a defense unique to specific plaintiffs, and noting how some plaintiffs testified they were paid for all time worked and others testified that while they missed a meal break they were permitted to leave work early); *Reed v. County of Orange*, 266 F.R.D. 446, 461 (C.D. Cal. 2010) (actual or constructive knowledge of off-the-clock work "is an inherently individualized inquiry"); *Camilotes*, 2012 WL 4754743, at *8; *Zivali*, 784 F. Supp. 2d at 468; *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006).[55]

Against this array of authority, Plaintiffs represent that "courts have held that the question of knowledge is a common question and in light of *Dukes* would warrant certification under even the more stringent Rule 23 standard," yet they fail to cite a single post-*Dukes* case that addresses the feasibility of classwide treatment of management knowledge – with the sole exception of *Vang*, which the Seventh Circuit vacated.  (Pls' Resp., pp. 57-58).[56]  And, even if it were feasible

---

[55]     *See also* Boelk, Ex. D, pp. 7-8 (rejecting on motion for reconsideration plaintiffs' theory that management knowledge could be resolved on a classwide basis); *Creely*, 2013 WL 377282, at *9 (manager testimony regarding actual or constructive knowledge of unpaid meal beak work is "especially relevant" in decertification); *Taylor v. Pittsburgh Mercy Health Sys., Inc.*, No. 09-377, 2012 WL 1739821, at *2 (W.D. Pa. May 16, 2012) (whether defendants had actual or constructive knowledge of meal break work presented individualized defense).

[56]     Plaintiffs also cite summary judgment decisions that address the actual or constructive knowledge standard, not the propriety of applying this defense on a classwide basis.  (Pls.' Resp., pp. 58, 59, 63), *citing Kallar v. Summit Seating Inc.*, 664 F.3d 169 (7th Cir. 2011); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 U.S. Dist. LEXIS 16288 (N.D. Ill. Aug. 17, 2004); *Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068 (N.D. Ill. 2005).

in some cases to adjudicate the management knowledge defense on a classwide basis, there could be little doubt that this case is not one of them.

Defendant has pointed to extensive testimony from Plaintiffs/opt-ins admitting to never being instructed to work off-the-clock, never informing their supervisors if they allegedly worked off-the-clock, working independently in the field outside of manager supervision, and their supervisors not being present when they allegedly engaged in pre- and post-shift work in the garage.  (Def.'s Mem., pp. 55-57); *cf.* Boelk, Ex. B, p. 3 (recognizing how plaintiffs "worked primarily in the field and spent most of their shifts working independently, outside the direct observation of their supervisors" in granting summary judgment on each plaintiff's claims).

Once again, Plaintiffs seem to assume this testimony can be disregarded, and that the Court will not credit, for example, Denny's testimony that he only told "[t]he guys you were working with" rather than his supervisor about skipping lunch breaks; or Smith's testimony that he would disregard his supervisor's instructions not to work through lunch without telling his supervisor he did so; or Palenske's testimony that his supervisor was not even at the same garage where he was based; or opt-in Tony Wright's testimony, "Well, working through lunch is – if the manager says there's no overtime, of course, I'm not going to go up and tell him I worked it because he said no overtime, so, no, I didn't tell him"; or that Porter answered, "Let me think. No I have not," when asked if he ever told a supervisor that he came to work before 7:00 to clean out his truck.  (Denny pp. 254:9-11; Smith pp. 73:9-16; Palenske pp. 46:4-17; Porter pp. 107:11-14; Wright p. 98:11-17).  Plaintiffs' self-defeating testimony on management knowledge cannot be reconciled with Illinois Bell's right to contest liability for any alleged off-the-clock work, especially when Illinois Bell requires employees to record all their time and indisputably has

paid employees for all time they do report, and when the entire premise of Plaintiffs' boosting their efficiency numbers theory *requires* that this activity be done covertly.

In response, Plaintiffs make sweeping statements like "[t]he evidence is overwhelming that splicers complained about *working overtime and not being paid*," on which they say "Blanchette's testimony is *typical* among the Plaintiffs" (Pls.' Resp., pp. 28-29) (emphasis added), but the testimony they cite does not even support this proposition – and, moreover, opt-in Bruce Blanchette testified to the contrary:

| Plaintiffs' Response (p. 29, *citing* Blanchette pp. 89:1-8) | Additional Testimony Not Cited by Plaintiffs |
|---|---|
| Q: Did you ever put down for overtime the time that you spent doing this work after the close of your shift?<br>A: No.<br>Q: How come?<br>A: Because I'm trying to make my numbers, and there's not enough time for getting all that in, and I've complained, like I said. | Q: So you're spreading eight and a half hours of work that you're actually doing to only eight hours on the timesheet?<br>A: Right.<br>**Q: Does your supervisor know that?**<br>**A: I don't broadcast it, no.**<br>Q: Okay.<br>A: They want you to make your numbers.<br>Q: Did your supervisor ever tell you to make your numbers by working through lunch?<br>A: No.<br>Q: Have you ever heard him tell anyone that?<br>A: No.<br>**Q: Did you ever complain to your supervisor that you had to work through lunch to make your numbers?**<br>**A: No.** (Blanchette pp. 50:23-51:16).[57] |

---

[57] Likewise, Plaintiffs cite opt-in Patrick Chambers' testimony that he complained about the numbers allocated to jobs being unrealistic (Pls.' Resp., p. 29; Chambers pp. 59:24-60:24,148:13-22), but Chambers testified that he never told a manager or supervisor that he was working through a lunch break, and he agreed that if he worked through lunch and did not put it down on this time sheet then there would be no way to tell from his timesheet that he worked through lunch (*id.*, pp. 41:14-21; 77:2-6). Further, both Blanchette and Chambers admitted that they have sought approval to work overtime and, when the request was denied, did not work that time. Blanchette pp. 93:12-94:7; Chambers pp. 82:19-83:17. Defendant is entitled to contest the claims of technicians like these two who report overtime in some instances but not in others. *See e.g.*, *Schremp v. Langlade County*, No. 11-c-590, 2012 WL 3113177, at
(Footnote Continued)

Also according to Plaintiffs, "splicers often complained about having to do work, but not be paid for it," and point the Court to presumably exemplar testimony from Parro and Palenske. (Pls.' Resp. p. 29). But here again, a full review of their testimony is illuminating:

| Plaintiffs' Response | Additional Testimony Not Cited by Plaintiffs |
|---|---|
| (Plaintiffs' Resp., p. 29, *citing* Parro p. 80:17-20)<br><br>Q: Did you ever complain that you had to stay late in order to finish your time sheet?<br>A: Yes. It became an issue for all of us when the computers were first installed. | Q: In this effort to stay off of the bottom quintile, you and possibly you and your partner decided to work through your lunch breaks, correct?<br>A: It would be a mutual decision.<br>**Q: And you didn't tell your supervisor, correct?**<br>**A: Correct.**<br>**Q: And you didn't put down that time on your time sheets, correct?**<br>**A: Correct.**<br>**Q: And was the goal to hide the 30 minutes that you had worked so that the numbers looked better?**<br>MR. MADUFF: I'm going to object as vague, ambiguous.<br>**A. I would have to conclude that, yes.** (Parro: 122:4-20). |
| (Plaintiffs' Resp., p. 29, *citing* Palenske p. 175:16-20)<br><br>Q: Have you ever complained to Mr. Biba about having to work through your lunch or having to do work before the start of your shift?<br>A: I have talked to Russ about many issues and those among them. | Q: When you mentioned MSOC being next to impossible to achieve, what did Mr. Biba say?<br>A: That it was the policy that the company was going with, and that's pretty much how it was going to be.<br>**Q: Did you tell Mr. Biba that you were working through your lunches, or you were working before the start of your shifts in order to meet your MSOC numbers?**<br>**A: It's possible I mentioned that to him.**<br>**Q: But you don't remember whether** |

