# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES BLAKES, *et al.*, for )
themselves and on behalf of similarly ) No. 11 CV 336
situated others, )
                         )
               Plaintiffs, )
                         )
       v. ) Magistrate Judge Young B. Kim
                         )
ILLINOIS BELL TELEPHONE )
COMPANY, *d/b/a* AT&T Illinois, )
                         ) December 17, 2013
            Defendant. )

## MEMORANDUM OPINION and ORDER

James Blakes, Steven Clark, Herman Deckys, Bradley Hunt, Phillipe Porter, Ernest Roberts, Jr., and Larry Williams (collectively, "the named plaintiffs") brought this purported collective action against Illinois Bell Telephone Company ("Illinois Bell") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, claiming that Illinois Bell systematically fails to pay its cable splicers for all of the time they work, including overtime. After this court conditionally certified the named plaintiffs' proposed class of allegedly similarly situated cable splicers, the case proceeded through the close of discovery. Now before the court is Illinois Bell's motion to decertify the class. The motion is granted in part and denied in part for the following reasons:

### Procedural History

The named plaintiffs filed their amended complaint in February 2011, claiming that Illinois Bell violates the FLSA by requiring cable splicers to include a

half-hour lunch break on their time sheets whether or not they actually take a break, unless they receive a supervisor's preapproval to work through lunch.[1] (R. 11, Am. Compl. ¶¶ 17-18.) They further alleged that management routinely disciplines cable splicers for seeking overtime compensation for hours that were not pre-approved, and as a result, cable splicers regularly underreport the hours they work. (Id. ¶¶ 19-20.) In describing the policies that require them to work through lunch, the named plaintiffs alleged that they are required to maintain the security of job sites and travel between job sites even during their lunch hours. (Id. ¶ 26.) They also alleged that because of restrictions governing when they can return to their garage at the end of a shift, and because of an alleged shortage of garage computers, they often have to work beyond their scheduled shift to enter their time on Illinois Bell's computer system. (Id. ¶¶ 27-30.) As relief for these alleged overtime violations, the named plaintiffs sought a declaratory judgment stating that Illinois Bell's actions are unlawful, as well as damages on behalf of all similarly situated people who opt into the action. (Id. ¶ 50.)

After the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 21), the named plaintiffs moved the court for conditional certification under 29 U.S.C. § 216(b), arguing that they should be permitted to issue a judicially supervised notice to similarly situated cable splicers allowing them the opportunity to opt into the suit. (R. 34, Pls.' Mot. at 1-2.) In support of their motion the named plaintiffs submitted similar declarations asserting that they rarely are able to take

---

[1] The plaintiffs' amended complaint included a claim under the Illinois Minimum Wage Law, but they have since dropped that claim. (R. 60.)

an uninterrupted 30-minute lunch break because they have to maintain the security of a job site or travel from job site to job site. (Id. at 5 & Exs. 1-7.) The notice they sought to distribute to potential opt-in plaintiffs described the suit as seeking back-pay for work that "includes, but is not limited to, working through meal breaks and completing time sheets at the end of the shift." (Id. Ex. 8, Proposed Notice at 1.)

On June 15, 2011, this court issued an opinion granting the motion for conditional certification in part and denying it in part. *See Blakes v. Illinois Bell Tel. Co.*, 11 CV 336, 2011 WL 2446598, at *10 (N.D. Ill. June 15, 2011). Applying the lenient standard that pertains to conditional certification, this court determined that the named plaintiffs had made a modest showing that Illinois Bell's policy requiring cable splicers to maintain the security of their job sites routinely interfered with their lunch breaks. *Id.* at *3. The court characterized the claim that cable splicers miss lunch because of inter-site travel as being "[o]n shakier ground," but found the evidence sufficient to justify issuing notice on that claim as well. *Id.* at *4. Finally, the court agreed that the named plaintiffs had made a sufficient showing that cable splicers are similarly forced to work past the end of their shifts to complete time sheets. *Id.* This court agreed with Illinois Bell, however, that the proposed notice's language reached too far in describing unpaid work as that which "includes, but is not limited to," working through meal breaks and completing time sheets post-shift. *Id.* at *8. Noting that the case is about unpaid lunch breaks and post-shift completion of time sheets, not "any possible

FLSA claim under the sun," this court ordered the named plaintiffs to excise the "but is not limited to" language from the proposed notice. *Id.*

Following the court's conditional certification order the named plaintiffs issued notice of the suit to more than 2,000 potential opt-in plaintiffs. Ultimately, 346 opted in. (*See* R. 196, Ex. UU, Zollman Decl. ¶ 3.) The litigation then entered the discovery phase and in December 2011 this court granted Illinois Bell permission to serve discovery on and depose 18 of the opt-in plaintiffs. (R. 139.)

In the fall of 2012 Illinois Bell sought a protective order barring the named plaintiffs from seeking information about its supervisors' and other managers' performance evaluations and compensation, arguing that such information "has nothing to do with the theories on which Plaintiffs moved for conditional certification and on which this Court authorized notice." (R. 180, Def.'s Mot. for Protective Ord. at 1-2.) At the hearing held on the motion Illinois Bell argued that the plaintiffs' discovery request showed that the "DNA of the claims in this case ha[s] changed" and that the plaintiffs were seeking information for a new, different claim based on productivity and efficiency standards. (R. 197, Nov. 13, 2013 Hearing Tr. at 4-7.) This court agreed that the efficiency theory represented a significant shift. In its order granting the motion, the court noted that the issues on which it had granted conditional certification included:

> whether Plaintiffs worked through their lunch breaks, whether they spent time completing the required time sheets post-shift, and whether they were denied compensation in violation of FLSA. The information Plaintiffs now seek—performance evaluation factors that may have encouraged and motivated first level supervisors and managers to

impose unreasonable efficiency goals for their subordinate cable splicers—is not relevant to resolve these issues.

*Blakes v. AT&T Corp.*, 11 CV 336, 2012 WL 5862747, at *1 (N.D. Ill. Nov. 19, 2012). Because this court agreed that the information regarding managers' and supervisors' performance evaluations and compensation criteria are irrelevant to the named plaintiffs' claims, this court granted Illinois Bell the requested protective order. *Id.*

After the protective order was entered the parties engaged in expert discovery and this litigation moved into the decertification phase. The parties have submitted hundreds of pages of briefing on Illinois Bell's motion to decertify the class, accompanied by thousands of pages of exhibits, including competing expert reports. In rendering this decision, the court has considered the allegations in the complaint and the declarations, deposition excerpts, and other materials submitted in support of the parties' positions.

## Facts

An Illinois Bell cable splicer's primary job is to install, maintain, and repair Illinois Bell's network of cable, fiber optics, and telephone services. (R. 11, Am. Compl. ¶ 10.) The cable splicers who opted into this lawsuit have been assigned to 48 different garages and have worked underneath approximately 209 different supervisors or acting supervisors. (R. 196, Ex. UU, Zollman Decl. ¶¶ 3-4.) They also have worked in one (or in some cases, more than one) of the following capacities: as a copper and fiber cable splicer, as a DAVAR tech, or as a member of the Digital Electronics Group ("DEG"). Copper and fiber cable splicers perform a

significant amount of their work underground in manholes, requiring them to set up and tear down their job sites at the beginning and end of an assignment. (R. 217, Pls.' Resp., Ex. 46, Harn Dep. at 227:18-230:3.) A DAVAR tech is responsible for verifying and testing the quality of cable pairs. (Id. Ex. 19, Anderson Dep. at 20-21.) The DAVAR tech is also responsible for maintaining the security of the equipment used to perform the assigned testing, which includes two computer terminals. (Id. at 108:17-22.) A DEG tech installs, maintains, and troubleshoots end-user equipment for Illinois Bell's customers. (Id. Ex. 21, Palenske Dep. at 10:12-10:15.) DEG techs use a computer to check on equipment needs and to complete paperwork. (Id. at 23:20-24:23.)

## A. Illinois Bell's Official Lunch Break and Route Policies

Illinois Bell's official wage policy is that cable splicers should receive a daily, unpaid lunch break between the third and sixth hour of their shift. (Id. Ex. 32, 2008 Telecom Operations at 3.) That policy is codified in its collective bargaining agreement ("CBA") with the cable splicers' union. (Id. Ex. 34, CBA § 17:10.) Consistent with that policy, cable splicers are required to seek and receive preapproval before working through their daily lunch break. (R. 196, Ex. SS, Zang Decl. Ex. 1.)

Several Illinois Bell policies officially reinforce the idea that cable splicers are required to report when they work through lunch or before or after a shift, regardless of whether they have received preapproval. (*See* id.) The Illinois Bell Code of Business Conduct provides that:

> [n]onexempt (overtime eligible) employees must accurately report all hours worked each day and each week and may not work overtime unless it is approved by a supervisor in advance. However, all overtime hours worked by nonexempt employees must be paid regardless of whether they were approved. Managers are prohibited from requiring or permitting nonexempt employees to work 'off the clock.'

(Id.) The Code of Business Conduct lists working through lunch periods or before or after a scheduled shift as examples of compensable time. (Id.) It also makes clear that employees should not work off the clock "voluntarily," reiterating that "working off the clock is never permitted." (Id.) Illinois Bell's 2008 Telecom Operations Non-Management Employee Expectations guidelines make clear that cable splicers "are responsible for submitting accurate and complete daily timesheets at the end of their shift" and that "[t]ime documented must match the time actually worked." (R. 217, Ex. 32, 2008 Telecom Operations at 2.) All cable splicers are required to sign forms acknowledging that they have received FLSA training and that they understand that they must "always report all hours worked." (*See, e.g.*, R. 196, Ex. WWW.)

Illinois Bell also has policies that govern whether a cable splicer can leave a job site or assignment to take a lunch break on a given day. The 2008 Telecom Operations Non-Management Employee Expectations state that cable splicers:

> working in the underground may not break down the work location to travel to lunch. Underground locations may not be left unattended. Lunches should be carried in this situation. Employees desiring to take other than the approved lunch must obtain approval from their manager.

(R. 217, Ex. 32, 2008 Telecom Operations at 3.) According to the CBA, if a job assignment "does not permit the employee to leave the building or job site/assignment, it is assumed no lunch period has been taken." (Id. Ex. 34, CBA § 17:11.) When the cable splicer is confined to a job site during lunch, the CBA states that the cable splicer "will be permitted reasonable paid time to eat on the job." (Id.)

