**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAMES BLAKES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS BELL TELEPHONE COMPANY d/b/a AT&T Illinois, <br><br> Defendant. | Case No. 11-cv-336 <br><br> Magistrate Judge Kim |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
<u>SUMMARY JUDGMENT CONCERNING POST-SHIFT ELECTRONIC TIMESHEET ENTRY</u>**

Plaintiff James Blakes, *et al.* ("Plaintiffs"), by their attorneys, Aaron B. Maduff, Michael L. Maduff, and Walker R. Lawrence of Maduff & Maduff LLC., respectfully submit this Response in Opposition to Defendant's Motion For Summary Judgment Concerning Post-Shift Electronic Timesheet Entry, and in support thereof state as follows:

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ............................................................................................................. I

**I. INTRODUCTION** ........................................................................................................ **1**

**II. FACTS** ............................................................................................................................ **3**

    A.   ILLINOIS BELL HAS A CUSTOM AND PRACTICE OF PAYING FOR ENTERING DATA IN JAMS ................ 3

    B.   THE INFORMATION INPUT INTO ILLINOIS BELL'S JOB ADMINISTRATION MANAGEMENT SYSTEM IS CRITICAL TO ITS BUSINESS ............................................................................................................ 3

    C.   ILLINOIS BELL KNOWS THAT ITS CABLE SPLICERS ARE WORKING OFF-THE-CLOCK ENTERING DATA INTO JAMS ...................................................................................................................... 4

**III. LEGAL STANDARD** ................................................................................................... **5**

**IV. ILLINOIS BELL'S PORTAL-TO-PORTAL ACT ARGUMENT FAILS** ................... **5**

    A.   ILLINOIS BELL HAS AGREED TO PAY FOR TIME SPENT ENTERING DATA INTO JAMS AND HAS A CUSTOM OR PRACTICE OF DOING SO ....................................................................................... 6

    B.   RECORDING INFORMATION INTO JAMS IS A PRINCIPAL ACTIVITY ............................................ 6

**V. ILLINOIS BELL HAD KNOWLEDGE THAT ITS POLICIES RESULTED IN POST-SHIFT OFF-THE-CLOCK WORK RECORDING TIME** ................................................ **8**

    A.   THERE IS A UNIFORM RETURN TO THE GARAGE POLICY ............................................................ 8

    B.   ILLINOIS BELL HAS DIRECT AND ACTUAL KNOWLEDGE OF OFF-THE-CLOCK WORK ..................... 8

    C.   ILLINOIS BELL HAS CONSTRUCTIVE KNOWLEDGE THAT OFF-THE-CLOCK WORK WAS BEING PERFORMED ................................................................................................................................ 9

    D.   ILLINOIS BELL HAS ABSOLUTE KNOWLEDGE ABOUT THIS VIOLATION SINCE THIS LAWSUIT WAS FILED — AT THE LATEST ............................................................................................................. 9

**VI. DR. JOHNSON'S CONCLUSIONS ARE FLAWED—ILLINOIS BELL'S DAMAGE ARGUMENTS MUST FAIL** ............................................................................................... **10**

    A.   DR. JOHNSON'S ANALYSIS AND ILLINOIS BELL'S ARGUMENTS IGNORE THE WORKWEEK PARADIGM OF THE FLSA ........................................................................................................... 10

B. DR. JOHNSON'S *DE MINIMIS* ANALYSIS IS INCONSISTENT WITH THE FLSA CASE LAW AND IN FACT PROVES THAT APPLYING THE *DE MINIMIS* DOCTRINE HERE IS INAPPROPRIATE ...................................... 12

C. ILLINOIS BELL MISAPPLIES §207(H) ................................................................................................ 14

    1. *Illinois Bell's Claim Of So Called "Rounding Up" Is A Red Herring. No Such Credit Exists Under The FLSA* ................................................................................................................ 14

    2. *Illinois Bell Has Not Met Its § 207(h) Evidentiary Burden With Regard To CBA Mandated Premium Wages* .......................................................................................................... 14

D. ILLINOIS BELL'S CONCLUSIONS ARE FATALLY FLAWED ....................................................................... 15

I. **INTRODUCTION**

Defendant moves for summary judgment as to the collective on two basic grounds: 1) entering time into Illinois Bell's Job Administration Management System ("JAMS") is not compensable because it is a postliminary activity excluded under the Portal-to-Portal Act; and 2) Plaintiffs cannot show that Defendant had actual or constructive knowledge (knew or should have known) that they performed this work off-the-clock. In its final section Illinois Bell argues that it should not be held to pay for some, but not all, off-the-clock work evidenced by its own timesheet data. In this regard it claims that: 1) payment is barred by the *de minimis* doctrine; and 2) Defendant is entitled to offsets against the overtime owed. These arguments should be rejected.

