# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAMES BLAKES, *et al.*, for themselves and on behalf of similarly situated others, | ) ) ) No. 11 CV 336 |
| Plaintiffs, | ) ) ) |
| v. | ) ) Magistrate Judge Young B. Kim ) |
| ILLINOIS BELL TELEPHONE COMPANY, d/b/a AT&T Illinois, | ) ) ) ) December 10, 2014 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

James Blakes, Steven Clark, Herman Deckys, Bradley Hunt, Phillipe Porter, Ernest Roberts, Jr., and Larry Williams (collectively, "the named plaintiffs") brought this action against Illinois Bell Telephone Company ("Illinois Bell") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, claiming that Illinois Bell systematically fails to pay its cable splicers for all of their overtime work. The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 21). This court previously granted in part and denied in part Illinois Bell's motion to decertify the named plaintiffs' conditionally certified class of cable splicers. (R. 233.) Illinois Bell now moves for summary judgment on both the individual and certified claims pursuant to Federal Rule of Civil Procedure 56. (R. 257 to 283.)[1] For the following reasons, Illinois Bell's motions regarding the

---

[1] The court only addresses Illinois Bell's motions on the individual claims here and will address Illinois Bell's motion on the certified claim in a separate opinion.

named plaintiffs are granted as to Blakes, Deckys, Porter, Roberts, and Williams, and denied as to Clark and Hunt:

## Background

As an initial matter, it must be noted that there are repeated instances in the parties' Local Rule ("L.R.") 56.1 statements in which a party states that a fact is disputed, but either cites record evidence that does not contradict the fact or relies on inferences that might contradict the fact rather than actual conflicting evidence. For example, although the named plaintiffs "dispute" many of Illinois Bell's facts, they fail in some instances to cite record evidence actually demonstrating the dispute, as required by L.R. 56.1(b)(3)(B)-(C). (See, e.g., R. 299, DSOF Blakes ¶¶ 27, 32, 36, 38-39, 42-43, 67).[2] The named plaintiffs also state in some of their responses that they deny the implications of a listed fact, (see, e.g., id. ¶¶ 6, 20, 27, 35, 38, 39, 43, 47, 58, 64, 67, 73), but arguing over the possible implications stemming from an otherwise undisputed fact does not render that fact in dispute, see Sommerfield v. City of Chi., No. 08 CV 3025, 2013 WL 4047606, at *2 (N.D. Ill. Aug. 9, 2013). Illinois Bell also commits some of the same errors in its responses to the named plaintiffs' additional facts. (See, e.g., R. 333, PSOF Blakes ¶¶ 3, 30.) To the extent these facts are not otherwise properly disputed, the court deems them admitted.

---

[2] "DSOF [Named Plaintiff] ¶ __" refers to Illinois Bell's L.R. 56.1(a)(3) Statement of Material Facts as to each named plaintiff, along with that named plaintiff's responses. "PSOF [Named Plaintiff] ¶ __" refers to each named plaintiff's L.R. 56.1(b)(3)(C) Statement of Additional Facts, along with Illinois Bell's responses.

Furthermore, where the named plaintiffs include additional facts in their responses that do not bear on whether a dispute exists as to the fact listed by Illinois Bell, these facts should instead have been listed in the named plaintiffs' statements of additional facts. (See, e.g., R. 299, DSOF Blakes ¶¶ 17, 23, 36, 38-39, 41, 44-45, 52, 57-58, 62, 64, 69, 72-73); *see Sommerfield*, 2013 WL 4047606, at *2. That said, many of the facts the named plaintiffs assert in their responses to Illinois Bell's facts also are set forth in their own responding statements of material facts, and thus are before the court. *See Rasic v. City of Northlake*, No. 08 CV 104, 2009 WL 3150428, at *3 (N.D. Ill. Sept. 25, 2009).

Although the court previously set forth this case's factual background in its decertification opinion, *see Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 WL 6662831, at *2-4 (N.D. Ill. Dec. 17, 2013), for purposes of the current motions the court will restate the facts and also include relevant facts that have since developed in the record. The following undisputed facts are taken from the parties' L.R. 56.1 statements of facts (unless otherwise indicated), and will be viewed, as they must be at this stage, in the light most favorable to the named plaintiffs. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## A.    The Parties

Defendant Illinois Bell is one of the largest providers of local telephone services in Illinois. (R. 299, DSOF Blakes ¶ 2.) The named plaintiffs are cable splicers who work or have worked for Illinois Bell's Construction and Engineering division. (See, e.g., id. ¶ 5.) Cable splicers install, maintain, and repair Illinois

3

Bell's network of cable, fiber optics, and telephone services. (Id. ¶ 6.) As part of their duties, the named plaintiffs sometimes work underground in manholes. (See, e.g., id. ¶¶ 9, 63.) They typically begin their scheduled shifts at 7:00 a.m. in one of Illinois Bell's garages but then spend the majority of their day out in the field at job sites outside the direct observation of their supervisors. (See, e.g., id. ¶¶ 7-8.) During the relevant time period, each of the named plaintiffs was a non-exempt employee paid on an hourly basis, and was typically scheduled to work an eight and one-half hour day, five days a week, including a half-hour unpaid lunch. (See id. ¶¶ 11, 14.)

## B.    Illinois Bell's Official Policies and Guidelines

Illinois Bell's official policies regarding compensation and time-reporting are set out in code of conduct and employee "expectations" documents, and are also codified in a collective bargaining agreement ("CBA") with the cable splicers' union. (R. 299, DSOF Blakes ¶¶ 19-28.) These policies state that employees should accurately report all hours worked and that any overtime must be approved by a supervisor in advance. (Id. ¶¶ 23, 25-28.) The policies also provide that all overtime hours worked by employees must be paid regardless of whether they were pre-approved, and managers are prohibited from "requiring or permitting nonexempt employees to work 'off the clock.'" (Id. ¶¶ 23-24.) Overtime hours include any time worked in excess of eight hours a day or forty hours a week. (Id. ¶ 22.)

4

Illinois Bell also has policies that govern lunch breaks for cable splicers. Lunch breaks are expected to be taken sometime between the third and sixth hour of a shift. (Id. ¶ 31.) When cable splicers are working at a job site with a manhole, policies dictate that they cannot leave open manholes unattended, so "lunches should be carried in this situation." (R. 333, PSOF Blakes ¶ 4.) According to the CBA, if an employee cannot leave a job site, "it is assumed no lunch period has been taken" and the employee "will be permitted reasonable paid time to eat on the job." (See id.)

## C.     Illinois Bell's Time-Recording System

In December 2009, Illinois Bell introduced electronic time reporting as part of its Jobs Administration Management ("JAM") system. (R. 299, DSOF Blakes ¶ 35.) Illinois Bell uses "task codes" to track time recorded for various types of work assignments instead of a traditional punch-in-punch-out system. (R. 333, PSOF Blakes ¶ 6.) For example, certain task codes are associated with underground work. (See id. ¶ 2.) After a cable splicer enters his time and submits it, the timesheet is then sent to a manager for approval before it is uploaded into "eLink," Illinois Bell's payroll system. (Id. ¶¶ 7-8.)

In February 2010, Illinois Bell implemented a system called Management System and Operating Control ("MSOC") which was intended to measure, among other things, how efficiently a cable splicer performs his or her job. (See id. ¶ 5.) Although the parties dispute whether or how time that is tracked for MSOC purposes translates into how technicians are paid, the parties agree that Illinois

Bell keeps track of how much time technicians report spending on a particular task and compares that time with the allocated or expected time it should take to complete that task. (See id. ¶¶ 5-6, 12, 23.)

## D. Named Plaintiffs

### 1. James Blakes

Blakes has worked as a cable splicer for Illinois Bell since 1992. (R. 299, DSOF Blakes ¶ 1.) In addition to his typical 7:00 a.m. to 3:30 p.m. shift, Blakes sometimes works a "buzz shift" from 7:00 p.m. to 7:00 a.m. (Id. ¶¶ 15-16.) He asserts that he sometimes performed pre-shift work for which he was not paid. (See id. ¶¶ 48, 53; R. 333, PSOF Blakes ¶ 31.) He estimates that he performed various pre-shift work activities at least twice a week, usually beginning 15 to 20 minutes before 7:00 a.m. (R. 333, PSOF Blakes ¶ 30.)

Blakes also alleges that he sometimes worked through lunch, and he estimates that he did so at least two days out of every five-day work week. (R. 299, DSOF Blakes ¶ 62.) He testified that on days when he worked at an open manhole, he would not take a lunch break because the manhole needed to be guarded. (Id. ¶ 63.) But if the manhole was not open he could take a lunch break, and if he worked with a partner at a manhole, it was possible for one person to guard the manhole while the other person ate lunch. (Id. ¶¶ 63-64.) According to Blakes, he worked through lunch on days that his timesheets indicate underground work tasks. (See R. 333, PSOF Blakes ¶ 29.)

When he worked through lunch, Blakes did not get approval to do so in advance. (R. 299, DSOF Blakes ¶ 40.) He admitted that he knew he was violating Illinois Bell's written policies by not getting approval and by not accurately reporting his time with respect to working through lunch. (Id. ¶¶ 39, 72.) He said that he never told his supervisor which days he may have reported his time incorrectly, (id. ¶ 43), and he never explicitly told his supervisor or manager that he had worked through lunch, (id. ¶ 73). Blakes also testified that he was not aware of any instances in which he reported working overtime on his timesheet and was not paid for that overtime. (Id. ¶¶ 36-37.) Blakes never requested to be paid for the time he worked through lunch and did not report that time on his timesheets, except when he was on a buzz shift. (Id. ¶¶ 70-71.)

Blakes further testified that he worked through lunch in order to meet his MSOC efficiency numbers, but was not aware of any document that would allow him to determine which jobs might have caused him to work through lunch to meet his MSOC goals. (See id. ¶ 69.) He said he would sometimes subtract time from a job task to artificially increase his efficiency numbers, but the parties dispute whether doing so affected the total amount of time for which he was actually paid. (See id. ¶ 44.) Blakes does not claim that he performed any post-shift work which would entitle him to compensation. (Id. ¶¶ 74-76.)

## 2. Steven Clark

Clark worked as an Illinois Bell cable splicer from 2000 until his termination in February 2011. (R. 328, DSOF Clark ¶ 1.) His tasks included splicing copper

wires underground or at cross boxes. (Id. ¶ 7.) He testified that he sometimes performed various work activities pre-shift, but that such time was not reflected on his timesheets. (Id. ¶¶ 43-44.)