---

*4 (E.D. Wis. July 31, 2012) ("The fact that [plaintiff] sometimes worked after hours was also insignificant, as Plaintiff acknowledged that he sometimes reported his overtime work on his timesheets and sometimes he allegedly did not.").

| | you did or didn't?<br>**A:    I couldn't say specifically.** (Palenske, pp. 177:1-177:13).[58] |
|---|---|

Plaintiffs' additional efforts to suggest that company knowledge presents a common inquiry turn on whether a supervisor happened to be at the job site or garage when the activities took place, a principle that not only is inherently circumstantial but also is one on which the record is anything but consistent.

| Plaintiffs' Response | Additional Testimony Not Cited by Plaintiffs |
|---|---|
| "Supervisors also often discuss jobs with splicers before and after shifts while the employee is 'off- the – clock' [sic].    See generally, Exhibit 6." (Pls.' Resp. p. 29). | Roberts p. 71:4-12, 200:12-19:<br><br>Q:    Do you ever do anything to make Mr. Pastorelli aware if you filled out your – did an update after your shift had already concluded?<br>A:    No.  Mr. Pastorelli is not there when my shift is concluded.<br>Q:    Understood.  Do you do anything to make him aware in any way that you happened to fill out an update after your shift had concluded?<br>A:    No.<br><br>…<br><br>Q:    So if I understand you correctly, the only time you made your supervisor aware if you reviewed a print was if he was with you at the time you were reviewing it?<br>A:    Yes<br>Q:    And was he always with you when you reviewed the print?<br>A:    No.<br><br>*See also* Roberts pp. 227:23-228:19 (believes |

---

[58]    Further illustrating the individualized nature of this inquiry, Biba is not aware of Palenske *ever* working outside of his shift or during a lunch break and denies that Palenske ever told him that he was. (Def.'s Mem., p. 59; Doc. No. 195-28, Ex. HH, ¶ 3).  *See also* Palenske pp. 219:19 ("Q: And you never made your supervisors aware that you were doing this pre-shift work or working during your lunch breaks, correct?  MR. LAWRENCE:  Objection.  Mischaracterizes his prior testimony. A: No.  I didn't tell 'em and they weren't around to see me doing it so …").

| | his supervisor came to his job site more frequently than others because his partner was on a PIP, so "you are slated for more visits"). |
|---|---|
| | Sterk p. 68:15-24: |
| | Q:      Were you ever in the manager's office on your laptop and he wasn't there?<br>A:      Yes.<br>Q:      So there would be times where you're going on to one of your two laptops, looking at plant maps and checking e-mails in the manager's office but the manager is not even present?<br>MR. MADUFF.      Objection.      Asked and answered.<br>A:      Yes.  I'm a self-starter. |
| | Crowder, p. 38:15-21: |
| | Q:      Sometimes you would see Mr. Burke in the garage in the mornings and evenings, sometimes you wouldn't?<br>A:      Yes.<br>Q:      Can you tell me how frequently he was there versus not there?<br>A:      No sir. |
| | *See also* Def.'s Mem., pp. 56-57 |
| "Supervisors also visited job sites during lunch, while splicers were eating and doing work." (Pls.' Resp. p. 29).<br><br>"Exhibit 12, Arvizu, 195:9-195:16" (Pls.' Resp,. p. 29). | Arvizu, pp. 189:2-12.<br><br>Q:      How do you know she observed you eating?<br>A:      Because I had thrown some eggshells in the bottom, and she asked me what it was, and why was that there.<br>Q:      What did you tell her?<br>A:      That I'll clean them as soon as I come down, that I dropped them.<br>Q:      Do you remember what time of day it was?<br>A:      No.<br>Q:      Was it the morning?<br>A:      I don't remember. |
| "Exhibit  7,  Blanchette,  147:1-147:5"  (Pls.' | Blanchette pp. 147:14-22: |

| | |
|---|---|
| Resp., p. 30). | Q:      How many visits would you say you got from Tony when he was your supervisor?<br>A:      It was regular.  I mean it depended on how close you were working to the office, you know, to his garage or if he was going somewhere, you know.  But he would come out midday, you know, where Ken Rauch he'd come out in the morning or in the afternoon or in the middle of the day.  That's what I mean by, you know, it could be real random." |
| "Exhibit 19, Anderson, 135:18-135:23" (Pls.' Resp., p. 30). | Anderson p. 134: 8-14:<br><br>Q:      Can you tell me about a visit to a job site that you can recall while you were eating and monitoring equipment?<br>A:      Can I –<br>Q:      Do you remember the specific instance?<br>A:      No, I don't remember a specific instance. |
| "Exhibit 21, Palenske, 168:19-169:4 ('he absolutely knew we were working through lunch')" (Pls.' Resp., p. 30). | Palenske pp. 169:5-20:<br><br>Q:      Did Mr. Faluka visit you every day?<br>A:      No.<br>Q:      Would he always come visit you at 11:00 a.m.?<br>A:      No.<br>Q:      When he did come to visit you at 11:00 a.m., is there any way for him to know whether you were gonna take a lunch break before he came or after he came?<br>MR. LAWRENCE: Objection. Vague.<br>A:      I have no idea when he'd know if I was taking lunch or not.<br>**Q:      So he couldn't have absolutely known?**<br>**A:      Right.** |
| "Exhibit 22, Parro, 186:18-22." | Parro pp. 186:18-187:12<br><br>Q:      You mentioned that your supervisor would have known that you weren't taking a |

|  | lunch break because he would come out and visit the job site?<br>A: Right.<br>A: Was there any way for him to have known whether or not you took a lunch before he got there?<br>A: I never discussed it with him.<br>Q: No way for --<br>A: He might have assumed that. I can't say.<br>Q: And there would be no way for him to have known if you took a lunch break after he left, correct?<br>A: That's correct. But we weren't trying to hide the information from him. He cared about the job getting done and generally didn't want the overtime – to pay the overtime out of his budget.<br><br>*See also* Chambers pp. 34:20-35:1<br><br>Q: Did the supervisors ever make visits to the job sites?<br>A: Occasionally?<br>Q: How often?<br>A: In three years I think twice, maybe three times.<br><br>*See also* Haynes pp. 133:7-137:21 (describing manager visits to job sites as "once a month" or "[e]very blue moon," generally lasting "five minutes," and stating that there was no way for these managers to know whether he took his lunch break); Smith pp. 97:15-98:18 ("[I]t's a crapshoot" as to when a supervisor comes to the job site; recalls talking to only one supervisor at the job site during a lunch break "back in the 2000, 2003, 2005. Somewhere in there.") |
|---|---|

Lastly, Plaintiffs suggest knowledge could be inferred because "there were a[n] [unknown, unspecified] number of supervisors who were once splicers themselves and they know how the job is done and hours not reported," for which they cite to Blakes. (Pls.' Resp., p. 30). Yet Blakes himself made clear the variable nature of this concept:

> Q:      Would any manager or supervisor looking at your timesheets, whether a manual timesheet or electronic timesheet, know if it was a particular day where you manipulated your time to meet your numbers?
>
> A:      Depending on the manager's cable splicing experience.
>
> Q:      What do you mean by that?
>
> A:      We have some managers there that have no cable splicing experience, and there's no way of them knowing what we do.  We have some that have very little cable splicing experience, and they be wondering what did we do.  And we have some cable splice – managers that have a lot of cable splicing experience, and they'll be able to figure out what we did.  (Blakes pp. 190:22-191:13).[59]

Even if the Court were to ignore Plaintiffs' own testimony demonstrating that Illinois Bell can contest individual technicians' allegations of company knowledge, Plaintiffs' argument that "proof of knowledge, regarding even a few individuals, in and of itself, proves knowledge for the entire collective because such knowledge is imputer to the employer" (Pls.' Resp., p. 58) is not valid in the class context.  Otherwise, courts would not have rejected certification despite evidence of company knowledge for "even a few individuals," such as when "some managers had no knowledge and others had little knowledge about subordinates' alleged off-theclock [sic] work activities" (*Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-cv-00738, 2012 WL 334038, at *5 (S.D. Tex. Feb. 2, 2012)), or when a branch manager instructed the named plaintiff not to record certain overtime hours on her timesheets (*Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *2 (N.D. Ga. July 25, 2006)), or when supervisors were alleged to have removed overtime from time cards before they were processed by payroll (*Prise*, 2011 WL 41001145, at **9-10); *see also Boelk*, 2013 WL 261265, at *6 ("Plaintiff Boelk

---

[59]      *See also* Blakes pp. 160:10-24 ("Q On those occasions where you worked through lunch, did you report on your timesheet that you did so? A: No. Q: Never? A: No? Q:   Did   you   ever   tell   your supervisor or manager that you had worked through lunch? A: No. Q: Did any of your partners or anyone you – anyone else you worked with inform your manager? A: I don't know. Q: Did you ever request to be paid for that time? A: No"); *see also* Appendix D for further testimony regarding lack of management knowledge.

told a garage manager in Beaver Dam that technicians were already working through meal breaks and could do no more to meet the company's productivity goals. Other plaintiffs testified that their supervisors would have no way of knowing whether they or other technicians were working during their meal breaks."); Def.'s Mem., pp. 60-61. As another Court recently put it:

> Some worked off the clock without discussing it with their supervisors, others informed their supervisors that they could not complete their preliminary work within the paid 'preshift' period. Some supervisors (or trainers) directly instructed CAEs to work off the clock, others merely encouraged the practice, others were aware of the practice but did not encourage it, and some were arguably unaware of any off-the-clock work. As the court has noted, there are currently 77 supervisors at Washington's Comcast call centers, supervising CAEs who performed many different types of work. There have been many more supervisors over the class period. Plaintiffs suggest no classwide means of demonstrating that each of these 77 supervisors required, encouraged, or knowingly permitted off-the-clock work. *Ginsburg*, 2013 WL 1661483, at *7.

Even further, Plaintiffs cannot account for the fact that the testimony from every single supervisor and manager in this case is that they have no knowledge of any off-the-clock work. If only a fraction of the 200-plus managers or supervisors implicated in this case deny every allegation made against them by the Cable Splicers who participated in discovery, it is hard to fathom how Illinois Bell would not be able to mount a similar defense for the rest. See e.g., Martin, 2013 WL 1234081, at *6 (emphasis added):

> Defendants point to seventeen branch managers and regional managers named in Plaintiffs' declarations and depositions who have allegedly withheld overtime payments, *all of whom insist that all overtime was accurately paid* … In order to resolve the question of liability, a fact-finder would need to determine whether the employee or the manager was being truthful. However, *Defendants correctly note that resolving this question with regard*

> *to one manager and one employee would not accomplish the task*
> *for any of the others.*[60]

Unable to escape the need for individual testimony, Plaintiffs' last resort is to argue that Illinois Bell's timekeeping system is so fundamentally flawed that it "invariably creates the incentive and need to under report time" and that Illinois Bell "has to have known this would have resulted." (Pls.' Resp., p. 64). But, as discussed (*supra* §IV, D, 2), this assertion misstates how JAM works; implies that every single day every Illinois Bell Cable Splicer is always unable to report all his time and therefore has worked "off-the-clock" each such day when not even Plaintiffs claim this is so; and that Illinois Bell (and every other AT&T entity that uses JAM) had what Plaintiffs characterize as a "deliberate[]" plan (*id.*) to systematically short-change its employees while at the same time requiring that employees report all time worked and never

---

[60]    *See also Reed*, 266 F.R.D. at 461, noting how many of the plaintiffs' supervisors submitted declarations that they were not aware that employees were performing work off-the-clock and that:

> Defendants' inability to cross-examine the vast majority of the opt-ins on this issue would be unfairly prejudicial in light of the fact that it appears that supervisors in certain assignments were not aware that Plaintiffs were working off-the-clock. To that end, a collective action would not allow OCSD to meaningfully or fairly challenge Plaintiffs' claims of knowledge.

*Ascolese v. County of Los Angeles*, ED CV 08-1267 ABC (CWX) (C.D. Cal. Aug. 6, 2012) (Doc. No. 592) (attached hereto as Ex. AA, p. 16):

> Surely, Plaintiffs will assert that management knew of their uncompensated overtime. Defendants will want to rebut that allegation, and clearly can only do so by individualized inquiry. The deposition excerpts presented are replete with conflicts concerning whether supervisors knew or should have known deputies were working uncompensated overtime. For example, Plaintiff Ascolese testified that all of his supervisors know that he checks his email prior to his shift without compensation … , but one of Ascolese's supervisors, Lt. Greenberg, testified that he did not know that any deputy under his supervision checked his email early.

work off-the-clock. This concept has no merit and cannot obviate the individualized nature of Defendant's actual or constructive knowledge defense.[61]

Indeed, as proven to be justified for the *Boelk* defendants when Judge Crabb granted summary judgment against each plaintiff, Illinois Bell should be able to raise the management knowledge defense to individual plaintiffs' assertions. After a class was rejected, Wisconsin Bell contested each plaintiff's claim by showing that no reasonable jury could find it had actual or constructive knowledge of each such plaintiff's alleged off-the-clock work. The *Boelk* plaintiffs' claims were demonstrated to be without merit once plaintiffs were forced to pursue them on an individual basis and defendants could assert individualized defenses, sparing the Court the need for any trial – much less the unwieldy class proceeding Plaintiffs contemplate.

### B. Defendant Must Challenge Credibility on an Individual Basis

Plaintiffs are not correct that credibility here "goes to the merits [and] is not relevant to certification questions" or that "credibility can never be a basis for decertification." (Pls.' Resp., pp. 49, 69). Rather, "[t]hat [Illinois Bell] would have to question and impeach individual plaintiffs, because no representative testimony exists as to the extent of a plaintiff's unpaid overtime, is a point the court must consider in deciding whether the plaintiffs are similarly situated[.]" *See Briggins*, 882 F. Supp. 2d at 1276. It is also incorrect that "any attack the Defendant makes on the credibility of any Representative Plaintiff will apply equally to the group, preserving this right to the Defendant." (Pls.' Resp., pp. 68-69). An assessment of one person's credibility cannot be a proxy for anyone else's in this case. *See Martin*, 2013 WL 1234081, at *6 ("Questioning opt-in Plaintiff Francisco Lugo-Rodriguez's credibility, because he

---

[61]     *See also Boelk*, Ex. B, p. 16 (rejecting argument that "defendants should have known that plaintiffs and other technicians would work through their lunch breaks because of the incentives created by the efficiency ranking system and the boredom created by the lunch restrictions.").

lied about being fired from a previous bank for theft in his Citizens employment application, would not help the fact-finder assess the credibility of any other Plaintiff.").