Illinois Bell policies also dictate when cable splicers are expected to leave and return to their garage at the start and end of their shifts. Specifically, they are required to arrive at their reporting location at the start of their shift and to leave for their first job immediately after receiving the day's assignment. (Id. Ex. 33, CT Expectations at 1.) Illinois Bell expects cable splicers to leave their garage within 15 minutes of the start of their shift and return 15 minutes prior to its end. (Id. Ex. 32, 2008 Telecom Operations at 2.) Illinois Bell also expects its cable splicers to use the time between their return to the garage and the end of their shift to "gas and stock their truck and to order supplies for the next day." (Id.) They are also supposed to use that time to enter their hours worked into the time-recording system. (Id. Ex. 33, CT Expectations at 1.)

**B.    Illinois Bell's Time-Recording System**

Illinois Bell uses a system called JAM to record cable splicers' work hours. (R. 217, Ex. 55, JAM OSP at 1.) Instead of following a traditional punch-in/punch-out format, JAM measures the hours worked by task so that Illinois Bell can determine how much time individual cable splicers are spending to perform specific

tasks.  (Id. at 6, Id. Ex. 47, Johnson Dep. 319:18-319:20.)  In completing their JAM time sheets, cable splicers are asked to account for all of the hours associated with their daily schedule and to divide the hours worked into particular tasks.  (Id. Ex. 49, Severson Dep. at 63:9-63:22.)  The hours allocated to tasks are supposed to total the scheduled hours worked, but there is a code that cable splicers can use to enter overtime beyond the scheduled hours.  (Id. at 63:9-64:3, 67:23-68:4.)  An Illinois Bell document conveying the answers to JAM-related "frequently asked questions" makes it clear that if a cable splicer "enters a known incorrect value into his timesheet, he is falsifying his timesheet."  (R. 226, Def.'s Reply, Ex. Y, JAM FAQ at 8.)  Illinois Bell also uses the information cable splicers input into JAM to rate their efficiency.  This efficiency rating is done through the MSOC system.  (R. 217, Ex. 48, Macon Dep. at 109-113:3.)

## C.    MSOC

In February 2010 Illinois Bell began using a methodology called "MSOC" to evaluate its cable splicers' performance, including their efficiency.  (Id. at 71:10-72:2.)  MSOC establishes a uniform measurement system using Key Measurement Indicators, or "KMIs," to hold employees accountable for their performance and to shape their behavior.  (Id. Ex. 51, MSOC 5 KMIs at 1.)  KMIs include an efficiency measure that evaluates the hours it should have taken to complete a task divided by the time an employee reported to complete the task.  They also include a productivity measure that analyzes the hours it should have taken to complete a task divided by the total hours paid.  (Id. Ex. 48, Macon Dep. 98:14-99:5.)  Illinois

Bell uses the KMIs to rank cable splicers into quintiles based on their efficiency. (Id. at 165:1-165:15.) A cable splicer whose efficiency ranks in the bottom quintile will find himself the subject of added supervisor scrutiny. (Id. at 165:5-167:3.) The parties dispute whether that scrutiny amounts to discipline or a threat of discipline.

## Analysis

Subject to certain limitations inapplicable here, the FLSA requires employers to pay their employees at a rate of one and one-half times their regular pay rate for any hours worked over 40 hours in a given week. 29 U.S.C. §§ 207, 213; *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). Employees who believe that their employer has violated that requirement are entitled to "bring a private cause of action on their own behalf and on behalf of other employees similarly situated." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013) (internal quotation omitted); *see also Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010). District courts typically follow a two-step process to get to the bottom of that question, involving conditional certification of a class pre-discovery followed by a second look at whether collective treatment is appropriate after the parties have engaged in discovery. *Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012). Here, the plaintiffs passed through the conditional certification stage by making the requisite "modest factual showing" of similarity. *See Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012) (quotation omitted). But now that they have navigated through extensive

discovery and arrived at the second stage, the plaintiffs are subject to a stricter, more probing inquiry into whether they are in fact similarly situated. *See id.*

In moving to decertify the conditionally certified class of cable splicers, Illinois Bell argues that discovery has shown that the plaintiffs' experiences in working through lunch or before or after their shifts are so varied that individualized inquiries inevitably will outweigh any efficiency benefits that could be gained by pursuing the case as a collective action. They argue that to the extent the plaintiffs claim that MSOC-related efficiency pressures force them to work off the clock, that theory is both outside the scope of this court's conditional certification order and unworkable on a class-wide basis. They further argue that the plaintiffs' remaining theories—that cable splicers work through lunch because they have to maintain job-site security or travel between sites, or that they work post-shift because they are unable to enter their hours before their shift ends—rest on factors that vary among garages, supervisors, and the particulars of the plaintiffs' daily job assignments.

In responding to the decertification motion, the plaintiffs argue that they are similarly situated with respect to "two primary indicia of liability." (R. 230, Pls.' Sur-Reply at 3.) First, they assert that the MSOC and JAM time-reporting systems uniformly result in cable splicers hiding their time to avoid being disciplined for failing to meet what they characterize as impossible efficiency goals. In other words, they argue that all of the opt-in cable splicers underreport the time it takes them to complete their daily tasks in order to avoid the bottom efficiency quintile,

causing them to forego compensation they are due, including overtime. Second, they argue that cable splicers work through lunch or before or after shifts for reasons that are specific to three sub-classes: cable and fiber splicers, DAG techs, and DAVAR techs. Specifically, they argue that plaintiffs in each of these sub-groups are forced to work through lunch because Illinois Bell requires them to monitor manholes and expensive equipment. (Id.)

Interspersed throughout the briefing on the motion to decertify is the parties' back-and-forth over whether this court should disregard the expert reports submitted by Dr. Robert Bardwell on behalf of the plaintiffs and Dr. John Henry Johnson IV on behalf of Illinois Bell.[2] Accordingly, before getting to the merits of the parties' decertification arguments this court will address these preliminary evidentiary issues.

A.      The Parties' Expert Reports

In support of its motion to decertify, Illinois Bell submitted the expert report of economist Dr. Johnson, who analyzed data from the opt-in plaintiffs' MSOC and JAM records and concluded that the only way to determine whether a particular employee performed uncompensated work in the manner the plaintiffs allege would be to review multiple electronic databases, paper records, and individual recollections of each individual plaintiff. (R. 193, Ex. B, Johnson Report at 3.) With

---

[2] Although in their sur-reply the plaintiffs attack the merits of the opinion submitted by another of Illinois Bell's experts, Professor Paul Mitchell, at no point do they argue that this court should exclude his report, that he is unqualified, or that the report is unreliable. (R. 230, Pls.' Sur-Reply at 11-19.) Accordingly, this court does not undertake a *Daubert* analysis with respect to Professor Mitchell's opinion.

their response, the plaintiffs submitted the expert report of statistician Dr. Bardwell, who opined that the court could use random sampling to determine how often the opt-in plaintiffs worked without compensation. (R. 217, Ex. 37, Bardwell Report at 5-6.)

Although neither side has explicitly moved to exclude its opponent's expert report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in their response to the motion to decertify the plaintiffs ask this court to "disregard" Dr. Johnson's analysis, and in its reply Illinois Bell asks the court to "reject" Dr. Bardwell's. Even though neither side presents a traditional *Daubert* argument, each side challenges the validity of its opponent's expert reports and this is enough to trigger the need for the court to embark on that analysis here. When an expert's report is critical to the question of class certification, this court "must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). In other words, where an expert's opinion is relevant to establishing whether class treatment is appropriate, the court must resolve any challenge to the expert's qualifications or the reliability of the expert's information before deciding the certification motion. *Id.* The Seventh Circuit has made clear that when there is doubt about whether a *Daubert* ruling is needed at the class certification stage, the district court should err on the side of engaging in an explicit *Daubert* ruling. *See Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 812 (7th Cir. 2012); *see also West v. Prudential Secs., Inc.*, 282 F.3d 935, 938 (7th Cir.

2002) ("A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits.").  Accordingly, this court will analyze the parties' objections to their opponent's expert reports under the analysis set forth in *Daubert*.

Under Rule 702 and *Daubert*, "expert testimony is admissible only if (1) the expert testifies to valid technical, scientific, or other specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner*, 669 F.3d at 811-12.  The *Daubert* framework requires the court to assess "whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).  To determine whether an expert is qualified, the court compares "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Id.* (quotation omitted).  To assess reliability, the court looks to factors including "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *American Honda*, 600 F.3d at 817.  Also relevant is the expert's methodology and range of experience and training in the subject area. *Gayton*, 593 F.3d at 616.

1. **Dr. Johnson's Report**

Illinois Bell engaged Dr. Johnson, the President and CEO of Edgeworth, Economics, LLC, to evaluate whether a common methodology can be employed to

show that the plaintiffs are similar with respect to working through their lunch breaks or after their shifts end without resorting to individual determinations regarding who worked when and why. (R. 193, Ex. B, Johnson Report at 2-3.) Dr. Johnson reviewed the depositions of the opt-in plaintiffs as well as JAM, MSOC, and GPS-tracking data supplied by Illinois Bell to form his opinions. (Id. at 3-4 & App'x B.) Dr. Johnson concluded that the data reflected "a range of circumstances and differences with respect to [the plaintiffs'] daily work patterns, overtime worked, efficiency scores and other relevant factors." (Id. at 3.) He further concluded that it would be impossible to determine from the data "on a class-wide basis, whether any given class member took a lunch break, submitted an electronic timesheet during the regularly scheduled work day, or was paid sufficient overtime." (Id. at 5.) In particular, Dr. Johnson opined that to determine whether the MSOC system motivated cable splicers to work through their lunches to improve their efficiency scores, the court would have to undertake "at a minimum an analysis of their individual performance, their assignments that day and prior days, their prior MSOC scores, and their own anticipated MSOC score that day." (Id. at 27.)

In responding to Illinois Bell's decertification motion, the plaintiffs challenge Dr. Johnson's qualifications and the reliability of his report. With respect to his qualifications, the plaintiffs argue that Dr. Johnson's experience as a labor economist has nothing to do with his report, which they characterize as requiring statistical expertise. (R. 217, Pls.' Resp. at 95-98.) But a close look at Dr. Johnson's

resume shows that his educational and professional background is sufficiently aligned with the field of statistics to render him qualified here. *See Gayton*, 593 F.3d at 616 (noting that to evaluate an expert's qualifications under *Daubert*, the court should compare the expert's area of knowledge, experience, and education with the proposed testimony). In addition to his Ph.D. in economics, Dr. Johnson has taught in the fields of Economics and Labor & Industrial Relations and is a member of the American Statistical Association. (R. 193, Ex. B, Johnson Report, App'x A.) He has provided expert opinions in a number of FLSA cases and has published articles that discuss the impact of statistics in employment litigation. (Id.) Given Dr. Johnson's range of experience in this field, he is qualified to provide the opinions reflected in his report.