Based on the Portal-to-Portal act Illinois Bell argues that entering information in JAMS is not compensable. This argument has no support in the law, nor the facts of this case. JAMS is a management system used by Illinois Bell for many purposes, e.g., time spent on various tasks and jobs, whether or not those tasks and jobs have been completed, what materials need to be ordered, etc. Clearly, entering this information into JAMS are integral and indispensable parts of the cable splicers' jobs.

Illinois Bell had both constructive **and** actual knowledge that cable splicers were entering data into JAMS after the end of their recorded shift. As this Court recognized in its order on decertification, there are numerous examples of cable splicers telling their supervisors that they simply could not record their JAMS data within the allotted time. Furthermore, JAMS data (given to Plaintiffs' attorneys by Illinois Bell for the first time when this motion was filed) demonstrate beyond any doubt that Plaintiffs were in fact frequently recording information into JAMS after the end of their shifts.

1

Although most of the claims in this case were decertified on the basis that individual issues predominated, claims relating to entering JAMS data after the end-of-shift were not decertified and can be proven precisely, using Illinois Bell's computer records. Simply put, Illinois Bell's computers recorded the exact time, to the second, that each cable splicer entered into JAMS data proving unequivocally that he was still working at that time. Where a cable splicer entered JAMS data after his end-of-shift there can be no doubt he worked off-the-clock during that time.

Illinois Bell retained Dr. John H. Johnson, IV, to examine never before disclosed JAMS data and prepare yet another report purporting to show that, although Plaintiffs had worked off-the-clock entering JAMS data, much of that time did not qualify as overtime.[1] As discussed in in Section V below, Dr. Johnson's report is inapposite because his "analysis" of the JAMS data is flawed, based on false or unsustainable assumptions, and contrary to the FLSA's requirement that overtime be paid for time worked in excess of 40 hours in a week without regard to the amount of work done in any single day.

Dr. Johnson also argues that Illinois Bell is entitled to offsetting credits for what he calls, "rounding-up", and credits pursuant to § 207(h). The "rounding up" is based on factual speculation[2] and has no basis in the law. Dr. Johnson's conclusion that Illinois Bell is entitled to § 207(h) credits is also speculation. It is not supported by evidence that such payments were made —Illinois Bell chose not to give him any of its payroll records, none

---

[1] Plaintiffs do not present their own expert to quantify damages in this response, but reserve the right to do so (now that the data has been produced), in the event of trial. Because Illinois Bell's motion for summary judgment presents its facts as all or nothing, i.e., if one proposed fact falls they all do, the Plaintiffs have presented examples of where the conclusions and factual statements are in dispute.

[2] All timesheets were scrutinized, and often "corrected" by Illinois Bell's managers before submission to the payroll department. By this argument, Dr. Johnson is now attacking the credibility of Illinois Bell's time records which it has been claiming all along are accurate and satisfy its timekeeping obligations under §211(c).

have been given to the Plaintiffs or otherwise placed in the record and Dr. Johnson certainly does not cite to any.

## II. FACTS

There is little dispute that there was off-the-clock work that was not being paid. Illinois Bell's own expert (even after attempting to diminish the amount of off-the-clock work done) confirms that Illinois Bell has violated the FLSA. Nonetheless, Illinois Bell denies liability, based on the Portal-to-Portal act, claiming that entering data into JAMS was no more than punching-out, a non-compensable postliminary act. In the alternative, Illinois Bell alleges that it did not know about this work. But the facts presented by Illinois Bell ignore the record and are at best disputed.