Clark also alleges that he worked through lunch about three times a week. (R. 343, PSOF Clark ¶ 30.) He testified that when he performed manhole work with a partner, one of them had to stay at the manhole and guard it for safety reasons. (R. 322, Ex. 35, Clark Dep. at 88-89.) He explained that he did not take a lunch break when he had to guard the manhole. (See id.) He also explained that for the most part, he worked with at least one other cable splicer on every job. (See R. 328, DSOF Clark ¶ 54.) Clark testified that he could not determine from his timesheets whether he took a lunch break or not on a given day, (id. ¶ 59), but he asserts that his time records at least show what days he performed certain underground tasks, (R. 343, PSOF Clark ¶ 2).

Clark said he knew that according to Illinois Bell's policies, he was responsible for accurately recording all the hours he worked and that he would get paid for all the time he reported, whether approved ahead of time or not. (R. 328, DSOF Clark ¶¶ 35-37.) He testified that whenever he recorded his overtime he was paid for it, (see id. ¶¶ 39, 41), and he admitted that he never told his supervisors or managers that he worked unreported overtime, (id. ¶ 42). However, Clark asserts that when he complained to his supervisor, Daniel Graham, about working through lunch, Graham told him he had to "make a sacrifice for the team," which Clark understood to mean that he would not be paid for his overtime. (R. 343, PSOF

Clark ¶ 23.)  Clark also said that a different supervisor, Peter Velez, told him that some jobs "didn't have overtime" but still needed to be completed.  (See id. ¶ 22.)

Clark further testified that MSOC numbers were "not so easily attainable," and that some of his managers were "creative in the way they would spread hours" among different tasks to improve the appearance of the technicians' efficiency numbers.  (See R. 322, Ex. 35, Clark Dep. at 42, 44-45.)  But he went on to testify that this practice did not affect their pay for that day.  (See id. at 45.)  He noted that while his managers did not directly tell him to record fewer hours than he actually worked, Clark inferred from the managers' practice of spreading hours that he should not report all his time worked.  (Id. at 42-44.)

Finally, Clark asserts that he sometimes performed post-shift work after completing his timesheets without receiving overtime pay, and on those occasions he worked for an additional 20 to 25 minutes after his shift.[3]  (See R. 343, PSOF Clark ¶¶ 33-34.)  He stated that his managers saw him getting supplies for his truck post-shift, but he could not specify which managers might have seen him or what he was doing when a supervisor saw him after his shift.  (R. 328, DSOF Clark ¶¶ 46-48).

### 3.    Herman Deckys

Deckys has worked at Illinois Bell as a cable splicer since 2001.  (R. 303, DSOF Deckys ¶ 1.)  Deckys is not claiming that he performed any pre-shift work,

---

[3]  All the named plaintiffs, with the exception of Blakes, allege that they performed post-shift work in addition to their certified claim for unpaid time spent completing electronic time sheets.  (R. 11, Am. Compl. ¶ 32.)  This opinion addresses the named plaintiffs' non-certified post-shift work claims.

(id. ¶ 50), but he alleges that he worked through three to four lunches a week. (R. 330, PSOF Deckys ¶ 31.) Like the other named plaintiffs, he testified that every time he worked at an open manhole he was forced to work through lunch, but if a job did not involve opening a manhole, he did not have to work through lunch. (R. 303, DSOF Deckys ¶ 51.) According to Deckys, there are always two people assigned to do underground work. (R. 301, Ex. 9, Deckys Dep. at 83.) He testified that on days when he worked at an open manhole, both he and his partner did not have to stay at the manhole, and that one person could leave and grab lunch. (Id. at 185-186.) Deckys could not remember or estimate how many days he worked underground, but like the other named plaintiffs, he asserts that his time records at least show what days he performed underground work tasks. (R. 303, DSOF Deckys ¶ 52.)

Deckys said he understands Illinois Bell's time-reporting policies. (Id. ¶¶ 32-34.) He testified that whenever he did record his overtime, he was paid for it, (see id. ¶¶ 35, 37-39), and he admitted that he never told his supervisors or managers that he was underreporting his time, (id. ¶ 72). However, Deckys said he believes he told all of his managers "probably at some point" that he had worked through lunch. (R. 330, PSOF Deckys ¶ 21.)

Deckys further testified that he sometimes did not record all his time worked in order to improve his efficiency numbers. (See R. 303, DSOF Deckys ¶ 45.) He said that he did so to avoid being coached about efficiency or suspended from work. (Id. ¶¶ 46-47.) Like the other named plaintiffs, Deckys asserts that he sometimes

had to record time spent on other tasks that he did not actually do because no allotted time was left for the tasks he performed. (R. 330, PSOF Deckys ¶ 14.) He noted that while his managers did not expressly tell him to record fewer hours than he actually worked, (R. 303, DSOF Deckys ¶ 48), on one occasion Velez instructed him to "get [the job] done within the time frame," which Deckys understood to mean that he should only report the allotted task time, (R. 330, PSOF Deckys ¶ 25). He also said he told his managers on more than one occasion that certain assigned tasks could not be done in the allotted time. (Id. ¶ 20.)

Lastly, Deckys asserts that he performed post-shift work other than completing his timesheets about three times a week, and that on those occasions he worked for an additional 15 minutes after his shift. (See R. 303, DSOF Deckys ¶ 64.) While he admits that he did receive some overtime pay for cleaning out his truck and throwing away garbage after his shift, (id. ¶ 70), Deckys claims he did not get paid for other times he did unreported post-shift work, (id. ¶ 67). He stated that Velez has seen him come back to the garage after 3:30 p.m. (R. 330, PSOF Deckys ¶ 28.)

### 4. Bradley Hunt

Hunt worked for Illinois Bell as a cable splicer from 2001 until December 2011, when he became a "premises technician." (R. 306, DSOF Hunt ¶ 1.) He testified that he sometimes performed various work activities pre-shift, such as checking on supplies for his truck, but that such time was not always reflected on his timesheets. (Id. ¶¶ 35-38.) Hunt also said that during the relevant time period,

11

he worked through lunch "99.9 percent of the time." (Id. ¶ 49.) The reasons he gave for working through lunch included setting up and breaking down job sites, meeting efficiency standards, avoiding discipline, and guarding manholes. (See id. ¶ 50.) He said he could not remember what he reported in his timesheets or how much he was paid on the days he worked through lunch. (Id. ¶¶ 52-53.) He testified that he did not know whether he was less likely to take a lunch break when he performed manhole work, but noted that "somebody has to be at the manhole." (R. 301-1, Ex. 20, Hunt Dep. at 108-09.) He explained that while one person is at the manhole, another technician assigned to the job site might be elsewhere. (R. 336, PSOF Hunt ¶ 6.)

Hunt said he understood that his pay was based on the hours he reported and that Illinois Bell's policy requires technicians to record all hours worked. (R. 306, DSOF Hunt ¶ 32.) But Hunt testified that when he told one of his supervisors, Robert Stokes, that he did not take a lunch break, Stokes said something to the effect of "I'm not eating that time." (Id. ¶ 56.) Hunt said he interpreted that to mean that the time was "lost" and that he would not be paid for it. (See R. 301-1, Ex. 20, Hunt Dep. at 84.) He explained that he stopped telling his supervisors about working through lunch because he believed it was a "waste of time" and that "they weren't going to acknowledge it." (Id. at 95.) Hunt also testified that Juan Cordova, his second-level supervisor above Stokes, announced to him and other technicians that there would be "no overtime in [Hunt's] garage whatsoever," regardless of any other garage's practice. (Id. at 170-71.) Hunt understood this to

mean that he should not report any overtime because he would not be paid for it. (Id. at 171-72.)  He noted that while no one ever directly told him to work through lunch or record fewer hours than he actually worked, Hunt took his supervisors' instructions to mean that he should not report all of his time.  (See R. 306, DSOF Hunt ¶ 59.)

Hunt further testified that he sometimes worked overtime to meet his MSOC numbers.  (R. 301-1, Ex. 20, Hunt Dep. at 139-40, 263-64.)  He said Stokes told him that "everybody's timesheet should be the same" and that time should be split among the technicians.  (See R. 336, PSOF Hunt ¶ 19; R. 301-1, Ex. 20, Hunt Dep. at 409.)  But Hunt also said he did not know whether such instructions resulted in him being paid less than all the hours he worked.  (R. 301-1, Ex. 20, Hunt Dep. at 138.)

Hunt also asserts that he sometimes performed post-shift work other than completing electronic timesheets for 12 to 20 minutes, but could not estimate how many times he did so.  (R. 306, DSOF Hunt ¶¶ 70-71, 73-74.)  He was unsure whether he ever told a manager or supervisor that he completed paper timesheets after his shift, (id. ¶ 72), but he stated in an interrogatory response that his managers saw him getting supplies for his truck pre- and post-shift, (R. 196-14, Ex. GGG, Hunt Interrog. No. 9).

### 5.  Phillipe Porter

Porter worked as a cable splicer for Illinois Bell from November 2002 until his termination in January 2012.  (R. 325, DSOF Porter ¶ 1.)  He testified that he

sometimes performed various work activities pre-shift, but he did not record that time on his timesheets and he never told his supervisors that he came to work early. (Id. ¶¶ 44-46, 49-50.) Porter also alleges that he worked through lunch without reporting his time about three times a week. (Id. ¶ 57.) He testified that he might have had to work through lunch if he was working in an open manhole or performing aerial work. (See id. ¶ 53; R. 322, Ex. 34, Porter Dep. at 259.) Most days he worked with at least one other person, and though it was possible that his partner could watch the manhole while he had lunch, Porter testified that his ability to take a lunch break varied depending on the job. (See R. 325, DSOF Porter ¶ 54.) He said there were days when he could use his lunch break to speak with his fiancée or go to a restaurant. (Id. ¶¶ 65-66.) Like the other named plaintiffs, Porter estimates his damages by identifying underground task codes in the time records. (See id. ¶ 59.)