The record shows ample cause for impeaching individual technicians through cross-examination, and a collective action would deprive Illinois Bell of the opportunity to effectively do so if the case proceeded to trial. None of the named plaintiffs identify MSOC in their opening declarations, and then represent in their interrogatory responses that MSOC caused them to work off-the-clock. (Doc. No. 25-2, Exs. 1-7, pp. 3-56; Doc. No. 196-5, ex. XX, p. 6, Interrogatory Resp. No. 5; Doc. No. 196-8, ex. AAA, p. 7, Interrogatory Resp. No. 5; Doc. No. 196-10, ex. CCC, p. 5, Interrogatory Resp. No. 5; Doc. No. 196-14, ex. GGG, p. 6, Interrogatory Resp. No. 5; Doc. No. 196-19, ex. LLL, p. 3, Interrogatory Resp. No. 5; Doc. No. 196-25, ex. RRR, p. 4, Interrogatory Resp. No. 5). Plaintiffs and opt-ins made contradictory statements under oath:

| Porter's March 7, 2011 Declaration Testimony | Porter's September 13, 2011 Deposition Testimony |
|---|---|
| "Illinois Bell's policy and practice is not to pay for any hours worked in excess of 40 unless it has been approved by a supervisor. As a result, if I am required to work overtime it is not paid by Illinois Bell unless I received approval from Illinois Bell before I work it." (Doc. No. 34-1, ¶ 29). | Q: You understand the policy is, even if you work – if you work overtime and it's not approved, you are still to get paid for it; correct, if you put it down, you are going to get paid for your overtime? You understand that, correct? <br> A: If you put it down, you are going to get paid for it. <br> Q: Whether it's approved or not? <br> A: From what that – from what they're saying, yes, from what I've heard, yes. (Porter p. 68:7-17). |

| Anderson's February 28, 2012 Interrogatory Responses | Anderson's August 7, 2012 Deposition Testimony |
|---|---|
| "The policies that cause me to do work, but not be paid include MSOC and Illinois Bells' [sic] security and safety protocols." (Doc. No. 196-3, ex. VV, p. 4, No. 3). | Q: Was MSOC in effect while you were assigned to either Mt. Prospect or – <br> A: I had never heard of it. <br> Q: You had never heard of it? <br> A: I haven't heard of it while I was |

|  | working there. It may have been in effect, but I didn't know of it. (Anderson, p. 107:10-16).<br><br>Anderson stopped working as a Cable Splicer in 2008, *before MSOC was even implemented*. (Doc. No. 196-3, ex. VV, p. 2, No. 1. ) |
| --- | --- |

| Rentschler's February 19, 2012 Interrogatory Responses | Rentschler's September 20, 2012 Deposition Testimony |
| --- | --- |
| "Also in my experience, Illinois Bell has a strict policy of disciplining employees that seek to be compensated for work that was not pre-approved by management." (Doc. No. 196-20, ex. MMM, p. 4, No. 3). | Q:    Well, do you know of anyone who ever requested to be paid for work that was not preapproved?<br>MR. MADUFF: Same objections.<br>A:    I don't know. Not that I know of. (Rentschler, p. 116:18-23).[62] |

*See Martin*, 2013 WL 1234081, at *6 ("Defendants also point to a number of Plaintiffs who made contradictory statements in their declarations and depositions, and those who have other, more substantial credibility issues. These issues would likely be useful tools on cross examination with regard to a specific Plaintiff.").

A collective action also would prevent Illinois Bell from challenging Plaintiffs' credibility through data:

- Hunt states in his declaration that, "Illinois Bell regularly requires me to work through my half-hour lunch breaks" and in his interrogatory responses that, "In a typical week I worked through almost every lunch break (sometimes less)," even though a map based on his VTS records shows his truck parked for 44 minutes, in the middle of a the day, several miles from his worksite, at a pizza restaurant (that Hunt would testify at deposition he does not know if he has ever been to before). (Doc. No. 34-1, ¶ 23(a); Doc. No. 35, p. 20; Doc. No. 196-14, ex. GGG, p. 4, Response To Interrogatory No. 3; Doc. No. 36-1, ex. 1, pp. 22-23; Hunt pp. 289:18-291:13).

---

[62]    *See also* Rentschler p. 128:12-24 ("Q: Do you see the last sentence in this paragraph – A. Yes. Q. It says 'Investigation continues' … Since February 2012, have you done any further investigation in connection with your responses to the interrogatories? A. I don't – I don't know. Q. You don't know whether you have done any investigation or not? A. I don't recall. Can I take a break?").

- Roberts states in his declaration that, "Illinois Bell *requires* me to complete and fill out my time sheet each day at the end of my shift beyond my scheduled end time of 3:30 PM," but JAM data shows he most frequently entered his time on day *subsequent* to the one he worked. (Doc. No. 34-1, ¶ 23(b) (emphasis added); Doc. No. 193-3, p. 12, Ex. 5).

- Deckys states in his declaration that he is "require[d]" to fill out his timesheet "*each day at the end of my shift beyond my scheduled end time of 3:30 p.m.*" and that "Illinois Bell *regularly* requires me to work through my half-hour lunch breaks." (Doc. No. 34-1, ¶ 23(a), (b) (emphasis added). But at his deposition he was presented with JAM and VTS data that showed how on one day he spent the morning at the central office and was back at his garage by 1:13 p.m. – i.e., had not been at a job site – and that he entered his timesheet at 3:07 p.m. (Deckys pp. 157:12-159:2; Deckys Dep. Ex. 15 (attached hereto as Ex. BB). Deckys could not explain what he did while at the garage for almost two hours before entering his timesheet, and does not know what he did between 3:07 and 3:30 p.m. (but acknowledged that he would leave right at 3:30 p.m.). (Deckys p. 161:4-15).

All of this information is fodder for cross-examination to undermine not just the "how much" damages question Plaintiffs point to, but also to show that their claims are simply not credible for liability purposes or could be challenged by individual proof. *See e.g., Briggins*, 882 F. Supp. 2d at 1275 (individualized defenses implicated when at least two plaintiffs' "scan-in" times into a facility contradicted their deposition testimony). Also, as Defendant pointed out in its opening brief (Def.'s Mem., pp. 61-63), certain Plaintiffs present particularly unique credibility issues, and every company witness denies Plaintiffs/opt-ins' assertions of off the-clock-work, thereby calling for the fact-finder at trial to weigh whom it believes to be more credible. It may find former manager Hugo Vasquez more credible than Roberts were Vasquez to testify to how a number of times he has seen Roberts talking on his cell phone at the end of the day rather than going directly to the computer room; or former manager Patricia Lewis more credible than Tripolitakis in describing how he would return to the garage *too early*; or Roberts and Porter's former manager, Michael Pastorelli, more credible in describing how technicians

would sit in the computer room talking about sports rather than entering their time. (Doc. No. 37, Ex. QQ, ¶ 6(b); Doc. No. 195-33, Ex. MM, ¶ 5; Doc. No. 195-35, Ex. OO, ¶ 6).[63]

Individual credibility matters in still another way. Plaintiffs' entire case is based on admittedly falsifying their own timesheets in derogation of company policy. Put more bluntly, to find for Plaintiffs, one must believe that they have systematically lied – on their timesheets, to their supervisors, and to Illinois Bell, which paid Plaintiffs/opt-ins every penny for every minute they reported. Accordingly, Plaintiffs by their very claims, and the way they would have to prove them (i.e., rationalize their admitted deception), have relied upon their own credibility.