In challenging the reliability of Dr. Johnson's report, the plaintiffs argue that it is impossible to test the reliability of his opinion because he did not provide the algorithms he used to produce his data, in violation of Federal Rule of Civil Procedure 26(a)(2)(B)(ii). (R. 217, Pls.' Resp. at 87-90.) Rule 26(a) requires an expert witness to disclose in his report "the facts or data considered by the witness in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). The plaintiffs argue that because Dr. Johnson did not provide them with the code he used to create the algorithms reflected in his data tables, they were deprived of the ability to depose him with respect to how he reached his conclusions. But most of the tables included in Dr. Johnson's reports represent summaries of data he gleaned from Illinois Bell's JAM, MSOC, and VTS systems, compiling information with respect to how many

regular and overtime hours the opt-in plaintiffs worked or summarizing how often employees worked underground. (R. 193, Ex. B, Johnson Report.) His report is supported by an exhibit listing the data sources he relied on to summarize that data. (Id. App'x B.) Moreover, in its reply brief Illinois Bell represents that the underlying data was produced to the plaintiffs long before they took Dr. Johnson's deposition. (R. 226, Def.'s Reply at 17 n.7 & Ex. F, Abrams Decl. ¶ 15.) The plaintiffs have not identified which of the tables they consider suspect based on what they characterize as the insufficient disclosure of Dr. Johnson's code. Accordingly, because Dr. Johnson provided an extensive list of the "facts or data" he relied on to form his opinions in Exhibit B to his report, the court will not disregard his opinion based on Rule 26(a)(2)(B).

The plaintiffs next argue that the court should disregard Dr. Johnson's report because, they say, his analysis is flawed and his results are unreliable. According to the plaintiffs, "Dr. Johnson is incapable of giving an opinion because his opinion starts from the premise that the Fair Labor Standards Act is wrong, or at the very least, unworkable." (R. 217, Pls.' Resp. at 86.) They rest this accusation on a selective excerpt from his deposition in which the plaintiffs tried to paint him into a corner by forcing him to come up with a hypothetical class that would be similar with respect to its FLSA claims. (Id. at 85-86.) His response to that attempt was to decline to come up with a hypothetical class on the fly, because, as he said, "I always think these things are very factually specific" and "it's very hard in the abstract" to identify the circumstances that would make class-wide treatment

appropriate.  (R. 217, Ex. 47, Johnson Dep. at 247-48.)  Dr. Johnson's reluctance to identify a hypothetically viable class outside the context of any specific data hardly translates to a conclusion that he summarily rejects the use of collective actions in the FLSA context.

Finally, the plaintiffs argue that Dr. Johnson's report is unreliable because he relied on data from Illinois Bell's computer systems and, according to them, he never analyzed the plaintiffs' deposition testimony.  But the point of Dr. Johnson's theory is that because the court has to look at the individual plaintiffs' deposition testimony to determine whether or not they took their lunch breaks, it is not possible to resolve the claims on a classwide basis.  The plaintiffs may disagree with the merits of that premise, but their disagreement does not render his opinion unreliable.  *See Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 809 (7th Cir. 2013) (noting that as long as there is "a rational connection between the data and the opinion" an expert's reliance on faulty data goes to the weight of his opinion rather than its admissibility).  And to the extent that they argue Dr. Johnson's report speaks more to damages than liability, that is a point the court can evaluate in reviewing the utility of his report in connection with the similarity argument, but it does not mean his report is unreliable.  Accordingly, this court will consider Dr. Johnson's analysis in evaluating whether the plaintiffs are sufficiently similar to warrant them continuing to pursue their claims on a collective basis.

### 2.    Dr. Bardwell's Report

Illinois Bell challenges the reliability of Dr. Bardwell's report, submitted by the plaintiffs in support of their response to the motion for decertification. Dr. Bardwell opines that with a sample size of the 18 deposed opt-in plaintiffs the court can estimate unpaid overtime for the entire collective within a margin of error of plus or minus 19%. (R. 217, Ex. 37, Bardwell Report at 5-6, 12.) Specifically, based on the opt-in plaintiffs' deposition testimony and interrogatory responses, Dr. Bardwell states that he calculated the average minimum unpaid hours per week as falling between 2.22 and 3.28 hours per week, and that the sample allows 90% confidence that the unpaid overtime for each opt-in plaintiff will fall within that range. (Id. at 13-14.) Dr. Bardwell also argues that the erratic fluctuations noted by Dr. Johnson regarding the opt-ins' MSOC daily scores "mask overall patterns that affected all employees." (Id. at 17.) Illinois Bell attacks the reliability of Dr. Bardwell's report by arguing that the 18 opt-in employees cannot provide the basis for accurate damages estimates because of the lack of randomness and bias in the sample. The latter is reflected, according to Illinois Bell, by the fact that several of the originally identified 25 representative opt-ins withdrew from the case because they did not want to participate in discovery, showing that the 18 who remained were particularly motivated to pursue their claims. The data is further skewed, Illinois Bell argues, by Dr. Bardwell's reliance on counsel-formulated interrogatory responses and his failure to consider differences between some of the opt-ins' testimony and interrogatory responses.

Again, the court concludes that Illinois Bell's arguments speak more to the weight to be given Dr. Bardwell's sampling results than whether the court should reject his entire methodology as being insufficiently reliable under *Daubert*. Illinois Bell does not challenge Dr. Bardwell's qualifications to render the report, and as the plaintiffs point out, his underlying methodology—the use of sampling data to extrapolate class damages—is one that has been accepted by experts and courts in dealing with FLSA collective action cases. *See American Honda*, 600 F.3d at 817 (noting that a scientific methodology may be sufficiently reliable if it is accepted by the relevant scientific community). But in the end, the court considers Dr. Bardwell's opinion only marginally helpful, because it fails to address the question of similarity among the plaintiffs' claims. Although his opinion suggests random sampling as a cure for the problem of individual variations in calculating damages, it does not lend a great deal of insight with respect to whether Illinois Bell's liability can be resolved on a collective basis. Accordingly, although the court has carefully considered Dr. Bardwell's report, his input ultimately does not weigh heavily in the court's step-two similarity analysis, which focuses on liability.

## B.     The Plaintiffs' Efficiency-Pressure Theory

Turning to the substance of Illinois Bell's decertification motion, the first path the plaintiffs pursue to demonstrate that all cable splicers are similarly situated for purposes of their FLSA claim consists of their theory that the MSOC efficiency metrics are so unrealistic that the only way the plaintiffs can avoid falling into the bottom quintile—an event which, they say, subjects them to discipline—is

to "hide time" from Illinois Bell. In other words, they argue that they are similarly situated based on a "common policy" that Illinois Bell knows or should know results in cable splicers underreporting their time. Illinois Bell argues that this court should bar the plaintiffs from pursuing this theory collectively, for both procedural and substantive reasons.

### 1. Illinois Bell's Procedural Challenge to the Efficiency-Pressure Theory

Illinois Bell argues that because the plaintiffs never presented at the conditional certification stage their theory that all cable splicers are forced to hide their time under the MSOC efficiency rating system, nor moved to modify the class after it was conditionally certified, they should not be allowed to proceed collectively with respect to that theory. (R. 205-2, Def.'s Br. at 4-5, 10-12.) The plaintiffs concede that they did not present this theory at the conditional certification stage, but argue that they "were not required at that point to present *all* evidence relevant to the case, only so much as the Court might require to grant conditional certification." (R. 230, Pls.' Sur-Reply at 21 (emphasis in original).) But that response lands wide of Illinois Bell's position. There is no suggestion that the plaintiffs were obligated to present all of their evidence at the conditional certification stage, before they engaged in discovery. But as Illinois Bell points out, the plaintiffs did not need evidence or discovery to present their theory earlier. If, as the named plaintiffs contend, they have been forced to underreport their time since the MSOC's inception, they did not require the benefit of discovery to present that theory at the conditional certification stage.

The question is whether they should be allowed to seek conditional certification based on one theory of off-the-clock work—or in this case, three theories: maintaining job-site security, inter-site travel, and a garage computer shortage—and then avoid decertification based on another. That question seems particularly salient here, where the plaintiffs who opted into the suit would have had no way of gleaning from the amended complaint or opt-in notice that the named plaintiffs intended to pursue a theory that turns on all of the opt-ins having routinely and purposefully manipulated their time sheets in order to improve their efficiency ratings. Put more bluntly, cable splicers who opted into the suit had no way of knowing that the named plaintiffs would argue that all of the opt-ins intentionally falsified their time sheets.

As the plaintiffs concede, they did not seek conditional certification on the basis of their efficiency-pressure theory. This court first became aware of the plaintiffs' percolating efficiency-pressure theory when Illinois Bell sought a protective order barring the plaintiffs' request for discovery on the topic of how Illinois Bell evaluates and compensates cable splicers' managers. The plaintiffs argued that the discovery was relevant because it might show that efficiency pressure motivated managers to overlook time cable splicers spent working off-the-clock. After extensive argument on the motion the plaintiffs were unable to persuade this court that those evaluation and compensation policies are relevant to the conditionally certified claims. In granting the protective order, this court noted that it conditionally certified the class "based on the named Plaintiffs' FLSA

allegations . . . about 'unpaid lunch breaks and post-shift work completing time sheets.'" *See Blakes*, 2012 WL 5862747, at *1. The court specifically said that "performance evaluation factors that may have encouraged and motivated first level supervisors and managers to impose unreasonable efficiency goals for their subordinate cable splicers" were not relevant to the certified issues. *Id.* Despite that decision, the plaintiffs never sought to modify the conditionally certified class to encompass that new theory and the possible expanded class of cable splicers it might cover before bringing this new theory as its primary shield in defense against Illinois Bell's decertification motion. *See, e.g., Mancuso v. Florida Met. Univ., Inc.*, 09-61984-CIV, 2010 WL 3702511, at *4 (S.D. Fla. Sept. 16, 2010) (denying motion to expand conditionally certified FLSA class based on evidence generated in course of discovery); *Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 643 (W.D. Tenn. 2009) (granting motion to expand conditionally certified FLSA class based on deposition testimony suggesting similarity among nationwide class).