### A. ILLINOIS BELL HAS A CUSTOM AND PRACTICE OF PAYING FOR ENTERING DATA IN JAMS

Illinois Bell has pays for time spent inputting information into JAMS. (PSF ¶1). This activity is defined in Illinois Bell's manuals as "work" that must be paid. (PSF ¶2). In an internal FAQ, supervisors requested the appropriate code so time spent recording data into JAMS could be paid. (PSF ¶3). Such a code would not be required if the time were not compensable. Moreover, Illinois Bell's declarants and supervisors admit this time should is to be paid. (DSF ¶¶ 56, PSF ¶1).

### B. THE INFORMATION INPUT INTO ILLINOIS BELL'S JOB ADMINISTRATION MANAGEMENT SYSTEM IS CRITICAL TO ITS BUSINESS

Illinois Bell's policy mandates that its cable splicers use JAMS to record their time. (DSF ¶¶5, 6; PSF ¶4). But cable splicers input a great deal other important information into JAMS including: time spent on each task, closing cable transfers, releasing delayed orders, the steps worked, whether a step or job was complete, the number of units completed, vehicle number, notations about the job, etc. (DSF ¶25 and PSF ¶5). JAMS functions as the interface not only to Illinois Bell's payroll system, but also to its material management

3

system. (PSF ¶6, 6494). The JAMS information is also used by Illinois Bell to evaluate efficiency of a technician and productivity of a supervisor on a daily and monthly basis. (PSF ¶7)

### C. ILLINOIS BELL KNOWS THAT ITS CABLE SPLICERS ARE WORKING OFF-THE-CLOCK ENTERING DATA INTO JAMS

Illinois Bell's policies mandate that cable splicers are not to return to the garage before a specified time to complete work. (PSF ¶10). After returning to the garage, time is to be spent fueling the truck, ordering supplies, stocking the truck, recording data into JAMS and preparing for the next day's work. (PSF ¶11). In Illinois Bell's 2008 Non-Management Employee Expectations manual, cable splicers were expected to be back at their garage no earlier than 15 minutes before their scheduled end-of-shift. (PSF ¶12). On January 1, 2011, this document was updated for cable splicers, and required that they be back no earlier than 10 minutes before their end-of-shift. (PSF ¶13). While Illinois Bell *reduced* the amount of time at the garage, it also added the additional requirement that cable splicers input their own time into JAMS. (PSF ¶14).[3] Illinois Bell's own time study found that recording information into JAMS alone should take 5 to 10 minutes (PSF ¶15).

Supervisors were aware cable splicers were completing their time sheets after the end of their shifts because:

- Cable splicers told management there was not enough time at the end of the day to complete all the required tasks. (PSF ¶17).
- Cable splicers were told by supervisors that they could not charge overtime to time recording time sheets. (PSF ¶18).
- Cable Splicers told supervisors that they were inputting their time after 3:30 p.m. but not asking to be paid for it. (PSF ¶19).
- Managers could observe cable splicers recording time after the end of their shift and see the back log. (PSF ¶22).

---

[3] Illinois Bell's discipline records also show occasions when splicers were disciplined for returning to the garage before 3:10 p.m. (when they had an end-of-shift time of 3:30 p.m.). (PSF ¶16).

4

Furthermore, supervisors should have known this work was being completed off-the-clock because:

- Illinois Bell's own time keeping system did not have a code to record time spent inputting information into JAMS. (PSF ¶20).
- Managers admit that they were aware that there may not be enough computers or that the system was slow. (PSF ¶21).
- The number of computers was inadequate for the number of people using them at the end of the day. (PSF ¶23).
- The computers were slow and would freeze making it difficult to complete timesheets at the end of the day. (PSF ¶24).

### III. LEGAL STANDARD

Summary judgment is only proper if there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). A motion for summary judgment "requires us to take the facts and plausible inferences in the light most favorable to the plaintiffs." *Bermudez v. TRC Holdings*, 138 F.3d 1176, 1177 (7th Cir. 1998); accord *Rothman v. Emory University*, 123 F.3d 446, 450 (7th Cir. 1997). A motion for summary judgment should not be granted unless it is "abundantly clear that there is no genuine issue of material fact," *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1002 (7th Cir. 1994), cert. denied, 513 U.S. 1001 (1994).