Porter admitted that he knew he was supposed to accurately record his time and seek approval for overtime. (Id. ¶¶ 34, 39, 41.) He also said he understood that if he recorded overtime, he would get paid for it whether it was approved or not. (Id. ¶¶ 37-38.) Porter testified that he once asked Velez for approval to work through lunch, but Velez denied his request and instructed him to take a lunch break. (R. 322, Ex. 34, Porter Dep. at 66.) Other than that instance, Porter does not recall seeking approval to work through lunch in advance. (See R. 325, DSOF Porter ¶¶ 56, 61-62.) He confirmed that he always got paid for the time he reported, (id. ¶ 36), and he never told his supervisors that he worked through lunch, (id.

14

¶¶ 63-64). He could not recall ever being disciplined for seeking payment for working through lunch without pre-approval. (Id. ¶ 67.)

As for Illinois Bell's efficiency standards, Porter testified that MSOC was problematic for him because there was not enough time allocated for some tasks given the number of people assigned to the job. (See R. 322, Ex. 34, Porter Dep. at 144.) He explained that his supervisor told technicians to complete the job anyway and to contact the engineer assigned to the task to "get more time." (Id. at 144-45.) Although Porter said he sometimes divvied up his time with other members of his crew because there was insufficient time left for a task, he also said that regardless of how time was distributed, if he worked eight hours in a day he would record that he worked eight total hours. (R. 339-18, Ex. Q, Porter Dep. at 174-75.)

Lastly, Porter alleges that he sometimes performed post-shift work other than completing electronic timesheets for about 15 minutes per shift. (R. 339, PSOF Porter ¶¶ 30-31.)

### 6. Ernest Roberts, Jr.

Roberts started working in Illinois Bell's installation and repair department in 2000 and began work as a cable splicer in 2007. (R. 321, DSOF Roberts ¶ 1.) He asserts that he used to do pre-shift work two to three times a week for 20 to 30 minutes each time, but he stopped doing pre-shift work in August 2009. (See id. ¶¶ 40-42, 47.) He also asserts that he worked through at least one lunch a week because he was "pressed for time," needed to meet his MSOC numbers, or had to secure an open manhole. (Id. ¶¶ 50-51, 53; R. 341, PSOF Roberts ¶¶ 32-33.)

15

Roberts said he told his managers on some occasions that he was unable to take any breaks during the day, but he could not recall whether he reported overtime in those instances or how much he was paid on those days. (R. 322, Ex. 33, Supp. Roberts Dep. at 245-49.) According to Roberts, he has also called his managers while at a job site to tell them he needed to work through lunch, received approval to do so, and reported that time. (See R. 321, DSOF Roberts ¶ 59.) He testified that he was paid for any unapproved overtime he reported as well, (id. ¶ 36), but that he did not always report the times he worked through lunch, (id. ¶ 60). Roberts confirmed that his timesheets would not indicate which days he worked through lunch, but he relies on the fact that his timesheets show which days he performed underground work. (Id. ¶¶ 3, 61.)

Like the other named plaintiffs, Roberts said he understood Illinois Bell's time-recording policies. (See id. ¶¶ 37-38.) However, he also said that his managers' instructions contradicted the company's written policies. For example, Roberts testified that his managers told him and other cable splicers to distribute their time between all of the technicians who performed work for a particular job. (Id. ¶ 39.) More specifically, Roberts said that Velez told him he should "put down the time that the lead tech . . . instructed [him] to put down." (R. 341, PSOF Roberts ¶ 21.) Roberts explained it was his understanding that "insubordination trumps what is written as policy," so to the extent a manager's instructions conflicted with official policies, Roberts did what his manager directed. (Id. ¶ 28.) But according to Roberts, these time distribution and recording practices did not

result in him being paid less time than he actually worked. (R. 321, DSOF Roberts ¶ 39.) Roberts further asserts that he spent five to fifteen minutes after the end of his shift doing work. (Id. ¶¶ 65-66; R. 341, PSOF Roberts ¶¶ 37-38.)

### 7. Larry Williams

Williams worked for Illinois Bell as a cable splicer from the mid-1980s until his voluntary separation in February 2012. (R. 309, DSOF Williams ¶ 1.) He was a copper splicer from about 1990 until 2007 or 2008, when he became a fiber splicer. (R. 301-1, Ex. 25, Williams Dep. at 22-23; R. 332-26, Ex. Y, Williams Dep. at 44, 71-72.) He asserts that for a period of time, he performed pre-shift work activities that took about 10 minutes each shift. (R. 332, PSOF Williams ¶ 30.) Williams also alleges that he worked through lunch without reporting his time in order to increase his efficiency numbers. (R. 309, DSOF Williams ¶¶ 47-49.) He explained that "realistically speaking, [he could] take all the breaks and lunches" he wanted, but doing so would mean failing to meet efficiency standards and getting disciplined. (Id. ¶¶ 38, 51.) He estimated that he typically worked through three lunches a week, (R. 196-26, Ex. SSS, Williams Interrog. No. 4), but he admitted that reports and records would not assist in determining which days he worked through lunch, (see R. 309, DSOF Williams ¶¶ 54, 56-60). Williams said that he did not recall working in any manholes while he was part of Illinois Bell's Fiber Work and Digital Electronics groups. (R. 332-16, Ex. Y, Williams Dep. at 147.)

Williams understood that Illinois Bell's written policies required that he report all hours worked. (R. 309, DSOF Williams ¶ 36.) But according to Williams,

on at least one occasion he was not paid for time he recorded. (Id. ¶ 41.) He said that in that instance, his timesheet erroneously showed an unexcused absence instead of the paid leave time he recorded, so he complained to human resources. (Id. ¶¶ 41, 66.) Williams could not recall whether that error affected his pay or whether the error was ultimately corrected. (See id. ¶¶ 66-69.) He testified that he also complained to management a few times about not being paid for all the hours he worked. (Id. ¶¶ 64-65.) When asked to give an example, Williams said he remembered one of his supervisors saying that he would "make it up" to Williams, presumably after Williams told his supervisor he had worked overtime. (R. 301-1, Ex. 25, Williams Dep. at 163-64.) Williams explained that his supervisor said: "You looked out for me on this one and somewhere down the road, you know, it will get made up." (Id. at 163.) Williams further testified that his supervisors expected him to complete jobs in the allocated time, which he understood to mean that he would not get paid for any extra time spent on those jobs. (Id. at 160.) Finally, Williams alleges that he spent at least five minutes after the end of his shift doing work, and that he sometimes reviewed blueprints at home. (R. 309, DSOF Williams ¶¶ 61-62.)

## Analysis

### A. Procedural Claims

Before reaching the heart of Illinois Bell's summary judgment motions, the court must first address Illinois Bell's argument that the named plaintiffs' asserted claims were not adequately pled. More specifically, Illinois Bell argues that the named plaintiffs failed to properly allege that they did any pre-shift work,

18

performed post-shift work other than electronic timesheet entry, or worked unpaid overtime because of pressure to meet their MSOC numbers. (See, e.g., R. 261, Def.'s Blakes Mem. at 3-5.) Illinois Bell points out that in the three years since filing this lawsuit and prior to the current motions, the named plaintiffs never sought to amend their complaint to include such pre-shift, post-shift, and MSOC-related allegations, despite the fact that they did not require the benefit of any discovery to do so.[4] (Id. at 6-7; R. 334, Def.'s Blakes Reply at 4-5.)

In their responses to Illinois Bell's arguments, the named plaintiffs focus their full attention on their MSOC theory. (See, e.g., R. 298, Blakes's Opp. at 8-10.) They contend that this court should freely permit them to amend their complaint to include MSOC allegations given that the factual and legal arguments at this stage of the proceedings are different from those at the certification stage. (See, e.g., id. at 8-9.) They further contend that they should be allowed to present their MSOC theory because discovery was conducted on MSOC and Illinois Bell had notice that MSOC-pressures would be an issue in the case. (Id.)

As for Illinois Bell's procedural challenges to the named plaintiffs' pre-shift and post-shift work claims unrelated to timesheet entry, the named plaintiffs' response briefs and motion for leave to file a second amended complaint are silent

---

[4] Two months after Illinois Bell filed its motions for summary judgment and before submitting their responses, the named plaintiffs moved for leave to file a second amended complaint to explicitly include their claim that MSOC standards and resulting efficiency pressures violated the FLSA. (R. 289.) The named plaintiffs noted in their motion that they believed the proposed amendment was unnecessary, but moved for leave to amend "in an abundance of caution[.]" (Id. at 1-2.) This court denied the motion without prejudice, deciding instead to address the parties' pleading arguments in its decision here. (R. 294.)

on those issues.  (See, e.g., id. at 8-10; R. 289.)  Even their proposed second amended complaint only mentions pre-shift work in passing, while going into extensive detail about post-shift timesheet, lunch break, and MSOC allegations.  (See generally R. 289-1.)  The proposed complaint also makes no mention of any post-shift work other than electronic timesheet entry.  As such, the named plaintiffs have waived any arguments regarding whether they adequately pled pre-shift work or post-shift work not tied to timesheet completion.  *See LG Elecs. v. Whirlpool Corp.*, No. 08 CV 242, 2009 WL 5579006, at *3 (N.D. Ill. Nov. 23, 2009) (noting that a party waives arguments not presented in response to summary judgment motion) (citation omitted).  But even if the named plaintiffs had properly responded to Illinois Bell's challenge of their pre-shift and post-shift work allegations by using the same arguments they put forth in support of their MSOC allegations, those arguments would still fall short.

Although the named plaintiffs are correct that a complaint need only narrate a claim, *see Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997), this court previously pointed out that their complaint does not include "any possible FLSA claim under the sun," *see Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2011 WL 2446598, at *8 (N.D. Ill. June 15, 2011).  The named plaintiffs specifically alleged in their complaint that they worked through lunch because they had to "maintain a job-site and/or travel between job-sites," (R. 11, Am. Compl. ¶ 26), and that they were forced to work post-shift to complete timesheets, (id. ¶¶ 30, 32).  The complaint explains that they did not report this extra time because management "routinely

disciplines" them for not getting overtime pre-approved. (Id. ¶¶ 19-20, 34.) The complaint makes no mention of pre-shift work, post-shift work unrelated to timesheets, efficiency pressures, or MSOC. Indeed, this court recognized at a November 2012 hearing that the introduction of the plaintiffs' efficiency theory represented a significant shift from the theories presented at the conditional certification stage. *See Blakes,* 2013 WL 6662831, at *2.