### C. Illinois Bell's Additional Defenses Are Individualized

It would not be as easy as Plaintiffs contemplate for this Court to sort through which of the multiple pre-shift and post-shift activities Plaintiffs and opt-ins have identified should be deemed compensable and which should not under the Portal to Portal Act (PPA). (Pls.' Resp., pp. 65-66). There is no "[d]iscrete [s]et [o]f [t]asks" (*id.*, p. 65) that the Court can evaluate, such as donning and doffing in the *Frank* case that Plaintiffs cite. *Id.*, p. 64, *citing Frank*, 2007 U.S. Dist. LEXIS 71179, at **10-11; *cf. Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. 09-85J, 2011 WL 6372873, at *11 (W.D. Pa. Dec. 20, 2011) ("Unlike meal break cases, courts have proven more amenable to granting stage II certification in those types of cases" involving "pre and post-shift walking and donning and doffing of work gear"). There are a potpouri of alleged pre-shift and post-shift activities, including de-icing trucks and filling ice buckets (Olmstead p. 393:9-16; Haynes p. 88:6-14), that may or may not have taken place by different Cable Splicers at different

---

[63] Plaintiffs accuse Defendant of "going out of its way to create credibility issues," through "self-serving declarations" from supervisors refuting Plaintiffs' testimony. (Pls.' Resp., p. 69, n. 70). Plaintiffs chose not to depose a single management employee except for Area Manager Harn, do not explain why these supervisors' and managers' testimony should be afforded less significance than that of the Plaintiffs and opt-ins who gave discovery in this case, and cannot dispute that the record now before the Court includes unequivocal denials of those claims that Plaintiffs say make them similar to everyone else.

times. A class approach to this defense is not feasible since, as explained in Defendant's opening brief, Illinois Bell "has demonstrated that there is no required series of events that begins or ends all Plaintiffs' work days, and there is no common routine among the Plaintiffs in terms of their pre- and post-shift actions. To the contrary, the Plaintiffs differ both in what they do before and after their shifts and in what their principal activities are." *Marshall*, 2012 WL 5499431, at *10; *see generally Whineglass*, 2013 WL 2237841, at *9 (PPA implicated individual defenses).

Plus, even if the Court could isolate specific tasks, factual inquiries would remain. Plaintiffs identify "[s]peak to a manger" [sic] (Pls.' Resp., p. 66) as one such task, which requires assessing whether these discussions were mandatory or sufficiently work-related to be considered compensable work. To that end, Plaintiffs point out how there are supervisors who used to be splicers themselves (Pls.' Resp., p. 30), making it even less appropriate to presume that speaking to a manager must qualify as "work." (*Compare* Rentschler, p. 15:2-9 (personal friends with one of his supervisors) with Olmstead pp. 83:1-6 (would not approach her manager "just to chitchat with him")).

Second, Defendant would need to assert the *de minimis* defense individually, because as "Plaintiffs' claims are highly individualized, determining whether and when a particular Plaintiff regularly engaged in additional work and calculating the average amount of time worked is an inherently individualized inquiry." *See Reed*, 266 F.R.D. at 462. Merely retorting that, based on Dr. Bardwell's (flawed) analysis, "the aggregate amount of time per week taken to perform the activities at issue is not *de minimis*" (Pls.' Resp., p. 67) is a red herring, as it presupposes the ability to ascertain the time spent engaging in these alleged activities in the first place, which Defendant submits is simply not possible without individual testimony. Further, this time is indeed "administratively difficult to track" since there is no record of when someone might have

cleaned his truck or filled out paperwork or plugged in a computer, to use Plaintiffs' examples. (Pls' Resp., pp. 65-66, 68).[64]

## VI.   NONE OF PLAINTIFFS' ARGUMENTS ON FAIRNESS AND PROCEDURAL GROUNDS WARRANT CERTIFICATION

Plaintiffs' Response Section VII regarding the third factor courts consider on decertification – fairness and procedural concerns – largely overlaps Plaintiffs' other points about the propriety of representative testimony and how the Court could, in their view, manage a collective action, which Defendant has already addressed.  (*Supra*, § III).  Defendant also stands on the points regarding this factor from its opening memorandum.  (Def.'s Mem., § IV, C). Nothing additionally Plaintiffs say about how "fairness and procedural grounds militate in favor of collective treatment" (Pls.' Resp., p. 70) is convincing.

Plaintiffs mainly point to the FLSA's remedial purpose and how decertification would be more cost-effective by avoiding "more than 300 individual trials."  (Pls.' Resp., p. 71).  But calling decertification inappropriate because it would result in individual proceedings means a class would always remain certified.  The judicial economy from a collective action is premised on the Court being able to litigate common issues of law and fact arising from the same alleged unlawful conduct.  *See Whineglass*, 2013 WL 2237841, at *10, *citing Hoffmann-LaRoche, Inc.*, 493 U.S. at 170.  As Plaintiffs have not shown that to be so if this case were to remain certified, "[r]esolution of the many fact-specific issues in this case would essentially require [more than 350] mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation – evidence that would then be subject to cross-

---

[64]      Plaintiffs cite *Kasten v. St.-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 951 (W.D. Wis. 2008) for the proposition that "'with today's technology, one could argue that all time can be recorded to the minute,' which could effectively eliminate the de minimis exception" but do not point out that this language is a direct quotation *from the defendant's brief*.  (Pls.' Resp., p. 67).

examination and similar challenge by the defendant. Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *See Zivali*, 784 F. Supp. 2d at 469 (internal citations and quotations omitted); *see also Briggins*, 882 F. Supp. 2d at 1280 (recognizing that "it is opening itself up to several hundred individual cases," but "[b]y decertifying the class, the court is saving the parties' [sic] time and expense of trying to litigate a case collectively that should have been litigated individually at the outset").

Nor does the prospect of saving costs by what Plaintiffs call the "pooling of resources" justify a collective action. (Pls.' Resp., p. 70). This interest does not overcome the inability to manage Plaintiffs' class claims efficiently and fairly and cannot justify grouping Cable Splicers' disparate allegations in one proceeding. Even if "this Court is sympathetic to Plaintiffs' argument regarding the desirability of pooling resources to seek vindication of their FLSA rights and the remedial nature of the FLSA, this argument does not outweigh the significant factual differences here." *See Creely*, 2013 WL 377282, at *9; *see also Hundt*, 2013 WL 3338586, at *8 ("Because the plaintiffs have not shown that they are similarly situated, the interests of judicial economy would not be preserved by allowing their claims to proceed collectively."); *Martin*, 2013 WL 1234081, at *8:

> We are mindful of Plaintiffs' concerns about the practical ramifications of decertification, and understand that the hundreds of opt-in Plaintiffs are now free to initiate their own suits on an individual basis … However, lower costs and pooling of resources are not the only considerations. Any efficiency gained through bringing this action collectively would be outweighed by the substantial likelihood of 'mini-trials,' and the risk of prejudice to both parties. Therefore, we find that fairness and procedural considerations, when considered in light of Plaintiffs' disparate factual and employment settings and individual defenses, require that the collective action be decertified.