Other courts have suggested that named plaintiffs in FLSA cases should not be allowed to engage in the kind of bait-and-switch that the plaintiffs' new theory represents here. For example, where opt-in plaintiffs testify during the discovery phase that they are seeking recovery for additional claims that were never pled by the named plaintiffs, that discrepancy weighs in favor of decertification. *See Gatewood v. Koch Foods of Miss., Inc.*, 3:07CV82-KS-MTP, 2009 WL 8642001, at *16 (S.D. Miss. Oct. 20, 2009); *see also Hart v. JPMorgan Chase Bank, N.A.*, 8:12-cv-00470-T-27TBM, 2012 WL 6196035, at *2 n.8 (M.D. Fla. Dec. 12, 2012) (noting that

plaintiffs should not seek conditional certification of FLSA claim based on theory that was never pled in the complaint). That consistency is necessary because "[i]t is patently unfair to expect a defendant to respond to a theory of liability that shifts with each response." *Adair v. Wisconsin Bell, Inc.*, 08-C-280, 2008 WL 4224360, at *5 (E.D. Wis. Sept. 11, 2008).

By waiting until their response to Illinois Bell's decertification motion to raise their efficiency-pressure theory, the plaintiffs have essentially asked this court to expand the opt-in class to encompass this new theory despite this court's previous statements that the conditional class does not include "any possible FLSA claim under the sun," and that evidence surrounding managers' pressure to maximize efficiency is irrelevant to the claims the plaintiffs asked the court to conditionally certify. *See Blakes*, 2011 WL 2446598, at *8; *Blakes*, 2012 WL 5862747, at *1. The plaintiffs could have sought to have the court modify the conditional certification order earlier, but having failed to do so, they will not be allowed at this late stage to expand "the criteria for participation in the collective action." *See Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1074 (N.D. Ind. 2012). As Illinois Bell suggests, modifying the certified collective now could ensnare opt-in plaintiffs in a theory of liability that implicates them in a practice of hiding time from their employer in a manner that at least arguably violates Illinois Bell's Code of Business Conduct. (*See* R. 196, Ex. SS, Zang Decl. Ex. 1.) None of them consented to that implication when they opted into the class. Accordingly, this court agrees with

Illinois Bell that the plaintiffs should not be allowed to avoid decertification based on a theory they never asked the court to conditionally certify.

## 2. Illinois Bell's Substantive Challenge to the Efficiency-Pressure Theory

Even assuming that the plaintiffs should be permitted to defend against decertification based on a theory of similarity they never presented at the conditional-certification stage, this court concludes that they have not demonstrated that their MSOC efficiency theory passes second-stage scrutiny. At the decertification stage, this court considers: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Strait*, 911 F. Supp. 2d at 718 (internal quotation and citations omitted). These factors taken together here support the conclusion that the plaintiffs are insufficiently similar on the basis of their efficiency-pressure theory.

## (a) The MSOC System Does Not Show That Cable Splicers' Factual and Employment Settings Are Similar

Although the plaintiffs need not show that their situations are identical to justify proceeding as a collective action, they must do more than simply claim that Illinois Bell violated the FLSA by denying them all overtime pay. *See Russell v. Illinois Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 812 (7th Cir. 2010). To demonstrate their similarity, the plaintiffs must identify a "factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws." *Id.*

(quotation omitted). In analyzing similarity, the court looks to factors like the plaintiffs' job locations, duties, supervision, and common policies. *See Strait*, 911 F. Supp. 2d at 723. Where individualized circumstances and questions predominate over common issues, decertification is appropriate. *See Alvarez*, 605 F.3d at 449; *Camilotes*, 286 F.R.D. at 346.

Conceding that the evidence gleaned in discovery in this case shows that the cable splicers who have opted into this case work in 48 different garages, underneath 209 different supervisors, and perform at least three subsets of job duties in work environments that vary by assignment, to demonstrate their similarity as a class the plaintiffs argue that it is enough that they are all subject to the MSOC rating system and the JAM time-keeping system. Many of the deposed cable splicers acknowledged that when they reported overtime work, Illinois Bell paid them for it, whether or not they sought preapproval. (*See, e.g.*, R. 217, Ex. 25, Chambers Dep. at 53; R. 194, Ex. J, Deckys Dep. at 125, 153, 293-94, Ex. L, Ericson Dep. at 23.) But the plaintiffs' theory is that the MSOC/JAM combination violates the FLSA because it intimidates cable splicers into hiding time that they spend to complete their daily tasks in an effort to meet what they describe as impossible efficiency expectations. They argue that all cable splicers who opted into this lawsuit perceive this system to be a disciplinary one and are forced to "hide time" from Illinois Bell in an effort to avoid falling into the bottom quintile. They argue that uncertainty in whether they will be able to meet expectations on a day-to-day basis forces them to "bank hours" by hiding time spent on a task to maximize their

efficiency numbers and to offset other days when they may not be able to complete their tasks according to Illinois Bell's expectations. According to the plaintiffs, this pattern of behavior shows that the MSOC efficiency ratings and JAM time-keeping system together are a common policy that results in routine underpayment of cable splicers, in violation of the FLSA.

The problem with the plaintiffs' theory is that the "common policy" they identify hinges on all opt-in cable splicers responding to efficiency pressure in a uniform way, but the evidence mined in discovery does not bear that out. Only 18 of the 346 opt-in plaintiffs in addition to the named plaintiffs have been deposed, but even within that small sample, the testimony shows that getting to the bottom of whether and when cable splicers "hid time" will require the court to engage in an overwhelming amount of individual inquiries. For example, several of the deposed plaintiffs testified that whether it was necessary for them to work through lunch without reporting it in an attempt to make their MSOC numbers depended on the nature of the job assigned and the tasks they were expected to complete in a given day. (R. 193, Ex. E, Blakes Dep. at 183-84; R. 194, Ex. I, Crowder Dep. at 167-68; R. 195, Ex. DD, Williams Dep. at 282.) Some plaintiffs admitted that it was sometimes possible for them to make their targets without having to skip lunch. Whether that was true turned on what the particular job looked like, the individual's experience level, and whether they were assigned to work together with experienced or particularly skilled workers. (R. 193, Ex. D, Arvizu Dep. at 99-101, 125; R. 194, Ex. N, Hunt Dep. at 319.) Even factors like the weather and whether

there were dogs in the yard at a particular job site can impact the cable splicers' numbers. (R. 193, Ex. D, Arvizu Dep. at 100-01.) For example, Blakes testified that whether he was able to meet his efficiency numbers without working through lunch depended "on the task at hand," and although he sometimes is able to complete his assigned tasks in the allotted time without working through lunch, he could not identify which jobs caused him to work through lunch and which did not. (Id. Ex. E, Blakes Dep. at 183:19-185:5.) He further testified that there are no documents or other materials he could review to determine which jobs forced him to work through lunch. (Id.) One cable splicer testified that prior to June 2012 he never worked through lunch in an attempt to meet his MSOC target. (R. 217, Ex. 11, Smith Dep. at 116.) Others testified that they did not pay attention to or stopped looking at their MSOC numbers. (R. 228, Ex. WW, Palenske Dep. at 135; R. 193, Ex. C, Anderson Dep. at 98.) When another opt-in plaintiff was asked whether he ever worked through a lunch break without reporting the time, he answered that he did not know. (R. 195, Ex. V, Rentschler Dep. at 77:17-19.) This testimony shows that even if cable splicers were hiding their time, they were not doing so in accordance with any reliable pattern or routine. Instead, these variations in testimony demonstrate that pressure stemming from MSOC impacted cable splicers in different ways on different days and sometimes not at all.

Dr. Johnson's report reinforces the conclusion that whether MSOC pressure forced cable splicers to work through lunch or otherwise off-the-clock varies with each plaintiff's individual circumstances. He prepared charts of the daily and

monthly efficiency scores of four of the opt-in plaintiffs and noted that those scores fluctuated on a daily basis. (R. 193, Ex. B, Johnson Report at 27.) He opined that the fluctuations are explained by factors including the changes in a cable splicer's number of job assignments, the difficulty of an assigned job, and the relative skill of the cable splicer or his partner. (Id.) According to Dr. Johnson, the only way to determine whether a given cable splicer would in fact have the incentive to work through a meal break to maintain or improve an efficiency score is to look not only at the plaintiff's individual testimony, but also at his performance, assignments, and prior MSOC scores. (Id.) Dr. Johnson's opinion in this regard apparently is shared by plaintiff Blakes, who admitted in his deposition that the only way to tell which technicians were manipulating their numbers to boost their MSOC scores would be to ask them directly. (Id. Ex. E, Blakes Dep. at 184-85, 190, 194, 222-23.) In light of the need for these individual inquiries to get to the bottom of liability, it is difficult to see how the MSOC system manifests in an illegal common policy for purposes of the plaintiffs' similarity argument. *See Ginsburg v. Comcast Cable Commn'cs Mgmt., LLC*, No. C11-1959RAJ, 2013 WL 1661483, at *8 (W.D. Wash. Apr. 17, 2013) (concluding class action unmanageable where claim based on systematic efficiency pressure required individual inquiries about how often, how much, and why employees worked off-clock).