### IV. ILLINOIS BELL'S PORTAL-TO-PORTAL ACT ARGUMENT FAILS

Illinois Bell asserts that the time spent by cable splicers entering data in JAMS is postliminary and therefore excluded from compensable work under the Portal-to-Portal act. (Dkt. 277 at 6-7). Illinois Bell asserts that "Cable Splicers were hired to splice cable, not fill out timesheets after their productive work ended." (Dkt. 277 at 7).[4] This argument ignores both the facts and the law. First, the Portal-to-Portal act *requires* payment for

---

[4] Taking this proposition to the extreme, Illinois Bell would assert that any activity before or after actually splicing cable would be non-compensable under the Portal-to-Portal act. Following this logic, all time spent prior to actually splicing cable in the field—morning meetings, getting supplies, and traveling to, or returning from, the job site, etc.—would not be compensable.

5

postliminary activities if those activities are rendered compensable by, (1) a CBA, or (2) a custom or practice of paying for such activities. 29 U.S.C. §254(b). Second, Illinois Bell misrepresents JAMS as just a time-keeping system, which its own statement of facts contradicts.[5]

### A. ILLINOIS BELL HAS AGREED TO PAY FOR TIME SPENT ENTERING DATA INTO JAMS AND HAS A CUSTOM OR PRACTICE OF DOING SO

The Portal-to-Portal act "provides, among other things, that employers are not required to pay their employees for 'activities which are preliminary to or postliminary to' the principal activities for which they are employed, **unless the employer agrees to do so**. § 254(a)(2)." *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 213 (4th Cir. 2009). (Emphasis added) There is no dispute that Illinois Bell agreed to pay for time spent recording data in JAMS (and argues in its brief it would have paid it if it was recorded). (PSF ¶1). Its own manuals advise employees that this is "work" and should be paid because it is completing company documents. (PSF ¶2). An FAQ regarding the new system used by the cable splicers to record time even included a question about whether there is a code to allocate to time spent recording time or if that time should be rolled into another task. (PSF ¶3). That question is only relevant if the activity is compensable.

### B. RECORDING INFORMATION INTO JAMS IS A PRINCIPAL ACTIVITY

The Portal-to-Portal act does not exclude all activities before or after the primary job function (as Illinois Bell suggests). In *Mitchell v. King Packing Co.*, 350 U.S. 260, 261, (1956), the Supreme Court characterized the standard as follows:

> [A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal

---

[5] If JAMS were a punch-out system as Illinois Bell argues, cable splicers would have to use it at the end of the day, every day. And yet, cable splicers are frequently told not to enter their time into JAMS at the end of the day, but delay entering it until the following day. DFS ¶¶ 55, 57, 58, 60, 61, 63, and 65.

6

> provisions of the Fair Labor Standards Act if those activities are an ***integral and indispensable*** part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1).

(Emphasis added). Accordingly, an activity is compensable if it is so closely related to the employee's duties performed as to be an integral part of his employment. *Steiner v. Mitchell*, 350 U.S. 247, 252 (1956)[6]; 29 C.F.R. § 790.79(g). The information entered into JAMS by cable splicers is not only closely related to their duties it is part of their duties and is designed to increase efficiency of Illinois Bell's operation. Cable splicers entered, among other things, the following information into JAMS: Daily Time For Each Task Performed, Closing of Cable Transfers, Releasing Orders, Tasks Completed, Jobs Completed, and Material Orders. (DSF ¶25; PSF ¶5). This information is used by Illinois Bell to evaluate each cable splicer's efficiency and each supervisor's productivity, *inter alia.* (PSF ¶7). The data entered into JAMS drives the entire MSOC system. (PSF ¶8). At its core MSOC drives Illinois Bell's processes, material ordering, and jobs to be performed. (PSF ¶9). ("This data is used to predict how much future work will come in and how many employees will be needed to handle that work.")[7] In short, without the data entered into JAMS, Illinois Bell's management control over its cable splicers, supervisors, and work would crumble. Any suggestion that it is not integral and indispensable to Illinois Bell's operations is simply wrong.

---

[6] *Steiner* suggests that the post-shift clothes-changing on the companies premises was necessary and therefore compensable, in part because it was designed to "increase the efficiency of its operation." *Steiner*, 350 U.S. at 251.

[7] This Court characterized the question as whether the task was "performed for the employer's benefit rather than for the employee's convenience." *Blakes v. Illinois Bell Tel. Co.,* 11 CV 336, 2013 WL 6662831 (N.D. Ill. Dec. 17, 2013). There can be no debate that entering time into JAMS was for Illinois Bell's benefit (and direction) and not for the cable splicer's convenience. (PSF ¶4).