The Seventh Circuit has stated that post-*Twombly*, a complaint must describe a claim "in sufficient detail to give the defendant fair notice of what the claim is and the ground upon which it rests." *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (citations omitted). For example, in *EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008), the court affirmed a district court's refusal to allow the EEOC to substitute AIDS for HIV as the factual basis of its discrimination claim, finding that such an amendment was "not a mere adjustment," but rather a "major alteration of 'what the claim is' and the 'grounds upon which it rests,'" regardless of whether HIV and AIDS are synonymous under applicable laws. Similarly here, venturing beyond allegations based on job-site maintenance, travel, and insufficient time to complete timesheets to include unreasonable efficiency standards, pre-shift work, and other post-shift activities changes the basic factual premises in the case.

But more importantly, as this court noted in its decision on Illinois Bell's decertification motion, "[i]f, as the named plaintiffs contend, they have been forced to underreport their time since the MSOC's inception, they did not require the

benefit of discovery to present that theory[.]" *Blakes,* 2013 WL 6662831, at *8. The same applies to the named plaintiffs' new pre-shift and post-shift work allegations. The named plaintiffs argue that a party does not have to amend its pleadings to reflect new information obtained through discovery, *see Umar v. Johnson*, 173 F.R.D. 494, 503 (N.D. Ill. 1997), but neglect to explain how MSOC's allegedly coercive effects or their performance of unpaid pre-shift or post-shift work constitute "new" information. While it is true that plaintiffs need not "plead with precision legal theories or detailed facts," *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011), denying an amendment is appropriate when the party seeking amendment knew or should have known of the facts upon which the proposed amendment is based, but failed to include them in the original complaint, *see Jones v. Psimos*, 882 F.2d 1277, 1285 (7th Cir. 1989); *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990) (citations omitted). Here the named plaintiffs must have known of any alleged MSOC pressures or additional pre-shift and post-shift work before filing their lawsuit, and could have incorporated such allegations in their complaint.

Indeed, the named plaintiffs had ample opportunities to amend their complaint before now, and encountered more than a few warning signs that they should. The named plaintiffs first amended their complaint in February 2011, (R. 11), and sought to amend their complaint again in June 2011, (R. 48), but neither the first nor the proposed amendment addressed efficiency pressures, pre-shift work, or post-shift activities unrelated to timesheet entry. As noted above,

this court's June 2011 conditional certification decision reminded the named plaintiffs that the case was proceeding only on the issues of "unpaid lunch breaks and time spent post-shift completing time sheets." *See Blakes*, 2011 WL 2446598, at *8. Certainly the named plaintiffs could have sought to amend their complaint after the court denied them access to certain MSOC discovery in November 2012, (R. 186), and then granted in part Illinois Bell's motion for decertification in December 2013, (R. 233). The named plaintiffs even admit in their most recent motion for leave to file a second amended complaint that the court's previous decisions left them with "some concern" and "some doubt" as to whether the court was satisfied that the current pleadings permit them "to present evidence relating to MSOC" standards. (R. 289 at 3, 5-6.) Yet instead of amending their complaint when they perceived that their pleadings were in question, the named plaintiffs chose to assume that the complaint was adequate as-is. Having made that choice, the named plaintiffs must now abide by its consequences.

To the extent the named plaintiffs contend that the complaint was constructively amended to include MSOC allegations in the course of discovery, the parties must have expressly or impliedly consented to the changes for constructive amendment to be effective. *See Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (citations omitted). This court has broad discretion in determining whether to constructively amend a complaint. *See id.* (citing *Sunstream Jet Express, Inc. v. Int'l Air Serv. Co., Ltd.*, 734 F.2d 1258, 1272 (7th Cir. 1984)). Although Illinois Bell did produce some discovery regarding MSOC, it did so "in light of Rule 26's broad

23

discovery parameters" and "to avoid unnecessary discovery disputes." (R. 292, Def.'s Opp. to Pls.' Mot. for Leave at 5-6.) MSOC is part of Illinois Bell's timekeeping system, and the way Illinois Bell tracks its technicians' time is a broader topic clearly relevant to the named plaintiffs' original claims. *See Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988) ("[T]he mere introduction of evidence relevant to a pled issue that incidentally establishes an unpled claim does not give rise to implied consent."). The court therefore is unwilling to fault Illinois Bell for cooperating in good faith with the named plaintiffs' initial MSOC-related discovery requests by finding that in doing so, Illinois Bell consented to amending the complaint.

Illinois Bell also objected as soon as the named plaintiffs sought more specific MSOC discovery relating to the "efficiency goals or expectations" of each of the named and opt-in plaintiffs, first-level supervisors, and area managers, which indicates that Illinois Bell did not consent to amendment. (R. 181-8, Ex. 3 at 7-9); *see In re Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) ("One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel." (citations omitted)). Illinois Bell went on to object to the named plaintiffs' presentation of their MSOC theory at the decertification stage, (R. 205-2, Def.'s Decertification Mem. at 4-5, 10-11), opposed their motion to amend the complaint to include MSOC allegations, (R. 292), and objected to the allegations in its opening and reply briefs in support of the motions currently before the court, (see, e.g., R. 261, Def.'s Blakes Mem. at 3-5, 6-7; R. 334, Def.'s Blakes Reply at 1-2,

4-6).  These repeated objections support a finding that no consent, express or implied, was given.  *See also Smith v. Safety-Kleen Sys., Inc.*, No. 10 CV 6574, 2012 WL 162206, at \*7 (N.D. Ill. Jan. 18, 2012) (finding defendants did not consent to amendment even though the plaintiffs' new theory of liability was mentioned in previous filings and "defendants responded to the argument, albeit in a footnote[,]" because defendants "objected to the argument in its summary judgment reply as an improper amendment to the complaint").

Furthermore, allowing constructive amendment at this stage would prejudice Illinois Bell.  Discovery has been closed since November 2012. (R. 186.)  Illinois Bell points out that if it had known the case included a claim that its efficiency standards violated the FLSA, it could have come forward with affirmative evidence regarding how MSOC time standards were created, provided more testimony from company experts who helped design and administer MSOC, and put forth additional evidence to rebut the named plaintiffs' theory. (See, e.g., R. 334, Def.'s Blakes Reply at 5.)  This argument has merit.  In a similar case involving a properly pled efficiency pressure theory, the parties presented monthly and annual statistics on the percentage of technicians who satisfied minimum performance expectations, as well as survey data showing how many plaintiffs said they were motivated to understate their time by efficiency standards.  *See Brennan v. Qwest Commc'ns Int'l, Inc.*, 727 F. Supp. 2d 751, 757 (D. Minn. 2010).  But here, instead of developing such evidence, which among other things would have indicated whether MSOC standards are objectively reasonable, Illinois Bell rightly presumed given the

named plaintiffs' failure to amend the complaint and this court's previous orders, that the issues in this case would be limited to the named plaintiffs' original theories. Allowing the named plaintiffs to add their MSOC theory now would unnecessarily prolong the litigation and prejudice Illinois Bell because the new allegations could easily have been made and addressed from the initial filing of the suit. *See Jones,* 882 F.2d at 1285.

Ultimately there must be a point at which a plaintiff makes a commitment to the theory of his or her case. *See Johnson v. Methodist Med. Ctr.*, 10 F.3d 1300, 1304 (7th Cir. 1993). Here the named plaintiffs seek to add new theories more than three years after initiating this action with no explanation as to why amendment did not take place sooner, except that they felt it was unnecessary. They chose to make specific allegations in their complaint about travel between job sites, job-site maintenance, and post-shift timesheet completion, thereby narrowing the issues beyond just any unpaid overtime. *See id.* (finding that where the plaintiff's preceding complaints made "very specific allegations," "it was not unreasonable for [the defendant] to be taken by surprise by the proposed complaint's new allegations"). Accordingly, this court denies the named plaintiffs' motion for leave to file a second amended complaint, (R. 289), and limits its consideration to their lunch break and post-shift claims based on travel between job sites, job-site maintenance, and insufficient time to complete timesheets.

**B.      Summary Judgment Standard**

This court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Illinois Bell bears the initial burden of informing the court of the basis for its motions, but once a proper motion has been made, the named plaintiffs cannot rest upon mere allegations or denials, but must present affirmative evidence setting forth specific facts to show the existence of a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson*, 477 U.S. at 247-48, 257.  Reasonable inferences drawn from the facts will be viewed in the named plaintiffs' favor, but they are not entitled to the benefit of inferences "that are supported by only speculation or conjecture."  *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation omitted).

**C.      FLSA**

To prevail on their FLSA claims,[5] the named plaintiffs must prove that: (1) they worked overtime without compensation; and (2) Illinois Bell knew or should have known of the overtime work.  *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176-77 (7th Cir. 2011); 29 C.F.R. § 785.11.  Regarding the first requirement, Illinois

---

[5]  The named plaintiffs initially brought a claim under the Illinois Minimum Wage Law, but they have since dropped that claim.  (R. 60.)

27

Bell's compliance with the FLSA's standards for keeping accurate records determines the burden of proof the named plaintiffs must bear in establishing the number of overtime hours they worked. *See* 29 U.S.C. § 211(c); *Brennan*, 727 F. Supp. 2d at 762 (citation omitted). The FLSA provides that every employer subject to its provisions must "make, keep, and preserve such records of the persons employed by [it] and of the wages, hours, and other conditions and practices of employment maintained by him[.]" 29 U.S.C. § 211(c). If Illinois Bell's records are inadequate under the above standard and their inaccuracy makes it difficult for the named plaintiffs to prove damages, the named plaintiffs can meet their burden by showing the amount and extent of the unpaid work they performed "as a matter of just and reasonable inference." *See Anderson*, 328 U.S. at 687; *Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 595 (7th Cir. 2008). The burden then shifts to Illinois Bell to produce either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *See Anderson*, 328 U.S. at 687-88. However, if Illinois Bell's records are adequate under the FLSA's standards, then the accurate time records will establish the amount of damages and the general rule precluding recovery of uncertain or speculative damages applies. *See Schremp v. Langlade Cnty.*, No. 11 CV 591, 2012 WL 3113177, at *3 (E.D. Wis. July 31, 2012) (citing *Brown*, 534 F.3d at 595).

As for Illinois Bell's knowledge of the overtime work, whether or not Illinois Bell asked the named plaintiffs to do the work is irrelevant, as is their reason for

performing the work. *See* 29 C.F.R. § 785.11; *see also Ross v. Citizens*, 667 F.3d 900, 909 (7th Cir. 2012) (holding that in a class action wage claim, the intent behind the allegedly unlawful company-wide policy is not relevant). As long as Illinois Bell had either actual or constructive knowledge that the named plaintiffs performed overtime work, they are entitled to overtime pay. *See Reich v. Dep't of Conservation and Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11). However, while an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about. *Kellar*, 664 F.3d at 177 (citation omitted).