Further, in light of this variability, and with Defendant unable to cross-examine individual plaintiffs, Defendant faces the risk of prejudice by the fact-finder improperly assuming that one Cable Splicer's experiences are reflective of others, particularly when the opportunity to depose individual Plaintiffs showed that their experiences were anything but common. As one Court recently explained this issue, a collective action:

> increases the possibility of prejudice to the defendants if the circumstances of one plaintiff's claim are erroneously attributed to others. For example, Whineglass alleges that, at the Habana Avenue office, Smith directed him "to adjust any hours to show no overtime was worked" … however, that statement is irrelevant to Seltzer's and Evanson's claims because, in addition to allegedly being made after their employment ended, Evanson and Seltzer stated that they never told Smith how many overtime hours they worked. *See Creely*, 2013 WL 1377282, at *10.

Ultimately, even if individual trials loom and Plaintiffs would have to go on their own, a class cannot proceed in these circumstances.[65]

---

[65] None of the cases Plaintiffs cite on the "fairness and procedural grounds" factor (that Defendant has not already discussed herein) is availing. *See Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 379 (W.D. Pa. 2011) (class of employees at *one plant* alleging post-donning and pre-doffing walking time claims in which "it is undisputed that U.S. Steel and the Union have a longstanding agreement, applicable to all represented employees working in regulated areas, that any time spent outside an employee's eight-hour shift walking to and from the locker rooms after donning and prior to doffing protective gear is *not* compensated.") (emphasis in original)); *Kautsch v. Premier Communications*, No. 06-cv-04035-NKL, 2008 U.S. Dist. LEXIS 7219, at **7-9 (W.D. Mo. Jan. 31, 2008) (evidence of instructing employees not to report overtime, of changing timesheets, that employer did not pay overtime because it thought certain employees were exempt, and of statement by company CEO that managers are to keep employees' timesheets at 40 hours and below); *Alvarez v. City of Chicago*, 605 F.3d 445 (7th Cir. 2010) (making no finding as to the propriety of a collective action); *Crawford v. Lexington-Fayette Urban County Gov't*, No. 06-299-JBC, 2008 WL 2885230 (E.D. Ky. July 22, 2008) (involving employees at one site, a corrections center, raising only meal break claims); *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1023 (D. Minn. 2007) (exemption case, in which Court found defendant had proven its "own generalized assumption that all store managers could be considered as similarly situated" by making classification decisions without individualized inquiries into the factual circumstances of each store); *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1351 (S.D. Fla. 2007) (exemption case, in which defendant's corporate representative testified that store managers' "duties and responsibilities are consistent throughout the organization" and that their duties and functions are "generally the same'").

## VII.    PLAINTIFFS' SUBCLASS PROPOSAL SHOULD BE REJECTED

Finally, the Court should deny Plaintiffs' eleventh-hour attempt to preserve their class by dividing it into subclasses of Copper and Fiber splicers, DAVAR technicians, and DEG technicians.  (Pls.' Resp., § III).  Subclassing would only create two relevant distinctions, neither of which would make a collective action more efficient.

First, subclassing would parse those who almost never work manholes, from those who work in manholes at varying levels of frequency.  The Copper and Fiber splicer subclass would still present though the same difficulties to adjudicate the "manhole" claim within that subclass, and the DAVAR and DEG technicians would still pursue their claim that lunch break work results from monitoring expensive equipment – both of which, Defendant has shown, call for individualized proof.  Second, subclassing would isolate those technicians who enter time on laptops in the field rather than at garage computers, but that is no more helpful either because they still allege the same slew of post-shift work (e.g., unload trucks, stock materials, etc.).  The Court still would need to confront for each subclass the same MSOC issues, the "route" expectations, and their JAM timekeeping theory.  Illinois Bell would have the same individualized defenses whether the case proceeded with one class or three.  No efficiency would be gained, except to have three unmanageable collections of mini-trials rather than one.

Notably, in *Marshall*, the plaintiffs proposed a similar methodology of subclasses by department, which plaintiffs argued would make the case "considerably more manageable" since plaintiffs could address specific tasks required in each common department, "and each of the nine subclasses will be (more or less) organized by job duties."  2012 WL 5499431, at *11.  The Court rejected this proposal because the plaintiffs in each department were not similarly situated; "[t]o the contrary, the employment conditions and work practices and job tasks vary widely from Plaintiff to Plaintiff *within* the nine departments."  *Id.* (emphasis in original).  Further, subclasses

would not obviate the need for individualized defenses because "[w]e are still faced with highly individualized fact-specific inquiries as to nearly every Plaintiff, and counsel have not demonstrated how representative testimony can be used in this situation." *Id.* Nor would subclassing result in "a neat or clean division of Plaintiffs into separate trials" since plaintiffs worked in multiple departments. *Id.*[66] These same concerns apply in spades in this case.

Employees Working Across Multiple Job Types

As Plaintiffs acknowledge (Pls.' Resp., p. 31, n. 5), Cable Splicers have worked in more than one proposed subclass during the putative class period, so who belongs in which of multiple subclasses would not be easily ascertainable. *See also* Def.'s Mem. p. 20. Employees also have worked in other Cable Splicer subgroups, like First Mile, which does not typically involve manhole work (Blakes pp. 117:7-118:1; Doc. No. 36-12, ¶ 6 (Hunter Declaration describing First Mile groups); Def.'s Mem., p. 19)), or were loaned to other groups outside of C&E, like I&R (Rentschler pp. 88:1-89:7), or can even be called upon to assist other groups on an "occasional" basis (Smith pp. 36:11-15; Tripolitakis pp. 63:17-64:2). Plaintiffs blend Copper and Fiber splicers into the same subclass, even though Rentschler testified that it takes longer to set up and close down a job site when he was assigned to Copper than Fiber because Copper involves more aerial work, which would affect his lunch break allegations, and Roberts testified that when he worked Copper rather than Fiber he was sent to do Repair (i.e., non-cable splicing) work. (Rentschler pp. 24:21-25:12; Roberts: pp. 163:18-164:7).

Plaintiffs' subclassing approach would require Plaintiffs/opt-ins (including at least Hunt, Blakes, Brian Ericson, Chambers, Roberts, Bruce Blanchette, and Sterk) to testify as to their

---

[66] *See also Briggins*, 882 F. Supp. 2d at 1279-80 (fairness and procedural concerns cannot be alleviated by creating subclasses given varying nature of plaintiffs' experiences); *Beauperthuy*, 772 F. Supp. 2d at 1128 (because plaintiffs' experiences "varied across so many dimensions," "neatly dividing them into similarly situated subclasses would be impracticable").

experiences in Copper and Fiber, and then return to the stand in the other proceedings to discuss their time in DEG and/or DAVAR. Their supervisors and any other witnesses would also then need to testify multiple times. Not only would this process create inefficiencies, it could lead to the Court finding a technician credible in one case but not the other or to make mutually exclusive findings – and then have to determine how to apply any inconsistent findings to the rest of the subclasses. *See Marshall*, 2012 WL 5499431, at *11 (movement among multiple departments "is particularly troublesome, because it opens the door to multiple recoveries by a single Plaintiff (and even inconsistent verdicts from different juries))."