Moreover, the plaintiffs' theory of liability hinges on the opt-in cable splicers uniformly fearing being disciplined or losing their jobs if they fall into the bottom quintile for efficiency (it is this fear, the theory goes, that leads to uniform

underreporting). But the opt-in plaintiffs' testimony does not support a conclusion that there was a uniform culture of discipline stemming from the MSOC numbers. Several plaintiffs testified that they had never been disciplined or could not recall being disciplined even though some of their numbers had put them in the bottom quintile. (R. 193, Ex. E, Blakes Dep. at 195:23-196:1, Ex. H, Clark Dep. at 270:23-271:9; R. 228, Ex. KK, Deckys Dep. at 199.) Several testified that they did not know anyone who had ever been disciplined for underperforming efficiency-wise. Moreover, the kinds of discipline the plaintiffs allude to in their response include supervisors reviewing their work more frequently, giving low-performing cable splicers "constructive criticism," and otherwise engaging in coaching. Although there is evidence that consistently poor efficiency ratings could also lead to supervisors implementing performance improvement plans ("PIP"), at least one opt-in plaintiff testified that he does not regard a PIP as being discipline in the caliber of a suspension or pay-docking. (R. 217, Pls.' Resp. at 12 & Ex. 10, McKey Dep. at 142.) And according to Illinois Bell's Manager's Guide to Corrective Action, the "primary goal of a PIP is to improve an employee's performance through training and coaching," via "regularly scheduled feedback meetings." (R. 230, Ex. 60, Manager's Guide to Corrective Action at 12.) Even a union newsletter the plaintiffs point to in support of their assertion that being in the bottom quintile subjects them to discipline acknowledges that "AT&T can't discipline for numbers alone." (R. 217, Pls.' Resp. at 14 & Ex. 36, IBEW at 12.) Whether the plaintiffs' claim that the MSOC standards actually operated as a disciplinary bludgeon is a merits question,

but what matters for purposes of the current motion is that the plaintiffs have been unable to show any uniformity in the plaintiffs' experience of MSOC-related discipline. Accordingly, all that is left is the opt-in plaintiffs' speculative fear of what could happen if they fall into the bottom quintile. But that collective speculation is not enough to bind a class. *See, e.g., Griffith v. Wells Fargo Bank, N.A.*, No. 04:11-CV-1440, 2012 WL 3985093, at *5 (S.D. Tex. Sept. 12, 2012) (noting that pressure is a subjective experience that varies with individual abilities and experiences with supervisors); *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-00738, 2012 WL 334038, at *5 (S.D. Tex. Feb. 2, 2012) ("Subjective beliefs or fear about logging overtime hours is insufficient to establish an actual company-wide policy.").

As Illinois Bell points out, this case is remarkably parallel to *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 261265, at *1 (W.D. Wis. Jan. 10, 2013), where the district judge refused to conditionally certify an FLSA collective action based in part on a finding that the same efficiency-measurement system that is at issue here could not support collective treatment of the claim that efficiency goals forced employees to work off the clock there. In *Boelk*, a collective of field technicians argued that the MSOC system compels them to work through their meal breaks without reporting the work. *Id.* at *1-*2. The court determined that the key question with regard to their claim is why they worked through their meal breaks without reporting their time, but it concluded that the plaintiffs had not shown "that this question could be resolved on a classwide basis." *Id.* at *12. The

court noted that the plaintiffs' testimony revealed that whether they worked through lunch because of efficiency pressure varied on a daily basis depending on the nature of the work, the route involved, and the technician's individual circumstances. *Id.* Based on these variations, the court concluded that "the common questions central to plaintiffs' claim could not be resolved on a classwide basis." *Id.*

Just as individual variations prevented certification in *Boelk*, the differences in the opt-in plaintiffs' testimony here demonstrate that it would be impossible to resolve the question of whether the combination of the MSOC and JAM rating systems compelled cable splicers to work off the clock on a classwide basis. The testimony reveals that whether and when cable splicers hid time from the JAM system turned on their daily assignments, their own past performance statistics, and their personal tolerance for the risk of falling into the bottom efficiency quintile. Because there is no way to determine on a collective basis whether and how often cable splicers hid their time, the "common policy" the plaintiffs point to does not establish that they are sufficiently similar to justify the continued collective treatment of their claim. *See Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1258 (N.D. Ala. 2012) (noting that the difference between "a compensation system that structurally results in unpaid overtime as opposed to one that pressures some plaintiffs to work off the clock is significant, because the extent to which plaintiffs worked off the clock—and whether such work even occurred—varies materially among the class").

In arguing against decertification the plaintiffs rely heavily on *Brennan v. Qwest Commuc'ns Int'l, Inc.*, No. 07-2024 ADM/JSM, 2009 WL 1586721, at *1 (D. Minn. June 4, 2009), a case that they argue has more in common with the facts of this case than *Boelk*. In *Brennan*, another FLSA case involving a telecommunications company, the court denied the defendant's motion to decertify a class of network technicians who alleged that the defendant's productivity standards compelled them to work through lunch or before or after their shifts without pay. *Id.* at *1-*2. But in analyzing whether the plaintiffs were substantially similar in *Brennan*, the court noted that the defendant had not unequivocally denied that the named and opt-in plaintiffs had "substantially the same responsibilities" and performed "substantially the same tasks." *Id.* at *3. The court also noted that the plaintiffs had submitted evidence showing that at least two supervisors from different facilities had instructed plaintiffs not to report overtime and many of the plaintiffs had complained to their employer that the productivity standards were impossible to meet. *Id.* at *5. Here, by contrast, the cable splicers performed a number of different tasks depending on their role and daily assignment and plaintiffs have pointed to no evidence that any of them informed their supervisors that they were hiding time in the JAM system. Although there is ample testimony that the deposed cable splicers complained generally that the MSOC numbers were too demanding, several of the deposed plaintiffs admitted that they never told their managers, or could not remember ever telling their managers, that they were hiding time spent working during lunch to

meet their MSOC numbers. (*See, e.g.*, R. 217, Ex. 7, Blanchette Dep. at 50-51, Ex. 14, Roberts Dep. at 299-300, Ex. 20, Blakes Dep. at 188, Ex. 21, Palenske Dep. at 177; R. 193, Ex. E, Blakes Dep. at 160; R. 194, Ex. I, Crowder Dep. at 102; R. 228, Ex. VV, Parro Dep. at 122.) Nor have the plaintiffs here pointed in their response brief to evidence that any of their supervisors instructed them not to report overtime when they worked through lunch. (*Contrast with* R. 193, Ex. E, Blakes Dep. at 160; R. 217, Ex. 7, Blanchette Dep. at 51, Ex. 25, Chambers Dep. at 41-42; R. 194, Ex. N, Hunt Dep. at 93 (all admitting supervisors never told them to hide time or could not remember supervisors telling them to work through lunch).) On the contrary, none of the managers who submitted affidavits here said that they had ever instructed a cable splicer to change time sheets to eliminate unapproved overtime or knew that cable splicers were working through lunch without reporting their time. (*See, e.g.*, R. 195, Ex. HH, Biba Decl. ¶¶ 3, 5, Ex. II, Burk Decl. ¶ 4, Ex. KK, Hardy Decl. ¶ 6.) Accordingly, significant factors that supported similarity in *Brennan* are not present in this case. Because the evidence here suggests that the only way to get to the bottom of whether cable splicers routinely hid their time from their supervisors in an effort to improve their MSOC standings would require hundreds of individualized inquiries into the plaintiffs' particular circumstances, the plaintiffs' efficiency-pressure theory simply does not support continued collective treatment here.

The plaintiffs' reliance on *Brennan* is also misplaced because after that decision issued, the Supreme Court clarified in the class-action employment

discrimination context that individual decisions about how to enforce a company-wide policy can preclude a finding of commonality among class members.[3]  *See Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2552 (2011).  There, the plaintiff argued that Wal-Mart's corporate policy of allowing local supervisors to exercise discretion over employment matters led to class-wide sex discrimination.  *Id.* at 2554.  The Court noted that "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction."  *Id.* at 2555.  The Court concluded that merely showing that Wal-Mart's policy of allowing management discretion produced a sex-based disparity was not enough to establish the existence of a common question.  *Id.* at 2556-57.  Here, the plaintiffs' assertion that they are similar is based not on individual managers' policy enforcement decisions, but on the individual decisions of the plaintiffs themselves with respect to whether and when to violate Illinois Bell's time-keeping policies by hiding their time to inflate their efficiency ratings.  Just as the Supreme Court found it "quite unbelievable" that managers would exercise their discretion in a uniformly discriminatory way, here the plaintiffs have not established that cable splicers reacted to the pressure created by the MSOC system in a uniform way.  Rather, as described above, whether a cable splicer underreported time depended on a whole host of individual circumstances that varied by day.  Accordingly, the MSOC system does not give rise

---

[3]  Although the Supreme Court's discussion in *Wal-Mart* focused on the standards for class certification under Rules 23(a) and (b)(2), the Seventh Circuit has made clear that "there isn't a good reason to have different standards for the certification of the two different types of action" and that the Rule 23 standards "are as relevant to collective actions as to class actions." *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013).

to the capacity of this proceeding to generate a common answer to the question whether that system violates the FLSA. *See id.* at 2551 (noting that class treatment is appropriate only where it is possible "to generate common *answers* apt to drive the resolution of the litigation") (emphasis in original) (quotation omitted)).

It should be noted that even if the evidence here supported the idea that all cable splicers hide their time in a uniform way, the Seventh Circuit has cast doubt on the idea that an employer is liable for its employees' attempts to improve their standing by manipulating their time records. *See Espenscheid*, 705 F.3d at 774. In *Espenscheid*, the Seventh Circuit affirmed the district court's decision to decertify an FLSA collective of 2,341 technicians who alleged that management compelled them to conceal from their time sheets time spent on certain tasks. *Id.* at 772-73. Like the cable splicers here, the technicians in *Espenscheid* were paid on a piece-rate system. *Id.* at 773. In concluding that the plaintiffs had not shown a workable method under which to determine how often and why technicians underreported their time, the court considered:

> the further complication presented by a worker who underreported his time, but did so . . . not under pressure by DirectSat but because he wanted to impress the company with his efficiency in the hope of obtaining a promotion or maybe a better job elsewhere—or just to avoid being laid off.

*Id.* at 774. The court characterized such conduct as "benign underreporting" and distinguished it "from unlawful conduct by DirectSat." *Id.* But if an employee's decision to underreport time to maximize his efficiency numbers in an attempt to avoid being laid off is "benign," *see id.*, then the plaintiff's efficiency-pressure theory

does not stem from a common policy that violates the FLSA, *see Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 2457956, at *7 (N.D. Ill. June 6, 2013) (decertifying FLSA collective in light of *Espenscheid* in part based on inability to distinguish between "benign" underreporting and unlawful conduct by defendant). After *Espenscheid*, it is not at all clear that the common policy to which the plaintiffs point here—even if it applied similarly to all of the opt-ins—is one that could support a finding of liability at the merits stage.

Finally, the plaintiffs' attempt to characterize the points of dissimilarity as pertaining only to damages, rather than liability, is unconvincing. Although it is true that variations in damage calculations among members of a collective often are not enough to justify decertification, *see Messner*, 669 F.3d at 815 (collecting cases), here the evidence demonstrates that there are not just variations in the amount of time cable splicers hid in the JAM system to improve their MSOC efficiency numbers, but whether they did so at all on a given day (or ever).[4] Thus even if Illinois Bell can be held responsible for its employees' individual decisions to manipulate their time sheets to improve their efficiency ratings, whether it is liable to a particular cable splicer depends on that employee's particular circumstances.