7

**V.     ILLINOIS BELL HAD KNOWLEDGE THAT ITS POLICIES RESULTED IN POST-SHIFT OFF-THE-CLOCK WORK RECORDING TIME**

The Seventh Circuit has held that this inquiry is whether Illinois Bell "had actual or constructive knowledge of [the] overtime work." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) citing *Reich v. U.S. Dep't of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994). The Eleventh Circuit in *Reich*, quoting *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474 (N.Y. 1918), held that "an employer 'does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates.... The cases must be ***rare*** where prohibited work can be done...and knowledge or the consequences of knowledge avoided.'") *Reich,* 28 F.3d at 1082 (emphasis added).

**A.     THERE IS A UNIFORM RETURN TO THE GARAGE POLICY**

Illinois Bell's policies—cited throughout its motion—establish a "return to work" (i.e., return to the garage) policy. This policy first required splicers to return 15, and later 10 minutes before the end their shifts, yet continue to complete a number of tasks including stocking trucks, ordering supplies and after December 2009 — entering time into JAMS (a task which Illinois Bell expected to take 5 to 10 minutes). (PSF ¶¶ 10 - 15). Illinois Bell's cited the return to garage policy when issuing discipline. (PSF ¶16).

**B.     ILLINOIS BELL HAS DIRECT AND ACTUAL KNOWLEDGE OF OFF-THE-CLOCK WORK**

As this Court noted in its decertification opinion, "there is a significant amount of evidence showing that computer shortages or glitches often caused log-jams at garages, creating a common problem that prevented cable splicers from completing their time sheets in the 3:10–3:30 p.m. window." *Blakes v. Illinois Bell Tel. Co.*, 11 CV 336, 2013 WL 6662831 (N.D. Ill. Dec. 17, 2013). For every manager and area manager claiming that Illinois Bell did not know, there is contrary evidence, including specific directives from

8

supervisors not to report time spent completing JAMS paperwork. (PSF ¶¶ 17 - 19). (Evidence of computer shortages). This is a dispute of fact.

### C. ILLINOIS BELL HAS CONSTRUCTIVE KNOWLEDGE THAT OFF-THE-CLOCK WORK WAS BEING PERFORMED

Besides the fact that the return to garage policy made it difficult to complete the time sheets within the scheduled shift, there is additional evidence which demonstrates disputes of fact that managers should have known this work was being done:

- Managers were at the garage when cable splicer entered their time and could observe cable splicers completing their time late (PSF ¶22)
- Managers knew the system was slow. (PSF ¶21)
- The number of computers was inadequate to meet the demand. (PSF ¶23)
- Managers told cable splicers that time sheets should be completed that same day (discipline) (PSF ¶25)
- Cable splicers told managers there was not enough time to complete their time sheet within the scheduled shift. (PSF ¶17)
- Managers told cable splicers they would not be paid for this activity (PSF ¶18)
- Illinois Bell's system did not include a code to be paid for "entering time." (PSF ¶20)

There is adequate evidence to show that Illinois Bell and its supervisors knew that this practice was occurring. *Cunningham v. Gibson Elec. Co., Inc.*, 43 F. Supp. 2d 965, 975 (N.D. Ill. 1999); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 U.S. Dist. LEXIS 16288, *14 (N.D. Ill. Aug. 17, 2004). It cannot turn a blind eye it. Illinois Bell's self-serving claim of ignorance should be rejected.

### D. ILLINOIS BELL HAS ABSOLUTE KNOWLEDGE ABOUT THIS VIOLATION SINCE THIS LAWSUIT WAS FILED — AT THE LATEST

Without any legal support Illinois Bell argues that damages should end as of May 2011 because cable splicers knew that Illinois Bell's "official" policy was that they be paid for that time. Illinois Bell has the law backwards — the employer armed with the knowledge that off-the-clock work is happening (and demonstrated by its ***own data***) has

9

an ***affirmative duty*** to stop it — and it knows its "official policies" fail to prevent this off-the-clock work from being performed. 29 C.F.R. §785.13 ("it is the duty of the management to exercise its control ... [t]he mere promulgation of a rule against such work is not enough.")