**D.    Lunch-Break Work**

Because the named plaintiffs failed to adequately plead their claims for pre- and post-shift work unrelated to timesheet completion, and then waived any arguments in favor of amending the complaint to include them, the court will only address the named plaintiffs' alleged lunch-break work. The court will also begin its discussion by addressing whether a genuine dispute exists regarding Illinois Bell's knowledge of each named plaintiff's alleged lunch-break work, because a lack of knowledge would shield Illinois Bell from liability.

**1.    James Blakes**

Blakes has not presented sufficient evidence that Illinois Bell had either actual or constructive knowledge that he was working through lunch without compensation. The only arguments he makes regarding actual knowledge relate to his pre-shift work claim, which for reasons already discussed is not properly before

this court. As for constructive knowledge, Blakes first asserts that because Illinois Bell's policies require that manholes be guarded, he was forced to remain at his job site during lunch. (See R. 298, Blakes's Opp. at 18.) But even assuming his assertion is true, those policies alone do not indicate that his supervisors knew or should have known that Blakes did not report the time he worked through lunch. He also relies on the assertion that one of his supervisors used to be a cable splicer and would sometimes work through lunch without reporting his time. (Id.) But it is unreasonable to infer that just because one of Blakes's supervisors sometimes performed unpaid work as a cable splicer in the past, that supervisor therefore should have known that Blakes was not reporting his own lunchtime work.

Blakes next cites to evidence which he says shows that his supervisors knew that splicers could not meet the expected efficiency standards, and yet their timesheets showed they met the standards. (Id. at 18-19.) Setting aside the fact that the efficiency standard theory was not properly pled, the evidence he cites does not support his assertion. Blakes first relies on the deposition testimony of another named plaintiff, Deckys, in which Deckys speculates as to what management "probably" should have known regarding efficiency numbers not being met. (See R. 301, Ex. 9, Deckys Dep. at 314, 425.) Blakes also cites to Deckys's testimony that he asked his supervisors about discrepancies in efficiency numbers between technicians. (See id. at 319.) At best, this testimony only shows that management may have known about inconsistencies in time recorded to specific tasks, not that technicians systematically were failing to report overtime. Even Deckys's testimony

30

that he told his managers he could not complete his tasks in the allotted time does not indicate that those managers knew that Blakes was not reporting overtime, especially since it is unclear from the cited testimony whether Deckys had the same managers as Blakes. (See id. at 344.) Moreover, Blakes's citation to Porter's testimony about his managers' knowledge of post-shift work is irrelevant to whether Blakes's supervisors knew about his lunchtime work. (See R. 301-1, Ex. 18, Porter Dep. at 116.)

Blakes next contends that he told each of his supervisors he was not recording his task time accurately, (R. 298, Blakes's Opp. at 11), but even his own testimony does not support that his supervisors knew or should have known he was performing unpaid work. Blakes cites to a portion of his deposition in which he says that he told all of his managers that he allotted his work time to certain tasks regardless of whether he actually did those tasks, but then subsequently testified that he did not specifically tell any of his managers that he was misallocating time in that way. (R. 301, Ex. 8, Blakes Dep. at 187-88.) Even assuming he did tell his managers he was allocating his task time inappropriately, this still would not show that his managers knew or should have known that Blakes was not reporting his *total* time worked. Blakes further relies on his attorney's declaration identifying instances in which Blakes noted in his timesheets that he was unable to charge time to a certain task code and had to charge his time to a different task, but again this evidence does not indicate that Blakes did not report all of the time he worked. (See R. 301, Ex. 7, Lawrence Decl. ¶ 8.) In other words, even if Blakes alerted his

supervisors to the fact that he did not always assign his time to the correct task codes, he has not presented evidence that would have given his supervisors reason to know that he was not recording all of his work time.

Blakes also points to evidence that in several instances his supervisors changed his timesheets after he submitted them by removing and adding tasks. (See R. 298, Blakes's Opp. at 6-7.) Illinois Bell contends that any such changes were made to correct mistakes or inconsistencies. (See R. 333, PSOF Blakes ¶¶ 9, 11.) Both parties admit that there is no way of determining the nature of the changes made, (see id.; R. 298, Blakes's Opp. at 6 n.5), and the fact that the timesheets were altered does raise some suspicion as to the substance of those changes. But at the end of the day, Blakes only presents evidence which could lead a reasonable jury to conclude that the time allocated to certain task codes was inaccurate, not that any inaccurate coding led to a failure to track all hours worked. "Some metaphysical doubt" as to whether changes in task codes led to reductions in the overall amount of time reported for payroll purposes is ultimately insufficient to overcome summary judgment. *See Anderson*, 477 U.S. at 261 (citation omitted). This is especially true given that Illinois Bell has presented unrebutted evidence that the payroll system ("eLink") is programmed to default to 40 hours regardless of the task codes entered, unless specific eLink codes are used to indicate exceptions for overtime or unpaid leave. (See R. 333, PSOF Blakes ¶¶ 6-7.) In fact, according to Illinois Bell, eLink defaults to 40 hours even if the employee's timesheet reports less than 40 hours of work. (Id.) Illinois Bell also submitted the unrebutted

testimony of manager Keith Harn who indicated that he made changes to timesheets in response to computerized error notifications regarding issues like insufficient vacation days or a missed check box. (See id. ¶ 9 (citing R. 333-13, Ex. L, Harn Dep. at 70-73).) Given this record, the court finds that Blakes's evidence of changed timesheets is insufficient to raise a genuine issue of material fact as to Illinois Bell's knowledge of unpaid overtime work.

Blakes next asserts that his supervisors told him that he and his partners' timesheets should reflect the same time spent on each task, which necessarily meant that some time had to be recorded inaccurately. (See id. ¶ 22.) Yet the testimony he cites makes no mention of his supervisors and what they may or may not have instructed him to do. (See R. 301, Ex. 8, Blakes's Dep. at 238-39.) Not only does his testimony fail to support his assertion, Blakes again runs into the same problem of being unable to show that dividing task time amongst the technicians somehow resulted in unpaid overtime.

Finally, Blakes contends that Illinois Bell's policies encouraged the practice of underreporting time to avoid discipline and accusations of insubordination. (R. 298, Blakes's Opp. at 19.) But his evidence is insufficient to show that his supervisors ever pressured him to underreport time or threatened to discipline him if he did not. Blakes contends that Illinois Bell requires that its technicians always obey management directives even if those directives conflict with written policies. (See id.) At best this would only show that a manager's directives trump Illinois Bell's written policies, not that any managers actually directed Blakes not to report

overtime. (See R. 333, PSOF Blakes ¶ 26.) Citing to his own testimony in support, Blakes attempts to bridge this gap in the evidence by asserting that Velez, one of his supervisors, told him that reporting time "accurately" meant reporting only the time allocated to a task instead of the time actually spent. (Id. ¶ 18.) But Blakes's testimony was that Velez instructed him to "submit[ ] accurate time reporting," which Blakes then interpreted to mean that he should only record the time allotted to a task. (See R. 301, Ex. 8, Blakes Dep. at 386-88.) Blakes presents no evidence to support his interpretation of Velez's instructions, but even assuming Blakes's interpretation was reasonable, he still lacks sufficient evidence indicating that recording only the allotted time to a task and distributing his time to other tasks resulted in him being underpaid.

Blakes nonetheless insists that this "mosaic of evidence" creates an inference that Illinois Bell had constructive knowledge about off-the-clock work being performed. (R. 298, Blakes's Opp. at 19.) But a nonmovant's burden is not satisfied by unsubstantiated assertions, speculation, or the mere existence of "a scintilla of evidence." *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Indeed, courts have granted summary judgment to defendants in situations similar to this one. For example, in *Gaines v. K-Five Construction Corp.*, 742 F.3d 256, 270-71 (7th Cir. 2014), and *Kellar*, 664 F.3d at 177-78, the Seventh Circuit affirmed summary judgment on the plaintiffs' FLSA claims based on their failure to show defendants' knowledge of unpaid overtime, even though the plaintiffs presented time records indicating they arrived early to work. In both

cases the court found that employers would not necessarily have known that their employees were actually working and not being paid. *See id.*

In another case also involving cable technicians, *Boelk v. AT&T Teleholdings, Inc.*, No. 12 CV 40, 2013 WL 3777251, at *7 (W.D. Wis. July 19, 2013), the court granted summary judgment to the defendants because the plaintiffs offered no evidence that the defendants instructed them not to report overtime, told them to delete overtime reported on their timesheets, or refused to pay them for reported overtime. Additionally, as is the case with Blakes, the plaintiffs in *Boelk* did not produce evidence that they told any of their supervisors or managers that they were working during their lunches without reporting their time. *See id.* The court concluded that by failing to record their hours accurately and failing to tell their supervisors or mangers about lunch-break work, the plaintiffs prevented the defendants from having actual knowledge of their off-the-clock work. *See id.*

The *Boelk* court also found that the plaintiffs failed to prove the defendants had constructive knowledge of unpaid work, despite evidence that one of the plaintiffs told his manager that efficiency pressures would cause technicians to work through lunch. *See id.* at *8-10. That plaintiff also said he told another manager that some technicians "were working through their lunches and breaks," and that the manager said "he knew." *Id.* at *9. Even assuming that those conversations occurred, the court found that those warnings were too vague to provide meaningful information to the defendants about *which* technicians were working through their breaks, how frequently they were doing it, and why it was

35

occurring. *See id.* at \*10. The court pointed out that even if the conversations established that the managers knew or should have known that unidentified technicians were working through breaks without being paid, the conversations did not place the defendants on notice that the five named plaintiffs in that case were working through their meal breaks. *See id.*

Similarly, in *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012), the Sixth Circuit granted summary judgment to the defendant even though the plaintiff occasionally told her supervisors that she was not getting her meal breaks. The court noted that she never told her supervisors she was not being compensated for missing her meal breaks, so there was no way the defendant should have known of her unpaid time. *Id.* The court went on to distinguish several cases in which courts denied summary judgment because the employers prevented their employees from reporting overtime or were otherwise notified of the employees' unreported work. *See id.*, 699 F.3d at 876-77 (collecting cases). Those cases included situations where supervisors were specifically instructed to monitor hours to ensure compliance with a no overtime policy, or where immediate supervisors insisted that reported overtime hours be kept to a stated minimum level. *See id.* (citing *Reich*, 28 F.3d at 1083-84; *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973)).