Variation by Supervisor

A subclass composed of all technicians in the same job type would include employees who have reported to different supervisors. (Hunter pp. 29:16-30:2) (all employees within a particular job type do not necessarily report to the same supervisor). Plaintiffs/opt-ins' allegations have been premised on supervisor-specific experiences. *See* Def.'s Mem., pp. 21-22. For example, Roberts testified that his supervisors targeted him and were stricter with him than other technicians regarding when he had to return to the garage; that "I don't think I had a serious problem with my numbers until I was under Mike Pastorelli"; that he was put on a performance plan by Pastorelli because he is stricter with Roberts than with other technicians; and that another supervisor "did not look to discipline as much." (Roberts pp. 75:2-6, 207:14-208:7, 209:23-210:18). Nowhere in their subclassing proposal or indeed anywhere else in their Response do Plaintiffs explain how the Court can efficiently address supervisor-specific issues.

Variation by Garage

Plaintiffs/opt-ins working in the same job types have described varying experiences based on the garages to which they have been assigned. Deckys seeks compensation for alleged

post-shift work only for his time at the Hastings garage but not when he worked at the garage on 63rd Street.  (Deckys pp. 36:17-38:4).  Rentschler testified that supervisors at the Roscoe garage were "more strict on numbers and accountability," and when asked how frequently his supervisor would come to his job site answered, "[o]ut of Roscoe, probably – Juan Cordova would pull up to the job maybe once or twice every two weeks.  Out of Springfield, Decatur, very little. Maryville, probably never."  (Rentschler pp. 17:11-18:1, 36:14-23).  *See also* Def.'s Mem., p. 21 (citing additional examples of variation by garage, including an analysis that Clark worked underground jobs 3.5 times more frequently in Hastings than Glenwood).

Taken together, Plaintiffs' suggestion that the Court could handle this case efficiently through proposed subclasses is not viable.  With Plaintiffs unable to meet their burden to establish that this case should remain a collective action, in any fashion, they have left the Court no option but to decertify.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, and those stated in Defendant's opening papers, Defendant requests that the Court grant its decertification motion and dismiss from this lawsuit all individuals who filed consents to opt into this case.

Respectfully submitted,
Illinois Bell.

By:  <u>/s/ Gregory P. Abrams</u>
         One of its attorneys

George A. Stohner (*pro hac vice*)
Morgan, Lewis & Bockius LLP
300 South Grant Ave.,
Twenty-Second Floor
Los Angeles, California  90071-3132
213-612-2500
1111 Pennsylvania Ave., NW
Washington DC 20004
202-739-3000

gstohner@morganlewis.com

Gregory P. Abrams
Rita Srivastava
Morgan, Lewis & Bockius, LLP
77 W. Wacker Drive
Chicago, Illinois 60601
312-324-1000
gabrams@morganlewis.com
rsrivastava@morganlewis.com

**Appendix A**
**Additional Testimony from Plaintiffs' Response regarding "Discipline" under MSOC**

- Palenske, p. 117:4-9 ("You can be disciplined for failure to make numbers, and a lot of it is – I don't understand how they do it.").

- Denny p. 164:6-17 (describing how he "could have gotten a written warning and not known it"), 157:8-20 (manager had "tried" to discipline him over numbers).

- Anderson pp. 171:8-18 (describing company's "selective enforcement" as "It's basically where if your numbers are good they don't bother you").

- Olmstead p. 122:6-18 (describing how if she does not work "extra hours" she is "going to be disciplined and possibly terminated for not meeting my numbers").

- Schilling p. 39:3-11 (describing "perceived threatened discipline.").

- Smith p. 117:18-118:10 ("[n]ot entirely sure" what kind of discipline would happen if he does not meet his numbers for three months).

- Crowder pp. 203:21-204:4: ("Q [from plaintiffs' counsel]: So it was important to be productive to avoid discipline? … [Objection; leading] … A:  I would say yeah, to a point.  You know, you'd get disciplined if your production drops.  That is part of it I'd say.").

- Parro p. 150:6-15 (referring to a "specified procedure that managers had to follow in order to discipline people who didn't make their numbers").

- Williams pp. 165:3-18: ("Now, realistically speaking, we can take all the breaks and lunches we want to, but we will not make our numbers and we'll be disciplined.  And that's part of what that discipline is about; you're not making your numbers so you get disciplined.").

- Rentschler, p. 189:1-3 ("Coached meaning my numbers are low.  If I don't get them picked back up, then I would be disciplined.).

- Sterk, p. 253:24-254:7 (describing his belief that management disciplines technicians to keep themselves from being disciplined).

- Palenske pp. 135:22-136:2 (received "verbal warnings about [his] numbers").

- Arvizu p. 120:20-23 (placed on PIP because for *three consecutive months he was in the bottom 20% of productivity*)

- Wright p. 77:2-10 (calls a PIP "discipline" even though it did not affect his pay).

Examples from Coaching Records:

- Reminding opt-in Efran Arvizu to turn in K-Task forms daily, which means obtaining from the engineering department revisions and modifications to jobs so that additional time for the job is made available (Def.'s Mem., p. 30).

- Telling Arvizu to "[r]eport time accurately everyday."

- Encouraging opt-in Gary Crowder to contact his manager if he encountered a roadblock.

- Encouraging opt-in David McKey to use K-Steps and to "call for OT approval" if needed to complete additional work steps.

- Noting that Clark wasted time by locking keys in his truck.

(Pls. Ex. 38 at ATTBLAKES020216, p. 2; ATTBLAKES020209, p. 1; ATTBLAKES 020318, p. 2; ATTBLAKES 016165; ATTBLAKES 002484).

## Appendix B
## Additional Testimony Regarding MSOC

- Schilling p. 94:2-9 ("Q: Some jobs were such that you could break for lunch, some jobs were such that you couldn't? A: I would – I'm saying more – more or less it would be the – yes, yes, it depended, right, correct. Q: And do you know which jobs would allow you to break for lunch and which ones wouldn't? No.").

- Blakes pp. 136:16-137:5 ("Q: So if you know on a Monday you're going back to the same job Tuesday, you might on Monday pick up the supplies? A: Right. Q: When on Monday would you do that? A: Between the time you pull your truck in to the time – until 3:30. Q: So between when you get to your truck and 3:30, you may get your materials for the following day? A: On occasion, yes. Q: Okay, Any other time you can recall in which you've gotten your materials? A: No.").

- Crowder pp. 229:18-230:1 (some supplies he gets "occasionally" before 3:30 and "occasionally" after 3:30).

- Palenske p. 114:10-24 (cleans garbage off of his truck during his shift "[o]n occasion": "It depends. Perhaps there was a central office that had a dumpster in between, you know, my work location and my office where I know I could get rid of it beforehand. Or perhaps another garage that had a dumpster at it, and I could get rid of it there instead of at my own location. Q: So it would depend on the location of the job? A: Absolutely.").

- Sterk p. 194 (whether he could complete a time sheet before his shift versus after depended on what job he was assigned on a given day).

- Tripolitakis, p. 95:15-18: ("Q: Did that happen, where you would enter your time and then, once you finished entering your time, you were free to go? A: Yeah. Yes, it did.").