---

[4] Even if the individual variations thoroughly catalogued by Illinois Bell go more to the question of damages—specifically, how often (rather than whether) MSOC forced cable splicers to work through lunch—recent cases suggest that collective treatment is inappropriate where individual damages issues overwhelm a common liability question. *See Comcast Corporation v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *Espenscheid*, 705 F.3d at 774-75 (casting doubt on the possibility of extrapolating from a representative sample of plaintiffs to the class as a whole the amount of unpaid overtime where a piece-rate time-keeping system like JAM is in play).

*See, e.g., Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 857 (N.D. Ohio 2013) (noting that where the "right to compensation hinges on" the plaintiffs' individual experiences it "is unclear how proceeding collectively and using representative testimony would be fair or useful"). For all of these reasons, this court agrees with Illinois Bell that the plaintiffs have not made a sufficient second-stage showing that any common policy connects the cable splicers who opted into the collective in a way that renders them similarly situated. *See Camilotes*, 286 F.R.D. at 345-46.

### (b) Illinois Bell's Individual Defenses

Illinois Bell also argues convincingly that the plaintiffs' efficiency-pressure theory is inappropriate for collective treatment based on what it characterizes as the individualized inquiries necessary to resolve its defense that it lacked knowledge that cable splicers were hiding their time and its plan to attack the credibility of the opt-ins' testimony about their response to the MSOC efficiency-rating system. In addressing this factor the court asks "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *Russell*, 721 F. Supp.2d at 820 (quotation omitted). If the defense would require the consideration of facts specific and unique to individual opt-in plaintiffs, this factor weighs against continued certification. *See Camilotes*, 286 F.R.D. at 352.

With respect to Illinois Bell's knowledge defense, the plaintiffs will be obligated to show that Illinois Bell had actual or constructive knowledge that they were hiding time on their time sheets. *See Kellar v. Summit Seating, Inc.*, 664 F.3d

169, 177 (7th Cir. 2011). Although an employer has a duty to ensure that its employees are not engaging in work it does not want performed, "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Id.* And while knowledge of a supervisor can be imputed to the employer, *Cunningham v. Gibson Elec. Co., Inc.*, 43 F. Supp. 2d 965, 975 (N.D. Ill. 1999), access to records showing that employees worked unpaid overtime is not necessarily sufficient to show constructive knowledge, *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 874 (6th Cir. 2012). An FLSA claim is ill-suited to collective treatment where variations in the opt-ins' work sites and managers mean that individual factual circumstances have to be assessed to determine whether an employer was aware of off-the-clock work. *See Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 400 (N.D. Ill. 2011); *see also Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011) (decertifying FLSA collective action where claims turned on individual managers having actual or constructive knowledge of off-the-clock work).

Here, determining whether Illinois Bell had actual or constructive knowledge that all cable splicers routinely hid time to improve their efficiency ratings would require proof specific to individual supervisors and locations. *See Camilotes*, 286 F.R.D. at 352. As pointed out above, the opt-in plaintiffs worked in 48 different garages and under 209 different supervisors. (R. 196, Ex. UU, Zollman Decl. ¶ 4.) The record suggests that there will be wide variations in whether those supervisors had actual or constructive knowledge that opt-in plaintiffs were hiding time to

maximize their efficiency ratings.  Several opt-in plaintiffs admitted that they never told their supervisors that they had to work through meal breaks so as to try to maximize their efficiency ratings.  (R. 193, Ex. F, Blanchette Dep. at 51; R. 217, Ex. 25, Chambers Dep. at 41:14-21, 57:9-11; R. 228, Ex. VV, Parro Dep. at 122.)  At least one opt-in plaintiff testified that even when his supervisor told him not to work through lunch he would do so anyway and not tell his supervisor.  (R. 195, Ex. Z, Smith Dep. at 73-74.)  Another testified that unless a manager has cable splicing experience, he would have no way of knowing that cable splicers hide time to improve their MSOC numbers.  (R. 193, Ex. E, Blakes Dep. at 190:22-191:18.)  That makes sense, because the very nature of the plaintiffs' efficiency-pressure argument hinges on management not realizing that cable splicers are under-reporting their time.  In other words, the strategy of hiding time to improve efficiency numbers only works if managers are unaware of the practice, but if an employee "deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation" of the FLSA.  *See Harvill v. Westward Comm'cs, LLC*, 433 F.3d 428, 441 (5th Cir. 2005) (quotation omitted).

Once again, the *Boelk* case is instructive here.  After the court denied the plaintiffs' motion to certify the FLSA collective action in *Boelk*, the plaintiffs moved for reconsideration arguing that the court "failed to recognize the importance of their contention that defendants' management knew or should have known that technicians worked through their lunch breaks without reporting or being paid for

the work." *Boelk v. AT&T Teleholdings, Inc.*, 12-CV-40-bbc, Doc. 124, Op. & Order at 3 (W.D. Wis. March 11, 2013). Even though the plaintiffs submitted some evidence that Boelk told the defendants' labor relations manager that the efficiency ranking system was causing technicians to work through their lunch breaks, the court concluded that his knowledge was insufficient to establish "'companywide knowledge of underreporting.'" *Id.* at 9-10. Although the plaintiffs argued that as long as the defendants knew that technicians were working through lunch it did not matter why they did so, the court concluded that the reasons could not be separated from the defendants' knowledge. *Id.* Accordingly, the court concluded that the labor relations manager's knowledge of underreporting "is not sufficient to show that the question of defendants' knowledge could be resolved on a classwide basis using common proof." *Id.* at 10-11.

As in *Boelk*, here the evidence is insufficient to show that the question of Illinois Bell's knowledge of underreporting could be resolved without resorting to myriad individual inquiries. The deposed plaintiffs testified that whether they worked through lunch to massage their numbers turned on many factors, including the day's assignment, their assigned partner, and their personal desire to bank time. Whether their managers realized they were hiding time would similarly turn on individual questions regarding the circumstances of each plaintiff, especially because many of the opt-in plaintiffs admitted they never told their managers about the pressure they felt from the efficiency crunch. Given these circumstances, there

simply is no way to resolve the question of Illinois Bell's knowledge via common proof that applies to the entire collective.

Illinois Bell's argument that its credibility defenses preclude ongoing certification is also well-taken. According to Illinois Bell, decertification is appropriate because it has "ample cause for impeaching individual technicians through cross-examination," and it would be deprived of that opportunity if the case proceeds collectively. (R. 226, Def.'s Reply at 84.) The plaintiffs argue that their credibility is a matter for the fact-finder to resolve and not an individualized defense that can preclude certification. *See, e.g., Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1362-63 (S.D. Fla. 2007) (noting that "contradictions are matter of credibility for the factfinder, not individualized *defenses*" (emphasis in original)). But here, there is no reason to think that any cable splicer could give truly representational testimony regarding the collective habits of cable splicers with respect to whether, when, why, and how they chose to manipulate their time records to increase their efficiency numbers. In these circumstances, to resolve whether cable splicers worked through lunch or otherwise hid time to maximize their efficiency numbers a fact-finder would have to "pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove their defenses." *See Espenscheid v. DirectSat, USA*, 09-cv-625-bbc, 2011 WL 2009967, at *7 (W.D. Wis. May 23, 2011) (internal quotation omitted), *aff'd by Espenscheid*, 705 F.3d at 774. Given the individual circumstances inherent in that question, it is not an inquiry that could be resolved at trial by looking to the

testimony of one cable splicer, or even a group of cable splicers. *See Martin v. Citizens Fin. Group, Inc.*, No. 10-260, 2013 WL 1234081, at \*6 (E.D. Pa. March 27, 2013) (noting that where question of liability hinges on truthfulness of employee testimony "resolving this question with regard to one manager and one employee would not accomplish the task for any of the others"). For these reasons, the individualized defense factor also weighs in favor of decertification.

### (c)    Fairness & Procedural Concerns

The final factor the court considers in determining whether the suit should continue on a collective basis turns on fairness and procedural concerns. *See Strait*, 911 F. Supp. 2d at 718. The collective action device is designed to promote judicial economy and to protect the interests of plaintiffs whose damages claims might be too small to justify the high costs of an individual lawsuit. But those interests are not served where the "need to address individualized factual issues" cuts against any efficiency to be gained from collective treatment and makes the aggregation of claims unmanageable. *See Hundt v. DirectSat USA, LLC*, __ F.R.D. __, 2013 WL 3338586, at \*8 (N.D. Ill. July 1, 2013); *see also Camilotes*, 286 F.R.D. at 353 ("While Plaintiffs' desire to litigate collectively for economic reasons is understandable, it does not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings."). Because the plaintiffs here have not shown that the efficiency pressure they allege stems from the MSOC parameters equates to a common policy, and because of the diversity of their individual experiences with respect to how that pressure plays out, those differences

"undercut any efficiency or cost-saving arguments as the collective will not be able to rely upon meaningful collective proof." *See Strait*, 911 F. Supp. 2d at 731. In the end, all three of the relevant factors weigh against the continued collective treatment of the plaintiffs' FLSA claim to the extent that it is based on their assertion that efficiency pressure requires all cable splicers to underreport their time. Accordingly, even if this claim had been certified at the first stage, this court agrees with Illinois Bell that it could not survive the scrutiny that applies at the decertification stage.

## C.    Collective Treatment of the Opt-In Plaintiffs' Proposed Sub-Classes

In response to the motion for decertification, the plaintiffs propose that as an alternative to all opt-in cable splicers pursuing their efficiency-pressure theory as an entire collective, this court could divide the cable splicers into three sub-classes—consisting of copper and fiber cable splicers, DEG technicians, and DAVAR technicians—to address alleged FLSA violations stemming from policies that are specific to each of those groups. (*See* R. 230, Pls.' Sur-Reply at 28-29.) As discussed above, in their original motion for conditional certification the plaintiffs argued that cable splicers are similarly situated because they work through lunch or before or after their shifts for three reasons: (1) Illinois Bell requires them to maintain the security of job sites; (2) they are required to travel between job sites during their lunch hours; and (3) they lack sufficient time to complete their time sheets given computer shortages at the garages combined with restrictions governing when they can return to their garage at the end of a shift. Under this court's reading of the

plaintiffs' responses to the current motion, it appears that they have abandoned their theory that inter-site travel cause cable splicers to work off the clock. Instead, their proposed sub-classes focus on the idea that Illinois Bell's policies requiring members of each sub-class to maintain the security of job sites forces them to perform work during what would otherwise be their lunch hour and before and after their shifts. (Id. at 29.) The plaintiffs argue that Illinois Bell's liability with respect to each sub-class can be determined collectively within those groups and then individual damages questions can be sorted out by a special master.