## VI. DR. JOHNSON'S CONCLUSIONS ARE FLAWED—ILLINOIS BELL'S DAMAGE ARGUMENTS MUST FAIL

Dr. Johnson offers conclusions he made after examining JAMS data. (It is the only source he cites to in his findings).[8] His report consists of cascading assumptions and conclusions summarized in tables, lined up like dominos, purporting to show how cable splicer after cable splicer is not entitled to payment for off-the-clock time spent entering data into JAMS after his end-of-shift. The result is a series of tables (Exhibits 1 – 5) purportedly excluding cable splicers whom he claims have no damages, followed by a series of tables (Exhibits 6 -10) eliminating individual time entries and culminating in a table (Exhibit 11) listing 92 named individuals who Dr. Johnson says have an aggregate of over 600 hours of unpaid off-the-clock overtime spent entering data in JAMS after the end of their paid shift. Even if all of Dr. Johnson's conclusions are taken as true, and all of Illinois Bell's arguments based on them are accepted, this single admission alone requires that summary judgment be denied. Of course, each succeeding table is built on those that preceded it, such that any error in any preceding table dooms all that follow.

### A. DR. JOHNSON'S ANALYSIS AND ILLINOIS BELL'S ARGUMENTS IGNORE THE WORKWEEK PARADIGM OF THE FLSA

In assessing damages under the FLSA, the question is whether an individual worked more than 40 hours in a week (29 U.S.C. §207). The amount of work on any given day

---

[8] Plaintiffs do not contest Dr. Johnson's qualifications to ***manipulate*** the data. Plaintiffs do, however, contest the conclusions he reaches because the premises upon which many of his conclusions rely are not founded in the law and he is not qualified to opine on that.

during the week is irrelevant so long as 40 hours of work was performed in the workweek. Nonetheless, Dr. Johnson chose to define a "qualifying workweek" as any workweek (Sunday through Saturday) in which the technician worked 40 or more hours *excluding* any day (and all hours worked that day) in which the technician worked less than 8 hours. This definition, which underlies much of Dr. Johnson's analysis, simply ignores the FLSA.

A single example can demonstrate just how flawed Dr. Johnson's assumptions make his conclusions. In his Exhibit 4 Dr. Johnson lists "PLAINTIFFS WITH NO TIMESHEETS SUBMITTED AFTER CALCULATED END OF WORK HOURS DECEMBER 1, 2009 – MAY 31, 2011". Here he asserts 38 individuals have no damages at all, *zero*. Yet Curtis Hudec, employee #CH2921 in just a single week, Sunday, January 3, 2010 through Friday, January 8, 2010 suffered a clear violation. Dr. Johnson gets it *dead flat wrong!* Using Dr. Johnson's formula for calculated end-of-shift, Mr. Hudec worked more than 40 hours. (PSF ¶26)

Dr. Johnson excludes Mr. Hudec's January 3, 2010, workweek (PSF ¶26) even though he recorded working 45 hours that week—because Dr. Johnson excludes January 5th, because the recorded time was only 4 hours, and January 7th, because the recorded time was only 5 hours. On January 7th the JAMS entry time was 1:55:37 p.m. even though Hudec's calculated end of shift (as Dr. Johnson defines it) was 12:30 p.m. In addition, because Mr. Hudec was eliminated by Dr. Johnson in Exhibit 4 he is excluded from all further analysis.[9] This demonstrates the cascading flow in Dr. Johnson's analysis. For all these reasons. Dr. Johnsons' "conclusions" cannot be correct under the FLSA. (PSF ¶26, 28).

---

[9] Dr. Johnson's Exhibit 3 lists 8 individuals for whom Illinois Bell curiously has no comprehensive data in JAMS even though at least one individual in this group continued to work as a cable splicer at Illinois Bell and enter his time. There can be no justice in denying recovery to a plaintiff just because Illinois Bell's records relating to him are flawed or missing.