Courts have also been presented with far more definitive evidence than what Blakes has submitted here before deciding to deny summary judgment. For example, in *Larbi v. Advocate Christ Medical Center*, No. 10 CV 4623, 2012 WL

6019107, at *8 (N.D. Ill. Dec. 3, 2012), the court denied summary judgment because it was undisputed that the plaintiff told her manager via emails and handwritten notes that she was unable to take her meal breaks. In *Skelton v. American Intercontinental University Online*, 382 F. Supp. 2d 1068, 1072-73 (N.D. Ill. 2005), the court denied summary judgment because the plaintiffs' supervisor admitted during his deposition that he limited the ability of his admissions advisors to record overtime, and the plaintiffs testified that they were repeatedly instructed to only record 40 hours of work per week. Blakes presents no such evidence, and the testimony he does offer is vague and speculative at best.

In *Allen v. Board of Public Education*, 495 F.3d 1306, 1320-21 (11th Cir. 2007), the Eleventh Circuit reversed a grant of summary judgment as to plaintiffs who testified that they either told their supervisors directly that they were working overtime or their supervisors clocked them out despite knowing they were still working, removed recorded hours from their timesheets, and directly instructed them not to record overtime. The court affirmed summary judgment, however, as to plaintiffs who said that no one told them to work off-the-clock and that they did not inform anyone of their overtime work, or who stated that the defendant was aware of off-the-clock work, but put forth no evidence to support such claims. *Id.* at 1322-23. Like the latter category of plaintiffs, Blakes did not inform anyone of his unpaid overtime work, and his evidence falls short of indicating that his supervisors knew or should have known he was working off-the-clock.

As the above cases demonstrate, courts require more than speculative or vague evidence of actual or constructive knowledge of unpaid overtime to overcome a motion for summary judgment. Even after granting Blakes every reasonable inference, no reasonable jury could conclude that his evidence, alone or in combination, shows that Illinois Bell knew or should have known that he was working through his lunch break without reporting that time. Without meeting his burden of proof regarding Illinois Bell's knowledge, Blakes cannot succeed in his FLSA claim. Accordingly, Illinois Bell's summary judgment motion is granted as to Blakes.

### 2. Steven Clark

Clark, unlike Blakes, does present evidence from which a reasonable jury could conclude that Illinois Bell had either actual or constructive knowledge that he was working through lunch without compensation. Although Clark did not tell his supervisors he worked through lunch, he asserted that his supervisor, Velez, gave him and his partner a task and told them that it was a "no overtime" job that needed to be completed regardless of the time it took. (See R. 196-8 at 15; R. 343 PSOF Clark ¶¶ 21-22.) When Clark reported overtime for that job, in part because he accidentally brought the wrong equipment and the task took longer than expected, Clark was reprimanded for "causing overtime." (Id.; R. 322, Ex. 35, Clark Dep. at 229-30.) Clark also stated that he complained to another supervisor, Graham, about having to work through lunch for a job, and in response Graham said that Clark had to "make a sacrifice for the team." (See R. 196-8 at 15.) Clark

understood this to mean that he would not be paid for his time, so he did not record working through his lunch. (Id.) Giving Clark the benefit of every reasonable inference, one could find that Graham and Velez discouraged Clark from reporting his overtime. Unlike in *Boelk* where similar conversations were vague as to which specific technicians might be working overtime, assuming the truth of Clark's account, Graham and Velez knew or should have known that Clark in particular would not report his overtime. *See Boelk*, 2013 WL 3777251, at \*10.

Illinois Bell nonetheless argues that Clark's failure to accurately report his time prevents his FLSA claim from succeeding. (R. 262, Def.'s Clark Mem. at 10-13.) More specifically, Illinois Bell contends that because Clark chose to underreport his time and did not comply with time reporting procedures, Illinois Bell cannot be liable for failure to pay him overtime. (Id. at 11.) But since Clark has presented evidence which could support a finding that he was told by his supervisors not to record all of his overtime, Illinois Bell cannot hide behind its time-keeping policies to avoid compensating Clark. *See Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005) (citations omitted); *see also Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 CV 5755, 2004 WL 1882449, \*4 (N.D. Ill. Aug. 18, 2004) (employer cannot "escape its responsibility to pay employees for all time worked by relying solely on the hours reported on employees' time sheets"). Again, unlike in *Boelk*, Clark has alleged that Graham and Velez instructed him not to report overtime. *See Boelk*, 2013 WL 3777251, at \*7. Though Illinois Bell argues that Clark prevented it from

39

discovering its obligation to pay him, Clark has presented evidence indicating that Illinois Bell's own management may have had a role in impeding his ability to report his overtime.

In addition to arguing that Clark's FLSA claim fails as a matter of law, Illinois Bell also presents evidence to rebut Clark's contention that his supervisors knew he was working off-the-clock. For example, Illinois Bell points to the fact that Clark never told management about working through lunch and could not remember anything specific about the jobs for which Velez and Graham allegedly instructed him not to report overtime. (R. 262, Def.'s Clark Mem. at 13.) Illinois Bell also notes that Clark was paid for all the time he actually reported, including some overtime. (Id. at 15.) However, these facts do not disprove Clark's testimony; rather, this evidence merely challenges the credibility of Clark's statements, an issue for a jury to decide. *See Shin Park v. Seoul Broad. Sys. Co.*, No. 05 CV 8956, 2008 WL 619034, at *8 (S.D.N.Y. Mar. 3, 2008) (finding summary judgment inappropriate because defendants' evidence only undermined the reliability of plaintiff's allegations, and assessment of credibility is a matter for the jury); *see also Brennan*, 727 F. Supp. 2d at 757 n.6 (holding that whether plaintiffs' own testimonial statements lack substantiation and corroboration is an issue regarding the weight and credibility of the evidence). Notably, Illinois Bell references no testimony or affidavits from Velez, Graham, or other managers denying they ever instructed Clark not to report overtime. But even if Illinois Bell had cited to evidence contradicting Clark's interrogatory answer, resolution of this matter would

still be "appropriately left in the hands of a jury." *See Stanislaw v. Erie Indem. Co.*, No. 07 CV 1078, 2012 WL 517332, at *10 (W.D. Pa. Feb. 15, 2012).

Since Clark has adduced enough evidence to overcome summary judgment on the issue of Illinois Bell's knowledge, the court next considers whether the same can be said of his evidence regarding the amount of unpaid overtime he worked. This court begins by addressing whether Clark's evidence must meet a "definite and certain" standard or the less restrictive "just and reasonable inference" standard. Illinois Bell argues that Clark must prove the number of hours he worked with "definite and certain evidence" because his own failure to record all his time accounts for any purported inaccuracy in Illinois Bell's records. (R. 262, Def.'s Clark Mem. at 8 & n.5 (citing *Anderson*, 328 U.S. at 686-87).) Clark responds that Illinois Bell is to blame for any lack of documentation showing the precise amount of his damages because Illinois Bell only tracks time spent on specific tasks, management pressured Clark into reporting his time inaccurately, and managers modified his time records. (R. 326, Clark's Opp. at 1.) As such, he contends that he is entitled to approximate his damages as a matter of "just and reasonable inference." (Id. at 12 (quoting *Brown*, 534 F.3d at 595).)

Both parties rely on the Seventh Circuit's opinion in *Brown*, 534 F.3d 593, to support their positions. In that case, the Seventh Circuit explained that the Supreme Court in *Anderson*, 328 U.S. 680, did not create a new "definite and certain evidence" standard, but simply recognized that "where an employer failed to keep accurate records required by the FLSA, the employer rather than the employee

41

should bear the consequences of that failure." *Brown*, 534 F.3d at 595. In other words, if an employer's own actions in failing to keep adequate records make the best evidence of an employee's damages unavailable, the employee can meet his burden by producing sufficient evidence showing the amount and extent of uncompensated work as a matter of "just and reasonable inference." *Id.* (citation omitted); *see Turner v. The Saloon, Ltd.*, 491 F. Supp. 2d 767, 769 (N.D. Ill. 2007) (citation omitted). The burden would then shift to the employer to produce evidence of "the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee's evidence." *Brown*, 534 F.3d at 595. If the employer does not meet that burden, a court may award damages even though they are approximations. *Id.*

Here, Clark has set forth sufficient evidence to bring the accuracy of Illinois Bell's records of his time into question, although not all of the evidence he points to passes muster. For example, Clark makes much of the fact that Illinois Bell records time spent on certain tasks, contending that such records are "systemically" inaccurate because Clark's supervisors instructed him to spread his time worked among different tasks whether he actually did work for those tasks or not. (R. 326, Clark's Opp. at 12-13.) Even assuming what Clark says is true, as discussed above, such evidence does not show that any inaccurate coding led to a failure to track all hours worked. Clark himself testified that even in instances where time was allocated to different tasks, technicians still got paid for all the time they worked. (R. 322, Ex. 35, Clark Dep. at 45.) Furthermore, Illinois Bell has presented

42

unrebutted evidence that the payroll system defaults to 40 hours regardless of the task codes entered, unless specific eLink codes are used to indicate exceptions for overtime or unpaid leave. (See R. 343, PSOF Clark ¶¶ 7-8.) Ultimately, Illinois Bell's alleged failure to keep accurate records of time spent on *tasks* does not mean it failed to comply with the FLSA's requirements for recording the total number of hours *worked*.

Clark's evidence that managers modified his time records also falls short. Like Blakes, Clark has not presented evidence indicating the nature of the changes made, and merely asserting that managers adjusted certain time entries is, by itself, insufficient to create a genuine issue of material fact. *See Marchman v. Advocate Bethany Hosp.*, No. 04 CV 6051, 2006 WL 1987815, at *6 (N.D. Ill. July 12, 2006). Although Clark contends that the timesheets are inaccurate because changes were made to them after submission, he offers no evidence to support an inference that the alterations were anything other than legitimate. *See O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 595 (6th Cir. 2009) (granting summary judgment to defendant on plaintiff's theory that her employer improperly altered her timesheets because she provided no evidence that the time records were altered to her detriment).