- Hunt pp. 258:10-259:7 (describing loading supplies into his truck and other activities as potentially taking place before, during, or after his shift).

- Roberts pp. 307:23:-308:3 ("Q: Would you agree that there are certain jobs that you just may work efficiently enough that you're able to get it done within the allocated time without manipulating your time in any way? A: Again, I believe so.").

- Schilling pp. 246:10-12 ("Q: Another variable you mentioned is some people just work faster than others? A: That – that's very true, yeah, yeah.").

- Crowder pp. 221:2-6 ("Q: So would it sometimes be the case that … you wouldn't know which materials you needed until you found out your job at the tailgate? A: That's true on certain things, yes.").

- Chambers pp. 107:20-108:2 ("Q: Did you ever fill out your time sheets before 3:30 p.m.? A: Occasionally. Q: Why would you fill out on some days before 3:30 p.m. and on some days after 3:30 p.m.? A: Depending on the work we did that day, where we were that day.").

## Appendix C
## Additional Testimony Regarding Requesting Overtime

- Smith p. 72:11-24 ("Q: Have you ever called your supervisor and told them you needed to skip lunch that day? A: Well, yes. That would be part of the working through lunch. Q: Okay. And so you've … called your supervisor from the job site? A: Yes. Q: What has your supervisor said in response? A: They say – they usually say yes. I've had bosses tell me that, you know, that it's not allowed to work through lunch. I've had that said before. So everybody knew you couldn't do that at that time.").

- Chambers, pp. 82:19-82:17 (would call his manager in the middle of the day to seek more time to finish a job, "Q: When they approved overtime, would you put it down on your time sheet? A: Yes. Q: What happened in the times when they did not approve overtime? A: We just packed up and came back to the garage. Q: So you didn't stay out on the job and continue to work? A: No.").

- Schilling, pp. 137:19-138:15:

  > Q:  Your [interrogatory] answer says, "Also in my experience, Illinois Bell has a strict policy of disciplining employees that seek to be compensated for work that was not pre-approved by management." That's in your interrogatory responses. Do you see that?
  > A:  Right.
  > Q:  Okay. What I'm asking is, can you identify one employee who was disciplined for seeking to be compensated for work that was not pre-approved management.
  > MR. LAWRENCE:  Objection; assumes facts not in evidence.
  > A:  I'm trying to think of off hand. Not that I can think of offhand.
  > Q:  Were you ever disciplined for seeking to be compensated for work that was not pre-approved by management?
  > A:  Not that I know of, no.

## Appendix D
## Additional Testimony Regarding Lack of Management Knowledge

- **Deckys, pp. 304:23 – 305:20**

Q: But while at Hastings -- and this is lunch time, rest time, whatever time it is. While at Hastings that's when you underreported your time occasionally because of the efficiency concern, you personally?

A: Yes.

Q: So my question would be, you would never want the manager to know that, right, because if the manager knew that, he would have to correct the time sheet and it would reduce your efficiency, would it not?

MR. MADUFF: Objection; calls for speculation, assumes facts not in evidence.

BY THE WITNESS:

A. Based on the rule book that they give us, I guess the manager would have to.

BY MR. STOHNER:

Q. Would have to do that?

A. Yes.

Q. Okay. So you never told a manager that you were eating time?

A. No.

- **Olmstead, p. 130:9 – 17**

Q. Do you tell your supervisor on the days that he doesn't come to the jobsite when you took your lunch break?

A. No.

Q. Do you -- if he did not come to this site on a particular day while you were on a lunch break, would he have any way of knowing when you took your lunch break?

A. No.

- **Crowder, p. 102:4 – 12**

Q. When you would work through lunch to avoid falling behind or get a head start, did you ever tell your manager that you had done so?

A. I don't recall telling him.

Q. Do you do anything to make your manager aware?

A. I don't recall telling him.· I mean, that would be the only way I could say make him aware of it.

- **Clark, pp. 318:1 – 320:4**

Q. You got asked [by plaintiffs' counsel] about whether a supervisor -- it appeared to you at anytime ever, when you came to work before 7:00 a.m. and did anything that you considered work, as to whether a manager or supervisor appeared to see you. Remember that testimony?

A. Yes, sir, I do.

Q. Okay. Tell me the circumstance and what work you were doing and what manager appeared to see you.

A. I couldn't be specific, sir.

Q. Can you name one manager that appeared to see you?

A. No, sir.

Q. Can you tell me what you were doing when you saw a supervisor who appeared to see you?

A. I couldn't be specific, sir.

Q. Did you ever go tell that supervisor or any other supervisor you came to work early that day to perform work that you thought you should be compensated for?

A. No, sir, I did not.

Q. And your counsel asked you whether it appeared that some supervisor saw you doing work

…

Q. Okay. Can you name before computers came in one supervisor who appeared to see you complete work after what you put down as the end time on your manual time sheet, and the circumstance of that?

A. I could not be specific, sir. I could not be specific, sir.

Q. After you began to submit your time sheets by computers, is it your testimony -- I think it has been your testimony that sometimes after submitting your time sheet on a computer, you would then go do something in your truck after doing that, correct?

A. Yes, sir, that is correct.

Q. Can you name one circumstance and one supervisor who appeared to see you, and tell me what you were doing that you think -- after you submitted your time sheet?

A. I could not, sir.

- **Sterk, pp. 95:12 – 96:10**

Q. How frequently would your manager be on the site with you?

A. Well, when you had -- he had 20-some techs under him and they could be working at as many as 20 different locations.· Not often.

Q. Would most days -- would it be the case that most days you didn't see the supervisor at all until you got back to the garage?

A. Right.

Q. I'm sorry?

A. And some days not.· And some days not. When I come back to the garage, maybe he was already gone.

Q. That was the next question. Sometimes when you came back to the garage he had already left for the day?

A. Right.

Q. That was the case in both Naperville and Westmont?

A. Correct.

Q. Was that the case both as a DaVaR and DEG tech?

A. Yes.

- **Sterk, pp. 150:22 – 151:3**

Q. Would there be any way for a manager to know recognizing that some days you threw out your scraps before your shift and some days you did after, would there be any way for a manager to know which days you did which?

A. No.

- **Sterk, pp. 155:20 – 156:19**

Q. Was your manager always in the garage -- first of all, when you were plugging in your test equipment and unboxing your equipment, you did that in the garage, I take it?

A. Right.

Q. Was your manager always in the garage with you when you did it?

A. No.

Q. Was he ever in the garage with you when you did it?

A. I suppose there were times, yes

Q. Without guessing, do you know for a fact whether he was in the garage with you?

A. I'm sure he was in the garage when I pulled in and saw me in and around the truck.· But whether or not he saw me actually plugging equipment in, I don't know.

Q. Do you know whether he actually saw you unboxing equipment?

A. I wouldn't have no idea.

Q. Did you ever tell your manager at any point when it was that you plugged in test equipment or unboxed equipment?

A. No.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on July 23, 2013 a true and correct copy of the foregoing document was served by electronic mail to:

>Aaron B. Maduff
>Michael L. Maduff
>Walker R. Lawrence
>Maduff & Maduff LLC
>205 North Michigan Avenue
>Suite 2050
>Chicago, IL 60601
>(312) 276-9000
>ABMaduff@madufflaw.com
>mlmaduff@madufflaw.com
>WRLawrence@madufflaw.com

s/ Gregory P. Abrams