The Seventh Circuit has made it clear that district courts have "wide discretion to manage collective actions." *Alvarez*, 605 F.3d at 449. That discretion includes parceling a collective action into sub-classes to sort out FLSA claims. *See id.* at 449-50. In some circumstances "a collective action including sub-classes is the most efficient way to resolve" a group of plaintiffs' FLSA claims. *See Russell*, 721 F. Supp. 2d at 823. Although dividing a collective action into sub-classes can create complications, the use of sub-classes "may be more efficient than the alternative of requiring plaintiffs to bring many individual claims or a variety of smaller collective actions." *Medina v. Happy's Pizza Franchise,* LLC, No. 10 CV 3148, 2012 WL 379751, at *3 (N.D. Ill. Feb. 3, 2012). For the following reasons, this court concludes that the plaintiffs have not met their burden of showing that the members of the proposed sub-classes are similarly situated with respect to Illinois Bell's policies requiring cable splicers to maintain the security of their assigned job sites and to leave from and return to their garages at a specified time.

### 1. The Factual and Employment Settings of the Proposed Sub-Classes

The plaintiffs argue that there is sufficient similarity in the factual and employment settings among the cable splicers in each individual sub-class to warrant proceeding with their claims on a collective basis. In analyzing similarity among the sub-classes, the court considers the evidence regarding their job locations, duties, and supervision, as well as any common policies that apply among the sub-class as a whole. *See Strait,* 911 F. Supp. 2d at 723. The plaintiffs contend that isolating the opt-ins into sub-classes by three specific job functions is a work-around for any dissimilarities this court might find given the cable splicers' varying job duties and overall work environments. But ultimately, even when the cable splicers are divided into smaller classes based on the functions they perform, the trier of fact would still have to analyze individual questions related to the plaintiffs' particular responses to alleged MSOC efficiency pressure in order to resolve their FLSA claims. Accordingly, as described below, this court determines that the same individual variations that preclude collective treatment of the class of opt-in cable splicers as a whole precludes a finding of the requisite degree of similarity among opt-in plaintiffs in each sub-class.

### (a) Copper and Fiber Splicers

The plaintiffs argue that the specific job requirements for copper and fiber splicers render them sufficiently similar to justify litigating their claims collectively as a sub-class. They have submitted evidence showing that Illinois Bell copper and fiber splicers perform their work in manholes, where they are responsible for toning

and tagging pairs of cable. (R. 217, Ex. 7, Blanchette Dep. at 11:19-12:1.) Working in a manhole requires significant set-up tasks, including pulling the lid off the manhole and setting up a crown and guard, setting up a blower and heater in the winter, purging the manhole, and testing for explosive gas. (Id. Ex. 46, Harn Dep. at 225: 22-25, 227:18-228:22.) At the end of a job the copper and fiber cable splicer must perform those tasks in reverse. (Id. at 229:6-229:8.) Their work requires them to carry a variety of equipment to each manhole, including a manhole guard, gas analyzer, blower, heater, continuous gas monitor, and various other devices. (Id. at 227:18-228:22.)

According to the plaintiffs, the particular duties of copper and fiber splicers routinely require them to work through lunch or before or after their shifts. Specifically, the plaintiffs assert that Illinois Bell's policies setting forth a precise time frame in which cable splicers have to leave or return to their garage force copper and fiber splicers to work before their shift to gather the equipment they need in order to leave the garage at the specified time. (R. 217, Pls.' Resp. at 33.) They also point to Illinois Bell's lunch policies stating that employees working in manholes "may not break down the work location to travel to lunch" or leave the manholes unattended during their lunch break. (Id. Ex. 32, 2008 Telecom Operations at 3.) The policy states that copper and fiber splicers must carry their lunch when working in a manhole. (Id.)

If this sub-class presented a straight-forward claim that, as a rule, Illinois Bell does not pay copper and fiber splicers for the time they spend maintaining the

security of manholes during what otherwise would be their lunch break, the similarity analysis would be fairly straight-forward. But as the plaintiffs concede, under the terms of their CBA if an employee cannot leave a job site during lunch, "it is assumed no lunch period has been taken." (R. 217, Ex. 34, CBA § 17.11.) Although the JAM time-keeping is set up so that copper and fiber splicers have to manually report that they have worked though lunch in order for that assumption to apply, the plaintiffs do not argue that Illinois Bell refuses to pay them when they use that override to report working through lunch. Instead, they again fall back on the premise that they routinely hide the fact that they have not taken a lunch break—or have worked pre- or post-shift to gather or replenish their equipment—to improve their apparent efficiency with respect to their MSOC ratings. (R. 217, Pls.' Resp. at 44.) But the same wild variations that characterize the collective of cable splicers as a whole pertain to the sub-class of copper and fiber splicers when it comes to this claim. For example, more than one member of this group testified that he sometimes took his lunch despite working at a manhole, several testified that they could leave for lunch when working at a manhole with a partner, and at least one of the deposed copper and fiber splicers never worked in a manhole at all. Given those variations, there is no way to resolve whether the combination of Illinois Bell's lunch-hour policies and the MSOC efficiency ratings routinely caused copper and fiber splicers to work through lunch or to hide time spent gathering or replenishing materials pre- or post-shift. It simply is not a question that the testimony of a handful of opt-in plaintiffs can answer for the sub-class as a whole.

*See Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008). Accordingly, the plaintiffs have not shown the requisite level of similarity among copper and fiber splicers.

### (b)    DAVAR and DEG Technicians

The plaintiffs also argue that DAVAR and DEG technicians are similarly situated among themselves based on the respective impact of Illinois Bell's policies regarding maintaining the security of equipment. DAVAR technicians verify cable pairs and test the quality of those pairs. (R. 217, Ex. 19, Anderson Dep. at 20-21.) The testing requires DAVAR technicians to carry expensive equipment with them, including two computers and a generator. Illinois Bell policies make clear that they cannot leave that equipment unattended. (Id. at 108:17-108:22.) A DEG technician troubleshoots and maintains end-user equipment in systems that have already been installed. (Id. Ex. 21, Palenske Dep. at 10:12-11:4.) DEG technicians use a laptop computer on which they can enter their time in the JAM system. (Id. Ex. 7, Blanchette Dep. at 90:12-90:23.) According to the plaintiffs, DEG technicians and DAVAR technicians are similarly situated among themselves because the amount of time it would take them to secure their equipment so they can take a lunch break is too onerous to justify taking lunch, but according to them, Illinois Bell docks their pay for lunch each day whether or not they work through. (R. 230, Pls.' Sur-Reply at 29.)

According to the plaintiffs, the opt-ins are similar within these two sub-classes because the MSOC standards give them incentive to work through lunch so

they do not have to take the time to break down and set their equipment back up before and after their break. (R. 217, Pls.' Resp. at 33.) According to them, MSOC also gave DEG technicians in particular incentive to work off the clock before their shift started, to allow them to boot up their computers and log on before their shift to increase their efficiency standings. (Id.) But because their arguments for similarity of these sub-classes come back to the idea that they were not paid for all of their time because of their individual decisions to underreport their time to improve their efficiency ratings, the same individual variances will apply. There is no way to determine from Illinois Bell's lunch break and equipment security policies whether they forced individuals within these sub-classes to work through lunch or otherwise off the clock without looking at how those policies applied to each individual's circumstance on a given day. In other words, there is no way to determine from the policies or the employees' time sheets how members of these subgroups spent their lunch hour and whether the time was spent primarily for the benefit of the employer. Because the liability questions with respect to these sub-classes require individualized assessments, the plaintiffs have not shown that these employees are sufficiently similar to justify continued collective treatment.

### 2. Remaining Considerations Within the Proposed Sub-Classes

Given that the FLSA claims within the proposed sub-classes hinge on whether individuals in those sub-classes intentionally worked off the clock without reporting it to improve their efficiency ratings, the same individualized defenses that Illinois Bell points to with respect to a class composed of all cable splicers apply

within each sub-class as well. Namely, whether the managers in each sub-class should have known their employees were hiding their time and the credibility of the sub-class members can only be resolved through individual testimony. And given that the job locations and conditions for technicians within each sub-class varied on a daily basis, there is no discrete and predictable routine that would obviate the need for individual defenses. *See Marshall v. Amsted Rail Co., Inc.*, No. 10-CV-0011-MJR-SCQ, 2012 WL 5499431, at *11 (S.D. Ill. Nov. 13, 2012).

Furthermore, all of the variations among individuals within each sub-class with respect to what triggered their decisions to hide time, the efficiency gains that drive division of collectives into sub-classes would not be present here. This court is mindful that the purpose behind § 216(b) is to allow the pooling of resources to make it possible for common claims to be litigated where litigating individual claims may be cost-prohibitive. *See Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 170 (1989). But where, as here, individual questions inevitably would result in numerous "mini trials" to get to the bottom of liability questions, there is no gain to be derived from the collective approach. *See Zivali*, 784 F. Supp. 2d at 469. Although the court is sympathetic to the plaintiffs' desire to pool their resources in their attempt to vindicate their FLSA claims, that factor is not enough to outweigh the significant barriers to getting to the bottom of MSOC-related liability on a collective basis. Accordingly, this court concludes that the proposed sub-classes do not cure the problems of dissimilarity that preclude continued collective treatment here.

**D.     The Plaintiffs' Conditionally Certified Claim Regarding Unpaid Post-Shift Work**

Having concluded that continued certification is inappropriate with respect to the plaintiffs' MSOC-related theory of similarity, the court turns to the aspects of the case that remain unrelated to the theory that cable splicers are similar based on their individual decisions to hide time to inflate their efficiency scores—the claim that the plaintiffs are required to complete time sheets post-shift without pay.  This is the only aspect of the case that appears to have legs independent of the idea that MSOC forces cable splicers to hide time.  That is because it is not MSOC pressure that the plaintiffs argue forces them to stay late to fill out time sheets, but rather Illinois Bell's requirement that they return to the garage no earlier than 3:10 p.m. That requirement leaves cable splicers only 20 minutes to complete their end-of-day tasks and fill out their time sheets, which, according to the plaintiffs, often results in them working past 3:30 p.m. without pay to complete their JAM paperwork. (R. 217, Pls.' Resp. at 21-23.)  They assert that this is a universal experience among cable splicers, and accordingly, argue that they are similarly situated with respect to this claim.