11

Because Dr. Johnson's "qualifying workweek" simply ignores the workweek premise of the FLSA the conclusions that flow from it are fundamentally and materially flawed. (PSF ¶28). If he had looked at the workweek as a whole—as required by FLSA—he would have calculated Mr. Hudec's time that week as 46:55:37 (i.e., 6:55:37 of overtime) instead of zero overtime. (PSF ¶26)

### B. DR. JOHNSON'S *DE MINIMIS* ANALYSIS IS INCONSISTENT WITH THE FLSA CASE LAW AND IN FACT PROVES THAT APPLYING THE *DE MINIMIS* DOCTRINE HERE IS INAPPROPRIATE

In section D of his Expert Report, Dr. Johnson determines the number of times the time records demonstrate an FLSA off-the-clock violation but where the violation is for less than 10 minutes.[10] Illinois Bell is asserting these violations are *de minimis* and need not be paid.[11] Because the *de minimis* doctrine is asserted as a defense, Illinois Bell bears the burden of proof. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176 (7th Cir. 2011). Courts, when applying the *de minimis* doctrine, consider the following:

> When evaluating whether work performed by an employee is *de minimis,* courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording

---

[10] Dr. Johnson claims there are XXX workweeks with violations of less than 10 minutes each and XXX workweeks with violations of more than 10 minutes each, a total of XXX workweeks with FLSA violations aggregating XXX hours. However, in reaching his conclusions he continues to ignore weeks in which someone worked more than 40 hours but worked less than 8 hours on any given day in the workweek.

[11] As noted by the Plaintiffs at the March 4, 2014 hearing (see 3/4/14 Transcript, Exhibit 33, the application of the *de minimis* argument is particularly prejudicial in this case. The *de minimis* doctrine is analyzed using the aggregate amount of time spent in a given day **and not each discrete activity**. Since *IBP, Inc. v. Alvarez,* 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), the *de minimis* doctrine has been limted, in large part because modern technology provides the means for more accurate recording of time. The DOL has stated that the *de minimis* "rule applies to the aggregate amount of time for which an employee seeks compensation***, not separately to each discrete activity***, and particularly not to certain activities 'as a matter of law.'" Wage and Hour Memorandum No. 2006-2, at 3 (Emphasis added.); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (discussing *de minimis* in terms of overtime "per day and in the aggregate"); see also *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790, 810 (M.D. Ten. 2008)(*de minimis* determination requires a consideration of the "aggregate amount of compensable time") (citing *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001); *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984)). Even the cases relied upon by Illinois Bell speak in terms of "daily periods" of work and not discrete activities. Because many of the Plaintiffs allege not only post-shift off-the-clock work at issue here, but also other off-the-clock work in the same day, the application of the *de minimis* doctrine is untenable.

12

>additional time, the regularity with which the additional work is performed, and the aggregate amount of compensable time.

*Id.* In its motion for summary judgment, Defendant does not address any of these factors (or even tell the Court that they exist) except to state Dr. Johnson's unsupported conclusion as to the number of plaintiffs and days with less than 10 minutes of recorded off-the-clock time after the end-of-shift. (Dkt 277, at 13). Illinois Bell's failure to meet or even explain why it is entitled to apply the *de minimis* doctrine should compel this Court to disregard it. Illinois Bell has not met its burden.

Nonetheless, should this Court consider the *de minimis* doctrine, Dr. Johnson's analysis (which is flawed and incomplete) demonstrates clearly that the *de minimis* doctrine has no application in this case because the off-the-clock time can be easily calculated and tracked, **to the second**, by Illinois Bell. To meet its burden, Illinois Bell "must show not merely that the time involved is minimal but that ***it would be difficult to measure the time in light of the realities of the industrial world.***" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 954 (W.D. Wis. 2008)(Emphasis added.)[12] Accordingly, is contrary to the principles of the FLSA to apply the *de minimis* doctrine when it would be administratively feasible to track the time with precision. *Id.*, *Spoerle v. Kraft Foods Global, Inc.*, 527 F. Supp. 2d 860, 869 (W.D. Wis. 2007) *clarified on denial of reconsideration,* 3:07-CV-00300-BBC, 2008 WL 4079234 (W.D. Wis. Jan. 31, 2008).

---

[12] In *Espenscheid, et al., v. Directsat USA, LLC, et al.*, 705 F.3d 770 (7th Cir. 2013) the Court held that it was proper to decertify a FLSA collective when the plaintiffs failed to present the court with a feasible trial plan. However, citing to a Rule 23 class action which it deemed analogous, the Court added,
>[W]hen "it appear[s] that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice …, the district court can award that relief without terminating the class action and leaving the class members to their own devices." *Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364, 372 (7th Cir.2012).