Nevertheless, Clark gains traction with the argument that his supervisors knew he was not recording time accurately. Viewing the evidence in Clark's favor, if Velez and Graham discouraged him from accurately recording his overtime, such actions indicate that Illinois Bell's records cannot be trusted, at least with regard to

43

Clark. *See Allen*, 495 F.3d at 1316 (applying "just and reasonable inference" standard where employees were discouraged from accurately recording overtime). It is reasonable to infer that Clark would have reported his overtime if he had not been pressured to do otherwise, so in that sense Illinois Bell's actions may be partly to blame for Clark's records being inaccurate as he alleges. *See id.* Where there is no indication that an employer instructed its employee not to accurately report his time, the accurate time records will establish the amount of damages and the general rule precluding recovery of uncertain or speculative damages is appropriate. *See Schremp*, 2012 WL 3113177, at *3 (citing *Brown*, 534 F.3d at 595). But here, Clark's testimony about his conversations with Velez and Graham indicates that they instructed him not to report his overtime, creating a genuine dispute as to the accuracy of Illinois Bell's records and opening the door to application of the "just and reasonable" standard.

Even if a fact-finder decides that Clark is entitled to approximate his damages as a matter of "just and reasonable inference," Clark still must meet his burden under this standard to succeed in his FLSA claim. Illinois Bell argues that Clark's evidence is insufficient because he could not identify a specific instance of when he worked through lunch, other than to say that he worked through lunch during manhole jobs. (R. 262, Def.'s Clark Mem. at 8.) Clark responds by pointing to time records indicating whether the tasks he performed on a given day were associated with underground work. (R. 326, Clark's Opp. at 14.) He also estimates

that he worked through three lunches per week "based on his recollection and experience as a cable splicer." (Id.)

The court finds that Clark's evidence is sufficient to create a genuine dispute as to the amount and extent of his unpaid overtime. Assuming for our purposes that Illinois Bell's time records are inaccurate or inadequate, Clark need not corroborate his testimony regarding the amount of overtime he worked with precise documentation or records. *See Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 815 (N.D. Ill. 2011) (finding that an employee may satisfy his burden of proof under the FLSA by relying on his recollection alone to approximate damages). It is sufficient for summary judgment purposes that Clark supplements his testimony and supports his approximations with timesheets showing task codes associated with underground work. The Seventh Circuit has recognized that plaintiffs are entitled to base estimates of time worked on "triggering factors" that aid employees in recalling when they worked overtime. *See Brown*, 534 F.3d at 597-98 (citing *Allen,* 495 F.3d at 1317). The court cited to examples in *Allen* where a plaintiff relied on occasional after-school events to provide a basis for inferring the extra hours worked. *Id.* Similarly, Clark uses the underground task codes as markers to indicate the days on which he likely worked through lunch. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (noting that an employee could reconstruct unreported time "from memory, inferred from the particulars of the jobs the technician[ ] did, or estimated in other ways"). The task code documentation, coupled with Clark's testimony that he worked through lunch

when he had to guard manholes, distinguishes Clark from the plaintiffs in other cases where summary judgment was granted to defendants because Clark has done more than make purely speculative, bare, undocumented allegations. *See, e.g., Golden v. World Sec. Agency, Inc.*, 884 F. Supp. 2d 675, 700 (N.D. Ill. 2012) (plaintiffs provided no foundational testimony or other evidence regarding days, times, or number of hours worked); *Schremp*, 2012 WL 3113177, at *3 (plaintiff only made speculative, unsupported averments that he worked an average of three hours per week of overtime); *Millington v. Morrow Cnty. Bd. of Comm'rs*, No. 06 CV 347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("[P]laintiff has submitted no evidence beyond bare allegations and vague undocumented estimates to support his claim.").

Illinois Bell challenges Clark's estimates by explaining that task codes associated with underground work do not necessarily indicate that the technician was guarding a manhole during that time. (R. 342, Def.'s Clark Reply at 6 & n.7.) For example, Illinois Bell contends that an underground task code could be used for time spent somewhere other than a manhole, and that underground work might only constitute a small portion of the day such that it does not interfere with lunch. (R. 343, PSOF Clark ¶ 1.) Illinois Bell also points to Clark's testimony that there were times when he could still take lunch on days he performed underground work. (R. 342, Def.'s Clark Reply at 6-7.) While these assertions might undermine Clark's reliance on the underground task codes as markers for overtime, they do not necessarily negate the reasonableness of the inferences to be drawn from Clark's

evidence. *See Park*, 2008 WL 619034, at *8. A fact-finder could certainly choose to credit Illinois Bell's refuting evidence and afford less weight to Clark's estimates, reducing or eliminating damages as he or she sees fit. *See, e.g., Urnikis-Negro v. Am. Family Prop. Servs.*, No. 06 CV 6014, 2008 WL 5539823, at *10 (N.D. Ill. July 21, 2008) (finding plaintiff's testimony regarding her overtime hours worked "significantly exaggerated and largely lacking in credibility," yet still proceeding to approximate "by inference and circumstantial evidence" the number of hours she actually worked to award damages), *aff'd*, 616 F.3d 665 (7th Cir. 2010). But having to approximate damages based on less than credible testimony would not in itself defeat Clark's entitlement to recover damages. *See id.* ("Though damages may not be based entirely on speculation, a plaintiff need only prove [his] damages to a reasonable degree of certainty."). Given that Clark has presented evidence which could lead a reasonable fact-finder to conclude that Illinois Bell had actual or constructive knowledge of his unpaid overtime work, along with evidence sufficient to create genuine disputes as to the accuracy of Illinois Bell's records and the amount of his unpaid overtime "as a matter of just and reasonable inference," Illinois Bell's summary judgment motion is denied as to Clark.

### 3. Herman Deckys

In contrast, Deckys, like Blakes, has not presented sufficient evidence that Illinois Bell had either actual or constructive knowledge that he was working through lunch without compensation. Deckys contends that Illinois Bell had actual knowledge because he told all of his supervisors, at one point or another, that he

47

had worked through lunch. (See R. 302, Deckys's Opp. at 18.) He asserts that they knew he was not being paid to work through lunch because they reviewed his timesheets each day and presumably should have noticed that he did not report any overtime. (See id.) While the parties do not dispute that Illinois Bell supervisors review and approve technicians' timesheets before they are submitted to payroll, Deckys has provided no evidence indicating that the supervisors he allegedly told about working through lunch were the same supervisors who reviewed his timesheets for that day. There is also no evidence showing whether the days he told his supervisors about working through lunch were days that he did not report and receive payment for overtime. *See Morgan v. Vill. of New Lexington*, No. 07 CV 1180, 2009 WL 2982877, at *3 (S.D. Ohio Sept. 15, 2009) (finding employer's signature on timesheets alone did not indicate actual or constructive knowledge of overtime work being performed because there was no evidence that the employer initialed the specific timesheets indicating overtime). Without more details regarding the instances when he told his supervisors he worked through lunch, Deckys's assertion that Illinois Bell had actual knowledge of his unpaid overtime is too speculative to survive summary judgment.

As for constructive knowledge, Deckys's arguments are similar in many respects to Blakes's and fall short for the same reasons. Deckys first asserts that because Illinois Bell's policies require that splicers remain at open manholes, he was often forced to remain at his job site during lunch. (See R. 302, Deckys's Opp. at 19.) But the existence of such policies does not show that Deckys's supervisors

knew or should have known that he did not report the times he worked through lunch to guard a manhole.

Deckys next relies on the assertion that splicers "routinely complained" about being unable to meet expected efficiency standards, and yet their timesheets showed they met the standards, so management should have known that technicians were underreporting. (See id.) He contends that managers knew technicians were "skirt[ing] corners to make their numbers." (Id.) Setting aside the fact that his efficiency standard theory was not properly pled, the cited evidence does not support Deckys's assertions. As an initial matter, some pages of testimony Deckys cites are not included in the cited exhibit, and thus are not considered by the court. (See R. 330, PSOF Deckys ¶ 19 (citing to R. 301, Ex. 9, Deckys Dep. at 349, 488)). The other testimony he cites to states that on multiple occasions, Deckys told his managers before starting a job that certain tasks could not be done in the allotted time. (See R. 301, Ex. 9, Deckys Dep. at 450-51.) But his testimony does not indicate that those managers knew or should have known that Deckys ended up underreporting his time for those tasks. When asked to explain what he might do when presented with a job that was "obviously impossible" to complete in the allotted time, Deckys said that he would just spread his time among different tasks, consistent with what other named plaintiffs have done. (See id. at 452-53.) This testimony, as explained above, only shows that he inaccurately reported time spent on tasks, not that he failed to report his total time worked.

Deckys compares himself to the plaintiffs in *Brennan,* in which the court found that constructive knowledge could be shown where the employer imposed "unattainably high expectations" on its employees and should have known such standards would cause off-the-clock work. (See R. 302, Deckys Opp. at 19 n.17 (citing *Brennan*, 727 F. Supp. 2d at 756).) But a key distinction between *Brennan* and this case is that in *Brennan*, the plaintiffs presented evidence in the form of surveys and the defendant's own testimony to support their assertion that the applicable efficiency standards were unreasonable. *See Brennan*, 727 F. Supp. 2d at 757. Deckys offers only bare assertions that MSOC was unreasonable and mere speculation as to what managers should have known, neither of which pass muster even under the favorable standards of summary judgment. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

Deckys, like the other named plaintiffs, also points to evidence that his supervisors changed his timesheets after he submitted them by removing and adding tasks, (see R. 302, Deckys's Opp. at 12-13), but this argument fails for the same reasons already discussed. Deckys next repeats the contention that Illinois Bell's policies encouraged the practice of underreporting time to avoid discipline and accusations of insubordination. (Id. at 6-7, 19.) But his evidence is insufficient to show that his supervisors ever pressured him to underreport time. Deckys testified that while he was never directly told to record fewer hours than he actually worked, on one occasion Velez instructed him to "get [the job] done within the time frame," which Deckys understood to mean that he should only report the allotted task time.

50

(Id. at 332-34.)  Assuming the truth of Deckys's allegations, he still lacks evidence indicating that Velez knew or should have known that his instruction would result in Deckys not reporting all the time he worked.

Even after granting Deckys every reasonable inference, his evidence suffers from infirmities similar to those this court identified in Blakes's evidence.  Because no reasonable jury could conclude that Illinois Bell knew or should have known that Deckys was working through his lunch break without reporting his overtime, Deckys cannot succeed in his FLSA claim.  Accordingly, Illinois Bell's summary judgment motion is granted as to Deckys.