Preliminarily, Illinois Bell argues that this is another "new" theory that the court should disregard.  But unlike their MSOC-related arguments, the plaintiffs put Illinois Bell on notice regarding the post-shift claim in their amended complaint.  (R. 11, Am. Compl. ¶¶ 28-32.)  There, the plaintiffs specifically cited the 20-minute period at the end of their shift as a factor contributing to unpaid overtime.  (Id. ¶ 28.)  Moreover, the time crunch caused by that required return

period is logically connected to the plaintiffs' theory that time-pressure stemming from computer shortages causes off-the-clock work. If cable splicers were permitted to submit their time at any point during their shift, those log-jams would be unlikely to occur. The computer shortage problem was among the issues this court conditionally certified for collective treatment. Accordingly, the court finds this aspect of the case is firmly rooted in the conditionally certified claims.

In moving to decertify the collective, Illinois Bell cites an array of opt-in testimony that it says shows insufficient similarity among the plaintiffs' individual experiences in working post-shift to submit their time or perform other required tasks. It also relies heavily on the Johnson Report, in which Dr. Johnson shows that on 95.2% of the days cable splicers worked after December 2009, (when cable splicers began entering their own time), the named and opt-in plaintiffs submitted their time sheets before the end of their shift or at the end of their submitted overtime, or on a day other than the work date, or a person other than the worker entered the information. (R. 193, Ex. B, Johnson Report, Ex. 4.) But inherent in that data is the concession that on 4.8% of the days the opt-in and named plaintiffs worked, they were not paid for time spent submitting their time sheets. The remaining question for this court then is whether it is possible, and practical, to remedy that on a collective basis. Answering that question requires another visit to the requisite three-part test.

### 1.    Similarity Based on Post-Shift Work Recording Time

According to the plaintiffs, Illinois Bell's policy requiring cable splicers to return to their garage by 3:10 p.m. routinely results in unpaid time spent to complete their JAM paperwork, because 20 minutes is an insufficient window in which to clean up and prepare for the next day and also submit their time sheets. Here, the court agrees that the submitted evidence points to a conclusion that there are sufficient parallels among the plaintiffs' experience of working post-shift to support a finding of similarity with respect to this aspect of their claim.  First, unlike their MSOC-related claims, determining whether they submitted their time after their shift ended without being paid does not require a finder of fact to second-guess the motivation for *why* time went unpaid.  The plaintiffs' theory is that Illinois Bell requires cable splicers to return to the garage at a designated time and to complete a number of tasks, including time-entry, before the end of their shift. Determining whether that 20-minute period is sufficient is an objective inquiry untied to any questions about individual desires to pad efficiency statistics or other subjective motivations.  Second, although Illinois Bell may be correct that most of the time cable splicers submit their time during their shifts, its own evidence shows that at least 20 of 22 cable splicers went unpaid for time spent completing time sheets past their shift.  (R. 193, Ex. B, Johnson Report, Ex. 5.)  Third, there is a significant amount of evidence showing that computer shortages or glitches often caused log-jams at garages, creating a common problem that prevented cable splicers from completing their time sheets in the 3:10-3:30 p.m. window.  (*See, e.g.,*

R. 217, Ex. 11, Smith Dep. at 122, Ex. 18, Deckys Dep. at 275-76; R. 194, Ex. H, Clark Dep. at 23.)   Finally, the plaintiffs have submitted evidence showing that some cable splicers were specifically told by Illinois Bell management not to report time spent completing JAM paperwork off the clock.   One plaintiff testified that he was "told in no uncertain terms that we were not to charge overtime for doing our time sheets."  (R. 217, Ex. 22, Parro Dep. at 65.)   Another testified that working overtime to fill out the time sheet is "not approved."  (Id. Ex. 14, Roberts Dep. at 273-74.)   Yet another testified that when he told a manager just before 3:30 p.m. that he would not have time to finish his time sheet before the end of the shift, his manager said, "Just get it done, and don't take any overtime."  (Id. Ex. 8, Ericson Dep. at 81-82.)   Because of that instruction, he was at work until 4:05 p.m. finishing his time sheet and did not get paid for the extra time.  (Id.)   Because the submitted evidence creates a record suggesting that the plaintiffs uniformly experienced difficulty getting through the expected tasks between 3:10 and 3:30 p.m., the question whether that time period is sufficient is one that can be answered on a collective basis.

With respect to the post-shift aspect of the case, the court agrees with the plaintiffs that most of Illinois Bell's objections with respect to similarity speak more to damages than liability.   Although Illinois Bell argues that cable splicers are permitted to complete their time sheets during the next shift if they do not have time the same day, some cable splicers testified that their managers told them that time had to be submitted the day it is worked.  (R. 217, Ex. 8, Ericson Dep. at 81-82,

Ex. 14, Roberts Dep. at 273-74.) If there are instances in which cable splicers submitted their time during the next day's shift, that can be accounted for by excluding those examples in calculating individual damages. Illinois Bell also argues, relying on Dr. Johnson's report, that there is too much variation in the frequency with which cable splicers submit their time after a shift or recorded overtime ends. As they point out, excluding two plaintiffs from the group, Dr. Johnson's report demonstrates that the number of days between December 2009 and May 2012 on which the plaintiffs submitted their time sheet after the end of a shift or any recorded overtime ranges from one to forty-three. (R. 193, Ex. B, Johnson Report, Ex. 5, Columns i & j.) But that range does not preclude a finding that the sufficiency of a 20-minute window is a common question. Instead, it governs the amount of damages individual plaintiffs will be entitled to recover if the finder of fact concludes that it is not. Importantly, Dr. Johnson's report suggests that determining individual damages on this aspect of the FLSA claim can be determined fairly easily by analyzing the JAM data. (Id.)

Illinois Bell's two remaining objections appear to be that cable splicers who enter their time on laptops or who left the company before it implemented electronic time entry in December 2009 cannot be similarly situated to the rest of the group. (R. 205-2, Def.'s Br. at 48.) But to the extent they are right, those discrete sub-groups can be dealt with either by modifying the class definition, such as to exclude the pre-December 2009 group, or by using sub-groups, for example to determine whether cable splicers who used laptops should be put under a separate umbrella

for the determination of liability.  Because those issues can be parsed out as the case approaches the trial stage, they do not stand as a bar to the finding of similarity here.

### 2.    Individual Defenses

Whether or not Illinois Bell's defenses require an inordinate amount of individual inquiries with respect to the post-shift claim appears to be a bit of a mixed bag.  To the extent it plans to challenge the credibility of the plaintiffs' claims that they stayed past their shift to record time and were not paid for it, for the same reasons discussed above in section B(2)(b), that defense could require individualized assessments.  But Illinois Bell's argument that knowledge is an individualized defense is not as strong when applied to these facts.  Unlike the evidence regarding cable splicers' independent choices to manipulate their time to game the MSOC system, with respect to finishing their time sheets, there is both evidence that managers knew cable splicers were working without pay and in some cases affirmatively instructed the plaintiffs to work without pay.  Another key distinction is that the unpaid post-shift work occurred in the garages, where managers often were present.  That factor makes it more likely that managers actually observed the off-the-clock work, possibly supporting a finding that they had at least constructive knowledge that cable splicers were submitting time sheets post-shift.  Although the defense may require evidence related to the conditions at each of the garages implicated in this case, that burden is not so great as to warrant decertification with respect to a claim that is otherwise amenable to collective treatment.

Additionally, Illinois Bell argues that it plans to assert that post-shift work was *de minimus* or otherwise not integral and indispensable to cable splicers' primary job duties. (R. 205-2, Def.'s Br. at 63-64.) Those defenses are two sides of the same coin. Work is *de minimus* unless "an employee is required to give up a substantial measure of his time and effort" to complete the task. *See Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 593 (7th Cir. 2012) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), *cert. granted*, *Sandifer v. U.S. Steel Corp.*, 133 S. Ct. 1240 (U.S. Feb. 19, 2013). And work is not compensable unless it is performed for the employer's benefit rather than for the employee's convenience. *See Kellar*, 664 F.3d at 175-76. Rather, an employer is liable "for any work of consequence performed for an employer for which the employer derives significant benefit." *Id.* at 175. Illinois Bell has not given the court a persuasive reason to doubt that the determinations regarding whether the post-shift work constitutes compensable time are amenable to collective treatment. On the contrary, the way in which cable splicers use the JAM system, with the possible exception of entering time on a laptop versus a garage computer, appears to be uniform. Because these two defenses are likely to be the same as applied to any cable splicers who submitted their JAM paperwork post-shift, they do not pose the same barriers of individual assessment that were present with respect to the MSOC-related defenses. Accordingly, the court concludes that this factor also weighs in favor of continued certification.

### 3.    Fairness and Procedural Concerns

Because the court finds that the claim with respect to post-shift time submission is sufficiently similar, both with respect to the cable splicer's individual experiences and Illinois Bell's defenses, it is fairly easy to weigh the last factor in the plaintiffs' favor.  As the plaintiffs point out, § 216(b) was designed both to promote judicial efficiency by allowing common issues to be resolved collectively and to give plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources."  *See Hoffman-LaRoche*, 493 U.S. at 170.  By allowing the one aspect of the plaintiffs' case that supports a finding of similarity among the plaintiffs to continue on a collective basis, the court can promote that goal. Collective treatment will salvage some of the time and expense that has been invested in the conditionally certified class.  It can also prevent a situation in which the same question—whether Illinois Bell's policy of requiring cable splicers to report to their garages in a specific window of time causes them to submit their time records post-shift and without pay—is litigated in hundreds of individual suits.  For all of these reasons, Illinois Bell's motion is denied to the extent that it seeks to decertify the collective with respect to the plaintiffs' claim that its policies force cable splicers to forego pay for time spent submitting their time sheets.

## Conclusion

For the foregoing reasons, Illinois Bell's motion to decertify the class is granted in part and denied in part. The motion is granted to the extent that the plaintiffs argue they are entitled to proceed collectively with respect to their theory that MSOC-related efficiency pressure forces them to work off the clock. The motion is denied to the extent that Illinois Bell seeks to decertify the collective with respect to the question whether its policies regarding when cable splicers may return to their garage at the end of their shift forced the plaintiffs to submit their time off the clock.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**