Id. at 773. **That, of course, is exactly the case here!**

13

### C. ILLINOIS BELL MISAPPLIES §207(H)

Illinois Bell asserts it is entitled to two "offsets": (1) "rounded up" time equal to an alleged overpayment in the same week and; (2) premium pay offsets arising out of the CBA.[13] As with *de minimis* doctrine, Illinois Bell bears the burden to establish it is entitled to the credits of §207(h). *Vancamper v. Rental World, Inc.,* 6:10-CV-209-ORL-19, 2011 WL 1230805 (M.D. Fla. Mar. 31, 2011) ("The Defendants bear the burden of establishing a credit for overtime compensation under Section 207(h)(2).")

#### 1. Illinois Bell's Claim Of So Called "Rounding Up" Is A Red Herring. No Such Credit Exists Under The FLSA

Illinois Bell cites to *Howard v. City of Springfield*, 274 F.3d 1141 (7th Cir. 2001), but ignores §207(h)(2) limiting credits to only those payments described in §207(e)(5)-(7). Nowhere in §207(e)(5)-(7) is there a provision for "rounded up" credits, and Illinois Bell fails to explain why such a doctrine should apply. The conclusions by Dr. Johnson and Illinois Bell necessarily assume that when the cable splicer submits his or her time sheet that is the "end" of the workday. This assumption (not supported by any citation to fact— on an issue where Illinois Bell bears the burden of proof) makes this argument untenable.

#### 2. Illinois Bell Has Not Met Its § 207(h) Evidentiary Burden With Regard To CBA Mandated Premium Wages

In asserting this defense, Illinois Bell has not provided any evidence that the alleged premium payments it seeks to use as "offsets" were in fact paid to the Plaintiffs. Dr. Johnson's analysis which identifies the time records and what they indicate as the "work hours" in a given "qualifying workweek".[14] The only source of information Dr. Johnson claims to have relied upon is "JAM data". "JAMS" consists of hundreds of thousands of lines,

---

[13] Illinois Bell and Dr. Johnson acknowledge that this analysis does not consider anyone who recorded his time less than 10 minutes after the end-of-shift. (Dkt. 277 at 14).
[14] .

millions of cells of data. Even if this vague description of source material were intelligible, it still contains absolutely no payroll information. Many of Dr. Johnson's (and Illinois Bell's) claimed offsetting credits are dependent on actual payment at premium rates. But Illinois Bell has presented absolutely no evidence that any of these claimed offsets were actually "***paid*** as described in paragraphs (5), (6), and (7) of subsection (e)...." §207(h)(2). As a result, it cannot meet its burden.

      **D.    ILLINOIS BELL'S CONCLUSIONS ARE FATALLY FLAWED**

Illinois Bell concludes (which it must) that there are in fact violations of the FLSA. Even after its own mangling and slicing and dice of the data (while concurrently ignoring the FLSA) it still agrees that it failed to pay its employees for all hours worked based on the time submitted after the end of the shift. Even, this "conclusion" is premised on each and every assumption, analysis, and data review that preceded it. As explained *supra*, these assumptions are based on a "qualifying workweek" which ignores the FLSA, eliminates allegedly *de minimis* time that should not be eliminated, and credits time where there is no legal basis for such credits or evidence that claimed credits were paid for. Put simply, Illinois Bell's argument is like a cool oasis in the desert that, when subjected to closer scrutiny, is no more than a mirage.

    Date:  10/31/2014                               Respectfully Submitted,

                                                           By:/s/ Walker R. Lawrence

Walker R. Lawrence
Attorney No. 6296405
Maduff & Maduff, LLC
Michigan Plaza At Illinois Center
205 N. Michigan Ave
Suite 2050
Phone: 312-276-9000
wrlawrence@madufflaw.com

15

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on Friday, October 31, 2014 a true and correct copy of the foregoing document was served by electronic means through the Court's ECF System to counsel of record.

By:/s/ Walker R. Lawrence

Walker R. Lawrence
Attorney No. 6296405
Maduff & Maduff, LLC
Michigan Plaza At Illinois Center
205 N. Michigan Ave
Suite 2050
Phone: 312-276-9000
abmmaduff@madufflaw.com
mlmaduff@madufflaw.com
wrlawrence@madufflaw.com

1