### 4.    Bradley Hunt

Hunt, however, has presented evidence from which a reasonable jury could conclude that Illinois Bell had either actual or constructive knowledge that he was working through lunch without compensation.  Unlike other named plaintiffs, Hunt testified that he actually told one of his supervisors he worked through lunch.  (See R. 306, DSOF Hunt ¶ 56.)  According to Hunt, his supervisor responded by saying "I'm not eating that time," which Hunt interpreted to mean that he would not be paid for his overtime.  (Id.)  He also testified that another supervisor announced at a meeting that there would be "no overtime in [Hunt's] garage whatsoever," which Hunt understood to mean that he should not report any overtime because he would not be paid for it.   (R. 301-1, Ex. 20, Hunt Dep. at 170-72.)

Giving Hunt the benefit of every reasonable inference, a reasonable jury could conclude that Hunt's supervisors discouraged him from reporting his

overtime. If that is the case, then Hunt's supervisors were at least partly responsible for Hunt's failure to report all of his overtime, and thus had at least constructive knowledge of the unreported time because they had the opportunity to get accurate overtime reports but opted instead to encourage artificially low reporting. *See Brennan,* 482 F.3d at 827-78 ("The company cannot disclaim knowledge when certain segments of its management squelched truthful responses.")

Illinois Bell also presents evidence to rebut Hunt's contention that his supervisors knew he was working off-the-clock. For example, Illinois Bell points out that Hunt says he only "probably" told supervisors that he worked time he did not report, and that he cannot even recall details regarding those conversations. (R. 268, Def.'s Hunt Mem. at 10-11.) But again, these facts merely undermine the reliability of Hunt's statements, and Illinois Bell references no testimony or affidavits from his supervisors denying Hunt's allegations. But even if Illinois Bell had cited to evidence contradicting Hunt's account, resolution of this matter would still be "appropriately left in the hands of a jury." *See Stanislaw,* 2012 WL 517332, at *10.

Because Hunt has presented sufficient evidence to overcome summary judgment on the issue of knowledge, the court next considers whether he has provided enough evidence regarding the amount of unpaid overtime he worked. This court applies the "just and reasonable inference" standard because like Clark, Hunt's evidence indicates that his supervisors knew he was not recording time

52

accurately, which would mean that Illinois Bell's records of Hunt's time are inaccurate. *See Allen*, 495 F.3d at 1316. As for whether Hunt's evidence is sufficient under this standard, Illinois Bell repeats its argument that Hunt, like the other named plaintiffs, fails to meet his burden because he does not recall specific days when he worked through lunch. (See R. 268, Def.'s Hunt Mem. at 9.) Hunt responds, in line with the other named plaintiffs, by pointing to time records identifying days that included tasks associated with underground work. (R. 305, Hunt's Opp. at 14.)

For the same reasons stated above, the court finds that Hunt's testimony regarding manhole work, along with his timesheets showing days he performed some kind of underground work, are sufficient to defeat summary judgment. Whether his testimony and records are credible enough to support his allegations is a question for a fact-finder. *See, e.g., Urnikis-Negro*, 2008 WL 5539823, at *10.

### 5. Phillipe Porter

Porter's claims, however, fail for lack of sufficient evidence that Illinois Bell had either actual or constructive knowledge that he was working through lunch without pay. He admits that he never told his supervisors he worked through lunch, (R. 325, DSOF Porter ¶¶ 63-64), and the only "evidence" he offers to show Illinois Bell had actual knowledge is an unsupported assertion that his supervisors knew he was working off-the-clock because they review his timesheets, (R. 324, Porter Opp. at 17). But for reasons already discussed above, such bare allegations are not enough to overcome summary judgment. *See Matthews v. Waukesha Cnty.*,

53

759 F.3d 821, 824 (7th Cir. 2014) (non-moving party must come forward with specific facts showing there is a genuine issue for trial).

Porter's arguments for constructive knowledge, though more numerous, also fail. Relying on a now-familiar refrain, Porter points to Illinois Bell's policy requiring that open manholes be guarded and relies on the fact that one of Porter's supervisors worked through lunch when he was a cable splicer. (R. 324, Porter Opp. at 18.) But neither of these facts shows that Porter's supervisors should have known that he did not report the times he worked through lunch. Porter, like Deckys, also asserts that splicers "routinely complained" about being unable to meet expected efficiency standards and were told not to record tasks accurately. (See id.) Not only are these assertions based on vague testimony that does not support his contentions, but even if true, Porter's allegations do not indicate that any inaccurate task-reporting led to underpayment. Finally, Porter's argument that he underreported his time to avoid discipline is also unsubstantiated because he has not shown that he was ever discouraged from recording all his time or reprimanded for doing so. In light of this dearth of evidence, Illinois Bell's summary judgment motion is granted as to Porter.

### 6. Ernest Roberts, Jr.

Roberts also has not presented sufficient evidence that Illinois Bell had either actual or constructive knowledge he was working through lunch without compensation. Although Roberts said he told his managers he had not taken a break while working in the field, there is no indication they knew he was not being

paid for that time. (See R. 319, Roberts Opp. at 18.) Like Deckys and Porter, Roberts relies on the fact that his supervisors reviewed his timesheets. (Id.) But Roberts admitted he did not know whether he reported overtime on the days he allegedly informed his managers that he had worked through breaks, or how much he was paid on those days. (R. 322, Ex. 33, Supp. Roberts Dep. at 248-49.) Furthermore, he testified that he had, on other occasions, been paid for both approved and unapproved overtime he reported after working through breaks. (R. 321, DSOF Roberts ¶¶ 36, 59); *see White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1085 (N.D. Cal. 2007) ("Imputing constructive knowledge would be particularly inappropriate" when evidence shows employees were paid for the overtime they reported.).

Roberts goes on to rely on the same faulty arguments for constructive knowledge presented by other named plaintiffs, namely that Illinois Bell's manhole policies, his supervisors' instructions, and splicers' complaints about efficiency standards all create a "mosaic of evidence" indicating Illinois Bell knew or should have known about his off-the-clock work. (R. 319, Roberts Opp. at 18-19.) The court will not repeat its reasons for rejecting such arguments, except to say that even assuming Roberts's supervisors did in fact instruct him to inaccurately distribute his time, Roberts admitted that those practices did not result in him being paid less time than he actually worked. (R. 321, DSOF Roberts ¶ 39.) And unlike Clark and Hunt, Roberts did not present enough evidence indicating that his

supervisors encouraged him to underreport his total time worked. Illinois Bell's summary judgment motion is therefore granted as to Roberts.

### 7. Larry Williams

Finally, although Williams has presented sufficient evidence indicating that Illinois Bell had actual or constructive knowledge of his off-the-clock work, his claim ultimately falls short for lack of evidence showing the amount of unpaid overtime he performed. Regarding Illinois Bell's knowledge, Williams testified that he informed management "three or four times" that he was not being paid for all the hours he worked. (See R. 309, DSOF Williams ¶¶ 64-65.) He specifically recalled one occasion when he told his supervisor that he had worked overtime, and his supervisor responded by saying he would "make it up" to Williams later because he "looked out for [him] on this one." (See R. 301-1, Ex. 25, Williams Dep. at 163-64.) While such a response is certainly ambiguous, a reasonable jury could conclude that the supervisor effectively encouraged Williams not to report overtime as a favor to him, and therefore knew or should have known that Williams was working off-the-clock.

However, despite the fact that Williams can clear the knowledge hurdle, even under the more relaxed "just and reasonable inference standard" his evidence is insufficient regarding the amount of unpaid overtime he worked. Like the other named plaintiffs, Williams relies on his own estimate of how many times a week he worked through lunch and on his timesheets showing days including underground tasks. (R. 308, Williams Opp. at 14.) But a critical difference between Williams and

the other named plaintiffs is that Williams did not present evidence indicating that the days he performed underground tasks bore any relation to the days he worked through lunch. Williams testified that he worked through lunch in order to meet efficiency standards, but did not testify about having to personally guard manholes. (See R. 309, DSOF Williams ¶¶ 47-49.) In fact, he admitted that he could "take all the breaks and lunches" he wanted, but did not do so because he wanted to meet efficiency standards. (Id. ¶¶ 38, 51.) He even testified that he did not recall working in manholes as a technician in Illinois Bell's Fiber Work and Digital Electronics groups. (Id. ¶ 9.)

Without some connection between his timesheets showing underground work and his stated reasons for working through lunch, Williams is left only with his rough estimate that he typically worked through three lunches per week. (See R. 196-26, Ex. SSS, Williams Interrog. No. 4.) Although Williams need not provide documentation to corroborate his recollection, he at least must provide some explanation for how he arrived at his estimate. *See Golden*, 884 F. Supp. 2d at 700 (finding plaintiffs' evidence was insufficient to show the extent of work as a matter of "just and reasonable inference" because plaintiffs provided no foundational testimony or other evidence indicating how they calculated the overtime wages supposedly due); *Millington*, 2007 WL 2908817, at *7 (granting summary judgment to defendant because "plaintiff has submitted no evidence beyond bare allegations and vague undocumented estimates to support his claim."). Given the lack of references to triggering factors or even specific types of jobs he did that would allow

a jury to infer when he may have worked overtime, Williams has failed to produce sufficient evidence showing the amount and extent of his unpaid work. *See Holaway v. Stratasys, Inc.,* No. 14 CV 1146, __ F.3d __, 2014 WL 5755987, at *3 (8th Cir. Nov. 6, 2014) (affirming summary judgment for defendant because although plaintiff approximated that he worked 60 hours per week, he did not provide evidence regarding specific weeks he worked overtime and failed to provide "a meaningful explanation" for how he arrived at his final estimate); *Simmons v. Wal-Mart Assocs.,* No. 04 CV 51, 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005) (finding plaintiff's "bald assertion" that he worked off the clock over 200 times on unspecified days insufficient to overcome summary judgment); *see also Espenscheid,* 705 F.3d at 775 (noting that unreported time could be inferred from the particulars of the jobs technicians did). Accordingly, Illinois Bell's motion is granted as to Williams.

## Conclusion

For the foregoing reasons, Illinois Bell's summary judgment motions on the named plaintiffs' individual claims are granted as to Blakes, Deckys, Porter, Roberts, and Williams, but denied as to Clark and Hunt.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**